Theodore J. Boutrous, Jr., SBN 132099
    tboutrous@gibsondunn.com
Andrea E. Neuman, SBN 149733
    aneuman@gibsondunn.com
William E. Thomson, SBN 187912
    wthomson@gibsondunn.com
Ethan D. Dettmer, SBN 196046
    edettmer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  213.229.7000
Facsimile:  213.229.7520

Attorneys for Defendant CHEVRON
CORPORATION

(additional counsel on signature page)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the Oakland City Attorney,<br><br>   Plaintiff,<br><br>  v.<br><br>BP P.L.C., a public limited company of England and Wales; CHEVRON CORPORATION, a Delaware corporation; CONOCOPHILLIPS COMPANY, a Delaware corporation; EXXON MOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10,<br><br>   Defendants. | CASE NO. _____<br><br>**NOTICE OF REMOVAL**<br><br>[Removal from the Superior Court of the State of California, County of Alameda, Case No. RG17875889]<br><br>Action Filed: September 19, 2017 |

Gibson, Dunn &
Crutcher LLP

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF THE PEOPLE OF THE STATE OF CALIFORNIA, ACTING BY AND THROUGH THE OAKLAND CITY ATTORNEY, AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants BP p.l.c. ("BP"), Chevron Corporation ("Chevron"), ConocoPhillips Company ("ConocoPhillips"), Exxon Mobil Corporation ("ExxonMobil"), and Royal Dutch Shell plc ("Shell," and collectively "Defendants") remove this action—with reservation of all defenses and rights—from the Superior Court of the State of California for the County of Alameda, Case No. RG17875889, to the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1331, 1334, 1441(a), 1442, 1452 and 1367(a), and 43 U.S.C. § 1349(b). All named defendants join in this Notice of Removal. Consequently, without conceding that each Defendant has been properly joined and served in this action, it is clear that any and all defendants who have been properly joined and served have joined in the removal of this action.

This Court has original federal question jurisdiction under 28 U.S.C. § 1331, because the Complaint arises under federal laws and treaties, and presents substantial federal questions as well as a claim that is completely preempted by federal law. Plaintiff asserts a single claim against Defendants, but to the extent Plaintiff argues or this Court construes any part of Plaintiff's claim as being non-federal, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims over which it does not have original federal question jurisdiction because they form part of the same case or controversy as those claims over which the Court has original jurisdiction. As set forth below, removal is proper pursuant to 28 U.S.C. §§ 1441, 1442, 1446, and 1452, and 43 U.S.C. § 1349(b).

In addition, the Complaint is legally without merit, and, at the appropriate time, Defendants will move to dismiss Plaintiff's claim pursuant to Rule 12 of the Federal Rules of Civil Procedure.

Through its Complaint, Plaintiff the People of the State of California, acting by and through the Oakland City Attorney ("Plaintiff"), calls into question longstanding decisions by the Federal Government regarding, among other things, national security, national energy policy, environmental protection, development of outer continental shelf lands, the maintenance of a national petroleum reserve, mineral extraction on federal lands (which has produced billions of dollars for the Federal Government), and the negotiation of international agreements bearing on the development and use of

fossil fuels.  Several of the Defendants (and/or their affiliates, which Plaintiff improperly amalgamate with Defendants) have contracts with the Federal Government to develop and extract minerals from federal lands and to sell fuel and associated products to the Federal Government for the Nation's defense.  The gravamen of the Complaint calls into question all of those Federal Government policies and seeks to force Defendants to finance an "abatement fund" to pay for "infrastructure" purportedly needed as a result of Defendants' conduct pursuant to contracts with the Federal Government or national policies to develop fossil fuel resources.

In the Complaint's view, a state court, on petition by a City Attorney, may effectively regulate the nationwide—and indeed, worldwide—economic activity of key sectors of the American economy, those that supply the fuels that power production and innovation, keep the lights on, and that form the basic materials from which innumerable consumer, technological, and medical devices are themselves fashioned.  Though nominally asserted under state law, the Complaint puts at issue long-established federal statutory, regulatory, and constitutional issues and frameworks.  It implicates bed-rock federal-state divisions of responsibility, and appropriates to itself the direction of such federal spheres as nationwide economic development, international relations, and America's national security.  Reflecting the uniquely federal interests posed by greenhouse gas claims like this one, the Ninth Circuit has recognized that causes of action of the type asserted here are governed by federal common law, not state law.

The Complaint has no basis in law and is inconsistent with serious attempts to address important issues of national and international policy.  Accordingly, Plaintiff's Complaint should be heard in this federal forum to protect the national interest by its prompt dismissal.

## I.     TIMELINESS OF REMOVAL

1.     Plaintiff filed a Complaint against Defendants in the Superior Court for Alameda County, California, Case No. CGC-17-561370, on September 19, 2017.  All Defendants were served (or purportedly served) on or after September 21, 2017.  Copies of all process, pleadings, or orders served (or purportedly served) upon Defendants are attached as Exhibits A-E to the Declaration of William E. Thomson, filed concurrently herewith.

2.     This notice of removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer than 30 days after service.  28 U.S.C. § 1446(b).  All Defendants that have been properly joined and served as of this date join in this removal.[1]

## II.     SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

3.     Plaintiff brings a claim against Defendants for alleged injuries relating to climate change, including from sea level rise.  Plaintiff asserts a single cause of action for public nuisance on behalf of the People of the State of California.  Plaintiff seeks a finding that Defendants are "jointly and severally liable for causing, creating, assisting in the creation of, contributing to, and/or maintaining a public nuisance," and an order requiring Defendants to pay for an "abatement fund" to "provide for infrastructure in Oakland necessary for the People to adapt to global warming impacts such as sea level rise."  Compl., Relief Requested.

4.     Several Defendants will deny that any California court has personal jurisdiction and will object to the sufficiency of process and service of process, and those Defendants properly before the Court will deny any liability as to Plaintiff's claim.  Defendants expressly reserve all rights in this regard.  For purposes of meeting the jurisdictional requirements for removal only, however, Defendants submit that removal is proper on at least seven independent and alternative grounds.

5.     ***First***, the action is removable under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claim, to the extent that it exists, implicates uniquely federal interests and is governed by federal common law, and not state common law.  *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985).  The Ninth Circuit has held that comparable claims, in which a municipality alleged that the defendants' greenhouse gas emissions led to global warming-related injuries such as coastal erosion, were governed by federal common law.  *See Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012) ("*Kivalina*").  Federal

---

[1]  In filing or consenting to this Notice of Removal, Defendants do not waive, and expressly preserve, their right to challenge personal jurisdiction, insufficient process, and/or insufficient service of process in any federal or state court with respect to this action.  A number of Defendants contend that personal jurisdiction in California is lacking over them, that process was insufficient, and/or that service of process insufficient, and these Defendants will move to dismiss for lack of personal jurisdiction, insufficient process, and/or insufficient service of process at the appropriate time.  *See, e.g.*, *Carter v. Bldg. Material & Const. Teamsters' Union Local 216*, 928 F. Supp. 997, 1000-01 (N.D. Cal. 1996) ("A petition for removal affects only the forum in which the action will be heard; it does not affect personal jurisdiction.").

Gibson, Dunn &
Crutcher LLP

common law applies only in those few areas of the law that so implicate "uniquely federal interests" that application of state law is affirmatively inappropriate. *See, e.g., Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988); *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 424 (2011) ("*AEP*") ("borrowing the law of a particular State would be inappropriate"). As a result, the Ninth Circuit's determination in *Kivalina* that federal common law applies to comparable claims of global warming-related injuries necessarily means that state law should not apply to those types of claims. Plaintiff's claim, therefore, (to the extent it exists at all) arises under federal common law, not state law, and is properly removed to this Court.

6. ***Second***, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because the action necessarily raises disputed and substantial federal questions that a federal forum may entertain without disturbing a congressionally approved balance of responsibilities between the federal and state judiciaries. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005). In fact, the cause of action as alleged in the Complaint attacks federal policy decisions, threatens to upset longstanding federal-state relations, second-guesses policy decisions made by Congress and the Executive Branch, and skews divisions of responsibility set forth in federal statutes and the United States Constitution.

7. ***Third***, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claim is completely preempted by the Clean Air Act and/or other federal statutes and the United States Constitution, which provide an exclusive federal remedy for plaintiffs seeking stricter regulation of the nationwide and worldwide greenhouse gas emissions put at issue in the Complaint.

8. ***Fourth***, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), because this action "aris[es] out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

9. ***Fifth***, Defendants are authorized to remove this action under 28 U.S.C. § 1442(a)(1) because, assuming the truth of Plaintiff's allegations, a causal nexus exists between their actions,

Gibson, Dunn & Crutcher LLP

taken pursuant to a federal officer's directions, and Plaintiff's claim; they are "persons" within the meaning of the statute; and can assert several colorable federal defenses. *See Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014).

10. **Sixth**, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claim arises on federal enclaves. As such, Plaintiff's claim arises under federal-question jurisdiction and is removable to this Court. *See* U.S. Const., art. I, § 8, cl. 17; *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'").

11. **Seventh and finally,** removal is authorized under 28 U.S.C. § 1452(a) and 28 U.S.C. § 1334(b) because Plaintiff's state-law claim is related to cases under Title 11 of the United States Code. Plaintiff alleges that Defendants (improperly defined by Plaintiff to include the conduct of De-fendants' subsidiaries, *see, e.g.*, Compl ¶ 32) engaged in conduct constituting a public nuisance over many decades. Because Plaintiff's claim is predicated on historical activities of Defendants, includ-ing predecessor companies and companies that they may have acquired or with which they may have merged, and because there are hundreds, if not thousands, of non-joined necessary and indispensable parties, there are many other Title 11 cases that may be related. *See PDG Arcos, LLC v. Adams*, 436 F. App'x 739 (9th Cir. 2011).

12. For the convenience of the Court and all parties, Defendants will address each of these grounds in additional detail. Should Plaintiff challenge this Court's jurisdiction, Defendants will fur-ther elaborate on these grounds and will not be limited to the specific articulations in this Notice.

## III. THIS COURT HAS FEDERAL-QUESTION JURISDICTION BECAUSE PLAINTIFF'S CLAIM ARISES, IF AT ALL, UNDER FEDERAL COMMON LAW

13. This action is removable because Plaintiff's claim, to the extent that such claim exists, necessarily is governed by federal common law, and not state common law. 28 U.S.C. § 1331 grants federal courts original jurisdiction over "'claims founded upon federal common law as well as those of a statutory origin.'" *Nat'l Farmers Union*, 471 U.S. at 850 (quoting *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*")). As the Ninth Circuit explained in holding that similar claims for injuries caused by global warming were governed by federal common law, even "[p]ost-

Gibson, Dunn &
Crutcher LLP

*Erie*, federal common law includes the general subject of environmental law and specifically includes ambient or interstate air or water pollution." *Kivalina*, 696 F.3d at 855. As Plaintiff's claim arises under federal common law, this Court has federal-question jurisdiction and removal is proper. That remains true even though Plaintiff's claim in the final analysis fails to state a claim: among other deficiencies, any such federal common law claim has been displaced by the Clean Air Act. *See, e.g.*, *AEP*, 564 U.S. at 424; *Kivalina*, 696 F.3d at 856-67.

14. Though "[t]here is no federal *general* common law," *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (emphasis added), federal common law continues to exist, and to govern, in a few subject areas in which there are "uniquely federal interests," *Boyle*, 487 U.S. at 504. *See generally* Henry J. Friendly, *In Praise of* Erie—*and the New Federal Common Law*, 39 N.Y.U. L. Rev. 383 (1964). Such uniquely federal interests will require the application of federal common law where, for example, the issue is one that by its nature, is "within national legislative power" and there is "a demonstrated need for a federal rule of decision" with respect to that issue. *AEP*, 564 U.S. at 421 (citation omitted). Federal common law therefore applies, in the post-*Erie* era, in those discrete areas in which application of state law would be inappropriate and would contravene federal interests. *Boyle*, 487 U.S. at 504-07. The decision that federal common law applies to a particular issue thus inherently reflects a determination that state law does *not* apply. *Nat'l Audubon Soc'y v. Dep't of Water*, 869 F.2d 1196, 1204 (9th Cir. 1988); *see also City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 n.7 (1981) ("*Milwaukee II*") ("[I]f federal common law exists, it is because state law cannot be used.").

15. In *Kivalina*, the Ninth Circuit held that federal common law governed a comparable suit asserting a comparable public nuisance claim due to global warming against many of these same defendants. 696 F.3d at 855. Quoting the Supreme Court's decision in *AEP*, the court reiterated that federal common law applies to "subjects within the national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands." *Id.* at 855 (quoting *AEP*, 564 U.S. at 421) (citation and internal quotation marks omitted). Although Congress thus sometimes affirmatively directs the application of federal common law, the *Kivalina* court noted that, "[m]ore often, federal common law develops when courts must consider *federal* questions that are not answered

Gibson, Dunn &
Crutcher LLP

by statutes." *Id.* (emphasis added). Given that claims asserting injuries from global warming have an intrinsic interstate and transnational character, the Ninth Circuit held that such claims inherently raise federal questions and fall within the settled rule that federal common law governs "the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id.* at 855; *see also id.* ("federal common law can apply to transboundary pollution suits" such as the plaintiff's); *AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area within national legislative power, [and] one in which federal courts may fill in statutory interstices."). Thus, while the Ninth Circuit had previously expressed skepticism that federal common law, as opposed to state law, would govern a *localized* claim for air pollution arising from a *specific source* within a single state, *see Nat'l Audubon Soc'y*, 869 F.2d at 1203-04, the court in *Kivalina* found that claims arising from injuries allegedly caused by *global* warming implicate interstate and, indeed, international aspects that inherently invoke uniquely federal interests and responsibilities. *See Kivalina*, 696 F.3d at 856-57; *see also Massachusetts v. EPA*, 549 U.S. 497, 498 (2007) ("The sovereign prerogatives to force reductions in greenhouse gas emissions, to negotiate emissions treaties with developing countries, and (in some circumstances) to exercise the police power to reduce motor-vehicle emissions are now lodged in the Federal Government."); *United States v. Solvents Recovery Serv.*, 496 F. Supp. 1127, 1134 (D. Conn. 1980) (describing Supreme Court jurisprudence recognizing "the strong federal interest in controlling certain types of pollution and protecting the environment").

16.     Although *Kivalina* did not expressly address the viability of the plaintiff's purported alternative common law claims resting on state law (which the district court dismissed without prejudice), the *Kivalina* court's finding that federal common law applied to the municipality's global warming-related claims means that state law *cannot* be applied to such claims. The conclusion that federal common law governs an issue rests, not on a discretionary choice between federal law and state law, but on a determination that the issue is so distinctively federal in nature that application of state law to the issue would risk impairing uniquely federal interests. *Boyle*, 487 U.S. at 506-07; *see also, e.g.*, *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159-60 (9th Cir. 2016) (liability of defense contractor to third party under government contract for weapons systems implicated "uniquely federal interests" in national security that would be impaired if disparate state-law rules

were applied); *Nat'l Audubon Soc'y*, 869 F.3d at 1204 ("[I]t is inconsistent to argue 'that both federal and state nuisance law apply to this case. . . . [I]f federal common law exists, *it is because state law cannot be used.*'") (emphasis added).

17. Accordingly, the Ninth Circuit's holding in *Kivalina* that federal common law governs global warming-related tort claims such as Plaintiff's here necessarily means that state law cannot govern such claims. Although Plaintiff purports to style its public nuisance claim as arising under state law, the question of whether a particular common law claim is controlled by federal common law rather than state law is itself a question of law that is governed by federal law as set forth in *Erie* and its progeny. While Plaintiff contends that its claim arises under California law, the question of which state, if any, may apply its law to address global climate change issues is a question that is itself a matter of federal law, given the paramount federal interest in avoiding conflicts of law in connection with ambient air and water. Moreover, the law is well settled that, in determining whether a case arises under federal law and is properly removable, the Plaintiff's proffered position on a question of law is not entitled to any deference but is instead subject to independent and *de novo* review by the court. *See, e.g.*, *United States v. California*, 932 F.2d 1346, 1349 (9th Cir. 1991) ("The issue of whether state or federal [common] law governs is a question of law and is reviewable de novo."); *Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 884, 889-91 (9th Cir. 1992) (same); *see also Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1086-87 (9th Cir. 2009) (applying de novo review to removal based on federal common law).

18. The extent to which the global warming-related tort claims in this case and in *Kivalina* would impair uniquely federal interests is confirmed by comparing these inherently interstate and transnational claims to the more localized pollution claims that the Ninth Circuit in *National Audubon* held were governed by state law. In *National Audubon*, the claims at issue involved a challenge to the Los Angeles Department of Water and Power's diversion of "four freshwater streams that would otherwise flow into Mono Lake." 869 F.2d at 1198. This discrete conduct in California allegedly exposed part of Mono Lake's lake bed, increased the lake's "salinity and ion concentration," and led to "air pollution in the form of alkali dust storms from the newly exposed lake bed." *Id.* at 1198-99. The Ninth Circuit held that the allegation that some of the dust reached Nevada was not enough

Gibson, Dunn &
Crutcher LLP

to show that the case involved the sort of "interstate dispute previously recognized as requiring reso-lution under federal law," such that it was "inappropriate for state law to control."  *Id*. at 1204.  Given their essentially localized nature, the claims involved only a "domestic dispute" that did not fit within the interstate paradigms that the Supreme Court had to that point recognized as properly governed by federal common law.  *Id*. at 1205; *cf. Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497-98 (1987) (hold-ing that New York law applied to pollution claims arising from discharges from a lakeside New York business, even though those effluents flowed to Vermont side of the lake and caused injury there).

19.     In light of the federal nature of the issues raised by global warming, as described in *AEP* and in *Massachusetts v. EPA*, the *Kivalina* court correctly reached a different conclusion with respect to global warming-related tort claims such as the one presented here.  Because (as Plaintiff alleges, *e.g.*, Compl. ¶¶ 4, 10) global warming occurs only as the result of the undifferentiated accu-mulated emissions of all emitters in the world over an extended period of time, any judgment as to the reasonableness of particular emissions, or as to their causal contribution to the overall phenome-non of global warming, inherently requires an evaluation at an interstate and, indeed, transnational level.  Thus, even assuming that state tort law may properly address local source emissions within that specific state, the imposition of tort liability for allegedly unreasonably contributing to *global* warming would require an overarching consideration of *all* of the emissions traceable to sales of De-fendants' (and/or the sales of their affiliates, which Plaintiff improperly amalgamates with Defend-ants) products in each of the states, and, in fact, in the more than 190 nations of the world.  Given the Federal Government's exclusive authority over foreign affairs and foreign commerce, and its preemi-nent authority over interstate commerce, tort claims concerning global warming directly implicate uniquely federal interests, and a patchwork of 50 states' common law rules cannot properly be ap-plied to such claims without impairing those interests.  Indeed, the Supreme Court expressly held in *AEP* that in cases like this, "borrowing the law of a particular State would be inappropriate."  564 U.S. at 422.  Such global warming-related tort claims, to the extent they exist, are therefore governed by federal common law.  *Kivalina*, 696 F.3d at 855-56.

20.     Under the principles set forth above, Plaintiff's claim, to the extent it exists at all, is governed by federal common law.  The gravamen of Plaintiff's claim is that "Defendants' cumulative

Gibson, Dunn &
Crutcher LLP

production of fossil fuels over many years places each of them among the top sources of global warming pollution in the world," and that such production of fossil fuels has contributed to global climate change.  Compl. ¶ 10; *see also, e.g., id.* ¶¶ 50, 52.  Plaintiff alleges that "Defendants have produced such vast quantities of fossil fuels that they are five of the ten largest producers in all of history," *id.* ¶ 52, and that "[o]ngoing and future warming caused by past and ongoing use of massive quantities of fossil fuels will cause increasingly severe harm to Oakland through accelerating sea level rise," *id.* ¶ 50.  As evident from the term "global warming" itself, both the causes and the injuries Plaintiff identifies are not constrained to particular sources, cities, counties, or even states, but rather implicate inherently national and international interests, including treaty obligations and federal and international regulatory schemes.  *See id.* ¶ 8 (describing alleged global warming-related effects in Greenland and Antarctica), ¶ 10 (describing Defendants as five of top ten "largest producers of fossil fuels *worldwide* from the mid Nineteenth Century to present") (emphasis added); *see also, e.g., Massachusetts*, 549 U.S. at 509, 523-24 (describing Senate rejection of the Kyoto Protocol because emissions-reduction targets did not apply to "heavily polluting nations such as China and India," and EPA's determination that predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427-29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *see also* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/01/statement-president-trump-paris-climate-accord (announcing United States withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on Chinese emissions).

21.     Indeed, the Complaint itself demonstrates that the unbounded nature of greenhouse gas emissions, diversity of sources, and magnitude of the attendant consequences have catalyzed myriad federal and international efforts to understand and address such emissions.  *See, e.g.*, Compl. ¶¶ 42-48.  The paramount federal interest in addressing the worldwide effect of greenhouse gas emissions is manifested in the regulatory scheme set forth in the Clean Air Act as construed in *Massachusetts v. EPA*.  *See AEP*, 564 U.S. at 427-29.  Federal legislation regarding greenhouse gas emissions reflects the understanding that "[t]he appropriate amount of regulation in any particular greenhouse

gas-producing sector cannot be prescribed in a vacuum: as with other questions of national or international policy, informed assessment of competing interests is required. Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance." *Id.* at 427. As a "question[] of national or international policy," the question of what is a reasonable amount of greenhouse gas emissions that underlies Plaintiff's claim implicates inherently federal concerns and is therefore governed by federal common law. *See id.*; *see also Milwaukee II*, 451 U.S. at 312 n.7 ("[I]f federal common law exists, it is because state law cannot be used."). Because common law claims that rest on injuries allegedly caused by global warming implicate uniquely federal interests, such claims (to the extent they exist at all) must necessarily be governed by federal common law. This Court therefore has original jurisdiction over this action.

## IV.     THE ACTION IS REMOVABLE BECAUSE IT RAISES DISPUTED AND SUBSTANTIAL FEDERAL ISSUES.

22.     "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). Federal district courts, in turn, "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Supreme Court has held that suits apparently alleging only state-law causes of action nevertheless "arise under" federal law if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. Applying this test "calls for a common-sense accommodation of judgment to the kaleidoscopic situations that present a federal issue." *Id.* at 313.

23.     Plaintiff's Complaint attempts to undermine and supplant federal regulation of greenhouse gas emissions and hold a national industry responsible for the alleged consequences of rising ocean levels allegedly caused by global climate change. There is no question that Plaintiff's claim raises a "federal issue, actually disputed and substantial," for which federal jurisdiction would not upset "any congressionally approved balance of federal and state judicial responsibilities."

24.     The issues of greenhouse gas emissions, global warming, and sea level rise are not unique to Oakland, the State of California, or even the United States.  Yet what the Complaint attempts to do is to supplant and undermine decades of national energy, economic development, and federal environmental protection and regulatory policies by prompting a California state court to order massive payments into an "abatement" fund based on a cause of action that is contrary to the federal regulatory scheme.

25.     Plaintiff's cause of action depends on the resolution of disputed and substantial federal questions in light of complex national considerations.  Indeed, "the scope and limitations of a complex federal regulatory framework are at stake in this case.  And disposition of whether that framework may give rise to state law claims as an initial matter will ultimately have implications for the federal docket one way or the other."  *Bd. of Comm'rs of Se. La. Flood Protection Auth. v. Tenn. Gas Pipeline Co*, 850 F.3d 714, 723 (5th Cir. 2017) (cert. petition pending) ("*Flood Protection Authority*").

26.     Under federal law, federal agencies must "assess both the costs and benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."  Executive Order 12866, 58 Fed. Reg. 190.  Under California law, were it to apply, a nuisance claim requires a plaintiff to prove that the defendant's conduct is "unreasonable": in other words, "the gravity of the harm [must] outweigh[] the social utility of the defendant's conduct."  *San Diego Gas & Elec. Co. v. Superior Ct.*, 13 Cal. 4th 893, 938 (1996).  Plaintiff alleges that Defendants, through their national and, indeed, global activities of "produc[ing] and promot[ing]" fossil fuels, "ha[ve] caused, created, assisted in the creation of, contributed to, and/or maintained and continue[] to cause, create, assist in the creation of, contribute and/or maintain to global warming-induced sea level rise, a public nuisance in Oakland."  Compl. ¶ 95; *see also id.* ¶ 10.  Plaintiff alleges that "Defendants' conduct constitutes a substantial and unreasonable interference with and obstruction of public rights and property, including, *inter alia*, the public rights to health, safety, and welfare of Oakland residents and other citizens."  *Id.* ¶ 95.

Gibson, Dunn & Crutcher LLP

27. But Congress has directed a number of federal agencies to regulate Defendants' conduct, and in doing so to conduct the same analysis of benefits and impacts that Plaintiff would have the state court undertake in analyzing Plaintiff's claim. The benefits and harms of Defendants' conduct are broadly distributed throughout the Nation, to all residents as well as all state and government entities. Given this diffuse and broad impact, Congress has acted through a variety of federal statutes—primarily but not exclusively the Clean Air Act—to strike the balance between energy extraction and production and environmental protections. *See* Clean Air Act, 42 U.S.C. § 7401(c) (Congressional statement that the goal of the Clean Air Act is "to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution prevention"); *see also, e.g.*, Energy Reorganization Act of 1974, 42 U.S.C. § 5801 (Congressional purpose to "develop, and increase the efficiency and reliability of use of, all energy sources" while "restoring, protecting, and enhancing environmental quality"); Mining and Minerals Policy Act, 30 U.S.C. § 1201 (Congressional purpose to encourage "economic development of domestic mineral resources" balanced with "environmental needs"); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 (Congressional findings that coal mining operations are "essential to the national interest" but must be balanced by "cooperative effort[s] . . . to prevent or mitigate adverse environmental effects").

28. The question of whether the federal agencies charged by Congress to balance energy and environmental needs for the entire Nation have struck that balance in an appropriate way is "inherently federal in character" and gives rise to federal question jurisdiction. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001); *see also Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Bennett v. Southwest Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007) (federal removal under *Grable* appropriate where claims were "a collateral attack on the validity of" agency action under a highly reticulated regulatory scheme). Adjudicating this claim in federal court, including whether a private right of action is even cognizable, is appropriate because the relief sought by Plaintiff would necessarily undermine and alter the regulatory regime designed by Congress, impacting residents of the Nation far outside the state court's ju-

riscdiction. *See, e.g.*, *Grable*, 545 U.S. at 312 (claims that turn on substantial federal questions "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues"); *West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007) (removal under *Grable* is appropriate where state common law claims implicate "an intricate federal regulatory scheme . . . requiring some degree of national uniformity in interpretation").

29. The Complaint also calls into question Federal Government decisions to contract with defendants for the extraction, development, and sale of fossil fuel resources on federal lands. Such national policy decisions have expanded fossil fuel production and use, and produced billions of dollars in revenue to the federal treasury. Available, affordable energy is fundamental to economic growth and prosperity generally, as well as to national security and other issues that have long been the domain of the Federal Government. Yet, Plaintiff's claim requires a determination that the complained-of conduct—the lawful activity of placing fossil fuels into the stream of interstate and foreign commerce and promoting the use of those products—is unreasonable, and that determination raises a policy question that, under the Constitution and the applicable statutes, treaties, and regulations, is a federal question. *See In re Nat'l Sec. Agency Telecommc'ns*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (holding that removal jurisdiction existed over case that implicated state-secrets privilege because "the privilege is 'not only a contested federal issue, but a substantial one,' for which there is 'a serious federal interest in claiming the advantages thought to be inherent in a federal forum'" (quoting *Grable*, 545 U.S. at 313)). The cost-benefit analysis required by the claim asserted in the Complaint would thus necessarily entail a usurpation by the state court of the federal regulatory structure of an essential, national industry. "The validity of [Plaintiff's] claim would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law." *Flood Control Authority*, 850 F.3d at 724; *see also Bader Farms, Inc. v. Monsanto Co.*, No. 16-cv-299, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017) ("Count VII is in a way a collateral attack on the validity of APHIS's decision to deregulate the new seeds."); *Bennett*, 484 F.3d at 909 (holding that federal removal is proper under *Grable* "when the state proceeding amounted to a collateral attack on a federal agency's action").

NOTICE OF REMOVAL

Gibson, Dunn &
Crutcher LLP

30.     Plaintiff's claim also necessarily implicates substantial federal questions by alleging that Defendants have waged a "public relations campaign . . . to deny and discredit the mainstream scientific consensus on global warming, downplay the risks of global warming, and even to launch unfounded attacks on the integrity of leading climate scientists" in order to "increase sales," "protect market share," and, ultimately, avoid regulation and payments for abatement.  Compl. ¶¶ 6-7.

31.     To show causation, Plaintiff must establish that the government and public were mis-led *and* would have adopted different energy and climate policies and consumption patterns absent the alleged misrepresentations.  Such determinations would require a court to construe federal regula-tory decision-making standards, and determine how federal regulators would have applied those standards under counterfactual circumstances.  *See id.* ¶¶ 7-8 ("The purpose of all this promotion of fossil fuels and efforts to undermine mainstream climate science was, like all marketing, to increase sales and to protect market share.  It succeeded.  And now it will cost of billions of dollars to build sea walls and other infrastructure to protect human safety and public and private property in Oakland from global warming-induced sea level rise."); *id.* ¶ 56 (alleging that the purpose of promoting fossil fuel use was to "foist onto the public the costs of abating and adapting to the public nuisance of global warming"); *see also Flood Protection Authority*, 850 F.3d at 723 (finding necessary and dis-puted federal issue in plaintiffs' state-law tort claims because they could not "be resolved without a determination whether multiple federal statutes create a duty of care that does not otherwise exist un-der state law").

32.     Plaintiff's Complaint, which requests equitable relief requiring Defendants to pay po-tentially "billions" into an abatement fund to address rising sea levels—despite Defendants' uncon-tested compliance with state and federal law—necessarily implicates numerous other disputed and substantial federal issues.  Beyond the strictly jurisdictional character of the points addressed above and herein, it is notable that this litigation places at issue multiple significant federal issues, including but not limited to:  (1) whether Defendants can be held liable consistent with the First Amendment for purportedly "engag[ing] in large-scale, sophisticated advertising and public relations campaigns" that Plaintiff alleges misled the public and displaced the costs of responding to climate change (Compl. ¶ 5); (2) whether a state court may hold Defendants liable for conduct that was global in

scale (production of fossil fuels), that allegedly produced effects that are global in scale (increased $CO_2$ levels and rising sea levels), and on that basis, order Defendants to finance an "abatement fund" to address these global impacts, consistent with the constitutional principles limiting the jurisdictional and geographic reach of state law and guaranteeing due process; (3) whether fossil fuel *producers* may be held liable, consistent with the Due Process Clause, for climate change when it is the combustion of fossil fuels—including by the City of Oakland and the People of the State of California themselves—that leads to the release of greenhouse gases into the atmosphere; (4) whether a state may impose liability under state common law when the Supreme Court has held that the very same *federal* common law claims are displaced by federal statute, and notwithstanding the common sense principle that "[i]f a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived *in any form*," *Kivalina*, 696 F.3d at 857 (emphasis added); (5) whether a state court may regulate and burden on a global scale the sale and use of what federal policy has deemed an essential resource, consistent with the United States Constitution's Commerce Clause and foreign affairs doctrine, as well as other constitutional principles; (6) whether a state court may review and assess the validity of acts of foreign states in enacting and enforcing their own regulatory frameworks; and (7) whether a state court may determine the ability to sue based on alleged damages to land, such as coastal and waterfront property, which depends on the interpretation of federal laws relating to the ownership and control of property.

33.     Plaintiff's Complaint also raises substantial federal issues because the asserted claim intrudes upon both foreign policy and carefully balanced regulatory considerations at the national level, including the foreign affairs doctrine. Plaintiff seeks to govern extraterritorial conduct and encroach on the foreign policy prerogative of the Federal Government's executive branch as to climate change treaties. "There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 413 (2003). Yet, this is the precise nature of Plaintiff's action brought in state court. *See United States v. Belmont*, 301 U.S. 324, 331 (1937) ("The external powers of the United

Gibson, Dunn &
Crutcher LLP

States are to be exercised without regard to state laws or policies… [I]n respect of our foreign relations generally, state lines disappear."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government . . . requires that federal power in the field affecting foreign relations be left entirely free from local interference.").

34.     Through its action, Plaintiff seeks to regulate and punish greenhouse gas emissions worldwide, far beyond the borders of the United States.  This is premised in part, according to Plaintiff, on Defendants' purported campaign to undermine international climate science and mislead the public at large.  *See* Compl. ¶¶ 5-7, 63-83.  Plaintiff alleges that its injuries are caused by rising sea levels, and that Defendants are a substantial contributing factor to such climate change as a result of their collective operations on a worldwide basis, which Plaintiff claims makes them "among the top sources of global warming pollution in the world."  *Id*. ¶ 10.  But "[n]o State can rewrite our foreign policy to conform to its own domestic policies.  Power over external affairs is not shared by the States; it is vested in the national government exclusively.  It need not be so exercised as to conform to State laws or State policies, whether they be expressed in constitutions, statutes, or judicial decrees."  *United States v. Pink*, 315 U.S. 203, 233-34 (1942).  States have no authority to impose remedial schemes or regulations to address what are matters of foreign affairs.  *Ginergy v. City of Glendale*, 831 F.3d 1222, 1228-29 (9th Cir. 2016) ("It is well established that the federal government holds the exclusive authority to administer foreign affairs.").

## V.     THE ACTION IS REMOVABLE BECAUSE IT IS COMPLETELY PREEMPTED BY FEDERAL LAW

35.     This Court also has original jurisdiction over this lawsuit because Plaintiff requests relief that would alter or amend the rules regarding nationwide—and even worldwide—regulation of greenhouse gas emissions.  This action is completely preempted by federal law.

36.     The Supreme Court has held that a federal court will have jurisdiction over an action alleging only state-law claims where "the extraordinary pre-emptive power [of federal law] converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule."  *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).

Gibson, Dunn & Crutcher LLP

NOTICE OF REMOVAL

37.     A state cause of action is preempted under this "complete preemption" doctrine where a federal statutory scheme "provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). It also requires a determination that the state-law cause of action falls within the scope of the federal cause of action, including where it "duplicates, supplements, or supplants" that cause of action. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

38.     Both requirements for complete preemption are present here. Among other things, Plaintiff's Complaint attempts to redefine the "reasonable" amount of emissions that have caused a global climate change and a rise in sea levels. As such, it calls into question greenhouse gas emissions far beyond the borders of California and even the borders of the United States. But such a reimagining of U.S. policy can be accomplished only by a nationwide and global reduction in the emission of greenhouse gases; even assuming that such relief can be ordered against Defendants for their production and sale of fossil fuels, which are then combusted by others at a rate Plaintiff claims causes the alleged injuries, this claim must be decided in federal court because Congress has created a cause of action by which a party can seek the creation or modification of nationwide emission standards by petitioning the EPA. That federal cause of action was designed to provide the exclusive means by which a party can seek nationwide emission regulations. Because Plaintiff's stated cause of action would "duplicate[], supplement[], or supplant[]" that exclusive federal cause of action, it is completely preempted. "If a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived in any form." *Kivalina*, 696 F.3d at 857.

**A.     The Clean Air Act Provides the Exclusive Cause of Action for Challenging EPA Rulemakings.**

39.     The Clean Air Act permits private parties, as well as state and municipal governments, to challenge EPA rulemakings (or the absence of such) and to petition the EPA to undertake new rulemakings. *See, e.g.*, 5 U.S.C. § 553(e); 42 U.S.C. §§ 7604, 7607. In addition, Congress created an independent scientific review committee, to include at least one person representing State air pollution control agencies, with a statutory role in the rulemaking process. *See* 42 U.S.C. § 7409(d)(2)(A).

NOTICE OF REMOVAL

Gibson, Dunn & Crutcher LLP

40. A petition for rulemaking under the Clean Air Act led to the determination in *Massachusetts* that greenhouse gases were air pollutants that could be regulated under the Act, *Massachusetts*, 549 U.S. at 510, and eventually led to the regulation of greenhouse gases from motor vehicles under section 202(a) of the Act, 75 Fed. Reg. 25,324 (May 7, 2010).

41. Rulemakings (and petitions for rulemaking) regarding the regulation of nationwide greenhouse gas emissions are subject to the federal statutory and regulatory scheme outlined in detail by the Clean Air Act. *See Massachusetts*, 549 U.S. at 516-17.

42. Under the Clean Air Act, "emissions have been extensively regulated nationwide." *North Carolina v. Tennessee Valley Auth.*, 615 F.3d 291, 298 (4th Cir. 2010). Regulation of greenhouse gas emissions, including carbon dioxide, is governed by the Clean Air Act, *see Massachusetts*, 549 U.S. at 528-29, and the EPA has regulated these emissions under the Act, *see, e.g.*, 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air quality permitting program); 77 Fed. Reg. 62,624 (Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and heavy-duty engines and motor vehicles).

43. Congress manifested a clear intent that judicial review of Clean Air Act matters must take place in federal court. 42 U.S.C. § 7607(b)(2). This congressionally provided statutory and regulatory scheme is thus the "exclusive" means for seeking the nationwide regulation of greenhouse gas emissions and "set[s] forth procedures and remedies" for that relief, *Beneficial Nat'l Bank*, 539 U.S. at 8, irrespective of the savings clauses applicable to some other types of claims. Federal courts have made clear that the Clean Air Act preempts state common law nuisance claims because "[i]f courts across the nation were to use the vagaries of public nuisance doctrine to overturn the carefully enacted rules governing airborne emissions, it would be increasingly difficult for anyone to determine what standards govern. Energy policy cannot be set, and the environment cannot prosper, in this way." *North Carolina*, 615 F.3d at 298.

## B. Plaintiff's Asserted State-Law Cause of Action Duplicates, Supplements, and/or Supplants the Federal Cause of Action.

44. Plaintiff directly attacks the reasonableness of Defendants' conduct—the production, promotion, and sale of fossil fuels and resulting emissions—which is undertaken in accordance with federal statutes and regulations, including nationwide emissions standards. Plaintiff also requests the Court to order Defendants to pay potentially "billions" of dollars into an "abatement fund" designed to address purported "global warming impacts." Compl., Relief Requested.

45. According to Plaintiff's own allegations, however, the alleged nuisance can be abated only by a global—or at the very least national—reduction in greenhouse gas emissions. *See, e.g.*, Compl. ¶ 50 (emphasizing rise in "*global* average surface temperature*" as a result of production and use of fossil fuels) (emphasis added).

46. It is well established that state tort law is a form of public regulation. *See BMW of N. Am., Inc. v.* Gore, 517 U.S. 559, 572 n.17 (1996) ("State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 278 (1964) ("Plainly the Alabama law of civil libel is a 'form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law.'") (citation omitted). Plaintiff's state-law tort claim is an end-run around a petition for a rule-making regarding greenhouse gas emissions because it seek to regulate and declare unreasonable nationwide emissions that conform to the EPA's emission standards. *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief."); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 539 (1992). The claim would require precisely the cost-benefit analysis of emissions that the EPA is charged with undertaking and would directly interfere with the EPA's determinations. *See supra* ¶ 26. Because Congress has established a clear and detailed process by which a party can petition the EPA to establish stricter nationwide emissions standards, Plaintiff's claim is completely preempted by the Clean Air Act.

47. Because Congress has provided an exclusive statutory remedy for the regulation of greenhouse gas emissions which provides federal procedures and remedies for that cause of action,

Gibson, Dunn &
Crutcher LLP

and because Plaintiff's claim falls within the scope of the federal cause of action, Plaintiff's claim is completely preempted by federal law and this Court has federal-question jurisdiction.

## VI.    THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

48.    This Court also has original jurisdiction pursuant to the Outer Continental Shelf Lands Act ("OCSLA").  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline*, 87 F.3d at 155.  This action "aris[es] out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) ("th[e] language [of § 1349(b)(1)] [i]s straightforward and broad")*.*  The outer continental shelf ("OCS") includes all submerged lands that belong to the United States but are not part of any State.  43 U.S.C. §§ 1301, 1331.

49.    The breadth of federal jurisdiction granted by OCSLA reflects the Act's "expansive substantive reach."  *See EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).  "OCSLA was passed . . . to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources."  *Id*. at 566.  "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary purpose for OCSLA."  *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  Indeed, OCSLA declares it "to be the policy of the United States that … the outer Continental Shelf … should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).  It further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States … such States, and through such States, affected local governments are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf."  *Id.* § 1332(4) (emphasis added).

50.    When enacting Section 1349(b)(1), "Congress intended for the judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to

Gibson, Dunn & Crutcher LLP

resource development on the [OCS]." *Laredo Offshore Constructors, Inc. v. Hunt Oil. Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985). Consistent with Congress' intent, courts repeatedly have found OCSLA jurisdiction where resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS.[2] *See, e.g.*, *EP Operating*, 26 F.3d at 569-70; *United Offshore v. S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

51.     OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims. *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163. The Court, moreover, may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists. *See, e.g.*, *Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 2011 A.M.C. 2624, 2640 (D. Del. 2011) (citing *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1205 (5th Cir. 1998)).

52.     Under OCSLA, the Department of Interior administers an extensive federal leasing program aiming to develop and exploit the oil and gas resources of the federal Continental Shelf. 43 U.S.C. § 1334 *et seq.* Pursuant to this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres. In FY 2015, production from these leases generated $4.4 billion in leasing revenue . . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production." Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), *available at* https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016. Certain Defendants here, of course, participate very substantially in the federal OCS leasing program. For example, from 1947 to 1995, a Chevron subsidiary produced 1.9 billion barrels of crude oil and 11 billion barrels of natural gas from the federal outer continental shelf in the Gulf of

---

[2]   As stated in 43 U.S.C. § 1333(a)(1): "The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed . . . for the purpose of exploring for, developing, or producing resources therefrom . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . ."

Gibson, Dunn &
Crutcher LLP

Mexico alone. U.S. Dep't of Int., Minerals Mgmt. Serv., Gulf of Mex. Region, Prod. by Operator Ranked by Vol. (1947–1995), *available at* https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%201947%-20-%201995.pdf. In 2016, that Chevron subsidiary produced over 49 million barrels of crude oil and 50 million barrels of natural gas from the outer continental shelf on the Gulf of Mexico. U.S. Dep't of Int., Bureau of Safety & Envtl. Enf't, Gulf of Mex. Region, Prod. by Operator Ranked by Vol. (2016), *available at* https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%202016.pdf. Defendants (and/or their affiliated companies, whose activities Plaintiff improperly amalgamates in the Complaint) conduct, and have for decades conducted, similar oil and gas operations on the federal OCS; indeed, Defendants and/or their affiliated companies presently hold approximately 16% of all outer continental shelf leases. *See* Bureau of Ocean Energy Management, Lease Owner Information, *available at* https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx. For example, certain BP companies and Exxon Mobil currently own lease interests in, and the BP companies operate, "one of the largest deepwater producing fields in the Gulf of Mexico," which is capable of producing up to 250,000 barrels of oil per day. *See* Thunder Horse Field Fact Sheet (last visited Aug. 21, 2017), *available at* http://www.bp.com/content/dam/bp-country/en_us/PDF/Thunder_Horse_Fact_Sheet_6_14_2013.pdf. And as noted on the BP website, production from this and other OCS activities will continue into the future. *Id.* ("BP intends to sustain its leading position as an active participant in all facets of the Deepwater US Gulf of Mexico—as an explorer, developer, and operator."). A substantial portion of the national consumption of fossil fuel products stems from production on federal lands, as approved by Congress and Executive Branch decision-makers.

53. The Complaint itself makes clear that a substantial part of Plaintiff's claim "arises out of, or in connection with," Defendants' "operation[s] 'conducted on the outer Continental Shelf'" that involve "the exploration and production of minerals." *In re Deepwater Horizon*, 745 F.3d at 163. Plaintiff, in fact, challenges *all of* Defendants' "cumulative production of fossil fuels over many years," Compl. ¶ 10, a substantial quantum of which arises from outer continental shelf operations, *see* Ranking Operator by Oil, Bureau of Ocean Energy Mgmt., *available at*

Gibson, Dunn & Crutcher LLP

https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil (documenting Chevron's oil and natural gas production on the federal outer continental shelf from 1947 to 2017).

54.     The relief sought also arises out of and impacts OCS extraction and development. *See, e.g.*, Compl., Relief Requested (seeking payments into an abatement fund which would significantly impact the energy industry and findings that would rein in extraction, including that on the OCS). And "any dispute that alters the progress of production activities on the OCS threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS. Congress intended such a dispute to be within the grant of federal jurisdiction contained in § 1349." *Amoco Prod. Co.*, 844 F.2d at 1211.

## VII.     THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

55.     The Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham*, 445 F.3d at 1251 (citations omitted). All three elements are satisfied here for Defendants (at least to the extent that Plaintiff improperly amalgamates the activities of Defendants and their respective affiliates), which have engaged in activities pursuant to the directions of federal officers that, assuming the truth of Plaintiff's allegations, have a causal nexus to Plaintiff's claim, and which have colorable federal defenses to Plaintiff's claim, including, for example, performing pursuant to government mandates and contracts, performing functions for the U.S. military, and engaging in activities on federal lands pursuant to federal leases.

56.     First, Defendants are "persons" within the meaning of the statute. The Complaint alleges that Defendants are corporations (Compl. ¶¶ 15, 18, 21, 24, 27), which the Ninth Circuit has held qualify as "person[s]" under the statute. *See Leite*, 749 F.3d at 1122 n.4.

Gibson, Dunn & Crutcher LLP

57.    Second, assuming the truth of Plaintiff's allegations, there is a causal nexus between Defendants' alleged actions, taken pursuant to a federal officer's direction, and Plaintiff's claim.  In *Leite*, the Ninth Circuit held removal proper where a military contractor, which was sued for failing to warn about asbestos in military equipment, showed extensive evidence of federal control over its activities.  This included "detailed specifications governing the form and content of all warnings that equipment manufacturers were required to provide," which the Navy was directly involved in preparing and which could not be altered.  749 F.3d at 1123.  Here, Plaintiff's causation and injury allegations depend on the activities of Defendants over the past decades—many of which were undertaken at the direction of, and under close supervision and control by, federal officials.

58.    To take only one example, Defendants have long explored for and produced oil and gas on federal lands pursuant to leases governed by the Outer Continental Shelf Lands Act as described above.  *E.g.*, Exs. F, G.  In doing so, those Defendants were "'acting under' a federal 'official'" within the meaning of Section 1442(a)(1).  *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153 (2007).  Under OCSLA, the Interior Department is charged with "manag[ing] access to, and . . . receiv[ing] a fair return for, the energy and mineral resources of the Outer Continental Shelf." Statement of Walter Cruickshank, Deputy Director, Bureau of Ocean Energy Management, Before The Committee On Natural Resources, July, 6, 2016, *available at* https://www.boem.gov/Congressional-Testimony-Cruickshank-07062016/.  To fulfill this statutory obligation, the Interior officials maintain and administer the OCS leasing program, under which parties such as Defendants are required to conduct exploration, development and production activities that, "in the absence of a contract with a private firm, the Government itself would have had to perform."  *Watson*, 551 U.S. at 154.

59.    OCS leases obligate lessees like Defendants to "develop[] . . . the leased area" diligently, including carrying out exploration, development and production activities approved by Interior Department officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area."  Ex. G § 10.  Indeed, for decades Defendants' OCSLA leases have instructed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions, and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee

NOTICE OF REMOVAL

Gibson, Dunn & Crutcher LLP

*shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles." Ex. F § 10 (emphasis added). All drilling takes place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"—all of which must undergo extensive review and approval by federal authorities, and all of which further had to conform to "diligence" and "sound conservation practices." Ex. G §§ 9, 10. Federal officers further have reserved the rights to control the rates of mining (Ex. F § 10) and to obtain "prompt access" to facilities and records (Ex. F § 11, Ex. G § 12). The government also maintains certain controls over how the leased oil and gas is disposed of once it is removed from the ground, as by preconditioning the lease on a right of first refusal to purchase all materials "[i]n time of war or when the President of the United States shall so prescribe" (Ex. F § 14, Ex. G § 15(d)), and mandating that 20% of all crude and natural gas produced pursuant to drilling leases be offered "to small or independent refiners" (Ex. G § 15(c)). The Federal Treasury has reaped enormous financial benefits from those policy decisions in the form of statutory and regulatory royalty regimes that have resulted in billions of dollars of revenue to the Federal Government.

60. Certain Defendants have also engaged in the exploration and production of fossil fuels pursuant to agreements with federal agencies. For example, in June 1944, the Standard Oil Company (a Chevron predecessor) and the U.S. Navy entered into a contract "to govern the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve," a strategic petroleum reserve maintained by the Navy. *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014). "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies." GAO Fact Sheet, Naval Petroleum Reserves – Oil Sales Procedures and Prices at Elk Hills, April Through December 1986 (Jan. 1987) ("GAO Fact Sheet"), *available at* http://www.gao.gov/assets/90/87497.pdf. In response to the OPEC oil embargo in 1973-74, the Naval Petroleum Reserves Production Act of 1976 (Public Law 94-258, April 5, 1976) was enacted, which "authorized and directed that NPR-1 be pro-

Gibson, Dunn &
Crutcher LLP

duced at the maximum efficient rate for 6 years." *Id.* In 1977, Congress "transferred the Navy's interests and management obligations" to the Department of Energy, and Chevron continued its interest in the joint operation until 1997. *Id.* That contract governing Standard's rights in the reserve granted the Navy authority over how much would be produced from the joint operating area, and when it would be produced. Indeed, the contract "afford[ed] Navy a means of acquiring complete control over the development of the entire Reserve and the production of oil therefrom" (Ex. H at Recital 6(d)(ii)), as well as "exclusive control over the exploration, prospecting, development, and operation of the Reserve" (*id.* § 3(a)). One of the goals of the contract was to "place the Reserve in a condition of readiness whereby it will be able promptly to produce oil in substantial quantities whenever the strategic situation of the United States in the future may so require." *Id.* at Recital 6(d)(iii). Finally, the contract was meant to "result in securing the maximum ultimate recovery of oil, gas, natural gasoline and associated hydrocarbons from the Reserve." *Id.* at Recital 6(d)(vi). "In accordance with the [Naval Petroleum Reserves Production] [A]ct, the president . . . certifi[ed] that it [was] in the national interest to continue production of NPR-1 at the maximum efficient rate through a second 3-year period ending on April 5, 1988." GAO Fact Sheet at 3.

61.     These and other federal activities are encompassed in Plaintiff's Complaint. *See supra* ¶¶ 48-60. Plaintiff alleges that the drilling and production operations Defendants performed led to the sale of fossil fuels—including to the Federal Government—which led to the release of greenhouse gases by end-users. Furthermore, the oil and gas Defendants extracted—which the Federal Government (i) reserved the right to buy in total in the event of a time of war or whenever the President so prescribed and (ii) has purchased from Defendants to fuel its military operations—is the very same oil and gas that Plaintiff alleges creates a nuisance condition. Accordingly, Plaintiff seeks to hold Defendants liable for the very activities Defendants performed under the control of a federal official, and thus the nexus element has been satisfied.

62.     Third, Defendants intend to raise numerous meritorious federal defenses, including preemption, *see Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, No. 15-55010, --- F.3d ---, 2017 WL 3273868, at *8 (9th Cir. Aug. 2, 2017), the government contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Gertz v. Boeing*, 654 F.3d 852 (9th Cir.

Gibson, Dunn &
Crutcher LLP

2011), and others.  In addition, Plaintiff's claim is barred by the United States Constitution, including the Commerce and Due Process clauses, as well as the First Amendment and the foreign affairs doctrine.  These and other federal defenses are more than colorable.  *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").  Accordingly, removal under Section 1442 is proper.

## VIII.  THE ACTION IS REMOVABLE BECAUSE THIS CASE ARISES FROM ACTS ARISING FROM MULTIPLE FEDERAL ENCLAVES

63.     This Court also has original jurisdiction under the federal enclave doctrine.  The Constitution authorizes Congress to "exercise exclusive legislation in all cases whatsoever" over all places purchased with the consent of a state "for the erection of forts, magazines, arsenals, dockyards, and other needful buildings."  U.S. Const., art. I, § 8, cl. 17.  "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'"  *Durham*, 445 F.3d at 1250; *see also Totah v. Bies*, No. C 10-05956 CW, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011) (denying motion to remand where defamation claim arose in the Presidio in San Francisco, a federal enclave).  The "key factor" in determining whether a federal court has federal enclave jurisdiction "is the location of the plaintiff's injury or where the specific cause of action arose."  *Sparling v. Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014); *see also Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992) ("Failure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status."); *Bd. of Comm'rs of Se. La. Flood Protection Auth.-E. v. Tenn. Gas Pipeline Co.*, *LLC*, 29 F. Supp. 3d 808, 831 (E.D. La. 2014) (noting that defendants' "conduct" or "the damage complained of" must occur on a federal enclave).  Federal jurisdiction is available if some of the events or damages alleged in the complaint occurred on a federal enclave.  *See Durham*, 445 F.3d at 1250; *Bell v. Arvin Meritor, Inc.*, No. 12-00131-SC, 2012 WL 1110001, at *2 (N.D. Cal. Apr. 2, 2012) (finding federal enclave jurisdiction where "some of the[] locations … are federal enclaves"); *Totah*, 2011 WL 1324471, at *2 (holding that court can "exercise supplemental jurisdiction over related claims" that did not arise on federal enclave).

64.     Three requirements exist for land to be a federal enclave:  (1) the United States must have acquired the land from a state; (2) the state legislature must have consented to the jurisdiction of

Gibson, Dunn & Crutcher LLP

the Federal Government; and (3) the United States must have accepted jurisdiction. *Wood v. Am. Crescent Elevator Corp.*, No. 11-397, 2011 WL 1870218, at *2 (E.D. La. May 16, 2011).

65.     Upon information and belief, the federal government owns federal enclaves in the area where Plaintiff's "damage complained of" allegedly occurs. *Tenn. Gas Pipeline*, 29 F. Supp. 3d at 831.  Indeed, Plaintiff broadly alleges injuries to huge swaths of Oakland, *see* Compl. ¶¶ 84-91, and "[f]ailure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status," *Fung*, 816 F. Supp. at 571.  Additionally, it is well established that Oakland contains federal enclaves, such as the Oakland Army Base, federal facilities, and national park areas.[3] *See, e.g.*, *Paul v. United States*, 371 U.S. 245, 247, 266 & n.36 (1963); *Azhocar v. Coastal Marine Servs., Inc.*, No. 13-cv-155, 2013 WL 2177784, at *1 (S.D. Cal. May 20, 2013) ("Federal enclaves include 'numerous military bases, federal facilities, and even some national forests and parks.'") (quoting *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1235 (10th Cir. 2012)).  As such, federal jurisdiction exists over Plaintiff's claim.

66.     On information and belief, Defendants (and/or their affiliates, whose activities Plaintiff improperly amalgamates in the Complaint) maintain or maintained oil and gas operations on military bases or other federal enclaves such that the Complaint, which bases the claim on the "cumulative production of fossil fuels over many years" and the "commercial promotion[] of fossil fuels" (Compl. ¶ 10), arises under federal law.  *See, e.g.*, *Humble Pipe Line Co. v. Waggoner*, 376 U.S. 369, 372 (1964) (noting that the United States exercises exclusive jurisdiction over oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Mississippi River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale AFB, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States").  Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.  *See* GAO, *U.S. Fish and Wildlife Service: Information on Oil and Gas Activities in the National Wildlife Refuge* (Oct. 30, 2001),

---

[3]  Plaintiff's assertion that it does not "seek abatement with respect to any federal land," Compl. at 33 n.39, is irrelevant.  For purposes of removal, the relevant inquiry is whether the events or damages complained of occurred on a federal enclave.  *See, e.g.*, *Durham*, 445 F.3d at 1250.  The answer to that question can only be in the affirmative for the reasons stated above.

Gibson, Dunn & Crutcher LLP

*available at* http://www.gao.gov/new.items/d0264r.pdf.  Furthermore, Chevron and its predecessor companies for many years engaged in production activities on the Elk Hills Reserve—a strategic oil reserve maintained by the Naval Department—pursuant to a joint operating agreement with the Navy. *See Chevron U.S.A.*, 116 Fed. Cl. at 205.  Pursuant to that agreement, Standard Oil "operat[ed] the lands of Navy and Standard in the Reserve."  Ex. H at 4.

## IX. THE ACTION IS REMOVABLE UNDER THE BANKRUPTCY REMOVAL STATUTE

67.     The Bankruptcy Removal Statute allows removal of "any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."  28 U.S.C. § 1452(a).  Section 1334, in turn, provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings, arising under Title 11, or arising in or related to cases under title 11" of the United States Code.  28 U.S.C. § 1334(b).  The Ninth Circuit has emphasized that "'related to' jurisdiction is very broad, including nearly every matter directly or indirectly related to the bankruptcy."  *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 868 (9th Cir. 2005).  An action is thus "related to" a bankruptcy case if it "could conceivably have any effect on the estate being administered in bankruptcy."  *PDG Arcos, LLC*, 436 F. App'x at 742 (quoting *In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988)).  Where a Chapter 11 plan has been confirmed, there must be a "close nexus" between the post-confirmation case and the bankruptcy plan for related-to jurisdiction to exist.  *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 166-67 (3d Cir. 2004)).  "[A] close nexus exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to support jurisdiction when the matter 'affect[s] the interpretation, implementation, consummation, execution, or administration of the confirmed plan.'"  *In re Wilshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013) (quoting *Pegasus Gold*, 394 F.3d at 1194).

68.     Plaintiff's claim is purportedly predicated on historical activities of Defendants, including predecessor companies, subsidiaries, and companies that Defendants may have acquired or

Gibson, Dunn & Crutcher LLP

with which they may have merged, as well as numerous unnamed but now bankrupt entities. Indeed, Plaintiff explicitly alleges that "[e]ach Defendant, directly *and through its subsidiaries*, substantially participates in the process by which raw crude oil is extracted from the ground, refined into fossil fuel products and delivered, marketed, and sold to California residents for use." Compl. ¶ 32 (emphasis added); *see also id.* ¶¶ 17, 20, 23, 26, 29 (alleging that Defendants are "responsible for [their] subsidiaries' past and current production and promotion of fossil fuel products").[4] Because there are hundreds of non-joined necessary and indispensable parties, there are many other Title 11 cases that may be related. Accordingly, Plaintiff's broad claim has the required "close nexus" with Chapter 11 plans to support federal jurisdiction. *Wilshire Courtyard*, 729 F.3d at 1289; *see also In re Dow Corning Corp.*, 86 F.3d 482, 493-94 (6th Cir. 1996).

69. As just one example, one of Chevron's current subsidiaries, Texaco Inc., filed for bankruptcy in 1987. *In re Texaco Inc.*, 87 B 20142 (Bankr. S.D.N.Y. 1987). The Chapter 11 plan, which was confirmed in 1988, bars certain claims against Texaco arising prior to March 15, 1988. *Id.* Dkt. 1743.[5] Plaintiff's Complaint alleges that Texaco, as well as unnamed Chevron "predecessors" and "subsidiaries," engaged in culpable conduct prior to March 15, 1988, and it attributes this conduct to defendant "Chevron." *See* Compl. ¶ 20 ("Defendant Chevron is responsible for its subsidiaries' past and current production and promotion of fossil fuel products."); *id.* ¶ 57 (alleging that "[a]t all relevant times, Defendants, their corporate predecessors and/or their operating subsidiaries over which they exercise substantial control, have been members of the API"); *id.* ¶ 59(a) ("In 1980, . . . scientists and executives from Texaco (a predecessor to Chevron)" attended an API meeting). Plaintiff's claim against Chevron thus is at least partially barred by Texaco's confirmed Chapter 11 plan to the extent that the claims relate to Texaco's conduct prior to 1988. Accordingly, even though Texaco's Chapter 11 plan has been confirmed and consummated, Plaintiff's claim has a "close nexus" to the plan to support federal jurisdiction. *See Wilshire Courtyard*, 729 F.3d at 1292-

---

[4] To the extent Plaintiff seeks to hold Defendants liable for the conduct of their subsidiaries, affiliates or other related entities, such attempts are improper. *See, e.g., Gustavson v. Wrigley Sales Co.*, 961 F. Supp. 2d 1100, 1132 (N.D. Cal. 2013) (holding that "parent-subsidiary relationship . . . is an insufficient basis, standing alone, for holding [parent] liable for [subsidiary's] conduct").

[5] There are pending motions to reopen Texaco's bankruptcy case, which motions are being actively litigated in the Bankruptcy Court. *See id.* Dkt. 3923.

Gibson, Dunn & Crutcher LLP

NOTICE OF REMOVAL

93 (federal court had "'related to' subject matter jurisdiction under the *Pegasus Gold* test despite the fact that the Plan transactions have been long since consummated").

## X.    THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

70.    Based on the foregoing allegations from the Complaint, this Court has original jurisdiction over this action under 28 U.S.C. § 1331.  Accordingly, removal of this action is proper under 28 U.S.C. §§ 1334, 1441, 1442, 1452, and 1446, as well as 43 U.S.C. § 1349(b).

71.    The United States District Court for the Northern District of California is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff originally filed this case, in the Superior Court of California for the County of Alameda.  *See* 28 U.S.C. § 84(a); 28 U.S.C. § 1441(a).  Pursuant to Local Rule 3-2(d), the action should be assigned to either the San Francisco or Oakland divisions of this Court.

72.    All defendants that have been properly joined and served (or purported to be served) join in the removal of the action.  28 U.S.C. § 1446(b)(2)(A).  Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders served (or purported to be served) on Defendants is attached as Exhibits A-E to the Thomson Declaration.

73.    Upon filing this Notice of Removal, Defendants will furnish written notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Superior Court of California for the County of Alameda, pursuant to 28 U.S.C. § 1446(d).

Accordingly, Defendants remove to this Court the above action pending against them in the Superior Court of California for the County of Alameda.

Respectfully submitted,

Dated: October 20, 2017                    GIBSON, DUNN & CRUTCHER LLP


By:    */s/ Theodore J. Boutrous, Jr.*
            Theodore J. Boutrous, Jr.

GIBSON, DUNN & CRUTCHER LLP

| | |
|---|---|
| 1 | By: **/s/ Jonathan W. Hughes _____ |
| 2 | Jonathan W. Hughes (SBN 186829) |
| | ARNOLD & PORTER KAYE SCHOLER |
| 3 | LLP |
| | Three Embarcadero Center, 10th Floor |
| 4 | San Francisco, California 94111-4024 |
| | Telephone: (415) 471-3100 |
| 5 | Facsimile: (415) 471-3400 |
| | E-mail: jonathan.hughes@apks.com |
| 6 | |

By: **/s/ Jonathan W. Hughes _____

Jonathan W. Hughes (SBN 186829)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
E-mail: jonathan.hughes@apks.com

Matthew T. Heartney (SBN 123516)
John D. Lombardo (SBN 187142)
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
E-mail: matthew.heartney@apks.com
E-mail: john.lombardo@apks.com

*Attorneys for Defendant BP P.L.C.*

By: **/s/ Herbert J. Stern _____

Herbert J. Stern (*pro hac vice* forthcoming)
Joel M. Silverstein (*pro hac vice* forthcoming)
STERN & KILCULLEN, LLC
325 Columbia Turnpike, Suite 110
P.O. Box 992
Florham Park, NJ 07932-0992
Telephone: (973) 535-1900
Facsimile: (973) 535-9664
E-mail: hstern@sgklaw.com
jsilverstein@sgklaw.com

By: **/s/ Neal S. Manne _____

Neal S. Manne (SBN 94101)
Johnny W. Carter (*pro hac vice* forthcoming)
Erica Harris (*pro hac vice* forthcoming)
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
E-mail: nmanne@susmangodfrey.com
jcarter@susmangodfrey.com
eharris@susmangodfrey.com

Steven Shepard (*pro hac vice* forthcoming)
SUSMAN GODFREY LLP
1301 Avenue of the Americas
32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
E-mail: sshepard@susmangodfrey.com

*Attorneys for Defendant Chevron Corporation*

Gibson, Dunn &
Crutcher LLP

By: **/s/ Megan R. Nishikawa

Megan R. Nishikawa (SBN 271670)
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
Email: mnishikawa@kslaw.com

Tracie J. Renfroe (*pro hac vice* forthcoming)
Carol M. Wood (*pro hac vice* forthcoming)
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290
Email: cwood@kslaw.com

Justin A. Torres (*pro hac vice* forthcoming)
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006-4707
Telephone: (202) 737 0500
Facsimile: (202) 626 3737
Email: jtorres@kslaw.com

*Attorneys for Defendant*
*CONOCOPHILLIPS COMPANY*

By: **/s/ Dawn Sestito

M. Randall Oppenheimer (SBN 77649)
Dawn Sestito (SBN 214011)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
E-Mail: roppenheimer@omm.com
E-Mail: dsestito@omm.com

Theodore V. Wells, Jr. (*pro hac vice* forthcoming)
Daniel J. Toal (*pro hac vice* forthcoming)
Jaren E. Janghorbani (*pro hac vice* forthcoming)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
E-Mail: twells@paulweiss.com
E-Mail: dtoal@paulweiss.com
E-Mail: jjanghorbani@paulweiss.com

*Attorneys for Defendant*
*EXXON MOBIL CORPORATION*

Gibson, Dunn & Crutcher LLP

By: **/s/ Elizabeth Kim

Jerome C. Roth (SBN 159483)
Elizabeth A. Kim (SBN 295277)
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:  (415) 512-4000
Facsimile:  (415) 512-4077
E-mail: jerome.roth@mto.com
E-mail: elizabeth.kim@mto.com

Daniel P. Collins (SBN 139164)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
E-mail: daniel.collins@mto.com

*Attorneys for Defendant*
*ROYAL DUTCH SHELL PLC*

** Pursuant to Civ. L.R. 5-1(i)(3), the elec-
tronic signatory has obtained approval from
this signatory

Gibson, Dunn &
Crutcher LLP