# EXHIBIT A

# SUMMONS
## *(CITACION JUDICIAL)*

**FILED BY FAX**
ALAMEDA COUNTY

September 19, 2017

CLERK OF
THE SUPERIOR COURT

By Burt Moskaira, Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Chevron Corporation
Additional Parties Attachment form is attached

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

People of the State of California, by and through the City Attorney for
the City of Oakland, California

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Alameda County Superior Court

**CASE NUMBER:** *(Número del Caso)* G17875889

René C. Davidson Alameda County Courthouse - Civil Division
1225 Fallon Street, Oakland, CA 94612

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Barbara J. Parker, City Attorney, One Frank H. Ogawa Plaza, 6th Fl           A 94612 510-238-3601

DATE: September 19, 2017                Clerk, by _____ , Deputy
*(Fecha)*                                *(Secretario)*                          *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):* Chevron Corporation

   under: ☑ CCP 416.10 (corporation)               ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)        ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*

4. ☑ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| People of the State of California v. BP p.l.c., et al. | |

**INSTRUCTIONS FOR USE**

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

ConocoPhillips Company, a Delaware Corporation

Exxon Mobil Corporation, a New Jersey Corporation

BP p.l.c., a public limited company of England and Wales

Royal Dutch Shell plc, a public limited company of England and Wales

Does 1-10

Page __1__ of __1__

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

FILED BY FAX

ALAMEDA COUNTY

September 19, 2017

CLERK OF
THE SUPERIOR COURT
By Burt Moskaira, Deputy

CASE NUMBER:

RG17875889

1  CITY OF OAKLAND
   BARBARA J. PARKER – SB #069722
2  City Attorney
   MARIA BEE – SB #167716
3  Special Counsel
   ERIN BERNSTEIN – SB # 231539
4  Senior Deputy City Attorney
   ebernstein@oaklandcityattorney.org
5  One Frank H. Ogawa Plaza, 6th Floor
   Oakland, California
6  Tel.: (510) 238-3601
   Fax: (510) 238-6500
7
   *Attorney for The People of the State of California*
8
   *[Other Counsel Listed on Signature Page]*
9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                        COUNTY OF ALAMEDA

12  THE PEOPLE OF THE STATE OF            No.
    CALIFORNIA, acting by and through the
13  Oakland City Attorney,

14          Plaintiff and Real Party in Interest,    **COMPLAINT FOR PUBLIC NUISANCE**

15      v.

16  BP P.L.C., a public limited company of England
    and Wales, CHEVRON CORPORATION, a
17  Delaware corporation, CONOCOPHILLIPS
    COMPANY, a Delaware corporation, EXXON
18  MOBIL CORPORATION, a New Jersey
    corporation, ROYAL DUTCH SHELL PLC, a
19  public limited company of England and Wales,
    and DOES 1 through 10,
20

21          Defendants.

22

23

24

25

26

27

28

010694-11 986494 V1

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................... 1

II. JURISDICTION AND VENUE .............................................................................. 5

III. PARTIES ................................................................................................................. 5

    A. Plaintiff ........................................................................................................ 5

    B. Defendants .................................................................................................... 5

    C. Defendants' connections to California. ........................................................ 9

IV. FOSSIL FUELS ARE THE PRIMARY CAUSE OF GLOBAL WARMING. ................................................................................................. 11

V. DEFENDANTS HAVE PRODUCED MASSIVE QUANTITIES OF FOSSIL FUELS AND HAVE CONTINUED TO DO SO EVEN AS GLOBAL WARMING HAS BECOME GRAVELY DANGEROUS. ................... 15

VI. DEFENDANTS HAVE PRODUCED MASSIVE AMOUNTS OF FOSSIL FUELS DESPITE HAVING FULL KNOWLEDGE FROM THEIR IN-HOUSE SCIENTIFIC STAFF, OR FROM API, THAT FOSSIL FUELS WOULD CAUSE GLOBAL WARMING. ................................. 16

VII. DESPITE THEIR EARLY KNOWLEDGE THAT GLOBAL WARMING WAS REAL AND POSED GRAVE THREATS, DEFENDANTS PROMOTED FOSSIL FUELS FOR PERVASIVE USE WHILE DOWNPLAYING THE REALITY AND RISKS OF GLOBAL WARMING. ................................................................................................... 21

    A. Defendants borrowed the Big Tobacco playbook in order to promote their products. ................................................................................. 22

    B. Defendants' direct promotion of fossil fuels. .............................................. 25

VIII. OAKLAND WILL INCUR SERIOUS CLIMATE CHANGE INJURIES THAT WILL REQUIRE BILLIONS IN EXPENDITURES TO ABATE THE GLOBAL WARMING NUISANCE. ................................................................ 28

IX. CAUSE OF ACTION: PUBLIC NUISANCE ON BEHALF OF THE PEOPLE ................................................................................................................ 32

X. RELIEF REQUESTED .......................................................................................... 34

1        Plaintiff, the People of the State of California ("the People"), by and through the Oakland

2 City Attorney, brings this action against Defendants BP p.l.c. ("BP"), Chevron Corporation

3 ("Chevron"), ConocoPhillips Company ("ConocoPhillips"), Exxon Mobil Corporation ("Exxon"),

4 and Royal Dutch Shell plc ("Shell") (collectively, "Defendants"), and alleges as follows:

5                     **I.    INTRODUCTION**

6     1.     Global warming is here and it is harming Oakland now. Global warming causes

7 accelerated sea level rise through thermal expansion of ocean water and melting of land-based ice.

8 Sea levels are rising at rates unprecedented in the history of human civilization due to global

9 warming. Global warming-induced sea level rise already is causing flooding of low-lying areas of

10 Oakland that border the San Francisco Bay, increased shoreline erosion, and salt water impacts to

11 water treatment systems. Many of the Oakland residents who are likely to be most affected by

12 climate change are low-income and/or people of color. As the U.S. government has pointed out,

13 people of color, low-income groups, and certain immigrant groups are (*e.g.*, because of poverty,

14 chronic health conditions, and social isolation) potentially more "vulnerable" to climate change

15 impacts, including heat waves, flooding, and degraded air quality. This is true in Oakland, where

16 "socially vulnerable" individuals such as African Americans and Hispanics, tend to live at lower

17 elevations most affected by sea level rise and higher storm surges. The rapidly rising sea level

18 along the Pacific coast and in San Francisco Bay, moreover, poses an imminent threat of

19 catastrophic storm surge flooding because any storm would be superimposed on a higher sea level.

20 This threat to human safety and to public and private property is becoming more dire every day as

21 global warming reaches ever more dangerous levels and sea level rise accelerates. Oakland must

22 take abatement action now to protect public and private property from this looming threat by

23 building sea walls and other sea level rise adaptation infrastructure. Exhibits 1 and 2 to this

24 Complaint, showing flood events' projected intrusion into Oakland as a result of global warming,

25 demonstrate just how stark the threat is.[1]

26

27 ───────────────

[1] City of Oakland, 2016-2021 Local Hazard Mitigation Plan (June 7, 2016), at 84-85, *available at*

28 http://www2.oaklandnet.com/oakca1/groups/ceda/documents/report/oak058455.pdf.

1       2.     This egregious state of affairs is no accident. Rather, it is an unlawful public

2    nuisance of the first order. Defendants are the five largest investor-owned fossil fuel corporations

3    in the world as measured by their historic production of fossil fuels. The use of fossil fuels – oil,

4    natural gas and coal – is the primary source of the greenhouse gas pollution that causes global

5    warming, a point that science established years ago. Defendants have produced massive amounts

6    of fossil fuels for many years. And recent disclosures of internal industry documents demonstrate

7    that they have done so despite knowing – since at least the late 1970s and early 1980s if not earlier

8    – that massive fossil fuel usage would cause dangerous global warming. It was at that time that

9    scientists on their staffs or with whom they consulted through their trade association, the American

10   Petroleum Institute ("API"), investigated the science and warned them in stark terms that fossil fuel

11   usage would cause global warming at a rate unprecedented in the history of human civilization and

12   present risks of "catastrophic" harm in coming decades.

13      3.     Undeterred by these stark warnings, Defendants proceeded to double-down on fossil

14   fuels. Most of the carbon dioxide now in the atmosphere as a result of combustion of Defendants'

15   fossil fuels is likely attributable to their recent production – *i.e.*, to fossil fuels produced by

16   Defendants since 1980. Even today, with the global warming danger level at a critical phase,

17   Defendants continue to engage in massive fossil fuel production and execute long-term business

18   plans to continue and even expand their fossil fuel production for decades into the future.

19      4.     The global warming-induced sea level rise from <u>past</u> fossil fuel usage is an

20   irreversible condition on any relevant time scale: it will last hundreds or even thousands of years.

21   Defendants' planned production of fossil fuels into the <u>future</u> will exacerbate global warming,

22   accelerate sea level rise even further, and require greater and more costly abatement actions to

23   protect Oakland.

24      5.     Defendants, notably, did not simply produce fossil fuels. They engaged in large-

25   scale, sophisticated advertising and public relations campaigns to promote pervasive fossil fuel

26   usage and to portray fossil fuels as environmentally responsible and essential to human well-being

27   – although they knew that their fossil fuels would contribute, and subsequently were contributing,

28   to dangerous global warming and associated accelerated sea level rise. These promotional efforts

1  continue through today even in the face of overwhelming and incontrovertible scientific evidence
2  that fossil fuels are altering the climate and global warming has become an existential threat to
3  modern life.

4        6.    Defendants' promotion of fossil fuels has also entailed denying mainstream climate
5  science or downplaying the risks of global warming. During the 1990s and early 2000s,
6  Defendants stole a page from the Big Tobacco playbook and sponsored public relations campaigns,
7  either directly or through the API or other groups, to deny and discredit the mainstream scientific
8  consensus on global warming, downplay the risks of global warming, and even to launch
9  unfounded attacks on the integrity of leading climate scientists. "Uncertainty" of the science
10 became the constantly repeated mantra of this Big Oil public relations ("PR") campaign just as
11 "Doubt is our product" was the Big Tobacco PR theme. Emphasizing "uncertainty" in climate
12 science, directly or through the API, has remained a focus of Defendants' efforts to promote their
13 fuels even though they are well aware that the fundamental scientific facts of global warming are
14 not in dispute and are a cause of grave danger through sea level rise.

15       7.    The purpose of all this promotion of fossil fuels and efforts to undermine
16 mainstream climate science, like all marketing, was to increase sales and protect market share. It
17 succeeded.

18       8.    And now it will cost billions of dollars to build sea walls and other infrastructure to
19 protect human safety and public and private property in Oakland from global warming-induced sea
20 level rise. A recent report by the State of California has rung the alarm bell as loudly as possible:
21 "Previously underappreciated glaciological processes, examined in the research of the last five
22 years, have the potential to greatly increase the probability of extreme global sea-level rise (6 feet
23 or more) within the century" under business as usual fossil fuel production and usage.[2]
24 Translation: the planet's enormous ice caps on Greenland and Antarctica are beginning to melt,
25 like their much smaller but more numerous cousins, the mountain glaciers, have been doing for
26

27    [2] Griggs et al., Rising Seas in California: an update on sea-level rise science, California Ocean
Science Trust, at 16 (Apr. 2017) ("Rising Seas in California"), *available at*
28 http://www.opc.ca.gov/webmaster/ftp/pdf/docs/rising-seas-in-california-an-update-on-sea-level-rise-science.pdf.

1  many years, and slide into the ocean; and this new dynamic is fundamentally increasing the risk of

2  catastrophic sea level rise. The report projects a risk of as much as ten feet of additional sea level

3  rise along the coastline of San Francisco Bay by 2100, which would be catastrophic.[3] Nearer-term

4  risks include 0.3 to as much as 0.8 feet of additional sea level rise by 2030,[4] which itself will

5  require the building of sea walls and other costly infrastructure given the dynamics of storm surge

6  and regular high tide flooding.

7      9.      This new information shows that the costs of dealing with global warming-induced

8  sea level rise – already immense – will be staggering for the public entities that must protect their

9  people and their coastlines. The City of Oakland already is taking action to adapt to accelerating

10  sea level rise. In 2016, Oakland adopted a five-year Local Hazard Mitigation Plan that analyzes

11  risks from sea level rise, identifies mitigation measures and presents an implementation plan for the

12  next five years. The plan warns that projected sea level rise in Oakland, absent adaptation, could

13  "substantially impact coastal areas" including low-lying coastal residences, the Port and Oakland

14  International Airport. As set forth in the Plan, projected sea level rise in Oakland puts at risk

15  property with a total replacement cost of between $22 and $38 billion. The magnitude of the

16  actions needed to abate harms from sea level rise, and the amount of property at risk, will increase

17  in light of the rapidly accelerating sea level rise and the increased scientific understanding of sea

18  level rise processes as set forth in the 2017 report.

19      10.     Defendants are substantial contributors to the public nuisance of global warming

20  that is causing injury to the People and thus are jointly and severally liable. Defendants'

21  cumulative production of fossil fuels over many years places each of them among the top sources

22  of global warming pollution in the world. Upon information and belief, Defendants are,

23  respectively, the first (Chevron), second (Exxon), fourth (BP), sixth (Shell) and ninth

24  (ConocoPhillips) largest cumulative producers of fossil fuels worldwide from the mid Nineteenth

25  Century to present; most of Defendants' global warming pollution from the usage of their fuels has

26  accumulated in the atmosphere since 1980. Defendants, moreover, are qualitatively different from

27

28
        [3] *Id.* at 26.
        [4] *Id.*

1   other contributors to the harm given their in-house scientific resources, early knowledge of global

2   warming, commercial promotions of fossil fuels as beneficent even in light of their knowledge to

3   the contrary, and efforts to protect their fossil fuel market by downplaying the risks of global

4   warming.

5       11.     The People seek an order requiring Defendants to abate the global warming-induced

6   sea level rise nuisance to which they have contributed by funding an abatement program to build

7   sea walls and other infrastructure that are urgently needed to protect human safety and public and

8   private property in Oakland.  The People do not seek to impose liability on Defendants for their

9   direct emissions of greenhouse gases and do not seek to restrain Defendants from engaging in their

10  business operations.  This case is, fundamentally, about shifting the costs of abating sea level rise

11  harm – one of global warming's gravest harms – back onto the companies.  After all, it is

12  Defendants who have profited and will continue to profit by knowingly contributing to global

13  warming, thereby doing all they can to help create and maintain a profound public nuisance.

## II.     JURISDICTION AND VENUE

15      12.     Jurisdiction is proper in this Court because Defendants have contributed to the

16  creation of a public nuisance in Oakland, and the Oakland City Attorney has the right and authority

17  to seek abatement of that nuisance on behalf of the People of the State of California.

18      13.     Venue is proper in this county in accordance with section 392(a)(1) of the California

19  Code of Civil Procedure because the People allege injuries to real property located in this county.

## III.    PARTIES

### A.    Plaintiff

22      14.     Plaintiff, the People of the State of California, by and through the Oakland City

23  Attorney, brings this suit pursuant to Code of Civil Procedure section 731, and Civil Code sections

24  3479, 3480, 3491, and 3494, to abate the public nuisance caused by Defendants.

### B.    Defendants

26      15.     Defendant BP is a public limited company registered in England and Wales with its

27  headquarters in London, England, doing business in California.  BP was created in 1998 as a result

28  of a merger between the Amoco Corporation ("Amoco"), a former U.S. corporation, and the British

1  Petroleum Company p.l.c.  BP is a multinational, integrated oil and gas company that explores for,

2  produces, refines, markets and sells oil, natural gas and fossil fuel products.

3      16.    BP controls company-wide climate change policies and fossil fuel production.  BP,

4  through its employees and/or agents, manages, directs, conducts and/or controls operations relating

5  to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are

6  produced, transported, refined, stored, distributed, marketed, and/or sold to consumers.  BP also

7  exercises control over company-wide decisions on production and use of fossil fuel reserves

8  considering climate change impacts.  BP's management, direction, conduct and/or control is

9  exercised through a variety of means, including through its employees' and/or agents'

10  implementation of policies, procedures, and programs relating to climate change generally and to

11  production of fossil fuels specifically.

12      17.    As a result of its management, direction, conduct and/or control of operations

13  relating to company-wide climate change policies and fossil fuel production, Defendant BP is

14  responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

15      18.    Defendant Chevron is a Delaware Corporation with its principal place of business

16  located in San Ramon, California.  Chevron and its predecessors had their headquarters in San

17  Francisco from 1879 to 2001.  Chevron is a multinational, integrated oil and gas company that

18  explores for, produces, refines, markets and sells oil, natural gas and fossil fuel products.

19      19.    Chevron controls company-wide climate change policies and fossil fuel production.

20  Chevron, through its employees and/or agents, manages, directs, conducts and/or controls

21  operations relating to its subsidiaries' participation in the process by which fossil fuels, including

22  raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to

23  consumers.  Chevron also exercises control over company-wide decisions on production and use of

24  fossil fuel reserves considering climate change impacts.  Chevron's management, direction,

25  conduct and/or control is exercised through a variety of means, including through its employees'

26  and/or agents' implementation of policies, procedures, and programs relating to climate change

27  generally and to production of fossil fuels specifically.

28

20. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant Chevron is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

21. Defendant ConocoPhillips is a Delaware Corporation with its principal place of business located in Houston, Texas, doing business in California. ConocoPhillips is a multinational oil and gas company that produces, markets and sells oil and natural gas and for many years also refined and sold finished oil products.

22. ConocoPhillips controls company-wide climate change policies and fossil fuel production. ConocoPhillips, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. ConocoPhillips also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. ConocoPhillips' management, direction, conduct and/or control is exercised through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

23. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant ConocoPhillips is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

24. Defendant Exxon is a New Jersey corporation with its principal place of business located in Irving, Texas, doing business in the State of California. Exxon is a multinational, integrated oil and gas company that explores for, produces, refines, markets and sells oil, natural gas and fossil fuel products and, as recently as 2009 produced, marketed and sold coal.

25. Exxon controls company-wide climate change policies and fossil fuel production. Exxon, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers.

Exxon also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. Exxon's management, direction, conduct and/or control is exercised through a variety of means, including through its employees and/or agents' implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

26. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant Exxon is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

27. Defendant Shell is a public limited company registered in England and Wales with its headquarters in The Hague, Netherlands, doing business in California. Shell is a multinational, integrated oil and gas company that explores for, produces, refines, markets and sells oil, natural gas and fossil fuel products.

28. Shell controls company-wide climate change policies and fossil fuel production. Shell, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. Shell also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. Shell's management, direction, conduct and/or control is exercised through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

29. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant Shell is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

30. Defendants DOES ONE through TEN are sued herein under fictitious names. Plaintiff does not at this time know the true names or capacities of said defendants, but prays that the same may be alleged when ascertained.

C. **Defendants' connections to California.**

31. Defendants have contributed to the creation of a public nuisance – global warming-induced sea level rise – causing severe harms and threatening catastrophic harms in Oakland.

32. Each Defendant, directly and through its subsidiaries, substantially participates in the process by which raw crude oil is extracted from the ground, refined into fossil fuel products and delivered, marketed, and sold to California residents for use.

33. BP, through its subsidiaries: owns and/or operates port facilities in California for receipt of crude oil. BP, through its subsidiaries, also produces oil in Alaska, and upon information and belief, BP, through its subsidiaries, transports some of this crude oil to California. In addition, BP operates 275 ARCO-licensed and-branded gasoline stations in California, including stations located in Oakland. BP offers credit cards to consumers on its interactive website to promote sales of gasoline and other products at its branded gasoline stations. BP's web site maintain a page of "BP Amoco Stations Near Me" for California listing virtually every municipality in California and hundreds of such gas stations. BP promotes gasoline sales by offering, consumers, through its interactive web site, twenty-five cents off every gallon of BP-branded gasoline for every $100 spent on a BP Visa® Credit Card or BP Credit Card for the first ninety days a consumer's account is open.

34. Chevron, through its subsidiaries: produces oil in California, owns and/or operates port facilities in California for receipt of crude oil, owns and operates two refineries where crude oil is refined into finished fossil fuel products including gasoline, and owns and operates approximately nine gasoline terminals in California. A gasoline terminal consists of enormous aboveground storage tanks that hold gasoline for distribution to retail gasoline stations and consumers. Chevron owns and operates the Richmond gasoline refinery and related terminals in the San Francisco Bay Area. Chevron, through its subsidiaries, also produces oil in Alaska, and upon information and belief, some of this crude oil is supplied to California. There also are numerous Chevron-branded gasoline stations in California, including in Oakland. Chevron offers credit cards to consumers through its interactive website, to promote sales of gasoline and other

1 products at its branded gasoline stations. Chevron promotes gasoline sales by offering consumers
2 three cents per gallon in fuel credits "every fill-up, every time at Chevron and Texaco stations."

3     35.     ConocoPhillips, through its subsidiaries: owns and/or operates port facilities in
4 California for receipt of crude oil, and previously owned and operated a refinery based in both
5 Rodeo and Arroyo Grande, California, from 2001 to 2012, where crude oil was refined into
6 finished fossil fuel products including gasoline. ConocoPhillips, through its subsidiaries, also
7 produces oil in Alaska, and transports some of this crude oil to California.

8     36.     Exxon, through its subsidiaries: produces oil in California, owns and/or operates
9 port facilities in California for receipt of crude oil, and previously owned and operated a refinery in
10 California until July 1, 2016, where crude oil was refined into finished fossil fuel products
11 including gasoline. Exxon owned the Benicia gasoline refinery for 30 years until 2000. Exxon,
12 through its subsidiaries, also produces oil in Alaska, and upon information and belief, Exxon,
13 through its subsidiaries, transports some of this crude oil to California. There also are numerous
14 Exxon-branded gasoline stations in California, including in Oakland and the greater Bay Area.
15 Exxon offers credit cards to consumers, through its interactive website, to promote sales of
16 gasoline and other products at its branded gasoline stations. Exxon promotes gasoline sales by
17 offering consumers twenty-five cents off every gallon of Synergy™ gasoline at Exxon™ or
18 Mobil™ stations for the first two months and then six cents off every gallon of Synergy gasoline at
19 Exxon- and Mobil-branded stations.

20     37.     Shell, through its subsidiaries: owns and/or operates port facilities in California for
21 receipt of crude oil, owns and operates a refinery in California where crude oil is refined into
22 finished fossil fuel products including gasoline, transports crude oil through a pipeline within
23 California, and owns and operates approximately six gasoline terminals in California. Since 1915,
24 Shell has owned a gasoline refinery in Martinez, California, twenty-five miles northeast of
25 Oakland. There are numerous Shell-branded gasoline stations in California, including in Oakland.
26 Shell offers credit cards to consumers on its interactive website to promote sales of gasoline and
27 other products at its branded gasoline stations. Shell promotes gasoline sales by offering

28

1   consumers, through its interactive web site, twenty-five cents off every gallon of Shell Fuel for the

2   first two months after they open an account.

3   **IV.    FOSSIL FUELS ARE THE PRIMARY CAUSE OF GLOBAL WARMING.**

4       38.    Production of fossil fuels for combustion causes global warming. When used as

5   intended, fossil fuels release greenhouse gases, including carbon dioxide ($CO_2$) and methane,

6   which trap atmospheric heat and increase global temperatures. Carbon dioxide is by far the most

7   important greenhouse gas because of the combustion of massive amounts of fossil fuels.

8       39.    Scientists have known for many years that the use of fossil fuels emits carbon

9
10  dioxide and that carbon dioxide is a greenhouse gas. In 1896, Svante Arrhenius, a Nobel-prize

11  winning scientist, published calculations projecting temperature increases that would be caused by

12  increased carbon dioxide concentrations in the atmosphere due to the burning of fossil fuels.

13      40.    By 1957, scientists at the Scripps Institute published a warning in the peer-reviewed

14  literature that global warming "may become significant during future decades if industrial fuel

15
16  combustion continues to rise exponentially" and that "[h]uman beings are now carrying out a large

17  scale geophysical experiment" on the entire planet.[5]

18      41.    In 1960, scientist Charles D. Keeling published results establishing that atmospheric

19  carbon dioxide concentrations were in fact rising.[6]

20      42.    By 1979, the National Academy of Sciences, which is charged with providing

21  independent, objective scientific advice to the United States government, concluded that there was

22  "incontrovertible evidence" that carbon dioxide levels were increasing in the atmosphere as a result

23  of fossil fuel use, and predicted that a doubling of atmospheric carbon dioxide would cause an

24

25      [5] Revelle, Roger, and Hans E. Suess (1957). "Carbon Dioxide Exchange between Atmosphere
    and Ocean and the Question of an Increase of Atmospheric CO2 During the Past Decades." *Tellus*
26  9: 18-27, *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.2153-
    3490.1957.tb01849.x/epdf.
27
        [6] Keeling, Charles D. (1960). "The Concentration and Isotopic Abundances of Carbon Dioxide
28  in the Atmosphere." *Tellus* 12: 200-203, *available at*
    http://onlinelibrary.wiley.com/doi/10.1111/j.2153-3490.1960.tb01300.x/epdf.

increase in global surface temperatures of between 1.5 °C and 4.5 °C [2.7 °F and 8.1 °F], with a probable increase of 3 °C [5.4 °F].

43. In 1988, NASA scientist Dr. James E. Hansen testified to the U.S. Senate's Energy and Natural Resources Committee that "[t]he greenhouse effect has been detected, and it is changing our climate now."

44. More recent research has confirmed and expanded on these earlier findings. In 1988, the United Nations established the Intergovernmental Panel on Climate Change ("IPCC") to assess the scientific and technical information relevant to global warming, and to provide advice to all parties to the U.N. Framework Convention on Climate Change, including the United States. The IPCC issues periodic assessment reports, which have become the standard scientific references on global warming. As Defendant Exxon has put it, the IPCC is "the leading international scientific authority on climate change."

45. In 1990, the IPCC issued its First Assessment Report ("FAR"). It stated that "we are certain" that "emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases," including carbon dioxide and methane, and that "these increases will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface."[7] The IPCC's FAR also predicted that a "business as usual" scenario (i.e. a future in which fossil fuel production and associated emissions continue to increase) would cause global mean temperature during the next century to increase at a rate "greater than that seen over the past 10,000 years," and "will result in a likely increase in global mean temperature of about 1 C [1.8 °F] above the present value by 2025 and 3 °C [5.4 °F] before the end of the next century" – higher than temperatures have been in the last 150,000 years.[8] The FAR also predicted that business as usual would result in substantial sea level rise by 2100.[9]

---

[7] https://www.ipcc.ch/ipccreports/far/wg_I/ipcc_far_wg_I_spm.pdf, at Executive Summary xi.
[8] Id. at xi and xxviii.
[9] Id. at Executive Summary xi.

COMPLAINT FOR PUBLIC NUISANCE

1    46.    The FAR further stated "with confidence" that continued emissions of carbon

2  dioxide "at present rates would commit us to increased concentrations for centuries ahead," and

3  that immediate reductions were required to stabilize carbon dioxide concentrations.

> In 1995, in its Second Assessment Report ("SAR"), the IPCC concluded that the
> "balance of evidence suggests a discernible human influence on global climate."
> This causal finding was profoundly important as confirmation that human-caused
> global warming had now been detected. By 2001, the IPCC strengthened its
> causal conclusion, stating that it was "likely" (an IPCC term of art meaning a 66%
> to 90% chance of being true) that temperature increases already observed were
> attributable to human activity.[10] The U.S. National Academy of Sciences
> reviewed this finding and concluded that it was accurate.

47.    The IPCC issued its most recent report, the Fifth Assessment, in 2013-14. It states

that it is "extremely likely" (95% to 100% likely) that "human influence has been the dominant

cause of the observed warming since the mid-20th century."[11]

48.    The increase in atmospheric carbon dioxide caused by the combustion of fossil fuels

has been clearly documented – and measured. Carbon dioxide from fossil fuels has a chemical

fingerprint and is the culprit; natural sources of carbon dioxide were in balance prior to the use of

fossil fuels and are not a cause of the global warming problem. Today, due primarily to the

combustion of fossil fuels produced by Defendants and others, the atmospheric level of carbon

dioxide is 410 ppm, higher than at any time during human civilization and likely higher than any

level in millions of years. The result has been dramatic planetary warming: sixteen of earth's

seventeen warmest years in the 136-year period of global temperature measurements have occurred

since 2001, and 2016 was the warmest year on record. As of July 2017, there were 391 months in

a row that were warmer than the twentieth century average. The years 2014, 2015 and 2016 were

the three hottest years ever recorded in California since modern temperature records were first

taken in 1895. California has warmed over 2 °F since 1895.

49.    Scientists typically use "double $CO_2$," or twice the pre-industrial level of

atmospheric carbon dioxide concentration, as a standard reference for considering the warming

impact of increased greenhouse gases. Double $CO_2$ is 550 ppm. According to the IPCC, double

---

[10] IPCC, Third Assessment Report, Working Group I, Summary for Policymakers at 10,
*available at* http://www.grida.no/climate/ipcc_tar/wg1/pdf/WG1_TAR-FRONT.pdf.

[11] IPCC, Climate Change 2013, The Physical Science Basis, Summary for Policymakers at 17,
*available at* https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_SPM_FINAL.pdf.

1      $CO_2$ will cause the global average surface air temperature to increase by 1.5 to 4.5 °C [2.7 to 8.1

2      °F] over the pre-industrial level, a rate of warming that is unprecedented in the history of human

3      civilization. By comparison, at the depths of the last ice age, 20,000 years ago, the global average

4      temperature of the Earth was only seven to eleven degrees Fahrenheit cooler than today. Globally,

5      approximately 1 °C [1.8 °F] of the temperature rise already has occurred, due primarily to carbon

6      dioxide and methane emissions from the combustion and use of fossil fuels.

7      50.      Ongoing and future warming caused by past and ongoing use of massive quantities

8      of fossil fuels will cause increasingly severe harm to Oakland through accelerating sea level rise.

9      In 2013, the IPCC projected that between 2081 and 2100, the global average surface temperature

10      will have increased by 4.7 °F to 8.6 °F under business-as-usual, *i.e.*, with continued massive levels

11      of fossil fuel production. Global warming causes sea level rise by melting glaciers and sea ice, and

12      by causing seawater to expand. This acceleration of sea level rise is unprecedented in the history

13      of human civilization. Since 1990, the rate of sea level rise has more than doubled and it continues

14      to accelerate. The rate of ice loss from the Greenland and Antarctic Ice Sheets is increasing, and

15      these ice sheets soon will become the primary contributor to global sea level rise. With production

16      of fossil fuels continuing on its business-as-usual trajectory, the resulting warming presents a risk

17      of "rapidly accelerating and effectively irreversible ice loss." The melting of even a portion of the

18      West Antarctic Ice Sheet, the "most vulnerable major ice sheet in a warming global climate," will

19      cause especially severe impacts in California. Rapid ice sheet loss on Antarctica due to global

20      warming risks a sea level rise in California of ten feet by 2100. This would be catastrophic for

21      Oakland.

22      51.      The Earth's climate can undergo an abrupt and dramatic change when a radiative

23      forcing agent, such as carbon dioxide, causes the climate system to reach a tipping point.

24      Defendants' massive production of fossil fuels increases the risk of reaching that tipping point,

25      triggering a sudden and potentially catastrophic change in climate. The rapidity of an abrupt

26      climate shift would magnify all the adverse effects of global warming. Crossing a tipping point

27      threshold also could lead to rapid disintegration of ice sheets on Greenland and/or Antarctica,

28      resulting in large and rapid increases in sea level rise.

**V.    DEFENDANTS HAVE PRODUCED MASSIVE QUANTITIES OF FOSSIL FUELS AND HAVE CONTINUED TO DO SO EVEN AS GLOBAL WARMING HAS BECOME GRAVELY DANGEROUS.**

52.    For many years, Defendants have produced massive quantities of fossil fuels that, when combusted, emit carbon dioxide, the most important greenhouse gas. Additionally, one of Defendants' primary fossil fuel products, natural gas, is composed of methane, which is the second most important greenhouse gas and which, as Defendants know, routinely escapes into the atmosphere from facilities operated by Defendants' customers and also consumers. The greenhouse gases from the usage of defendants' fossil fuels remain in the atmosphere for long periods of time: a substantial portion of carbon dioxide emissions remains in the atmosphere for over 1,000 years after they are emitted.[12] As noted above, Defendants have produced such vast quantities of fossil fuels that they are five of the ten largest producers in all of history, with most of the $CO_2$ that has built up in the atmosphere from the use of their products dating from 1980 or later. The cumulative greenhouse gases in the atmosphere attributable to each Defendant has increased the global temperature and contributed to sea level rise, including in Oakland.

53.    Once Defendants produce fossil fuels by, for example, extracting oil from the ground, those fossil fuels are used exactly as intended and emit carbon dioxide.

54.    Despite their internal warnings, an overwhelming scientific consensus on the unfolding imminent catastrophe, and actual gravely dangerous impacts from global warming, Defendants to this day maintain high levels of fossil fuel production. This production will intensify future warming and exacerbate Oakland's injuries from sea level rise.

55.    Defendants' conduct will continue to cause ongoing and increasingly severe sea level rise harms to Oakland because Defendants are committed to a business model of massive fossil fuel production that they know causes a gravely dangerous rate of global warming. The following graph from a 2015 study published in the peer-reviewed scientific literature demonstrates the grave indifference Defendants BP, Shell and Exxon have for human safety and welfare.

---

[12] IPCC, Climate Change 2013, The Physical Science Basis, Summary for Policymakers at 28, *available at* https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_SPM_FINAL.pdf.





The graph compares the greenhouse gas emissions trajectory necessary to prevent global warming

from exceeding a 2 °C increase over the pre-industrial temperature (IEA 450 from International

Energy Agency) to BP, Exxon and Shell's projections of total worldwide future emissions that they

use to make long-term business plans.[13] The 2 °C level of global warming is widely considered to

be a red line of highly dangerous global warming. Upon information and belief, all Defendants

base their long-term business plans upon similar projections.

## VI.  DEFENDANTS HAVE PRODUCED MASSIVE AMOUNTS OF FOSSIL FUELS DESPITE HAVING FULL KNOWLEDGE FROM THEIR IN-HOUSE SCIENTIFIC STAFF, OR FROM API, THAT FOSSIL FUELS WOULD CAUSE GLOBAL WARMING.

56.     For decades, Defendants have known that their fossil fuel products pose risks of

"severe" and even "catastrophic" impacts on the global climate through the work and warnings of

their own scientists or through their trade association. Yet each Defendant decided to continue its

conduct and commit itself to massive fossil fuel production. This was a deliberate decision to

place company profits ahead of human safety and well-being and property, and to foist onto the

public the costs of abating and adapting to the public nuisance of global warming.

---

[13] Frumhoff, et al., The climate responsibilities of industrial carbon producers, Climatic Change, at 167 (2015), *available at* https://link.springer.com/article/10.1007/s10584-015-1472-5.

1    57.    The American Petroleum Institute ("API") is a national trade association that

2    represents the interests of America's oil and natural gas industry. At all relevant times,

3    Defendants, their corporate predecessors and/or their operating subsidiaries over which they

4    exercise substantial control, have been members of the API. On information and belief, the API

5    has acted as Defendants' agent with respect to global warming, received funding from Defendants

6    for the API's global warming initiatives, and shared with Defendants the information on global

7    warming described herein.

8    58.    Beginning in the 1950s, the API repeatedly warned its members that fossil fuels

9    posed a grave threat to the global climate. These warnings have included, for example, an

10   admission in 1968 in an API report predicting that carbon dioxide emissions were "almost certain"

11   to produce "significant" temperature increases by 2000, and that these emissions were almost

12   certainly attributable to fossil fuels. The report warned of "major changes in the earth's

13   environment" and a "rise in sea levels," and concluded: "there seems to be no doubt that the

14   potential damage to our environment could be severe."[14] Similar warnings followed in the ensuing

15   decades, including reports commissioned by the API in the 1980s that there was "scientific

16   consensus" that catastrophic climate change would ensue unless API members changed their

17   business models, and predictions that sea levels would rise considerably, with grave consequences,

18   if atmospheric concentrations of $CO_2$ continued to increase.

19   59.    The API's warnings to Defendants included:

20   a)    In 1951, the API launched a project to research air pollution from petroleum

21   products, and attributed atmospheric carbon to fossil fuel sources. By 1968, the API's scientific

22   consultant reported to the API that carbon dioxide emissions were "almost certain" to produce

23   "significant" temperature increases by 2000, and that these emissions were almost certainly

24   attributable to fossil fuels. The report warned of "major changes in the earth's environment" and a

25

26

27

28

---

[14] E. Robinson & R.C. Robbins, Final Report, Sources, Abundance, and Fate of Gaseous
Atmospheric Pollutants, SRI Project PR-6755, prepared for American Petroleum Institute, at 109-110, *available at* https://www.smokeandfumes.org/#/documents/document16.

1 "rise in sea levels," and concluded: "there seems to be no doubt that the potential damage to our

2 environment could be severe."[15]

3   b) In 1980, an API task force on climate change invited Dr. J.A. Laurman, a "recognized

4     expert in the field of $CO_2$ and climate," to make a presentation to the API $CO_2$ and Climate

5     Task Force. Attendees to the presentation included scientists and executives from Texaco

6     (a predecessor to Chevron), Exxon and SOHIO (a predecessor to BP). Dr. Laurman

7     informed the API task force that there was a "Scientific Consensus on the Potential for

8     Large Future Climatic Response to Increased $CO_2$ Levels." He further informed the API

9     task force in his presentation that, though exact temperature increases were difficult to

10    predict, the "physical facts agree on the probability of large effects 50 years away." His

11    own temperature forecast was of a 2.5 °C [4.5 °F] rise by 2035, which would likely have

12    "MAJOR ECONOMIC CONSEQUENCES," and a 5 °C [9 °F] rise by 2067, which would

13    likely produce "GLOBALLY CATASTROPHIC EFFECTS." He also suggested that,

14    despite uncertainty, "THERE IS NO LEEWAY" in the time for acting. API minutes show

15    that the task force discussed topics including "the technical implications of energy source

16    changeover," "ground rules for energy release of fuels and the cleanup of fuels as they

17    relate to $CO_2$ creation," and researching "the Market Penetration Requirements of

18    Introducing a New Energy Source into World Wide Use."[16]

19    (c)    In March 1982, an API-commissioned report showed the average increase in global

20 temperature from a doubling of atmospheric concentrations of $CO_2$ and projected, based upon

21 computer modeling, global warming of between 2 and 3.5 °C [3.6 to 6.3 °F]. The report projected

22

23

24

25

---

26 [15] E. Robinson & R.C. Robbins, Final Report, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants, SRI Project PR-6755, prepared for American Petroleum Institute, at 109-110, *available at* https://www.smokeandfumes.org/#/documents/document16.

27 [16] CO2 and Climate Task Force, Minutes of Meeting, at 1-2 & Attachment B, *available at* http://insideclimatenews.org/sites/default/files/documents/AQ-9%20Task%20Force%20Meeting%20%281980%29.pdf.

1  potentially "serious consequences for man's comfort and survival," and noted that "the height of

2  the sea level can increase considerably."[17]

3      60.    In addition to the API information, some of the Defendants produced their own

4  internal analyses of global warming. For example, newly disclosed documents demonstrate that

5  Exxon internally acknowledged in the late 1970s and early 1980s that its products posed a

6  "catastrophic" threat to the global climate, and that fossil fuel use would have to be strictly limited

7  to avoid severe harm.

8      a)    Exxon management was informed by its scientists in 1977 that there was an

9  "overwhelming[]" consensus that fossil fuels were responsible for atmospheric carbon dioxide

10  increases. The presentation summarized a warning from a recent international scientific conference

11  that "IT IS PREMATURE TO LIMIT USE OF FOSSIL FUELS BUT THEY SHOULD NOT BE

12  ENCOURAGED." The scientist warned management in a summary of his talk: "Present thinking

13  holds that man has a time window of five to ten years before the need for hard decisions regarding

14  changes in energy strategies might become critical."[18]

15      b)    In a 1979 Exxon internal memo, an Exxon scientist calculated that 80% of fossil

16  fuel reserves would need to remain in the ground and unburned to avoid greater than a doubling of

17  atmospheric carbon dioxide.[19]

18      c)    In a 1981 internal Exxon memo, a scientist and director at the Exxon Research and

19  Engineering Company warned that "it is distinctly possible" that $CO_2$ emissions "will later produce

20

21

22

23

24  [17]
    http://insideclimatenews.org/sites/default/files/documents/API%201982%20Climate%20models%20and%2
25  0CO2%20warming.pdf at 3, 5.
    [18]
26  https://insideclimatenews.org/system/files_force/documents/James%20Black%201977%20Present
    ation.pdf?download=1 at 2.
27  [19]
28  http://insideclimatenews.org/sites/default/files/documents/CO2%20and%20Fuel%20Use%20Projections.pdf
    at 3.

1  effects which will indeed be catastrophic (at least for a substantial fraction of the earth's

2  population)."[20]

3       d)     A year later, the same scientist wrote another memo to Exxon headquarters, which

4  reported on a "clear scientific consensus" that "a doubling of atmospheric $CO_2$ from its pre-

5  industrial revolution value would result in an average global temperature rise of $(3.0 \pm 1.5)$ °C [2.7

6  °F to 8.1 °F]."[21]  The clear scientific consensus was based upon computer modeling, which Exxon

7  would later attack as unreliable and uncertain in an effort to undermine public confidence in

8  climate science.[22]  The memo continued: "There is unanimous agreement in the scientific

9  community that a temperature increase of this magnitude would bring about significant changes in

10  the earth's climate, including rainfall distribution and alterations in the biosphere."

11       e)     In November 1982, an Exxon internal report to management warned that

12  "substantial climatic changes" could occur if the average global temperature rose "at least 1°C [1.8

13  °F] above [1982] levels," and that "[m]itigation of the 'greenhouse effect' would require major

14  reductions in fossil fuel combustion." The report then warns Exxon management that "there are

15  some potentially catastrophic events that must be considered," including the risk that "if the

16  Antarctic ice sheet which is anchored on land should melt, then this could cause a rise in sea level

17  on the order of 5 meters." The report includes a graph demonstrating the expected future global

18  warming from the "CO2 effect" demonstrating a sharp departure from the "[r]ange of natural

19  fluctuations." This graph is attached hereto as Exhibit 3.[23]

20       f)     By 1983, Exxon had created its own climate models, which confirmed the main

21  conclusions from the earlier memos. Starting by at least the mid-1980s, Exxon used its own

22

---

23  [20]
http://insideclimatenews.org/sites/default/files/documents/%2522Catastrophic%2522%20Effects%20Letter%20%281981%29.pdf

24  [21] Cohen memo to Natkin at 1 (Sept. 2, 1982), *available at*
25  http://insideclimatenews.org/documents/consensus-co2-impacts-1982.

  [22] *See infra* ¶ 76.

26  [23] M. B. Glaser, Memo to R.W. Cohen et al. on "CO2 Greenhouse Effect," Nov. 12, 1982, at 2, 12-
27  13, 28, *available at*
http://insideclimatenews.org/sites/default/files/documents/1982%20Exxon%20Primer%20on%20C
28  O2%20Greenhouse%20Effect.pdf.

1    climate models, and governmental ones to gauge the impact that climate change would have on its

2    own business operations and subsequently took actions to protect its own business assets based

3    upon these modeling results.

4         61.     Exxon's early research and understanding of the global warming impacts of its

5    business was not unique among Defendants. For example, at least as far back as 1970, Defendants

6    Shell and BP began funding scientific research in England to examine the possible future climate

7    changes from greenhouse gas emissions. Shell produced a film on global warming in 1991, in

8    which it admitted that there had been a "marked increase [in global temperatures] in the 1980s" and

9    that the increase "does accord with computer models based on the known atmospheric processes

10    and predicted buildup of greenhouse gases."[24] It acknowledged a "serious warning" that had been

11    "endorsed by a uniquely broad consensus of scientists" in 1990. In the film, Shell further admits

12    that by 2050 continued emissions of greenhouse gases at high levels would cause a global average

13    temperature increase of 1.5 to 4 °C (2.7 to 7.2 °F); that one meter of sea level rise was likely in the

14    next century; that "this could be disastrous;" and that there is a "possibility of change faster than at

15    any time since the end of the ice age, change too fast, perhaps, for life to adapt without severe

16    dislocation."

17

18    **VII.   DESPITE THEIR EARLY KNOWLEDGE THAT GLOBAL WARMING WAS**
       **REAL AND POSED GRAVE THREATS, DEFENDANTS PROMOTED FOSSIL FUELS**

19       **FOR PERVASIVE USE WHILE DOWNPLAYING THE REALITY AND RISKS OF**
       **GLOBAL WARMING.**

20

21         62.     Defendants have extensively promoted fossil fuel use in massive quantities through

   affirmative advertising for fossil fuels and downplaying global warming risks. First, Defendants

22    promoted massive use of fossil fuels by misleading the public about global warming by

23    emphasizing the uncertainties of climate science and through the use of paid denialist groups and

24    individuals – a striking resemblance to Big Tobacco's propaganda campaign to deceive the public

25    about the adverse health effects of smoking. Defendants' campaign inevitably encouraged fossil

26    fuel consumption at levels that were (as Defendants knew) certain to severely harm the public.

27

28    [24] https://www.youtube.com/watch?v=0VOWi8oVXmo.

1　Second, Defendants' fossil fuel promotions through frequent advertising for their fossil fuel

2　products, including promotions claiming that consumption at current and even expanded levels is

3　"responsible" or even "respectful" of the environment, have encouraged continued fossil fuel

4　consumption at massive levels that Defendants knew would harm the public.[25]

5　**A.　Defendants borrowed the Big Tobacco playbook in order to promote their products.**

6　　　63.　Notwithstanding Defendants' early knowledge of climate change, Defendants have

7　engaged in advertising and public relations campaigns intended to promote their fossil fuel

8　products by downplaying the harms and risks of global warming. Initially, the campaign tried to

9　show that global warming was not occurring. More recently, the campaign has sought to minimize

10　the risks and harms from global warming. The campaign's purpose and effect has been to help

11　Defendants continue to produce fossil fuels and sell their products on a massive scale. This

12　campaign was executed in large part by front groups funded by Defendants, either directly or

13　through API, and through statements made by Defendants directly.

14　　　64.　One front group was the Global Climate Coalition ("GCC"). The GCC operated

15　between 1989 and 2002. Its members included the API, and predecessors or subsidiaries of

16　Defendants. William O'Keefe, former president of the GCC, was also a former executive of the

17　API.

18　　　65.　The GCC spent millions of dollars on campaigns to discredit climate science,

19　including $13 million on one ad campaign alone. The GCC distributed a video to hundreds of

20　journalists which claimed that carbon dioxide emissions would increase crop production and feed

21　the hungry people of the world.

22　　　66.　However, internal GCC documents admitted that their "contrarian" climate theories

23　were unfounded. In December 1995, the GCC's Science and Technology Advisory Committee

24　("GCC-STAC"), whose members included employees of Mobil Oil Corporation (an Exxon

25　predecessor) and API, drafted a primer on the science of global warming for GCC members. The

26

27　　　[25] ConocoPhillips, the changing energy landscape, *available at*
http://www.conocophillips.com/who-we-are/our-company/spirit-values/responsibility/Pages/the-

28　changing-energy-landscape.aspx; Chevron TV ad (2009), https://www.youtube.com/watch?v=-
KyjTGMVTkA.

1  primer concluded that the GCC's contrarian theories "do not offer convincing arguments against
2  the conventional model of greenhouse gas emission-induced climate change." Due to this
3  inconvenient conclusion, at its next meeting, in January 1996, the GCC-STAC decided simply to
4  drop this seven-page section of the report. Nonetheless, for years afterward, the GCC and its
5  members continued to tout their contrarian theories about global warming, even though the GCC
6  had admitted internally these arguments were invalid.

7      67.    In February 1996, an internal GCC presentation stated that a doubling of carbon
8  dioxide levels over pre-industrial concentrations would occur by 2100 and cause "an average rate
9  of warming [that] would probably be greater than any seen in the past 10,000 years." The
10  presentation noted "potentially irreversible" impacts that could include "significant loss of life."

11      68.    Certain Defendants also funded another front group in the 1990s, the Global
12  Climate Science Communications Team ("GCSCT"). GCSCT members included Exxon, Chevron,
13  and API. A 1998 GCSCT task force memo outlined an explicit strategy to invest millions of
14  dollars to manufacture uncertainty on the issue of global warming, directly emulating a similar
15  disinformation campaign by the tobacco industry. The memo stated: *"Victory Will Be Achieved*
16  *When,"* among other things, *"Average citizens 'understand' (recognize) uncertainties in climate*
17  *science,"* public *"recognition of uncertainty becomes part of the 'conventional wisdom,'"* and the
18  *"Media 'understands' (recognizes) uncertainties in climate science."*[26] The plan stated that
19  progress would be measured by the percentage of new articles that raise questions about climate
20  change.

21      69.    Over at least the last nineteen years, Exxon in particular has paid researchers and
22  front groups to create uncertainties about basic climate change science and used denialist groups to
23  attack well-respected scientists. These were calculated business decisions by Exxon to undermine
24  climate change science and bolster production of fossil fuels.

25      70.    Between 1998 and 2014, Exxon paid millions of dollars to organizations to promote
26  disinformation on global warming. During the early- to mid-1990s, Exxon directed some of this
27  funding to Dr. Fred Seitz, Dr. Fred Singer, and/or Seitz and Singer's Science and Environmental

28
      [26] Global Climate Science Communications: Action Plan, Apr. 3, 1998.

1  Policy Project ("SEPP") in order to launch repeated attacks on mainstream climate science and

2  IPCC conclusions, even as Exxon scientists participated in the IPCC. Seitz, Singer and SEPP had

3  previously been paid by the tobacco industry to create doubt in the public mind about the hazards

4  of smoking. Seitz and Singer were not climate scientists.

5      71.    Exxon's promotion of fossil fuels also entailed the funding of denialist groups that

6  attacked well-respected scientists Dr. Benjamin Santer and Dr. Michael Mann, maligning their

7  characters and seeking to discredit their scientific conclusions with media attacks and bogus studies

8  in order to undermine the IPCC's 1995 and 2001 conclusion that human-driven global warming is

9  now occurring.

10      72.    One of Defendants' most frequently used denialists has been an aerospace engineer

11  named Wei Hock Soon. Between 2001 and 2012, various fossil fuel interests, including Exxon and

12  API, paid Soon over $1.2 million. Soon was the lead author of a 2003 article which argued that the

13  climate had not changed significantly. The article was widely promoted by other denial groups

14  funded by Exxon, including via "Tech Central Station," a website supported by Exxon. Soon

15  published other bogus "research" in 2009, attributing global warming to solar activity, for which

16  Exxon paid him $76,106. This 2009 grant was made several years after Exxon had publicly

17  committed not to fund global warming deniers.

18      73.    Until recently, API's website referred to global warming as "possible man-made

19  warming" and claimed that the human contribution is "uncertain." The API removed this

20  statement from its web site in 2016 when journalistic investigations called attention to the API's

21  misleading statements on global warming and its 1970s/1980s task force on global warming.

22      74.    In 2000, Exxon took out an advertisement on the Op-Ed page of the *New York*

23  *Times* entitled "Unsettled Science." The advertisement claimed that "scientists remain unable to

24  confirm" the proposition that "humans are causing global warming."[27] This was six years after the

25  IPCC had confirmed the causal link between planetary warming and anthropogenic greenhouse gas

26  emissions – a historic moment in climate science – and some eighteen years after Exxon itself had

27

28
---
[27] https://assets.documentcloud.org/documents/705605/xom-nyt-2000-3-23-unsettledscience.pdf.

1    admitted in a 1982 internal memoranda to corporate headquarters that there was "a clear scientific
2    consensus" that greenhouse gas emissions would cause temperatures to rise.

3        75.    On May 27, 2015, at Exxon's annual shareholder meeting, then-CEO Rex Tillerson
4    misleadingly downplayed global warming's risks by stating that climate models used to predict
5    future impacts were unreliable: "What if everything we do it turns out our models were really lousy
6    and we achieved all of our objectives and it turned out the planet behaved differently because the
7    models just weren't good enough to predict it?" But as noted above, in 1982 Exxon's scientific
8    staff stated, based upon the climate models, that there was a "clear scientific consensus" with
9    respect to the level of projected future global warming and starting shortly thereafter Exxon relied
10   upon the projections of climate models, including its own climate models, in order to protect its
11   own business assets.

12       76.    Until recently Exxon's website continued to emphasize the "uncertainty" of global
13   warming science and impacts: "current scientific understanding provides limited guidance on the
14   likelihood, magnitude, or time frame" of events like temperature extremes and sea level rise.[28]
15   Exxon's insistence on crystal ball certainty was clear misdirection, since Exxon knew that the
16   fundamentals of climate science were well settled and showed global warming to present a clear
17   and present danger.

18   **B.    Defendants' direct promotion of fossil fuels.**

19       77.    Defendants continue to promote massive fossil fuel use by the public
20   notwithstanding that global warming is happening, that global warming is primarily caused by their
21   fossil fuels, and that global warming is causing severe injuries. Defendants promote the massive
22   use of fossil fuels through advertisements lauding fossil fuels as "responsible" and "respectful" to
23   the environment, identifying fossil fuels as the only way to sustain modern standards of living, and
24   promoting sales of their fossil fuels without qualification. Defendants and/or their U.S.
25   subsidiaries are members of the API. The API also promotes the benefits of fossil fuel products on
26
27

28   [28] Formerly found at http://corporate.exxonmobil.com/en/current-issues/climate-policy/meeting-global-needs/managing-climate-change-business-risks.

behalf of Defendants and its other members. Defendants' message to consumers is that fossil fuels may continue to be burned in massive quantities without risking significant injuries.

78. Defendants bombard the public and consumers with the following advertisements, although these are a mere sliver of Defendants' extensive campaigns. Defendants' advertisements must be understood in their proper context – as following Defendants' substantial early knowledge on global warming risks and impacts, and following a decades-long campaign of misleading statements on global warming that primed the pump for massive use of their fossil fuel products.

a) Exxon's "Lights Across America" website advertisement states that natural gas is "helping dramatically reduce America's emissions"[29] even though natural gas is a fossil fuel causing widespread planetary warming and harm to coastal cities like Oakland and the use of natural gas competes with wind and solar, which have no greenhouse gas emissions.

b) In 2017, Shell's CEO promoted massive fossil fuel use by stating that the fossil fuel industry could play a "crucial role" in lifting people out of poverty.[30] A Shell website promotion states: "We are helping to meet the world's growing energy demand while limiting CO2 emissions, by delivering more cleaner-burning natural gas."[31]

c) BP touts natural gas on its website as "a vital lower carbon energy source" and as playing a "crucial role" in a transition to a lower carbon future.[32] BP promotes continued massive fossil fuel use as enabling two billion people to be lifted out of poverty.

d) Chevron's website implores the public that "we produce safe, reliable energy products for people around the world."[33] Chevron also promotes massive use of fossil fuels as the key to lifting people out of poverty: "Reliable and affordable energy is necessary for improving

---

[29] https://www.youtube.com/watch?v=tMu1CBjXfq4&list=PLIrXlHj7zayYGaExfTp_B4t6gqTtkGf9A&index=6 (at 0:46).

[30] Shell CEO speech, Mar. 9, 2017, *available at* http://www.shell.com/media/speeches-and-articles/2017/deliver-today-prepare-for-tomorrow.html.

[31] Shell United States, Transforming Natural Gas, *available at* http://www.shell.us/energy-and-innovation/transforming-natural-gas.html.

[32] http://www.bp.com/en/global/corporate/energy-economics/energy-outlook/energy-overview-the-base-case.html.

[33] Chevron, Products and Services, *available at* https://www.chevron.com/operations/products-services.

COMPLAINT FOR PUBLIC NUISANCE

1 standards of living, expanding the middle class and lifting people out of poverty. Oil and natural
2 gas will continue to fulfill a significant portion of global energy demand for decades to come –
3 even in a carbon-constrained scenario." A prior Chevron advertisement still available on the web
4 promotes Chevron fossil fuels on a massive scale by stating that "our lives demand oil."[34]

5 c) ConocoPhillips promotes its fossil fuel products by stating that it "responsibly
6 suppl[ies] the energy that powers modern life."[35] Similarly, ConocoPhillips has the following
7 advertising slogan on its website: "Providing energy to improve quality of life."[36]

8 79. Contrary to Defendants' claims that the use of massive amounts of fossil fuels is
9 required to lift people out of poverty, the IPCC has concluded: "Climate-change impacts are
10 expected to exacerbate poverty in most developing countries and create new poverty pockets in
11 countries with increasing inequality, in both developed and developing countries."[37]

12 80. Defendants BP and Exxon have also used long-term energy forecasts and similar
13 reports to promote their products under the guise of expert, objective analysis. These forecasts
14 have repeatedly sought to justify heavy reliance on fossil fuels by overstating the cost of renewable
15 energy.

16 81. Defendants' energy forecasts are aimed in substantial part at consumers and are
17 promoted to the public through their respective websites and other direct media. Exxon continues
18 to promote its annual "Outlook for Energy" reports in videos currently available on the internet.
19 But Defendants' energy "analyses" are self-serving means of promoting fossil fuels and
20 undercutting non-dangerous renewable energy and clean technologies. For example, Exxon has
21 claimed in a recent forecast that natural gas is a cheaper way to reduce carbon dioxide emissions
22 than wind or solar power while BP has claimed that solar and wind power will be more expensive

23
24 [34] Chevron TV ad (2009), *available at* https://www.youtube.com/watch?v=-KyjTGMVTkA.

25 [35] ConocoPhillips, the changing energy landscape, *available at*
http://www.conocophillips.com/who-we-are/our-company/spirit-values/responsibility/Pages/the-changing-energy-landscape.aspx.

26 [36] ConocoPhillips, Producing energy, *available at* http://www.conocophillips.com/what-we-do/producing-energy/Pages/default.aspx.

27
28 [37] IPCC, Climate Change 2014: Mitigation of Climate Change, Working Group III Contribution to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change, Summary for Policymakers at 20, *available at* https://www.ipcc.ch/pdf/assessment-report/ar5/wg3/ipcc_wg3_ar5_full.pdf.

in 2050 than natural gas or coal even though wind and solar are already cheaper than natural gas or coal in some circumstances. Exxon and BP also have understated in recent "forecasts" the expected market share of electric vehicles even as electric vehicle technology has taken off, prices have dropped and GM announced (in 2015) that it was investing billions in electric cars because the "future is electric."

82. Defendants' reports also promote their fossil fuel products by warning consumers of supposed downsides to reducing fossil fuel use and carbon dioxide emissions. For example, Exxon's most recent report claims that the costs of carbon dioxide reductions, are "ultimately borne by consumers and taxpayers."

83. These reports by BP and Exxon, and a similar one by Shell, predict massive increases in fossil fuel use over roughly the next 15 years. This is part of a larger strategy of "mak[ing] the case for the necessary role of fossil fuels," as BP's chief executive stated in a moment of candor in 2015.

## VIII. OAKLAND WILL INCUR SERIOUS CLIMATE CHANGE INJURIES THAT WILL REQUIRE BILLIONS IN EXPENDITURES TO ABATE THE GLOBAL WARMING NUISANCE.

84. According to a 2012 California governmental report, by 2050, California is projected to warm by approximately 2.7 °F above the average temperature in 2000, regardless of the level of future emissions, a rate of warming three times greater than over the last century. By 2100, California's average temperatures could increase by 8.6 °F, if not more. Oakland's average summertime high temperature is projected to increase from 72.36 °F to 79.61 °F by 2100, making Oakland's summers similar to those now experienced in Vista, CA, some 400 miles to the south. Continued production of massive amounts of fossil fuels will exacerbate global warming, increase sea level rise and result in grave harms to Oakland.

85. Global warming has caused and continues to cause accelerated sea level rise in San Francisco Bay and the adjacent ocean with severe, and potentially catastrophic, consequences for Oakland. Scientists recently concluded that coastal California is already experiencing impacts from accelerated sea level rise, including "more extensive coastal flooding during storms, periodic

1    tidal flooding, and increased coastal erosion." In the last 100 years, the California coast has

2    experienced sea level rise of 6.7 to 7.9 inches.

3         86.     Storms with their attendant surges and flooding occur on top of and superimposed

4    on sea level rise, causing storm surges to be greater, extend farther inland, and cause more

5    extensive damage – including greater inundation and flooding of public and private property in

6    Oakland. A 100-year flood event is, an event that – without global warming – normally has a 1%

7    chance of happening every year. But by 2050, a "100-year flood" in the Oakland vicinity is

8    expected to occur on average once every 2.3 years and by 2100 to occur 44 times per year – or

9    almost once per *week*. Similarly, the 500-year storm surge flood would occur 13 times per year by

10    2100. Even with lower levels of future fossil fuel production, there will be substantial increases in

11    flood frequencies in Oakland due to past and ongoing fossil fuel combustion.

12         87.     Accelerated sea level rise in California is causing and will continue to cause

13    inundation of both public and private property located within Oakland. Oakland is projected to

14    experience up to 66 inches of sea level rise by 2100, putting at risk thousands of city residents. Sea

15    level rise of even 16 inches will put at risk numerous city facilities, including schools, fire stations,

16    health care facilities, and homeless shelters located in low-lying areas of Oakland. Projected sea

17    level rise in Oakland threatens property with a total replacement cost of between $22 and $38

18    billion. The Oakland International Airport is located at only 5.6 feet above sea level and is one of

19    the four lowest-lying airports in the country. The 2014 National Climate Assessment, produced by

20    over 300 experts and the National Academy of Sciences, specifically identified Oakland's airport

21    as threatened by sea level rise; it is more than a foot lower than New York-LaGuardia, which was

22    flooded during Hurricane Sandy, a one-in-260 year event. Sea level rise and related flooding also

23    imminently threaten Oakland's sewer system. Rising sea levels imminently threaten to prevent

24    water from discharging properly from the sewer system, which will cause sewage to back up and

25    flood certain sections of the city. Oakland has already begun to feel injury from sea level rise,

26    although its most severe injuries by far are the injuries that will occur in the future if prompt action

27    is not taken to protect Oakland and its residents from rising sea levels caused by global warming.

28    The sea level rise projection is an understatement in light of a new, 2017 report that sea level is

1  likely to rise faster than projected and could reach as much as a catastrophic ten feet by the end of
2  the century.[38]

3       88.    Oakland must adapt now to ongoing sea level rise to abate ongoing damage to
4  property, facilities, and equipment, with risks of increasingly severe damage in the future. Oakland
5  is actively planning to protect itself from sea level rise because it recognizes that the ongoing
6  harms will imminently become more severe absent adaptation. The City of Oakland already is
7  taking action to adapt to accelerated sea level rise. In 2016, for example, Oakland adopted a five-
8  year Local Hazard Mitigation Plan that analyzes risks from sea level rise, identifies mitigation
9  measures to reduce those risks, and contains a five-year implementation plan. Oakland has been
10  working to identify specific infrastructure necessary for adaptation, including upgrades to sewer
11  and storm water infrastructure, protecting Oakland International Airport, and armoring Oakland's
12  coast. For example, significant flood protection infrastructure is planned for the airport, including
13  the Old Earhart Road Floodwall Improvement (estimated to cost $800,000) and improvements to
14  the existing, 4.5-mile Airport Perimeter Dike (estimated to cost $55 million). Oakland also plans
15  to complete a $2 million Sea Level Vulnerability and Assessment Improvement Plan for the Port of
16  Oakland, and it is working with the San Francisco Bay Conservation and Development
17  Commission on a regional study of sea level rise risk. The magnitude of the actions needed to
18  abate harms from sea level rise and the amount of property at risk will increase in light of the
19  rapidly accelerating sea level rise.

20       89.    Oakland is already experiencing, and working to abate, current harms caused by sea
21  level rise. But while harms to Oakland and its residents have commenced, additional far more
22  severe injuries will occur in the future if prompt action is not taken to protect Oakland and its
23  residents from rising sea levels. Indeed, the sea level rise harms inflicted on Oakland by global
24  warming are insidious partly because they are projected to continue, and to worsen, far into the
25  future. Pervasive fossil fuel combustion and greenhouse gas emissions to date will cause ongoing
26  and future harms regardless of future fossil fuel combustion or future greenhouse gas emissions.
27  Future production and use of fossil fuels will exacerbate sea level rise and require even greater

28  [38] Rising Seas in California.

1  expenditures to abate the injuries. Oakland must plan for and adapt to sea level rise future harms

2  now to ensure that abatement of ongoing and future sea level rise harms is done as efficiently and

3  effectively as possible and in order to protect human well-being and public and private property

4  before it is too late. Additionally, the significant infrastructure needed to abate global warming

5  requires long lead times for planning, financing, and implementation. Planning to abate the known

6  and projected adverse effects of global warming on Oakland and its citizens remains underway,

7  and will continue. Sea level rise impacts in the future are imminent in the context of planning for

8  and carrying out large-scale, complex infrastructure projects to protect Oakland from sea level rise.

9      90.    Sea level rise, storm surges, and flooding caused by global warming threaten not

10  only the physical infrastructure and property of Oakland and its citizens, but also the safety, lives,

11  daily way of life, sense of community, and security of Oakland residents. A severe storm surge

12  coupled with higher sea levels caused by global warming could occur at any time, potentially

13  resulting in the loss of life and extensive damage to public and private property. The risk of

14  catastrophic sea level rise harm to Oakland and its citizens will increase, just as rising sea levels

15  will continue to cause regular damage, the longer concrete action is not taken to abate the harms

16  and effects of sea level rise.

17      91.    Many of the Oakland residents who are likely to be most affected by climate change

18  are low-income and/or people of color. As the U.S. government has pointed out, people of color,

19  low-income groups, and certain immigrant groups are (e.g., because of poverty, chronic health

20  conditions, and social isolation) potentially more "vulnerable" to climate change impacts, including

21  heat waves, flooding, and degraded air quality. This is true in Oakland, where "socially

22  vulnerable" individuals such as African Americans, Hispanics and other people of color tend to

23  live at lower elevations most affected by sea level rise and higher storm surges. These populations

24  also face challenges due to the legacies of slavery, such as redlining, predatory mortgage and other

25  lending, systemic racism and discrimination in securing insurance and other assets that would

26  protect them from the consequences of global warming and the ensuing climate change. More

27  affluent residents live farther from the Bay and at higher elevations. For example, of the City of

28  Oakland population that lives on land within three vertical feet of the current local high tide line,

1  more than 70% have been categorized as having high "social vulnerability." This makes it all the
2  more imperative for the People to act now to prevent harm, as those most vulnerable have the
3  fewest resources to protect themselves.

4      92.    Building infrastructure to protect Oakland and its residents, will, upon information
5  and belief, cost billions of dollars.

6  **IX.    CAUSE OF ACTION: PUBLIC NUISANCE ON BEHALF OF THE PEOPLE**

7      93.    The People incorporate by reference the preceding paragraphs.

8      94.    The People of the State of California, acting by and through the Oakland City
9  Attorney, bring this claim seeking abatement pursuant to California public nuisance law, including
10  section 731 of the California Code of Civil Procedure, and Civil Code sections 3479, 3480, 3491,
11  and 3494.

12      95.    Defendants' production and promotion of massive quantities of fossil fuels, and
13  their promotion of those fossil fuels' pervasive use, has caused, created, assisted in the creation of,
14  contributed to, and/or maintained and continues to cause, create, assist in the creation of, contribute
15  and/or maintain to global warming-induced sea level rise, a public nuisance in Oakland.
16  Defendants, both individually and collectively, are substantial contributors to the global warming-
17  induced sea level rise and the People's attendant injuries and threatened injuries. The People's
18  injuries and threatened injuries from each Defendant's contributions to global warming are
19  indivisible injuries. Each Defendant's past and ongoing conduct is a direct and proximate cause of
20  the People's injuries and threatened injuries. Defendants each should have known that this
21  dangerous global warming with its attendant harms on coastal cities like Oakland would occur
22  before it even did occur, and each Defendant in fact did have such knowledge. Each Defendant has
23  at all relevant times been aware, and continues to be aware, that the inevitable emissions of
24  greenhouse gases from the fossil fuels it produces combines with the greenhouse gas emissions
25  from fossil fuels produced by the other Defendants, among others, to result in dangerous levels of
26  global warming with grave harms for coastal cities like Oakland. Defendants were aware of this
27  dangerous global warming, and of its attendant harms on coastal cities like Oakland, even before
28  those harms began to occur. Defendants' conduct constitutes a substantial and unreasonable

1    interference with and obstruction of public rights and property, including, *inter alia*, the public

2    rights to health, safety and welfare of Oakland residents and other citizens whose safety and lives

3    are at risk from increased storm surge flooding and whose public and private property, including

4    key infrastructure properties such as Oakland International Airport, is threatened with widespread

5    damage from global warming-induced sea level rise, greater storm surges, and flooding.

6        96.    Defendants, individually and collectively, are substantial contributors to global

7    warming and to the injuries and threatened injuries suffered by the People. Defendants have

8    caused or contributed to accelerated sea level rise from global warming, which has and will

9    continue to injure public property and land located in the City of Oakland, including Oakland

10    International Airport, through increased inundation, storm surges, and flooding, and which

11    threatens the safety and lives of Oakland residents. Defendants have inflicted and continue to

12    inflict injuries upon the People that require the People to incur extensive costs to protect public and

13    private property, including Oakland International Airport, against increased sea level rise,

14    inundation, storm surges and flooding.

15        97.    Defendants have promoted the use of fossil fuels at unsafe levels even though they

16    should have known and in fact have known for many years that global warming threatened severe

17    and even catastrophic harms to coastal cities like Oakland. Defendants promoted fossil fuels and

18    fossil fuel products for unlimited use in massive quantities with knowledge of the hazard that such

19    use would create.

20        98.    Defendants are jointly and severally liable to the People for committing a public

21    nuisance. The People seek an order of abatement requiring Defendants to fund a climate change

22    adaptation program for Oakland consisting of the building of sea walls, raising the elevation of

23    low-lying property and buildings and building such other infrastructure as is necessary for Oakland

24    to adapt to climate change.[39]

25

26

27

28    _____

[39] The People also do not seek abatement with respect to any federal land.

COMPLAINT FOR PUBLIC NUISANCE

## X.  RELIEF REQUESTED

**WHEREFORE**, the People pray for judgment and an order against each Defendant, jointly and severally, as follows:

1.     Finding Defendants BP, Chevron, ConocoPhillips, Exxon, and Shell jointly and severally liable for causing, creating, assisting in the creation, of, contributing to, and/or maintaining a public nuisance;

2.     Ordering an abatement fund remedy to be paid for by Defendants to provide for infrastructure in Oakland necessary for the People to adapt to global warming impacts such as sea level rise;

3.     Awarding attorneys' fees as permitted by law;

4.     Awarding costs and expenses as permitted by law;

5.     Awarding pre- and post-judgment interest as permitted by law; and

6.     Awarding such other relief as this Court deems just and proper.

Dated:  September 19, 2017

Respectfully submitted,

*[signature]*

BARBARA J. PARKER, City Attorney
bparker@oaklandcityattorney.org
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California
Tel. 510.238.3601
Fax 510.238.6500

*Attorney for Plaintiff*

Of Counsel:

*[Counsel Listed in Alphabetical Order]*

STEVE W. BERMAN (*pro hac vice* application to be submitted)
steve@hbsslaw.com
EMERSON HILTON (*pro hac vice* application to be submitted)
emersonh@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Ave. Suite 3300
Seattle, WA 98101
Tel. (206) 623-7292
Fax (206) 623-0594

SHANA E. SCARLETT (bar no. 217895)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Tel. (510) 725-3000
Fax (510) 725-3001

MATTHEW F. PAWA (*pro hac vice* application to be submitted)
mattp@hbsslaw.com
BENJAMIN A. KRASS (*pro hac vice* application to be submitted)
benk@hbsslaw.com
WESLEY KELMAN (*pro hac vice* application to be submitted)
wesk@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1280 Centre Street, Suite 230
Newton Centre, Massachusetts 02459
Tel.: (617) 641-9550
Fax: (617) 641-9551

*Attorneys for The People*

Exhibit 1: Map showing projected sea level rise, 48-inch scenario, West Oakland detail

Source: City of Oakland 2016-2021 Local Hazard Mitigation Plan (June 2016), p. 84

**Figure 9.1 Projected Sea-Level Rise 48-Inch scenario, West Oakland Detail**

Planning and Building Department
March 2016

**Local Hazard Mitigation Plan 2016**

Projected Sea Level Rise - 2050 Scenario, West Oakland

Exhibit 2: Map showing projected sea level rise, 48-inch scenario, East Oakland detail

Source:  City of Oakland 2016-2021 Local Hazard Mitigation Plan (June 2016), p. 85

**Figure 9.2 Projected Sea-Level Rise 48-Inch scenario, East Oakland Detail**



Legend
- Bird
- Government Building
- Hospitals
- Libraries
- Schools
- Recreation Centers
- Fire Stations (Station #)
- Police Stations
- Dams
- Areas of Inundation with 48" SLR
- City Limits

0  1,000
Feet

Source: BCDC 2015
This map is for reference purposes only.



**Local Hazard Mitigation Plan 2016**
Projected Sea Level Rise - 2050 Scenario, East Oakland

Planning and Building Department
March 2016

Exhibit 3: "Range of Global Mean Temperature From 1850 to the Present with the Projected Instantaneous Climatic Response to Increasing $CO_2$ Concentrations"

Source: M.B. Glaser, Memo for Exxon management (Nov. 12, 1982), pp. 1, 28

M. B. GLASER
Manager
Environmental Affairs Programs

Cable: ENGREXXON, N.Y.

November 12, 1982

CO$_2$ "Greenhouse" Effect

82EAP 266

TO: See Distribution List Attached

     Attached for your information and guidance is briefing material on the CO$_2$ "Greenhouse" Effect which is receiving increased attention in both the scientific and popular press as an emerging environmental issue. A brief summary is provided along with a more detailed technical review prepared by CPPD.

     The material has been given wide circulation to Exxon management and is intended to familiarize Exxon personnel with the subject. It may be used as a basis for discussing the issue with outsiders as may be appropriate. However, it should be restricted to Exxon personnel and not distributed externally.

               Very truly yours,

               M. B. GLASER

MBG:rva

Attachments

H. N. WEINBERG

NOV 1 5 1982

## Figure 9

Range of Global Mean Temperature From 1850 to the Present
with the Projected Instantaneous Climatic Response to
Increasing $CO_2$ Concentrations.



FILED BY FAX
ALAMEDA COUNTY

September 19, 2017

CLERK OF
THE SUPERIOR COURT
By Burt Moskaira, Deputy

CASE NUMBER:

RG17875889

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* |
|---|
| Barbara J. Parker, City Attorney for City of Oakland, SBN 069722 <br> Maria Bee, SBN 167716 <br> Erin Bernstein, SBN 231539 <br> City Hall, One Frank H. Ogawa Plaza, 6th Floor, Oakland CA 94612 |

TELEPHONE NO: 510-238-3601    FAX NO: 510-238-6500

ATTORNEY FOR *(Name):* People of the State of California

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland, California 94612
BRANCH NAME: René C. Davidson Courthouse - Civil Division

CASE NAME:
People of the State of California v. BP p.l.c. et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder <br> Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: <br> DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[✓] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties    d. [✓] Large number of witnesses
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [✓] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision
         ABATEMENT FUND
3. Remedies sought *(check all that apply):* a. [✓] monetary   b. [✓] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action *(specify):* One: public nuisance on behalf of the people of the State of California
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 19, 2017
Barbara J. Parker
*(TYPE OR PRINT NAME)*          *(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)*

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

CITY OF OAKLAND
Attn: PARKER, BARBARA J.
One Frank Ogawa Plaza, 6th Fl
Oakland, CA 94612____

BP P.L.C., a public limited company of
England and Wahles

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| The People of the State of Ca <br><br> Plaintiff/Petitioner(s) <br> VS. <br><br> BP P.L.C., a public limited <br> Defendant/Respondent(s) <br> (Abbreviated Title) | No. <u>RG17875889</u> <br><br><br> NOTICE OF HEARING |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

Case Management Conference
Complex Determination Hearing

You are hereby notified to appear at the following Court location on the date and time noted below:

Case Management Conference:
DATE: 10/31/2017   TIME: 03:00 PM   DEPARTMENT: 30
LOCATION: U.S. Post Office Building, Second Floor
          201 13th Street, Oakland

Complex Determination Hearing:
DATE: 12/05/2017   TIME: 03:00 PM   DEPARTMENT: 30
LOCATION: U.S. Post Office Building, Second Floor
          201 13th Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 30 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 268-5104. Please consult Rule 3.30(c) of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 30.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions. Case Management Statements may be filed by E-Delivery, by submitting directly to the E-Delivery Fax Number (510) 267-5732. No fee is charged for this service. For further information, go to **Direct Calendar Departments** at

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be scheduled for hearing in Department 30.

If the information contained in this notice requires change or clarification, please contact the courtroom clerk for Department 30 by e-mail at Dept.30@alameda.courts.ca.gov or by phone at (510) 268-5104.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions under Local Rule 3.90.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing (CDH) must be scheduled in the same department as that hearing.

If the information contained in this notice requires change or clarification, please call the courtroom clerk for the department where the CDH is scheduled.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling 1-888-882-6878, or faxing a service request form to 1-888-882-2946. This service is subject to charges by the vendor.

Dated: 09/20/2017            Chad Finke  Executive Officer / Clerk of the Superior Court

By            *Michelle Bank*
                                                          Digital
                                              Deputy Clerk

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 09/21/2017.

By            *Michelle Bank*
                                                          Digital
                                              Deputy Clerk

CITY OF OAKLAND
Attn: PARKER, BARBARA J.
One Frank Ogawa Plaza, 6th Fl
Oakland, CA 94612____

BP P.L.C., a public limited company of
England and Wahles

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| The People of the State of Ca | No. <u>RG17875889</u> |
| Plaintiff/Petitioner(s) | |
| VS. | |
| BP P.L.C., a public limited | **NOTICE OF HEARING** |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above entitled action has been set for:

Case Management Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Case Management Conference:
DATE: 10/31/2017    TIME: 03:00 PM    DEPARTMENT: 30
LOCATION: U.S. Post Office Building, Second Floor
201 13th Street, Oakland

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions under Local Rule 3.90.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing (CDH) must be scheduled in the same department as that hearing.

If the information contained in this notice requires change or clarification, please call the courtroom clerk for the department where the CDH is scheduled.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling 1-888-882-6878, or faxing a service request form to 1-888-882-2946. This service is subject to charges by the vendor.

Dated: 09/20/2017          Chad Finke  Executive Officer / Clerk of the Superior Court

By        *Michelle Bank*
                                             Digital
                                    Deputy Clerk

---

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 09/21/2017.

By        *Michelle Bank*
                                             Digital
                                    Deputy Clerk



# Superior Court of California, County of Alameda
# Alternative Dispute Resolution (ADR) Information Packet

The person who files a civil lawsuit (plaintiff) must include the ADR Information Packet with the complaint when serving the defendant. Cross complainants must serve the ADR Information Packet on any new parties named to the action.

---

The Court *strongly encourages* the parties to use some form of ADR before proceeding to trial. You may choose ADR by:

- Indicating your preference on Case Management Form CM-110;

- Filing the Stipulation to ADR and Delay Initial Case Management Conference for 90 Days (a local form included with the information packet); or

- Agree to ADR at your Initial Case Management Conference.

**QUESTIONS?** Call (510) 891-6055. Email adrprogram@alameda.courts.ca.gov
Or visit the court's website at http://www.alameda.courts.ca.gov/adr

---

### What Are The Advantages Of Using ADR?

- *Faster* –Litigation can take years to complete but ADR usually takes weeks or months.

- *Cheaper* – Parties can save on attorneys' fees and litigation costs.

- *More control and flexibility* – Parties choose the ADR process appropriate for their case.

- *Cooperative and less stressful* – In mediation, parties cooperate to find a mutually agreeable resolution.

- *Preserve Relationships* – A mediator can help you effectively communicate your interests and point of view to the other side. This is an important benefit when you want to preserve a relationship.

### What Is The Disadvantage Of Using ADR?

- *You may go to court anyway* – If you cannot resolve your dispute using ADR, you may still have to spend time and money resolving your lawsuit through the courts.

### What ADR Options Are Available?

- *Mediation* – A neutral person (mediator) helps the parties communicate, clarify facts, identify legal issues, explore settlement options, and agree on a solution that is acceptable to all sides.

  o **Court Mediation Program**: Mediators do not charge fees for the first two hours of mediation. If parties need more time, they must pay the mediator's regular fees.

Some mediators ask for a deposit before mediation starts which is subject to a refund for unused time.

o **Private Mediation:** This is mediation where the parties pay the mediator's regular fees and may choose a mediator outside the court's panel.

- *Arbitration* – A neutral person (arbitrator) hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial and the rules of evidence are often relaxed. Arbitration is effective when the parties want someone other than themselves to decide the outcome.

o **Judicial Arbitration Program** (non-binding): The judge can refer a case or the parties can agree to use judicial arbitration. The parties select an arbitrator from a list provided by the court. If the parties cannot agree on an arbitrator, one will be assigned by the court. There is no fee for the arbitrator. The arbitrator must send the decision (award of the arbitrator) to the court. The parties have the right to reject the award and proceed to trial.

o **Private Arbitration** (binding and non-binding) occurs when parties involved in a dispute either agree or are contractually obligated. This option takes place outside of the courts and is normally binding meaning the arbitrator's decision is final.

## Mediation Service Programs In Alameda County

Low cost mediation services are available through non-profit community organizations. Trained volunteer mediators provide these services. Contact the following organizations for more information:

**SEEDS Community Resolution Center**
2530 San Pablo Avenue, Suite A, Berkeley, CA 94702-1612
Telephone: (510) 548-2377    Website: www.seedscrc.org
Their mission is to provide mediation, facilitation, training and education programs in our diverse communities – Services that Encourage Effective Dialogue and Solution-making.

**Center for Community Dispute Settlement**
291 McLeod Street, Livermore, CA 94550
Telephone: (925) 373-1035    Website: www.trivalleymediation.com
CCDS provides services in the Tri-Valley area for all of Alameda County.

*For Victim/Offender Restorative Justice Services*
**Catholic Charities of the East Bay: Oakland**
433 Jefferson Street, Oakland, CA 94607
Telephone: (510) 768-3100    Website: www.cceb.org
Mediation sessions involve the youth, victim, and family members work toward a mutually agreeable restitution agreement.

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:       FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: | |

**SUPERIOR COURT OF CALIFORNIA, ALAMEDA COUNTY**

STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR) AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS | CASE NUMBER: |
|---|---|

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

This stipulation is effective when:

- All parties have signed and filed this stipulation with the Case Management Conference Statement at least 15 days before the initial case management conference.
- A copy of this stipulation has been received by the ADR Program Administrator, 1225 Fallon Street, Oakland, CA 94612.

1. Date complaint filed: _____. An **Initial Case Management Conference** is scheduled for:

   Date:               Time:               Department:

2. Counsel and all parties certify they have met and conferred and have selected the following ADR process (*check one*):

   ☐ Court mediation      ☐ Judicial arbitration

   ☐ Private mediation     ☐ Private arbitration

3. All parties agree to complete ADR within 90 days and certify that:

   a. No party to the case has requested a complex civil litigation determination hearing;
   b. All parties have been served and intend to submit to the jurisdiction of the court;
   c. All parties have agreed to a specific plan for sufficient discovery to make the ADR process meaningful;
   d. Copies of this stipulation and self-addressed stamped envelopes are provided for returning endorsed filed stamped copies to counsel and all parties;
   e. Case management statements are submitted with this stipulation;
   f. All parties will attend ADR conferences; and,
   g. The court will not allow more than 90 days to complete ADR.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____   ▶ _____
(TYPE OR PRINT NAME)               (SIGNATURE OF PLAINTIFF)

Date:

_____   ▶ _____
(TYPE OR PRINT NAME)               (SIGNATURE OF ATTORNEY FOR PLAINTIFF)

Form Approved for Mandatory Use<br>Superior Court of California,<br>County of Alameda<br>ALA ADR-001 [New January 1, 2010] **STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR) AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS** Cal. Rules of Court,<br>rule 3.221(a)(4)

| PLAINTIFF/PETITIONER: | CASE NUMBER.: |
|---|---|
| DEFENDANT/RESPONDENT: | |

Date:

_____     ▶ _____
(TYPE OR PRINT NAME)                      (SIGNATURE OF DEFENDANT)

Date:

_____     ▶ _____
(TYPE OR PRINT NAME)                      (SIGNATURE OF ATTORNEY FOR DEFENDANT)

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA ADR-001 [New January 1, 2010]

**STIPULATION TO ATTEND ALTERNATIVE DISPUTE RESOLUTION (ADR)
AND DELAY INITIAL CASE MANAGEMENT CONFERENCE FOR 90 DAYS**

Cal. Rules of Court,
rule 3.221(a)(4)

CITY OF OAKLAND
Attn: PARKER, BARBARA J.
One Frank Ogawa Plaza, 6th Fl
Oakland, CA 94612____

BP P.L.C., a public limited company of
England and Wahles

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| The People of the State of Ca | No. RG17875889 |
| Plaintiff/Petitioner(s) | |
| VS. | |
| | NOTICE OF HEARING (AMENDED) |
| BP P.L.C., a public limited | |
| | Case Management Conference on 10/31/2017 has been vacated and rescheduled. |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above entitled action has been set for:

Case Management Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Case Management Conference:
DATE: 10/31/2017 TIME: 03:00 PM DEPARTMENT: 23
LOCATION: Administration Building, Fourth Floor
1221 Oak Street, Oakland

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions under Local Rule 3.90.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing (CDH) must be scheduled in the same department as that hearing.

If the information contained in this notice requires change or clarification, please call the courtroom clerk for the department where the CDH is scheduled.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling 1-888-882-6878, or faxing a service request form to 1-888-882-2946. This service is subject to charges by the vendor.

Dated: 09/22/2017     Chad Finke  Executive Officer / Clerk of the Superior Court

By _____

Deputy Clerk

### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 09/25/2017.

By     Lynne Orr

Digital

_____

Deputy Clerk

CITY OF OAKLAND
Attn: PARKER, BARBARA J.
One Frank Ogawa Plaza, 6th Fl
Oakland, CA 94612____

BP P.L.C., a public limited company of
England and Wahles

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

The People of the State of Ca

Plaintiff/Petitioner(s)

VS.

BP P.L.C., a public limited

Defendant/Respondent(s)
(Abbreviated Title)

No. RG17875889

NOTICE OF HEARING (AMENDED)

Complex Determination Hearing on 12/05/2017
has been vacated and rescheduled.

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

Complex Determination Hearing

You are hereby notified to appear at the following Court location on the date and time noted below:

Complex Determination Hearing:
DATE: 12/05/2017    TIME: 03:00 PM    DEPARTMENT: 23
LOCATION: Administration Building, Fourth Floor
1221 Oak Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 23 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 267-6939. Please consult Rule 3.30(c) of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 23.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions. Case Management Statements may be filed by E-Delivery, by submitting directly to the E-Delivery Fax Number (510) 267-5732. No fee is charged for this service. For further information, go to **Direct Calendar Departments** at **http://apps.alameda.courts.ca.gov/domainweb**.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be

scheduled for hearing in Department 23.

If the information contained in this notice requires change or clarification, please contact the courtroom clerk for Department 23 by e-mail at Dept.23@alameda.courts.ca.gov or by phone at (510) 267-6939.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Dated: 09/25/2017        Chad Finke  Executive Officer / Clerk of the Superior Court

By     *Lynae Ory*
                                  Deputy Clerk

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 09/26/2017.

By     *Lynae Ory*
                                  Deputy Clerk

| | FOR COURT USE ONLY |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 217,895 <br> NAME: Shana E. Scarlett <br> FIRM NAME: Hagens Berman Sobol Shapiro LLP <br> STREET ADDRESS: 715 Hearst Avenue, Suite 202 <br> CITY: Berkeley STATE: CA ZIP CODE: 94710 <br> TELEPHONE NO.: 510 725-3000 FAX NO.: 510 725-3001 <br> E-MAIL ADDRESS: shanas@hbsslaw.com <br> ATTORNEY FOR (name): The People of the State of California | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1221 Oak Street
MAILING ADDRESS: 1225 Fallon Street
CITY AND ZIP CODE: Oakland 94612
BRANCH NAME: Rene C. Davidson Courthouse - Civil Division

Plaintiff/Petitioner: The People of the State of California

Defendant/Respondent: BP p.l.c. et al.

| | |
|---|---|
| **PROOF OF SERVICE—CIVIL** | CASE NUMBER: <br> RG17875889 |
| **Check method of service (only one):** <br> ☐ By Personal Service ☒ By Mail ☐ By Overnight Delivery <br> ☐ By Messenger Service ☐ By Fax | JUDICIAL OFFICER: <br> Seligman |
| | DEPARTMENT: <br> 23 |

**Do not use this form to show service of a summons and complaint or for electronic service.**
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   1280 Centre Street, Suite 230, Newton Centre, MA 02459

3. ☐ The fax number from which I served the documents is *(complete if service was by fax):*

4. On *(date):* September 27, 2017    I served the following **documents** *(specify):*
   Notice of hearing (amended), dated September 22, 2017
   Notice of hearing (amended), dated September 25, 2017

   ☐ The documents are listed in the *Attachment to Proof of Service–Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:
   a. Name of person served: See attached Form POS-040(P)

   b. ☒ *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

      Business or residential address where person was served:
      See attached Form POS-040(P)

   c. ☐ *(Complete if service was by fax.)*

      Fax number where person was served:

      ☐ The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*
   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

Form Approved for Optional Use <br> Judicial Council of California <br> POS-040 [Rev. February 1, 2017]

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

Code of Civil Procedure, §§ 1011, 1013, 1013a, <br> 2015.5; Cal. Rules of Court, rule 2.306 <br> www.courts.ca.gov

POS-040

| CASE NAME:<br>The People of the State of California v. BP p.l.c. et al. | CASE NUMBER:<br>RG17875889 |
|---|---|

6. b. [x] **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one):*

   (1) [x] deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

   (2) [ ] placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

   I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):*

c. [ ] **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

d. [ ] **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

e. [ ] **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: September 27, 2017

Wesley Kelman
<br>(TYPE OR PRINT NAME OF DECLARANT)

▶ *(signature)*
<br>(SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[ ] **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

<br>(NAME OF DECLARANT)

▶
<br>(SIGNATURE OF DECLARANT)

POS-040 [Rev. February 1, 2017]     **PROOF OF SERVICE—CIVIL**<br>**(Proof of Service)**     Page 2 of 3

POS-040(P)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| The People of the State of California v. BP p.l.c. et al. | RG17875889 |

## ATTACHMENT TO PROOF OF SERVICE—CIVIL (PERSONS SERVED)
*(This attachment is for use with form POS-040.)*
### NAMES, ADDRESSES, AND OTHER APPLICABLE INFORMATION ABOUT PERSONS SERVED:

| Name of Person Served | Where Served |
|---|---|
| *(If the person served is an attorney, the party or parties represented should also be stated.)* | *(Provide business or residential address where service was made by personal service, mail, overnight delivery, or messenger service. For service by fax, provide fax number.)* |
| Chevron Corporation | 2710 Gateway Oaks Drive, Suite 150N, Sacramento CA 95833 |
| ConocoPhillips Company | 2710 Gateway Oaks Drive, Suite 150N, Sacramento CA 95833 |
| Exxon Mobil Corporation | 2710 Gateway Oaks Drive, Suite 150N, Sacramento CA 95833 |
| BP America Inc., general manager for BP p.l.c. | 818 West 7th Street, Suite 930 Los Angeles CA 90017 |
| Shell Oil Company, general manager for Royal Dutch Shell PLC | 818 West 7th Street, Suite 930 Los Angeles CA 90017 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Form Approved for Optional Use
Judicial Council of California
POS-040(P) [Rev. February 1, 2017]

**ATTACHMENT TO PROOF OF SERVICE—CIVIL (PERSONS SERVED)**
**(Proof of Service)**

Page____ of ____

CEB®
www.ceb.com
www.courts.ca.gov