# EXHIBIT H

UNIT PLAN CONTRACT

BETWEEN

NAVY DEPARTMENT AND STANDARD OIL COMPANY OF CALIFORNIA

RELATING TO
NAVAL PETROLEUM RESERVE NO. 1 (ELK HILLS)

JUNE 19, 1944

# UNIT PLAN CONTRACT

This contract made and entered into this 19th day of June, 1944, by and between the United States of America, acting herein by and through the Secretary of the Navy, (hereinafter referred to as "Navy"), and Standard Oil Company of California, a corporation organized and existing under the laws of the State of Delaware, (hereinafter referred to as "Standard"),

**WITNESSETH:**

## Recitals

(1) This contract covers and relates to all of the lands lying within the boundaries of Naval Petroleum Reserve No. 1, located in Kern County, California, (hereinafter referred to as the "Reserve"), comprising 45,815 acres, more or less, and indicated by the area embraced within the heavy black line on the map attached hereto, marked Exhibit "A" and hereby made a part hereof.

(2) Standard owns lands and interests in lands lying within the boundaries of the Reserve, as follows:

    (a) It is the owner in fee simple of the following described lands, comprising 8297.6 acres:

All of Section Thirteen (13), Township Thirty (30) South, Range Twenty-Three (23) East , M.D.B.& M.

Northwest Quarter (NW¼) of Section Seventeen (17), Township Thirty (30) South, Range Twenty-Three (23) East, M.D.B.& M.

Northwest Quarter (NW¼) of Section Nineteen (19), Township Thirty (30) South, Range Twenty-Three (23) East, M.D.B.& M.

South Half (S½) of Section Thirteen (13), Township Thirty-One (31) South, Range Twenty-Three (23) East, M.D.B.& M.

All of Section Seventeen (17), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Nineteen (19), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Twenty-One (21), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Twenty-Five (25), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Twenty-Seven (27), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Twenty-Nine (29), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Thirty-One (31), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Thirty-Three (33), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

A62922

All of Section Thirty-Five (35), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

All of Section Thirty-Six (36), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

Northwest Quarter (NW$\frac{1}{4}$) of the Northwest Quarter (NW$\frac{1}{4}$) of Section Twenty-Three (23), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

South half (S$\frac{1}{2}$) of the Northwest Quarter (NW$\frac{1}{4}$) of Section Twenty-Three (23), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

Southwest Quarter (SW$\frac{1}{4}$) of the Northeast Quarter (NE$\frac{1}{4}$) of Section Twenty-Three (23), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

South half (S$\frac{1}{2}$) of Section Twenty-Three (23), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M.

Southwest Quarter (SW$\frac{1}{4}$) of the Southwest Quarter (SW$\frac{1}{4}$) of Section Twenty-Four (24), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.& M., (according to the Official Plat of the survey of the said land returned to the General Land Office by the Surveyor General), EXCEPTING THEREFROM, that portion thereof conveyed to Elk Hills School District by deed recorded November 20, 1933 in Book 411, Page 312 of Official Records of Kern County, California, described as follows: Commencing at a point in the East line of the Southwest Quarter (SW$\frac{1}{4}$) of the Southwest Quarter (SW$\frac{1}{4}$) of said Section Twenty-Four (24) which point is distant three hundred thirty feet (330') North of the Southeast corner of said Southwest Quarter (SW$\frac{1}{4}$) of the Southwest Quarter (SW$\frac{1}{4}$) of said Section; running thence North along said East line a distance of six hundred sixty feet (660'); thence at right angles West, a distance of six hundred sixty feet (660'); thence at right angles South, a distance of six hundred sixty feet (660'); thence at right angles East, a distance of six hundred sixty feet (660') to the point of beginning; Also, EXCEPTING THEREFROM, all oil and gas in said lands as reserved in that certain United States of America Land Patent Number 692254 dated the first day of July 1919, being Land Office Serial Number Visalia 07529.

All that portion of the Southwest Quarter (SW$\frac{1}{4}$) of the Southeast Quarter (SE$\frac{1}{4}$) of Section Twenty-Four (24), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., (according to the Official map of the survey of said land returned to the General Land Office by the Surveyor General), lying South and West of the so-called "Outlet Canal" as same existed on June 14, 1932, date of the deed of said land from Commercial Land Company, a corporation to Kern Investment Company, a corporation, recorded June 14, 1932 in Book 446, Page 63 of Official Records of Kern County, California; EXCEPTING THEREFROM, that portion thereof lying within the townsite of Tupman as shown by map of said townsite, recorded September 2, 1923 in Book 3, Page 94 of Maps in the Office of the County Recorder; ALSO EXCEPTING a parcel of land one hundred feet (100') by one hundred fifty feet (150') comprising 0.34 acres more or less, particularly described as beginning at the Northwest corner of the Southwest Quarter (SW$\frac{1}{4}$) of the Southeast Quarter (SE$\frac{1}{4}$) of said Section, and running thence North 89°54' East along the North line of the Southwest

Quarter (SW 1/4) of the Southeast Quarter (SE 1/4) of said Section Two Hundred Forty feet (240'); thence South 51° 36' East one hundred fifty feet (150') to the true point of beginning of said excepted parcel; thence South 38° 24' West one hundred feet (100'); thence South 51° 36' East One Hundred Fifty feet (150'); thence North 38° 24' East one hundred feet (100'); thence North 51° 36' West one hundred fifty feet (150') to the true point of beginning; also, EXCEPTING THEREFROM all oil and gas in said lands as reserved in Patent from the United States of America dated June 29, 1923 recorded July 16, 1923 in Book 21, Page 445 of Patents; AND SUBJECT to right-of-way for pipe line granted to Commercial Land Company, a corporation, by deed recorded November 4, 1935 in book 625, Page 236 of Official Records of Kern County, California.

Southwest Quarter (SW 1/4) of Section 7, Township Thirty-One South (31), Range Twenty-Four (24) East, M.D.B.&M.

(b) It is the owner of oil and gas leasehold interests in the West Half (W½) of Section 31, Township 30 South, Range 25 East, M.D.B.&M., comprising 335.6 acres, under two certain oil and gas leases dated March 10, 1920, and September 16, 1941, respectively, from Kern County Land Company, as lessor, to Standard, as lessee.

The above described fee lands, and Standard's leasehold interest under the aforementioned oil and gas lease, dated March 10, 1920, from Kern County Land Company, are hereinafter collectively referred to as "Standard's lands."

(3) Navy owns the full right, title and interest in and to all of the remaining lands in the Reserve, with the following exceptions and subject to the following outstanding interests:

(a) West Half (W½) of Section Thirty-One (31), Township Thirty (30) South, Range Twenty-Five (25) East, M.D.B.&M., comprising 335.6 acres, owned in fee by Kern County Land Company and subject to two certain oil and gas leases dated March 10, 1920 and September 16, 1941, respectively, to Standard, as lessee.

(b) Southwest Quarter (SW 1/4) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sec. 019525, to Union Oil Company, as lessee.

South Half (S½) of the Northeast Quarter (NE¼) of the Southeast Quarter (SE¼), West Half (W½) of the Southeast Quarter (SE¼), and Southeast Quarter (SE¼) of the Southeast Quarter (SE¼) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sec. 019527, to B.&M. Oil Company, as lessee.

Northwest Quarter (NW 1/4) of Section Six (6), Township Thirty-One (31) South, Range Twenty-Five (25) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sec. 019516, to Richfield Oil Corporation, as lessee.

(c) East Half (E½) of the East Half (E½), Northwest Quarter (NW 1/4) of the Northeast Quarter (NE 1/4), and Southwest Quarter (SW 1/4) of the Southeast Quarter (SE 1/4) of Section Twenty-Two (22), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sec. 019265, to Exeter Oil Company, as lessee.

South Half (S½) of the Northwest Quarter (NW 1/4), and Northwest Quarter (NW 1/4) of the Northwest Quarter (NW 1/4) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sec. 019569, to Gibson Oil Company, as lessee.

North Half (N½) of the Northeast Quarter (NE 1/4) of the Southeast Quarter (SE 1/4) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. C20998, to F. O. Manser, as lessee.

West Half (W½) of the West Half (W½), and Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section Twenty-Two (22), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019264, to Pacific Western Oil Company, as lessee.

Southwest Quarter (SW 1/4) of Section Six (6), Township Thirty-One (31) South, Range Twenty-Five (25) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sec. 019491, to Richfield Oil Corporation, as lessee.

Northeast Quarter (NE 1/4) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019654, to Transport Oil Company, as lessee.

Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section Twenty-Six (26), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., owned in fee by the United States of America and subject to a certain oil and gas lease, numbered Sac. 019459, to Transport Oil Company, as lessee.

South Half (S½) of the Southwest Quarter (SW 1/4), and Southwest Quarter (SW 1/4) of the Southeast Quarter (SE 1/4) of Section Twenty-Four (24), Township Thirty (30) South, Range Twenty-Four (24) East, M.D.B.&M., the mineral rights to which are owned by the United States of America subject to a certain oil and gas lease, numbered Sac. C31888, to Mary C. Hagood, as lessee.

The lands, leases, and interests in land referred to in this paragraph (3), including the interest now owned by Kern County Land Company in the above described 338.6-acre tract under the aforementioned oil and gas lease, dated March 10, 1920, to Standard, and any interests in lands in the Reserve acquired by Navy, are hereinafter collectively referred to as "Navy's lands."

(4)  Standard is presently operating the lands of Navy and Standard in the Reserve under an agreement, dated September 8, 1943, between Navy and Standard entitled "Reacissicn and Temporary Operating Agreement," as extended by agreements respectively dated December 8, 1943, March 7, 1944, and June 5, 1944, which rescinded an earlier agreement, dated November 20, 1942, between Navy and Standard relating to the Reserve.

(5)  Certain of the lands of Navy and Standard, respectively, have heretofore been developed in varying degrees. Petroleum engineers and geologists representing Navy and Standard, respectively, have prepared an engineering report, dated September 28, 1942, pertaining to the subsurface conditions underlying a portion of the lands in the Reserve. Such report is entitled "Revised Estimate of Commercially Productive Acre Feet of Formation Proved Zones Elk Hills by United States Navy and Standard Oil Company of California Representatives," (hereinafter referred to as the "Engineering Report"), and is incorporated herein by reference.

(6)  The following considerations have led Navy and Standard to conclude that the most desirable and effective means of protecting the Reserve and of assuring the maximum ultimate recovery of oil, gas, natural gasoline and associated hydrocarbons from the Reserve is to develop and operate all lands in the Reserve as a unit:

(a)  The Reserve is a part of a single geologic structure; and the practice of offset drilling has not proved to be an effective means of assuring to Navy its proper share of oil produced from the Reserve and does not conserve Navy's oil in the ground.

(b)  The independent development and operation of privately-owned lands in the Reserve, from which oil may be freely produced without control or restraint by Navy, would constitute a grave threat to the security of the Reserve and would impair Navy's power to conserve oil in the ground.

-4-

(a) Navy deems it inadvisable to shut in the wells on Navy's lands forthwith in view of possible permanent damage to the wells or to the national interest in the ultimate economical production of oil therefrom, and in view of the probable drainage of oil from Navy's lands in the event lands not controlled by Navy are developed and operated without simultaneous protective development and operation of Navy's lands.

(d) The unit plan of development and operation as set out herein will:

    (i)    Afford Navy a means of acquiring complete control over the development of the entire Reserve and the production of oil therefrom in order that Navy may protect the Reserve and conserve in the ground all of Navy's share of the oil in the Reserve as well as a substantial portion of Standard's share of oil in the Reserve.

    (ii)    Make available to Standard a limited quantity of oil from one of its most important sources at a time when it is needed by Standard to meet its war requirements for refined petroleum products in the West Coast area.

    (iii)    Place the Reserve in a condition of readiness whereby it will be able promptly to produce oil in substantial quantities whenever the strategic situation of the United States in the future may so require.

    (iv)    Result in the eventual receipt by Navy and Standard, respectively, from the various commercially productive zones underlying the Reserve of the quantities of recoverable oil, gas, natural gasoline and associated hydrocarbons underlying their respective lands as of November 20, 1942.

    (v)    Provide for the economical and efficient development and operation of the Reserve.

    (vi)    Result in securing the maximum ultimate recovery of oil, gas, natural gasoline and associated hydrocarbons from the Reserve.

(7) The authority for the Secretary of the Navy to enter into this contract for the development and operation of the Reserve as a unit is to be found in an Act of Congress approved June 4, 1920, relating to the conservation, care, custody, protection and operation of the Naval petroleum and oil shale reserves (41 Stat. 813), as amended by an Act of Congress approved June 30, 1938 (52 Stat. 1252), and as further amended by an Act of Congress approved June 17, 1944 (Public Law No. 343, 78th Congress, 2d Session).

(8) It is expressly recognized by Navy and Standard that this contract does not and cannot, in and of itself, authorize the production of any of Navy's share of the oil, gas, natural gasoline and associated hydrocarbons in the Reserve, as distinct from that portion of Standard's share hereinafter permitted to be produced and received by Standard under the terms of paragraphs (d) and (f) of Section 5. The production of the remainder of Standard's share and of all of Navy's share must, except for the purpose of protecting, conserving, maintaining, or testing the Reserve, be preceded by and based upon an authorization by joint resolution of the Congress as provided in the Act of June 4, 1920, as amended; and references hereinafter to an authorization or election by Navy to order the production of any of such oil are intended to be limited to action by the Navy within the terms of any such joint resolution. The production of that portion of Standard's share hereinafter permitted to be produced and charged to its account under paragraphs (d) and (f) of Section 5, including the oil so produced and charged from November 20, 1942 to the date of this contract, is authorized under the provision of the Act of June 4, 1920, as amended, directing the use and operation of the Reserve for its protection, conservation, maintenance and testing; and the production and receipt of such portion by Standard is intended to, and does in fact, represent a consideration moving to Standard under the contract for its agreement hereinafter to relinquish to Navy the control over the time and rate of production from its lands. (See H. R. Report No. 1529, 78th Congress, 2d Session.)

NOW, THEREFORE, Navy and Standard, in consideration of the premises and of the mutual undertakings herein contained, do hereby agree as follows:

Section 1.  *Development and Operation of the Reserve as a Unit.*

(a) Navy's lands and Standard's lands shall be developed and operated as a unit for the protection of the Reserve and, to the extent herein provided or hereafter authorized by

Navy, for the production of oil, gas, natural gasoline and associated hydrocarbons therefrom. All operations on the Reserve shall be in accordance with the provisions of this contract.

b) The ownership interests of Navy and Standard, respectively, in the lands within the Reserve shall not, as between themselves, be regarded as changed or altered hereby in any manner, except to the extent that they are to be developed and operated as a unit for the purposes of this contract. The rights and obligations of Standard under the lease, dated March 10, 1920, from Kern County Land Company, referred to in sub-paragraph (b) of paragraph (2) of the Recitals, shall, subject to the acquisition by Navy of the interest of Kern County Land Company subject to such lease, be governed by this contract.

(c) The duly authorized representatives of Navy and Standard, respectively, shall have the right to go upon the lares of the other, freely and without liability for trespass, for the purpose of carrying on the functions contemplated by this contract.

(d) Any and all wells, equipment and facilities (including gathering lines and stock tanks), owned or hereafter acquired by either Navy or Standard and located on the lands of Navy and Standard in the Reserve on November 20, 1942, shall be held for use, and may be used, by Navy or by any operator selected by Navy in the development and operation of the Reserve hereunder without charge for such use or for depreciation occasioned by such use. Any and all wells drilled on such lands after November 20, 1942, and any and all equipment and facilities acquired pursuant to this contract after November 20, 1942, shall be similarly available for use by Navy or any operator selected by Navy in the development and operation of the Reserve hereunder. The foregoing undertakings by Navy and Standard with respect to equipment and facilities shall not, however, be deemed to extend to (i) automotive, drilling or other equipment placed on the Reserve for merely temporary use or (ii) trunk pipe lines, including any branches thereof and any pump stations and telephone or telegraph poles and lines used in connection therewith.

## Section 2. *Relative Participations in Production.*

(a) The following terms and references are defined and identified as follows:

(1) "Acre-foot"

One acre, one foot thick, of oil and/or gas bearing formations which, in the opinion of the Engineering Committee, are capable of being produced in paying quantities.

(2) "Commercially productive zones"

Geologic strata beneath the surface of the earth which, in the opinion of the Engineering Committee, contain oil and/or gas bearing formations capable of producing oil or gas in paying quantities.

(3) "Engineering Committee"

A committee which shall consist of six members, two of whom shall be the members of the Operating Committee hereinafter described. The other four members shall be petroleum engineers or geologists, two of whom shall be appointed by and shall represent Navy, and two of whom shall be appointed by and shall represent Standard; each member so appointed shall have had at least ten (10) years' experience as a petroleum geologist or petroleum engineer, or if a graduate geologist or engineer, at least five (5) years' such experience. Navy and Standard shall appoint their respective representatives on the Engineering Committee within thirty (30) days after the date of this contract, and shall each have the right at any time and from time to time to remove any one or more of its representatives on such Committee and to appoint a new representative or representatives in substitution therefor.

(4) "Estimated Limiting Line of Commercial Productivity"

Surface boundary line or lines, fixed heretofore by the Engineering Report or hereafter by the Engineering Committee, which mark out the geographical surface areas underlain by the various commercially productive zones.

(b) Navy and Standard shall, subject to the further provisions of this contract, share in the oil, gas, natural gasoline and associated hydrocarbons produced from each commercially productive zone underlying the Reserve upon the basis of the percentages representing the ratio between (1) the estimated acre-feet (heretofore determined in the manner provided in the Engineering Report or hereafter determined by the Engineering Committee applying weighting factors in accordance with sound oil field engineering principles) of oil and/or gas bearing formations within the Estimated Limiting Line of Commercial Productivity for each such commercially productive zone underlying the respective lands of Navy and Standard as of November 20, 1942, and (2) the total of such estimated acre-feet within the Estimated Limiting Line of Commercial Productivity for such zone as of November 20, 1942. These percentages are initially established for each known commercially productive zone in paragraph (d) of this Section 2. Such percentages may be revised as hereinafter provided and when so revised shall be retroactive to November 20, 1942.

(c) The known commercially productive zones identified by the Engineering Report are as follows:

Dry Gas Zone:     All dry gas bearing formations above the top of the Lower Scales
                  marker bed.

Shallow Oil Zone:     All oil and gas bearing formations of Pliocene Age above the Reef
                      Ridge Shale.

Stevens Zone:     All oil and gas bearing formations of Upper Miocene Age within the
                  stratigraphic interval between the top of the Reef Ridge Shale and
                  the top of Valvulineria Californica or associated faunas of Middle
                  Miocene Age.

(d) The percentage participations of Navy and Standard in the production from the known commercially productive zones underlying the lands in the Reserve are, as set out in the Engineering Report, initially established as follows:

### Dry Gas Zone

|         |           |
|---------|-----------|
| Navy    | 77.0492 % |
| Standard | 22.9508 % |

### Shallow Oil Zone

|         |           |
|---------|-----------|
| Navy    | 63.9301 % |
| Standard | 36.0699 % |

### Stevens Zone

|         |           |
|---------|-----------|
| Navy    | 65.4517 % |
| Standard | 34.5483 % |

(e) As any other prospective zone is proved by development to be commercially productive, an Estimated Limiting Line of Commercial Productivity for such zone shall be established by the Engineering Committee and a determination made of (1) the estimated acre-feet of oil and/or gas bearing formations in such zone underlying the respective lands of Navy and Standard, and (2) the total of such estimated acre-feet within the Estimated Limiting Line of Commercial Productivity for such zone. The initial percentages of participation in production from such zone shall then be determined in accordance with the formula described a paragraph (b) of this Section 2. Such determination shall be made by the Engineering Committee after examination of all available data, provided the members of such Committee agree unanimously thereon. Such determination shall be set forth in a written report to be furnished Navy and Standard and shall be binding upon Navy and Standard. If the Engineering Committee is unable to agree unanimously upon such determination, the Secretary of the Navy shall make such determination, as hereinafter provided in Section 9.

(f) The initial or any subsequently established percentage participations in the production from any commercially productive zone underlying lands in the Reserve shall be subject to revision from time to time in the manner hereinafter set forth. Whenever Navy or Standard is of the opinion that consideration should be given to the revision of such percentages, it shall

notify the other thereof in writing. The Engineering Committee shall promptly examine and review all available data, and if the Committee finds that any one or more of the following exist:

(1) The presence, as of November 20, 1942, of commercially productive oil and/or gas bearing formations extending beyond the Estimated Limiting Line of Commercial Productivity for any zone;

(2) The absence or exhaustion, as of November 20, 1942, of commercially productive oil and/or gas bearing formations within the Estimated Limiting Line of Commercial Productivity for any zone;

(3) A variation, as of November 20, 1942, from the acre-feet of commercially productive oil and/or gas bearing formations previously estimated to be contained within the Estimated Limiting Line of Commercial Productivity for any zone;

(4) A variation, as of November 20, 1942, from the acre-feet of commercially productive oil and/or gas bearing formations previously estimated to underlie the respective lands of Navy and Standard; or

(5) Any condition, fact or circumstance which will aid in a more accurate determination of such percentages as of November 20, 1942;

said Committee shall thereupon determine, in accordance with the formula described in paragraph (b) of this Section 2, the revision, if any, to be made. Any revision unanimously agreed upon by the members of the Engineering Committee shall be set forth and explained in a written report to be furnished Navy and Standard, and such revision shall be binding upon both Navy and Standard. If the Engineering Committee is unable to agree unanimously upon any such proposed revision, the Secretary of the Navy, as hereinafter provided in Section 9, shall determine what revision, if any, shall be made.

(g) Revisions of percentage participations under this Section 2 shall be retroactive to November 20, 1942, and all necessary adjustments shall be made in future allocations of production between Navy and Standard in order to give effect to such revisions of percentage participations.

Section 3. *Control by Navy of Exploration, Prospecting, Development, and Operation of the Reserve.*

(a) Navy shall, subject to the provisions hereof, have the exclusive control over the exploration, prospecting, development, and operation of the Reserve, and Navy may, in its discretion, explore, prospect, develop, and/or operate the Reserve directly with its own personnel or it may contract for all or any part of such exploration, prospecting, development and/or operation with competent and responsible parties. Such contracts may be awarded by Navy either upon the basis of competitive bids or by direct negotiation, in its sole discretion, subject to applicable law, but Navy shall always use its best efforts to secure as economical an operation as is consistent with sound oil field engineering practices. If any such contract is awarded to Standard at any time, it shall provide for the performance of the work thereunder at the actual cost thereof to Standard. Subject to the other provisions hereof, Navy and Standard shall each be obligated to bear its respective share of all costs and expenses incurred or contracted for by Navy in the exploration, prospecting, development and operation of the Reserve as a unit under this contract.

(b) All exploration, prospecting, development, and producing operations on the Reserve shall be carried on under the supervision and direction of an Operating Committee consisting of two petroleum engineers, one of whom shall be appointed by and shall represent Navy and the other shall be appointed by and shall represent Standard. Each appointee shall have had at least ten (10) years' experience as a petroleum engineer, or if a graduate engineer, at least five (5) years' such experience. Navy and Standard shall each have the right at any time and from time to time to remove its representative on such Committee and to appoint a new representative in substitution therefor. Subject to the other provisions hereof, the Operating Committee shall perform the following functions:

(1) Determine the number of wells to be drilled on the Reserve necessary to secure and to maintain production under this contract, and the location and depth of each well.

(2) Determine the rate at which each well should be produced in accordance with sound oil field engineering practices.

(3) Inspect and supervise all exploration, prospecting, development and producing operations on the Reserve.

(4) Require the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the Reserve.

(5) Act with respect to such other matters as may be elsewhere herein provided or as may hereafter be referred to the Committee from time to time by both Navy and Standard.

## Section 4. *Control by Navy of Rate of Exploration, Prospecting, Development, and Production.*

(a) Except as otherwise limited or provided in this contract, and subject always to the limitations described above in paragraph (8) of the Recitals, Navy shall have full and absolute power to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires.

(b) Until Standard shall have received from its share of production from the Shallow Oil Zone the quantity of oil it is permitted to receive under the provisions of paragraph (d) of Section 5, the Reserve shall be developed and operated in such manner and to such extent as will, so far as practicable, permit production from the Shallow Oil Zone to be maintained at a rate sufficient to produce therefrom not less than 15,000 barrels of oil per day, averaged over each quarterly period, or such lesser amount as may be fixed by the Secretary of the Navy under the terms of paragraph (d) of Section 5. Navy may, however, at any time and at its election, increase such rate of production. After Standard shall have received the quantity of production permitted to be received by it under the provisions of paragraph (d) of Section 5, production from the Shallow Oil Zone shall be maintained at a rate no greater than that required to insure the delivery to Standard of the quantity of oil which Standard is permitted, under the provisions of paragraph (f) of Section 5, to receive from the Reserve, unless Navy determines to increase such rate of production.

c) The drilling of wells hereafter for exploratory purposes shall be governed by the following provisions of this paragraph:

(1) Either Navy or Standard may at any time advise the Engineering Committee of its desire to have an exploratory well drilled at a given location for the purpose of securing additional data for possible revision of the percentage participations of Navy and Standard (then obtaining under Section 2) in the production from any established commercially productive zone or zones in the Reserve. If the Engineering Committee unanimously determines that such well should be drilled for such purpose, then such well shall be drilled and the cost of drilling and equipping such well shall be borne by Navy and Standard in proportion to their percentage participations (then obtaining under Section 2) applicable to the zone to which such well is drilled. In the event of the failure of the Engineering Committee to reach such a unanimous determination, the matter shall be referred to the Secretary of the Navy for determination in the manner hereinafter provided in paragraph (b) of Section 9. If the Secretary determines that such well shall be drilled for such purpose, the cost of drilling and equipping such well shall be borne by Navy and Standard in proportion to their percentage participations (then obtaining under Section 2) applicable to the zone to which such well is drilled. If upon such reference the Secretary determines that such well should not be drilled for such purpose, or if the Engineering Committee shall in the first instance unanimously make the same determination, the party proposing the drilling of such well shall, notwithstanding such determination, be entitled to have such well drilled but the cost of drilling and equipping such well shall be borne solely by such party.

(2) If either Navy or Standard desires at any time to have an exploratory well drilled for the purpose of establishing the existence of any additional commercially productive zone in the Reserve, it shall so advise the other party. If Navy and Standard agree that

such well shall be drilled, fifty percent (50%) of the cost of drilling and equipping such well shall initially be paid by Navy and fifty percent (50%) by Standard. If such well establishes the existence of a commercially productive zone, a subsequent adjustment of such initial equal division of cost shall be made between Navy and Standard on the basis of their respective percentage participations in the production from such additional zone when such percentages are initially determined pursuant to paragraph (e) of Section 2. If Navy and Standard do not agree upon the drilling of such well, then the party desiring to drill such well shall be entitled to have such well drilled but at its sole cost and expense.

(3) The production taken from any exploratory well drilled pursuant to this paragraph (c) shall, irrespective of the manner in which the costs of initially drilling and equipping such well are borne by Navy and/or Standard under the foregoing sub-paragraphs (1) and (2), be allocated between Navy and Standard as provided hereinafter in Section 5 with respect to production from the zone to which such well is drilled.

## Section 5. *Allocation of Production.*

(a) Standard shall be charged with the quantity of production which it shall have received from the Shallow Oil Zone underlying the Reserve (whether produced from Navy's lands or Standard's lands) during the period from November 20, 1942 to the date of this contract. Such quantity shall be retained by Standard and charged against Standard's interest in the total production from such zone. Standard shall, notwithstanding any provision of the Rescission and Temporary Operating Agreement, dated September 8, 1943, as extended, be under no obligation to account to Navy for that portion of such production which came from Navy's lands.

(b) Standard shall account in cash to Navy for Navy's share (based upon Navy's percentage participations then obtaining under Section 2) of all production which Standard shall have received from the Dry Gas Zone and from the Stevens Zone during the period from November 20, 1942 to the date of this contract, and such total production from each such zone shall be charged against the respective interests of Navy and Standard in the total production from such zone.

(c) All production from any of the tracts of land referred to in sub-paragraphs (b) and (c) of paragraph (5) of the Recitals, but which are not now owned or controlled by Navy (although included in the calculation of Navy's percentage participations set forth in paragraph (d) of Section 2), during the period from November 20, 1942 to the date upon which Navy shall acquire or otherwise gain control of any such tract, shall be charged against Navy's interest, as of November 20, 1942, in the total production from the zone or zones from which such production came.

(d) Standard shall be permitted to receive from production from the Shallow Oil Zone after the date of this contract 15,000 barrels of oil per day, averaged over each calendar quarterly period, together with associated hydrocarbons, or such lesser quantity as the Secretary of the Navy in his absolute discretion (provided that he is not then causing petroleum to be produced pursuant to a joint resolution of Congress) may, after not less than 90 days' written notice to Standard, fix as the average daily quantity which Standard will thereafter be permitted to receive under this paragraph (d), until either

(1) such time as the Secretary of the Navy in his absolute discretion (provided that he is not then causing petroleum to be produced pursuant to a joint resolution of Congress) may, after not less than 90 days' written notice to Standard, suspend such production; or

(2) the total quantity of oil received by Standard from production from the Shallow Oil Zone from and after November 20, 1942 equals 25,000,000 barrels of oil, together with associated hydrocarbons; or

(3) the total quantity of oil received by Standard from production from the Shallow Oil Zone from and after November 20, 1942 equals one-third (1/3) of Standard's share of the estimated recoverable oil, determined by the Engineering Committee, within the Estimated Limiting Line of Commercial Productivity for the Shallow Oil Zone, as of November 20, 1942;

whichever of said events shall first occur. The period of time during which Standard is, permitted to receive production from the Shallow Oil Zone under this paragraph (d) is hereinafter sometimes referred to as the "primary period." All oil so received by Standard during the primary period shall be charged against Standard's interest in the total production from the Shallow Oil Zone. The Engineering Committee shall convene within thirty (30) days after the date of this contract for the purpose of determining, as provided in subparagraph (5) of this paragraph (d), the estimated recoverable oil within the Estimated Limiting Line of Commercial Productivity for the Shallow Oil Zone as of November 20, 1942. Such determination shall be completed, or notification of disagreement given as provided in paragraph (b) of Section 9, not later than six (6) months after the date of this contract. Consideration shall be given by the Engineering Committee to the revision of such determination whenever, in the opinion of either Navy or Standard and upon notice in writing to the other, developments in the field warrant such re-examination.

(e) If, during the primary period, Navy shall elect to require production from the Shallow Oil Zone at a rate in excess of the average daily quantity which Standard is permitted to receive under the provisions of paragraph (d) of this Section 5, Navy shall take all of such excess production until such time as the total quantity of production received by Navy from the Shallow Oil Zone, together with any production charged to Navy's interest in the production from such zone under the provisions of paragraph (e) of this Section 5, shall equal Navy's share (based upon the percentage participations then obtaining under Section 2) of all production from the Shallow Oil Zone from and after November 20, 1942. Thereafter, all production from the Shallow Oil Zone shall be allocated to and received by Navy and Standard, respectively, in accordance with the percentage participations then obtaining under Section 2 applicable to such zone, provided, however, that Standard's right to receive production from the Shallow Oil Zone during the primary period under paragraph (d) of this Section 5 shall not be impaired or lessened except in the manner and on the conditions provided in such paragraph (d). All production received by Navy and Standard, respectively, under this paragraph (e) shall be charged against their respective interests in the total production from the Shallow Oil Zone.

(f) If, at any time, Navy shall elect (see paragraph (8) of the Recitals) to suspend or to reduce production from the Reserve, Standard shall nevertheless, subject to the other provisions of this paragraph (f), be permitted to receive a daily quantity of production from the Reserve, the value of which, averaged over each quarterly period, shall equal the sum of (1) Standard's share of the current expenses of protecting, conserving, testing, and maintaining the Reserve in good oil-field condition, and (2) the real and personal taxes levied or assessed against Standard's lands and equipment and/or its rights and interests under this contract. In determining the quantity of such production, the value of crude oil and natural gasoline shall be measured by the average posted market price offered and paid for crude oil and natural gasoline of similar gravity, quality and grade in Kern County, California by the major oil purchasing companies, excluding Standard, at the time such crude oil and natural gasoline are run, (the price so used to be in no event less than Standard's posted price), and the value of dry gas shall be measured by the average price per thousand cubic feet paid in Kern County, California by gas purchasing companies, or the highest price paid to Standard by such companies for gas produced from the Reserve, whichever is higher at the time such gas is run. The production to be received by Standard under this paragraph (f) shall be taken from such zone or zones as may be determined from time to time by Navy, and, all such production shall be charged against Standard's interest in the total production from the zone from which produced. If the total quantity of production received by Standard under this paragraph (f) from any zone, together with the quantity theretofore received by Standard from such zone from and after November 20, 1942, shall at any time equal one-third (1/3) of Standard's share of the estimated recoverable oil, determined by the Engineering Committee, within the Estimated Limiting Line of Commercial Productivity for such zone, as of November 20, 1942, then Standard shall not be permitted to receive any further production from such zone under this paragraph (f). In such event Standard shall be permitted to receive production under this paragraph (f) from any other zone or zones (to be determined by Navy), provided that Standard shall not be permitted to receive production under this paragraph (f) from any such other zone at any time when the total quantity of oil received by Standard therefrom since November 20, 1942 shall equal one-third (1/3) of its share of the estimated recoverable oil, determined by the Engineering Committee, within the Estimated Limiting Line of Commercial Productivity for such zone, as of November 20, 1942.

(g) If, during the primary period, Navy shall elect to permit production from any zone other than the Shallow Oil Zone, or if, after the expiration of the primary period, Navy shall elect to permit production from the Reserve in excess of the production which Standard may then be receiving under the provisions of paragraph (f) of this Section 5, then and in either such event Navy and Standard, respectively, shall take and share in such production from the respective zones as follows:

Standard shall take and receive only one-third (1/3) of what its percentage participations in the production from the respective zone would have been if the quantities of oil received by Navy and Standard, respectively, from such zone were in balance with the percentage participations (then obtaining under Section 2) in the total production from such zone, and Navy shall take and receive the remainder of the production from such zone until such time as such allocations have had the effect of bringing the quantities of oil received by Navy and Standard, respectively, from the respective zones from and after November 20, 1942, (including any production charged to Navy's interest in production from the respective zones under the provisions of paragraph (c) of this Section 5), into balance with their respective percentage participations (then obtaining under Section 2) in the total production from such respective zones. Thereafter, subject always to the provisions of paragraph (f) of this Section 5, all production from each zone shall be allocated to and received by Navy and Standard, respectively, in accordance with the percentage participations then obtaining under Section 2 applicable to such zone. The quantities of production received by Navy and Standard, respectively, from the respective zones under this paragraph (g) shall be charged against their respective interests in the total production from such respective zones.

(h) Neither Navy nor Standard shall be permitted ultimately to receive, so far as is feasible, a proportion of the total production withdrawn from any zone in excess of its percentage participation in such zone. If, however, at the time when any zone shall become exhausted or substantially so, the quantities of production received by Navy and Standard, respectively, from such zone shall not, for any reason, be in balance with their respective percentage participations (then obtaining under Section 2) in the total production from such zone, then an adjustment shall be made in future allocations of production from other zones in order to bring such quantities into balance. If, on the termination of this contract under paragraph (a) of Section 11, the quantities of production received by Navy and Standard, respectively, from all zones shall not be in balance with their respective percentage participations (then obtaining under Section 2) in the total production from all zones, an appropriate cash adjustment shall be made.

Section 6. *Costs of Exploration, Prospecting, Development and Operation.*

(a) Ultimate Sharing of Costs. The costs of exploring, prospecting, developing and operating the Reserve, incurred by Navy and/or Standard (including any costs which Navy may hereafter incur, directly or indirectly, by reason and in respect of the development of "Navy's lands", as defined in subparagraphs (a),(b) and (c) of paragraph (3) of the Recitals, by Navy's predecessors in title, after November 20, 1942 and prior to acquisition by Navy) from and after November 20, 1942 and throughout the life of this contract with respect to each zone underlying the Reserve, and, in the case of the Stevens Zone, certain additional exploratory, prospecting and development costs incurred prior to November 20, 1942, as shown on Exhibit B annexed hereto and hereby made a part hereof, and which disclosed the existence of commercial production in the Stevens Zone, shall be borne ultimately by Navy and Standard in accordance with their respective percentage participations under Section 2 of this contract in the total production from such zone, except as otherwise provided in paragraph (c) of Section 4 with respect to exploratory wells. The cost to Navy or Standard of any and all wells, equipment and facilities (including gathering lines and stock tanks), owned or hereafter acquired by either Navy or Standard and located on the lands of Navy and Standard in the Reserve on November 20, 1942, shall be borne by either Navy or Standard alone, as the case may be, and shall not, with the exception of the Stevens Zone costs referred to in Exhibit B, be included within the costs to be borne ultimately by Navy and Standard under this paragraph. All taxes levied or assessed against Standard's lands and equipment and/or its rights and interests under this contract shall be borne by Standard alone and shall not be included within the costs to be borne ultimately by Navy and Standard under this paragraph.

(b) Current Payment of Costs. Subject to the ultimate sharing of responsibility as specified in paragraph (a) of this Section 6, the respective liabilities of Navy and Standard for current costs under the preceding paragraph (a) shall accrue and be paid at the times and in the manner hereinafter set forth:

(1) Navy and Standard shall each pay currently at least once each month that proportion of the total costs accruing during the period for which payment is made with respect to each zone which the quantity of production currently received by it from such zone during such period bears to the total quantity of production currently received by both Navy and Standard from such zone during such period, except in the following instances:

(i) *Additional production from the Shallow Oil Zone during the primary period.*

If, at any time during the primary period, Navy shall determine, under Section 4, to require production from the Shallow Oil Zone at a rate in excess of that permitted to be received by Standard under paragraph (d) of Section 5, and, in order to accomplish such purpose, it becomes necessary, in the opinion of the Operating Committee, to drill or recondition and to equip wells to achieve such increased rate of production, and to install tanks and other equipment to receive and handle the production at such increased rate, the cost thereof shall be currently paid by Navy at least once each quarter until such increased rate has been obtained. For this purpose the Operating Committee shall determine, as soon as practicable after the expiration of each quarter during the primary period, the proportion of the costs accruing during such period which are properly to be paid currently by Navy under the provisions of this subparagraph (i). When such increased rate of production has been attained, the cost of such development as may thereafter be needed to maintain the total production at the increased rate shall be paid by Navy and Standard as hereinbefore provided in paragraph (1) of this Section 6.

(ii) *Exploratory Wells in the Shallow Oil Zone.*

If, at any time during the primary period, there shall be drilled to the Shallow Oil Zone an exploratory well, the cost of which is (pursuant to paragraph (c) of Section 4) to be borne ultimately by Navy and Standard in the proportions of their respective percentage participations applicable to such Zone under Section 2, the costs of drilling such well and of testing it for production shall be paid currently by Navy and Standard in the same proportions; provided that, if any such well is drilled and completed when, under Section 4, Navy has not determined to require production from the Shallow Oil Zone in excess of that permitted to be received by Standard under paragraph (d) of Section 5, and if Standard elects to utilize such well for production (beyond that necessary for test purposes) in order to maintain the rate of production to which it is entitled under paragraph (d) of Section 5, Standard shall thereupon currently pay the full cost of drilling and equipping such well; and provided, further, that if any such well is drilled and completed when, under Section 4, Navy has determined to require production from the Shallow Oil Zone at a rate in excess of that permitted to be received by Standard under paragraph (d) of Section 5, but prior to the time the increased rate is attained, and if Navy elects to utilize such well for production (beyond that necessary for test purposes), the full cost of drilling and equipping such well shall be currently paid by Navy in the same manner as provided in subparagraph (i) of paragraph (b) of this Section 6.

(iii) *Exploratory Wells in the Stevens Zone.*

If, at any time, Navy shall suspend or reduce production from the Reserve as contemplated in paragraph (f) of Section 5 and shall elect to permit production from the Stevens Zone under such paragraph, and as a result thereof the quantity of production received by Standard from such zone is greater than its share (based upon the percentage participations then obtaining under Section 2) of all production from such zone from and after November 20, 1942, then, notwithstanding that Navy and Standard are not in balance in production received from such zone, the costs of drilling and equipping any exploratory wells in the Stevens Zone which, pursuant to the provisions of paragraph (c) of Section 4, are to be borne by Navy and Standard in proportion to their percentage participations (then obtaining under Section 2) applicable to such zone, shall be currently paid by Navy until such time as the total payments by Navy and Standard, respectively, of the costs of exploration, prospecting, development and operation referred to in paragraph (a) of this Section 6 with respect to such zone have been brought into balance with their respective percentage participations (then obtaining under Section 2) in the total production from such zone.

(iv)  *Development for readiness purposes.*

If, at any time during the life of this contract, Navy shall drill and equip, or cause to be drilled and equipped, wells (other than exploratory wells drilled pursuant to paragraph (c) of Section 4) for the purpose, not of immediate production, but of having productive capacity available and ready to produce in the future as Navy shall determine, the cost thereof shall be currently paid by Navy.

(v)  *Equilibrium in receipt of production.*

If, as to the Shallow Oil Zone, at any time after the primary period, and, as to any other zone, at any time during the life of this contract, the quantities of production received by, or charged to, Navy and Standard, respectively, from any zone since November 20, 1942 shall be in balance with their percentage participations (then obtaining under Section 2) in the total production from such zone, and if at such time the payments of the costs of exploration, prospecting, development and operation referred to in paragraph (a) of this Section 6 theretofore made by Navy and Standard, respectively, with respect to such zone shall not be in the same proportions as the respective quantities of production received by, or charged to, each from such zone since November 20, 1942, thereafter current payment of all costs accruing in respect of such zone, except those costs provided for in subparagraph (vi) below, shall be made by either Navy or Standard, as the case may be, in such manner and for such period of time as may be necessary to bring the total payments of such costs by Navy and Standard, respectively, into balance with their percentage participations (then obtaining under Section 2) in the total production from such zone.

(vi)  *Suspension of production by Navy.*

If, at any time, Navy shall suspend or reduce production from the Reserve as contemplated in paragraph (f) of Section 5, thereafter the costs incurred in producing the limited quantity of production provided in paragraph (f) of Section 5 shall be paid currently by Standard. All other costs of protecting, maintaining and operating the Reserve shall be currently paid by Navy (subject to appropriations by Congress) and Standard in accordance with the percentage participations then obtaining under Section 2. The Operating Committee shall determine, as soon as practicable after the expiration of each quarterly period referred to in paragraph (f) of Section 5, the proportions of the costs accruing during such period which are properly to be paid currently by Navy and Standard, respectively, under the terms of this subparagraph (vi).

(c)  The costs referred to in paragraph (a) of this Section 6 with respect to the Stevens Zone incurred prior to the date of this contract have been paid by Standard and shall, therefore, be deemed to have accrued against Standard at the time so paid; and Standard's ultimate liability for the costs referred to in said paragraph (a) in respect of the Stevens Zone shall, to that extent, be deemed to have been satisfied. It is recognized by Navy and Standard that the quantities of production received by each since November 20, 1942 from the Stevens Zone are, by reason of paragraph (b) of Section 5, in balance, as of the date of this contract, with their respective percentage participations in the Stevens Zone (initially obtaining under Section 2); and, further, that the costs so paid by Standard shall be taken into account in determining, under subparagraph (v) of paragraph (b) of this Section 6, the liability for current payment of costs in respect of the Stevens Zone incurred after the date of this contract.

(d)  This contract shall supersede the provisions of the Rescission and Temporary Operating Agreement, dated September 8, 1943, as extended, relating to the costs incurred by Standard in the development of, and operations on, Navy's lands.

Section 7.  *Disposition of Production.*

Navy (subject to applicable law) and Standard shall each have the right to take delivery, and make such disposition, of the production allocated to it hereunder as it may desire, and each party shall make prompt disposition thereof or provide its own storage over and above such storage facilities as may be available for use under the provisions of paragraph (d) of Section 1. Neither Navy nor Standard shall have any preferential right to purchase any portion of the other's share of such production.

-14-

## Section 8. *Helium.*

The right to extract helium from any gas produced from the Reserve shall belong exclusively to Navy, and Navy shall not be compelled to account to Standard in any degree for such helium as it may elect to take hereunder. Navy shall bear all costs directly attributable to the extraction of such helium.

## Section 9. *Determination of Disputes.*

(a) In the event the Operating Committee is unable to agree upon any matter arising in the performance of its functions, such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and shall be binding upon Navy and Standard.

(b) In the event the Engineering Committee is unable to agree unanimously upon any matter subject to determination by it, said Committee shall notify both Navy and Standard thereof and shall refer such matter to the Secretary of the Navy for determination. Thereupon the Secretary of the Navy on his own initiative may, and upon the request of Standard shall, submit the matter to an independent petroleum engineer, to be selected by him, for the purpose of securing an advisory report thereon from such engineer. The compensation and expenses of such engineer shall be borne by Navy and Standard in the respective percentages then obtaining under Section 2, and a copy of such report shall be supplied to Standard. After consideration of the matter, the Secretary of the Navy shall render his decision thereon and such decision in each such instance shall be final and shall be binding upon Navy and Standard.

## Section 10. *Accounting.*

Navy shall cause to be kept complete and accurate records of all matters and transactions affecting the Reserve or its development and operation hereunder, and such records shall be available at all reasonable times for inspection by Standard's accredited representatives. Navy shall, within a reasonable time after the end of each calendar month throughout the term of this contract, cause to be furnished to Standard a detailed statement of account setting forth the quantity of production from the Reserve during such month and the costs of development and operation incurred therein. The expenses incurred or contracted for by Navy under this Section 10 shall be deemed a part of the costs of operating the Reserve hereunder and, as such, shall be borne and paid by Navy and Standard under the provisions of Sections 3 and 6. All records of Standard pertaining to the exploration, prospecting, development and operation of the Reserve, either prior to or after the date of this contract, and all data obtained from wells on lands owned in fee by Standard outside the Reserve but contiguous thereto, shall be available at all reasonable times for inspection by Navy's accredited representatives.

## Section 11. *Term.*

(a) Unless sooner terminated as provided in paragraph (b) of this Section, this contract shall continue and remain in full force and effect as long as oil, gas, natural gasoline and/or associated hydrocarbons can be produced from the Reserve in paying quantities.

(b) This contract may be terminated at any time by the Secretary of the Navy in his discretion and subject to the approval of the President on six (6) months' written notice to Standard. Such termination shall be effective as of the date fixed therefor and shall not operate retroactively or to impair the rights and obligations of Navy or Standard under this contract accruing to the termination date. Termination shall be followed by an adjustment of all such rights and obligations, including the rights and obligations growing out of the costs incurred, and the respective quantities of production received, by Navy and Standard, respectively, under the contract, on a fair and equitable basis.

## Section 12. *Notices.*

All notices required or permitted to be given under this contract shall be directed to the parties as follows:

        Secretary of the Navy,
        Navy Department,
        Washington, D. C.

Standard Oil Company of California
225 Bush Street
San Francisco, California

Any such notice shall be in writing and may be personally delivered or sent by registered mail or telegraph to the party for whom intended at the address of such party as specified above. Either party may by notice given as aforesaid change its address for notices thereafter.

## Section 13. *Unlawful Interest.*

No Member or Delegate to Congress or Resident Commissioner, after his election or appointment, or either before or after he has qualified and during his continuance in office, and no officer, agent or employee of the Department of the Navy, shall be admitted to any share or part of this contract or derive any benefit that may arise therefrom but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit; and the provisions of Section 3741 of the Revised Statutes of the United States, and Sections 114, 115 and 116 of the Codification of the Penal Laws of the United States approved March 4, 1909 (35 Stat. 1109), relating to contracts, enter into and form a part of this contract so far as the same may be applicable.

## Section 14. *Covenant Against Contingent Fees.*

Standard warrants that it has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage or contingent fee. Breach of this warranty shall give Navy the right to annul this contract or, in its discretion, to deduct from any amounts which may become owing to Standard by Navy hereunder the amount of such commission, percentage, brokerage or contingent fee.

## Section 15. *Inclusion of Additional Lands.*

(a) Navy and Standard have expressly excluded from this contract Standard's leasehold interest under an oil and gas lease, dated September 16, 1941, from Kern County Land Company, covering the 335.6-acre tract owned in fee by Kern County Land Company in the W 1/2 of Section 31, T. 30 S., R. 25 E., M.D.B.&M., within the Reserve. This exclusion has resulted from uncertainty, due to the present lack of adequate information, as to whether or not the Stevens Zone underlying all or any part of such tract is part of the same Stevens Zone structure underlying the remainder of the Reserve and covered by this contract. It is contemplated by Navy and Standard that an exploratory program will be carried on, independently of this contract, to determine the relationship of these structures. If it is established that the Stevens Zone underlying all or any part of such tract is a part of the same Stevens Zone structure underlying the remainder of the Reserve, Standard's leasehold interest in the area affected will, upon the acquisition by Navy of control over the Kern County Land Company's interest in the area affected, be included within the unit operation created hereby.

(b) It is contemplated that it may hereafter be desirable to include under the terms of this contract other lands located outside of the present limits of the Reserve but which lie on the same geologic structure underlying the present limits of the Reserve. If and when any such situation shall arise, Navy and Standard will endeavor to agree upon the terms and conditions on which such additional lands may be included under this contract upon the basis of the estimated acre-feet of commercially productive formations in each commercially productive zone underlying such additional lands. If Navy and Standard shall be unable to agree upon the terms and conditions on which such additional lands may be included, the Secretary of the Navy shall decide such terms and conditions upon a fair and equitable basis, and such decision in each such instance shall be final and shall be binding upon Navy and Standard. In determining the estimated acre-feet of commercially productive formation underlying such additional lands, the Secretary shall, at Standard's request or on his own initiative, secure and consider an advisory report from an independent petroleum engineer in the manner provided in paragraph (b) of Section 9.

-16-

IN WITNESS WHEREOF, the parties hereto have executed this contract in triplicate as of the day and year first above written.

THE UNITED STATES OF AMERICA

By   /s/  JAMES FORRESTAL
          Secretary of the Navy

STANDARD OIL COMPANY OF CALIFORNIA

By   /s/  H. D. COLLIER
          President

[SEAL]

Attest:

/s/ G. M. FOSTER
Assistant Secretary

I, FRANKLIN D. ROOSEVELT, President of the United States of America, on the ___28th___ day of _June_, 1944, do hereby approve the execution of the foregoing contract by the Secretary of the Navy.

/s/   FRANKLIN D. ROOSEVELT
      President of the United States

STATE OF CALIFORNIA        }
                             } ss.

City and County of San Francisco}

On this __26th__ day of June in the year one thousand nine hundred and forty-four, before
me, __FRANK L. OWEN__ , a Notary Public in and for the City and County of San Francisco,
State of California, residing therein, duly commissioned and sworn, personally appeared
                  H. D. COLLIER 2nd
                  G. M. FOSTER                     known to me to be
              President and Assistant Secretary, respectively
of Standard Oil Company of California, the corporation described in and that executed
the within instrument, and also known to me to be the persons who executed the within
instrument on behalf of said corporation and acknowledged to me that such corporation
executed the same.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, in
the City and County of San Francisco, the day and year in this certificate first above
written.

        /s/   FRANK L. OWEN
Notary Public in and for the City and County of San Francisco, State of California.

My Commission Expires __Nov. 22, 1945__