ARNOLD & PORTER KAYE SCHOLER LLP
Jonathan W. Hughes (SBN 186829)
jonathan.hughes@arnoldporter.com
Three Embarcadero Center, 10th Floor
San Francisco, California  94111-4024
Telephone:    1 415.471.3100
Facsimile:    1 415.471.3400

ARNOLD & PORTER KAYE SCHOLER LLP
Matthew T. Heartney (SBN 123516)
matthew.heartney@arnoldporter.com
John D. Lombardo (SBN 187142)
john.lombardo@arnoldporter.com
777 South Figueroa Street, 44th Floor
Los Angeles, California  90017-5844
Telephone:    1 213.243.4000
Facsimile:    1 213.243.4199

ARNOLD & PORTER KAYE SCHOLER LLP
Philip H. Curtis (*pro hac vice*)
philip.curtis@arnoldporter.com
Nancy Milburn (*pro hac vice*)
nancy.milburn@arnoldporter.com
250 West 55th Street
New York, New York 10019-9710
Telephone:    1 212.836.8000
Facsimile:    1 212.836.8689

Attorneys for Defendant BP p.l.c.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF OAKLAND, a Municipal Corporation, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the Oakland City Attorney,<br><br>                    Plaintiffs,<br><br>          v.<br><br>BP P.L.C., a public limited company of England and Wales; CHEVRON CORPORATION, a Delaware corporation; CONOCOPHILLIPS, a Delaware corporation; EXXONMOBIL CORPORATION, a New Jersey corporation; ROYAL DUTCH SHELL PLC, a public limited company of England and Wales; and DOES 1 through 10,<br><br>                    Defendants. | First Filed Case: 3:17-cv-06011-WHA<br>Related Case: 3:17-cv-06012-WHA<br><br>Case No. 3:17-cv-06011-WHA<br><br>**DEFENDANT BP P.L.C.'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINTS FOR LACK OF PERSONAL JURISDICTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Fed. R. Civ. P. 12(b)(2)]<br><br>Date:        May 24, 2018<br>Time:        8:00 a.m.<br>Courtroom:  12<br><br>Judge:  Honorable William H. Alsup |

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the San Francisco City Attorney DENNIS J. HERRERA, | Case No. 3:17-cv-06012-WHA |
| Plaintiffs, | |
| v. | |
| BP P.L.C., a public limited company of England and Wales; CHEVRON CORPORATION, a Delaware corporation; CONOCOPHILLIPS, a Delaware corporation; EXXONMOBIL CORPORATION, a New Jersey corporation; ROYAL DUTCH SHELL PLC, a public limited company of England and Wales; and DOES 1 through 10, | |
| Defendants. | |

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ............................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 2

Introduction ......................................................................................................................... 2

Background .......................................................................................................................... 4

    A.    The Cities' Claim ............................................................................................. 4

    B.    BP p.l.c.'s Lack Of Forum Contacts ................................................................ 4

    C.    How The Cities Might Estimate BP p.l.c.'s Purported Contribution To The
          Nuisance ........................................................................................................... 6

Argument ............................................................................................................................. 9

THE AMENDED COMPLAINTS SHOULD BE DISMISSED FOR LACK OF
PERSONAL JURISDICTION OVER BP P.L.C. ................................................................. 9

    A.    BP p.l.c. Is Not "At Home" (And Thus Subject To General Jurisdiction) In
          The Forum ...................................................................................................... 11

    B.    Nor Is BP p.l.c. Subject To Specific Jurisdiction For This Claim ............................. 13

          1.    The Claim Does Not Arise out of or Relate to BP p.l.c.'s Forum
                Activities, Even Imputing All Claim-Related Activities of Indirect
                Subsidiaries to BP p.l.c. ................................................................. 13

                a.    The amended complaints do not allege BP p.l.c.'s
                    California or U.S. activities are a but-for cause of the
                    Cities' claimed injury ....................................................... 16

                b.    If the Cities rely on "attribution science," that methodology
                    likewise suggests that BP p.l.c.'s forum contacts are not a
                    but-for cause of the claimed injury ................................... 17

                c.    Permitting specific jurisdiction on the basis of these
                    tenuous links with the forum would subject BP p.l.c. to
                    jurisdiction in every state, a result that cannot be squared
                    with recent Supreme Court decisions .................................. 18

                d.    Describing the operational details of indirect subsidiaries is
                    not a substitute for pleading and proving the required but-
                    for causation ....................................................................... 19

          2.    Exercising Jurisdiction over BP p.l.c. Would Be Unreasonable ................... 21

Conclusion ........................................................................................................................ 22

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*,
5
    551 F.2d 784 (9th Cir. 1977)...................................................................................... 10

6

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
7
    874 F.3d 1064 (9th Cir. 2017)............................................................................ 10, 13

8

*BNSF Ry. Co. v. Tyrrell*,
    137 S. Ct. 1549 (2017) ............................................................................................. 12

9

*Brackett v. Hilton Hotels Corp.*,
10
    619 F. Supp. 2d 810 (N.D. Cal. 2008) ..................................................................... 13

11

*Brayton Purcell LLP v. Recordon & Recordon*,
    606 F.3d 1124 (9th Cir. 2010)................................................................................... 10

12

*Bristol-Myers Squibb Co. v. Superior Court*,
13
    137 S. Ct. 1773 (2017) ........................................................................................*passim*

14

*Burger King Corp. v. Rudzewicz*,
15
    471 U.S. 462 (1985) ................................................................................................. 21

16

*CollegeSource, Inc. v. AcademyOne, Inc.*,
    653 F.3d 1066 (9th Cir. 2011)............................................................................ 10, 11

17

*Corcoran v. CVS Health Corp.*,
18
    169 F. Supp. 3d 970 (N.D. Cal. 2016) ..................................................................... 10

19

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014) .........................................................................................*passim*
20

21

*Doe v. Am. Nat'l Red Cross*,
    112 F.3d 1048 (9th Cir. 1997)........................................................................ 13, 15, 17

22

*Doe v. Unocal Corp.*,
23
    248 F.3d 915 (9th Cir. 2001).............................................................................. 13, 14

24

*Dole Food Co. v. Watts*,
    303 F.3d 1104 (9th Cir. 2002)................................................................................... 13
25

26

*EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*,
    711 F. Supp. 2d 1074 (C.D. Cal. 2010).................................................................... 11

27

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
28
    564 U.S. 915 (2011) ............................................................................................ 11, 13

- ii -

BP P.L.C.'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR LACK
OF PERSONAL JURISDICTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
Case No. 3:17-cv-06011-WHA; Case No. 3:17-cv-06012-WHA

*Holland Am. Line Inc. v. Warstila N. Am., Inc.*,
    485 F.3d 450 (9th Cir. 2007) ................................................................................. 10, 11

*Martinez v. Aero Caribbean*,
    764 F.3d 1062 (9th Cir. 2014) .................................................................................... 12

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
    647 F.3d 1218 (9th Cir. 2011) .................................................................................... 10

*Morrill v. Scott Fin. Corp.*,
    873 F.3d 1136 (9th Cir. 2017) .................................................................................... 13

*Mulato v. Wells Fargo Bank, N.A.*,
    76 F. Supp. 3d 929 (N.D. Cal. 2014) ......................................................................... 10

*Panavision Int'l, L.P. v. Toeppen*,
    141 F.3d 1316 (9th Cir. 1998) .................................................................................... 21

*Perkins v. Benguet Consol. Mining Co.*,
    342 U.S. 437 (1952) .................................................................................................... 12

*Ranza v. Nike, Inc.*,
    793 F.3d 1059 (9th Cir. 2015) ............................................................................ 9, 10, 11

*Rashidi v. Veritiss, LLC*,
    No. 2:16-cv-04761-CAS, 2016 WL 5219448 (C.D. Cal. Sept. 19, 2016) ................... 14

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ............................................................................... 10, 13

*Sullivan v. Ford Motor Co.*,
    No. 16-cv-03505-JST, 2016 WL 6520174 (N.D. Cal. Nov. 3, 2016) ............... 14, 16, 17

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ..................................................................................... 10

*Terracom v. Valley National Bank*,
    49 F.3d 555 (9th Cir. 1995) ................................................................................. 15, 17

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ................................................................................................ 9, 21

**Statutes and Rules**

Federal Rules of Civil Procedure
    4(k)(2) ................................................................................................................... 10, 11
    12(b)(2) ......................................................................................................................... 2

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE that on May 24, 2018, at 8:00 a.m., or as soon thereafter as the

4

matter may be heard, in the United States District Court, Northern District of California, San Francisco

5

Courthouse, Courtroom 12, 19th Floor, 450 Golden Gate Avenue, San Francisco, California, before

6

the Honorable William Alsup, Defendant BP p.l.c. will and hereby does move the Court, pursuant to

7

Federal Rule of Civil Procedure 12(b)(2), to dismiss the first amended complaints filed by the City of

8

Oakland and the City and County of San Francisco ("the Cities") insofar as they relate to BP p.l.c. for

9

lack of personal jurisdiction.

10

By this Motion, BP p.l.c. seeks dismissal of all claims against it.

11

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of

12

Points and Authorities, declarations, and exhibits, the pleadings on record in this action, and any other

13

written or oral evidence or argument that may be presented at or before the time this Motion is

14

decided.

15

16

Dated:  April 19, 2018.                                  ARNOLD & PORTER KAYE SCHOLER LLP

17

18

                                                         By:   /s/ Jonathan W. Hughes
19                                                             Jonathan W. Hughes
                                                               Matthew T. Heartney
20                                                             John D. Lombardo
                                                               Philip H. Curtis
21                                                             Nancy Milburn

22                                                             Attorneys for Defendant BP p.l.c.

23

24

25

26

27

28

BP P.L.C.'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR LACK
OF PERSONAL JURISDICTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
Case No. 3:17-cv-06011-WHA; Case No. 3:17-cv-06012-WHA

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

BP p.l.c. respectfully submits this memorandum in support of its motion to dismiss the first

3

amended complaints for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2).

4

### Introduction

5

BP p.l.c. moves to dismiss for lack of personal jurisdiction. BP p.l.c. is a United Kingdom

6

parent company that is not "at home" in California or the United States and therefore cannot be

7

subjected to general jurisdiction under *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). Nor can BP

8

p.l.c. be subjected to specific jurisdiction because the Cities' claim does not "arise out of or relate to"

9

BP p.l.c.'s claim-related forum contacts—even imputing all contacts of subsidiaries to BP p.l.c.[1]—as

10

that requirement is defined in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), and

11

in controlling Ninth Circuit case law requiring that a foreign defendant's forum contacts be a "but for"

12

cause of the claim.

13

Examining the expansive contours of the Cities' claim reveals why the Cities cannot show, as

14

they must, that their claim would not exist but for BP p.l.c.'s imputed California or U.S. activities.

15

First, as the Court noted, the claim "attack[s] behavior worldwide." (Order Denying Mots. To

16

Remand at 7:10-11, ECF No. 134; *id.* at 6 n.2 (the claims "are not localized . . . and instead concern

17

fossil fuel consumption worldwide").) Indeed, the extraction, transportation, and/or burning of fossil

18

fuels has taken place at every spot on the surface of the earth and most spots under or on the oceans.

19

Second, the actors involved in the behaviors that are allegedly producing climate change and related

20

sea-level rise are equally vast in number. They include sovereign nations that own the fossil fuels and

21

decide to have them produced; private and sovereign companies that extract the fossil fuels who far

22

outnumber the five defendants the Cities have sued; transportation companies that move the raw

23

product to treatment and refining centers; and various end users (manufacturers; power plants; airlines;

24

———————————————

25

[1] The Cities have named BP p.l.c. as a proxy for various separately organized indirect subsidiary companies that now or in times past have extracted oil or natural gas from the earth. They have done so as a transparent expedient for trying to avoid the due process limitations on personal jurisdiction over those subsidiaries. While BP p.l.c. denies that its indirect subsidiaries' production of fossil fuels can properly be imputed to it for jurisdictional purposes, and reserves all rights in that regard for any other purpose or proceeding, solely for purposes of this motion it will assume that all fossil fuel production in California or the United States by any indirect subsidiary may be imputed to BP p.l.c.

26

27

28

1  federal, state, and local governments; and ordinary folks who drive cars and heat homes) who burn the

2  fossil fuels.  Third, and most critically, the fossil fuel production that the Cities would impute to BP

3  p.l.c. and that occurred in California or other U.S. states could have made, even under the Cities'

4  purported method of quantifying each defendant's individual responsibility, at most only a de minimis

5  contribution to global greenhouse gas emissions, and consequently, to the alleged public nuisance.

6      More specifically, as will be shown below, if the Cities' "attribution science" methodology[2] is

7  applied to all oil and gas produced by any indirect subsidiary of BP p.l.c. in California or the United

8  States since 1975—the earliest date the Cities allege defendants knew that burning fossil fuels would

9  cause climate change and sea-level rise—that methodology would estimate that this California

10  production contributed less than four one-hundredths of one percent (more exactly, 0.037%) and this

11  U.S. production less than thirty one-hundredths of one percent (0.287%) of the greenhouse gases

12  emitted globally from all fossil fuel and cement production and from certain other human-controlled

13  sources of greenhouse gas emissions (namely, deforestation, agriculture, livestock production, and

14  other land-use changes).  The percentages this method generates are even tinier when used to estimate

15  BP p.l.c.'s imputed California and U.S. contributions to changes in global surface temperatures and

16  sea-level rise (*i.e.*, the conditions said to be causing the nuisance).

17      Given this extraordinarily tenuous nexus, the Cities cannot show that their claimed property

18  harms would have appeared any different today in the absence of the California and U.S. activities of

19  BP p.l.c.'s indirect subsidiaries.  It is unsurprising, therefore, that even after amending their original

20  complaints in response to BP p.l.c.'s initial motion to dismiss, the Cities still do not allege the essential

21  jurisdictional fact that BP p.l.c.'s California or U.S. activities are a but-for cause of the alleged public

22  nuisances in San Francisco and Oakland.  The Court should accordingly dismiss the amended

23  complaints as against BP p.l.c. for lack of personal jurisdiction.

---

[2] To be clear, although BP p.l.c. does not challenge the attribution methodology solely for purposes of this motion, BP p.l.c. does not credit or otherwise subscribe to the methodology and, in fact, believes the analyses of Richard Heede and others discussed in detail below (*infra* pp. 6-9) are flawed for a host of reasons.  Nonetheless, because the Cities have the burden to demonstrate that their claim would not have arisen but for BP p.l.c.'s claim-related forum activities, BP p.l.c. discusses the theory and evidence that the Cities have signaled they will use to estimate BP p.l.c.'s individual contribution to the alleged nuisance, and shows why, even if the flawed method is applied to BP p.l.c.'s California and U.S. fossil fuel production, the Cities still cannot meet their burden.

1

**Background**

2

**A.**     **The Cities' Claim**

3

        The Cities allege that global warming-induced sea-level rise is threatening public and private

4

property in San Francisco and Oakland.  (FAC ¶ 1.)[3]  They call each defendant a "multinational,

5

vertically integrated oil and gas company" (*id.* ¶¶ 16, 19, 22, 25, 28) that is among the "ten largest

6

producers [of fossil fuels] in all of history" (*id.* ¶ 92).  BP p.l.c., they claim, is the fourth largest such

7

producer.  (*Id.* ¶ 94.b.)  The Cities have not named as a defendant any other fossil fuel producer

8

(including any of the other "largest cumulative producers" (*id.*)), nor other refiners, transporters, or

9

sellers.  Nor have they sued anyone for *using* (combusting) fossil fuels, which of course is what

10

releases greenhouse gases into the atmosphere.  (*Id.* ¶¶ 74, 92.)

11

        Defendants allegedly have known "since at least the late 1970s and early 1980s" that fossil

12

fuels would contribute to "dangerous global warming and associated accelerated sea level rise."

13

(*Id.* ¶¶ 2, 5.)  Fossil fuels do so, the Cities allege, by releasing "greenhouse gases, including carbon

14

dioxide ($CO_2$) and methane, which trap atmospheric heat and increase global temperatures."  (*Id.*

15

¶ 74.)  Greenhouse gases emitted when a defendant's fossil fuels are combusted "combine[]" in the

16

atmosphere "with the greenhouse gas emissions from fossil fuels produced by the other Defendants,

17

among others," and can remain for hundreds of years or longer.  (*Id.* ¶¶ 4, 140.)  Despite allegedly

18

knowing these facts, defendants continued to produce "massive amounts of fossil fuels" and to

19

promote their usage as "environmentally responsible," including by "denying mainstream climate

20

science."  (*Id.* ¶¶ 2, 5, 6.)  The allegedly "wrongful conduct" at issue in the Cities' claim "is the

21

production and promotion of fossil fuels."  (Pl.'s Reply Supp. Mot. Remand at 18, ECF No. 91.)  The

22

Cities are not suing defendants for their "direct emissions of greenhouse gases."  (FAC ¶ 11.)

23

**B.**     **BP p.l.c.'s Lack Of Forum Contacts**

24

        BP p.l.c. is a public limited company that is registered in England and Wales and

25

headquartered in London, England.  (FAC ¶ 16.)  It is the ultimate parent company for a group of

26

27

────────────────

[3] The allegations contained in the Cities' first amended complaints are materially identical, and

28

therefore, for ease of reference, all citations to "FAC" in this Motion are to the first amended
complaint filed by the City and County of San Francisco in Case No. 3:17-cv-06012-WHA.

1    separately organized companies that together comprise a global energy business.  (Decl. of Donna

2    Sanker ("Sanker Decl.") ¶ 3, filed concurrently.)  Among other activities, the direct and indirect

3    subsidiaries (for convenience, the BP group) find and produce oil and gas on land and offshore around

4    the globe; refine oil into products such as gasoline, diesel fuel, and jet fuel; and market and sell oil,

5    fuel, other refined petroleum products, and natural gas around the globe.  (*Id.*)  BP p.l.c. itself does not

6    operate in California or the United States.  (*Id.* ¶¶ 3-5.)

7          No indirect subsidiary of BP p.l.c. has owned any oil- or natural gas-producing assets in

8    California since 2000.  (*Id.* ¶ 6.)  Some indirect subsidiaries of BP p.l.c. extracted fossil fuels in

9    California between 1975 and 1999—*before* they joined the BP group of companies (namely, Atlantic

10   Richfield Company); and some extracted fossil fuels outside California for shipment into the state

11   between 1975 and 2010 (namely, BP Exploration (Alaska) Inc. and Standard Oil Company of Ohio).

12   (*Id.*)  None of these indirect subsidiaries is "at home" in California.  (*Id.* ¶ 6.a-c.)

13         In one lengthy and repetitive paragraph, the Cities list eight indirect subsidiaries of BP p.l.c.

14   that allegedly "do business," are registered to do business, and have designated agents for service of

15   process in California.  (FAC ¶ 35 (calling each an "agent" of BP p.l.c.).)  None of these subsidiaries

16   has extracted oil or natural gas in California since at least 1975, except for Atlantic Richfield (and only

17   before it joined the BP group).  (Sanker Decl. ¶ 6 n.1.)  The Cities allege, however, that "through its

18   subsidiaries," BP p.l.c. has "[c]onnections [t]o California" that have included owning or operating port

19   facilities to receive crude oil, shipping Alaskan crude oil to California, licensing the ARCO trademark

20   and brand to gasoline stations, and promoting gasoline sales over a company Web site that offers

21   credit cards and gasoline discounts.  (FAC at 10:18, ¶¶ 35-41.)

22         The Cities go on to allege that BP p.l.c., "through its subsidiaries and agents," also "does

23   business in the United States."  (*Id.* ¶ 42.)  These business activities are alleged to include producing

24   fossil fuels in the Gulf of Mexico, Alaska, Colorado, New Mexico, Oklahoma, and Wyoming; owning

25   refineries (in Illinois, Ohio, and Washington) and pipelines in various states; marketing gasoline

26   through BP-branded stations; and registering the BP trademark with USPTO.  (*Id.* ¶¶ 42-50.)

27         Despite amending the original complaints in response to BP p.l.c.'s initial motion to dismiss,

28   the Cities still do not allege, either factually or conclusorily, that these purported forum activities gave

- 5-

BP P.L.C.'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR LACK
OF PERSONAL JURISDICTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
Case No. 3:17-cv-06011-WHA; Case No. 3:17-cv-06012-WHA

1    rise to the alleged public nuisance.  Nor do they allege that global levels of greenhouse gases in the

2    atmosphere (which are what the Cities assert cause climate change) would have decreased *at all* in the

3    absence of BP p.l.c.'s alleged contacts with California or the United States.  Based on the amended

4    complaints' citations to the 2014 and 2015 articles discussed in the next section, the Cities likely will

5    seek to rely on an "attribution science" theory to try to prove BP p.l.c.'s individual contribution to

6    climate change.  However, that theory cannot fill this jurisdictional void because it does not show that

7    the alleged sea-level-rise harm would not have arisen but for the fossil fuels extracted from California

8    or the United States by indirect subsidiaries of BP p.l.c., which could have made at most a de minimis

9    contribution, if that attribution science theory is believed.

10   **C.      How The Cities Might Estimate BP p.l.c.'s Purported Contribution To The Nuisance**

11          The Cities assert that defendants "are substantial contributors to the public nuisance of global

12   warming that is causing injury to Plaintiffs."  (*Id.* ¶ 10.)  Indeed, the Cities claim defendants' products

13   "contribute[] measurably to global warming and to sea level rise" (*id.*), and they may claim they have

14   quantified defendants' individual and collective contributions to global greenhouse gas emissions and

15   associated global warming and sea-level rise.  BP p.l.c. disagrees.  But as purported support for the

16   Cities' position, the amended complaints numerically rank each defendant on a supposed list of the

17   "largest cumulative producers of fossil fuels" that plaintiffs copied from a 2014 study by Richard

18   Heede in the purported field of climate "attribution science" (*id.* ¶ 94.b & n.71), and cite a 2015 "peer-

19   reviewed scientific" study (*id.* ¶ 94.f & n.74) entitled "The Climate Responsibilities of Industrial

20   Carbon Producers," which, building on Heede's earlier work, claims to quantify "the responsibility of

21   industrial carbon producers" for "anthropogenic climate change."  (Decl. of John Lombardo

22   ("Lombardo Decl.") ¶ 2 n.1 & Ex. 19 at 161-62 & Fig. 2.)  The Cities' lead counsel has called the

23   methodology utilized in these studies "hugely important" because it "individualizes responsibility" for

24   climate change "in a way that had not been done before."  (Dan Zegart, *Want To Stop Climate*

25   *Change? Take the Fossil Fuel Industry to Court*, The Nation, May 12, 2014, available at

26   https://www.thenation.com/article/want-stop-climate-change-take-fossil-fuel-industry-court/.)  In

27   particular, according to the Cities' attorney, these attribution science methodologies "help[] assign

28   blame" by providing "a list with names and numbers" (*id.*)—a list that "demonstrate[s] how much of

1    the carbon dioxide and methane from the combustion of fossil fuels in the atmosphere is attributable to

2    Exxon and Chevron and other particular companies going back to the 1800s." (*Climate Reparations:*

3    *Companies to Be Liable for "Harm" "Going Back to the 1800s,"* YouTube (Feb. 18, 2016),

4    https://www.youtube.com/watch?v=KFsGJ1-iEo8.)

5           As noted, BP p.l.c. disagrees with these studies, which it views as flawed in numerous respects.

6    (*Supra* note 2.)  But if their estimates are accepted *arguendo* solely for purposes of this motion, the

7    studies would attribute to all defendants as a group 11% (FAC ¶ 94.c), and to BP p.l.c. individually

8    2.47%, of global "industrial" greenhouse gas emissions between 1854 and 2010 (Lombardo Decl. Ex.

9    1 at 237 Table 3 (Richard Heede, *Tracing Anthropogenic Carbon Dioxide and Methane Emissions to*

10   *Fossil Fuel and Cement Producers, 1854-2010*, 122 Climatic Change 229 (2014)).  To derive this

11   percentage, Heede sought to collect information about worldwide fossil fuel and cement production by

12   each of what he called the ninety "Carbon Majors," including data on oil, gas, and coal production by

13   worldwide affiliates of BP p.l.c. (or predecessor entities) going back to 1913.  (*Id.* at 231-32; *id.* ¶ 3,

14   Ex. 2 at 9-15 & Ex. 3.)  After applying numerous interpolations, assumptions, and other adjustments to

15   this necessarily incomplete historical production data, he then sought to calculate the volume of

16   greenhouse gas emissions allegedly attributable to each Carbon Major's historical production activities

17   by multiplying the estimated production volumes that he obtained through the foregoing steps times

18   various "emissions factors," which attempt to "account[] for the carbon content of each fuel, and

19   therefore the $CO_2$ released on combustion to the atmosphere."  (*Id.* Ex. 1 at 232.)  Finally, Heede then

20   sought to compute each Carbon Major's individual percentage contribution to global carbon dioxide

21   and methane emissions by comparing the $CO_2$-equivalent emissions attributed to that Carbon Major's

22   estimated historical production activities (the numerator) to estimates by other authors of worldwide

23   carbon dioxide and methane emissions from all "industrial" sources, meaning oil, natural gas, coal,

24   and cement production (the denominator), from 1751 to 2010.  (*Id.* at 232, 237 Table 3.)  In their most

25   recent study (2017), which introduces new flaws on top of those in the original analysis, Heede and his

26   collaborating authors extended this analysis to attempt to quantify not merely individual contributions

27   to *emissions*, but also to changes in global mean surface *temperatures* and global *sea levels*.  (*Id.*

28   Ex. 4.)  This study claims to attribute approximately 1.5% and 0.5% of historical global sea-level rise

1    to emissions from BP p.l.c.'s worldwide fossil fuels production over the periods 1880-2010 and 1980-

2    2010, respectively.  (*Id.* at 585 Fig. 2.)

3           These analyses illustrate how the Cities might say they assess BP p.l.c.'s supposed individual

4    contribution to the alleged public nuisance for purposes of this motion, with at least two important

5    adjustments:

6           *Time period adjustment.*  The Cities claim defendants have tortiously produced and promoted

7    fossil fuel products since the late 1970s and early 1980s, when they allege defendants knew of the

8    dangers of global warming.  (FAC ¶ 2.)  Adjusting these centuries-long studies to count only BP

9    p.l.c.'s imputed production during the years 1975 to 2010 reduces BP p.l.c.'s attributed share of global

10   emissions to 1.5%.  (Lombardo Decl. ¶¶ 19 & 25.)

11          *Forum-related adjustment.*  Further adjusting the studies' *worldwide* production data to count

12   only fossil fuels that BP p.l.c. subsidiaries[4] produced in or for shipment to California or in the United

13   States further reduces BP p.l.c.'s attributed share of global emissions to 0.079% (or 1/1,265ths) or

14   0.605% (1/165ths), respectively.  (*Id.* ¶¶ 20 & 25.)

15          These adjustments replicate the studies' methods after tailoring BP p.l.c.'s imputed production

16   to cover only the time period and geography that could possibly be relevant to this motion.  These

17   figures—the outputs of a flawed methodology—nonetheless still vastly *over*state BP p.l.c.'s (and each

18   defendant's) alleged individual contribution to anthropogenic greenhouse gas emissions, however,

19   because, in one of many critical shortcomings, the methodology only counts emissions from fossil fuel

20   and cement production.  Doing so ignores other, *larger* sources of recognized anthropogenic

21   greenhouse gas emissions, the largest of which are deforestation, land-use changes, agriculture, and

22   livestock production.  (*Id.* ¶¶ 6-17.)  Collectively, these sources more than *double* the total

23   anthropogenic greenhouse gas emissions above the limited "industrial" emissions the studies consider.

24   (*Id.*)  Against this more robust pool of anthropogenic greenhouse gas emissions, BP p.l.c.'s imputed

25

26   ───────────────

27   [4] These studies even impute production to BP p.l.c. by business entities that BP p.l.c. did not own
     when the production occurred.  For example, Amoco did not join BP p.l.c until 1998, yet the studies
     count that company's pre-1998 production in BP p.l.c.'s total.  (Lombardo Decl. Ex. 3.)  As noted,
28   BP p.l.c. does not contest that imputation solely for purposes of this motion.  (*Supra* note 1.)

1    contribution from subsidiaries' production in or for California or in the United States, from 1975 to

2    2010, shrinks to a paltry 0.037% (or 1/2,703rds) or 0.287% (1/348ths), respectively, if one

3    extrapolates from the studies' flawed methodology.  (*Id.* ¶ 25.)

4         Finally, even these vanishingly small percentages overstate any contribution BP p.l.c. allegedly

5    could have made to the claimed nuisance, because they only reflect the studies' estimates of BP p.l.c.'s

6    *emissions* contributions, not BP p.l.c.'s imputed contribution to *sea-level rise*; and the latter

7    contribution is, even according to the 2017 study, a small fraction of the former.[5]  (*Compare id.* ¶ 5

8    *with id.* ¶¶ 18-25.)

9                                   <u>Argument</u>

10                      **THE AMENDED COMPLAINTS SHOULD BE DISMISSED**
11                **<u>FOR LACK OF PERSONAL JURISDICTION OVER BP P.L.C.</u>**

12        Due process limits the power of a court "to render a valid personal judgment against a

13   nonresident defendant."  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980).  The

14   Supreme Court "recognize[s] two types of personal jurisdiction:  'general' (sometimes called 'all-

15   purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction."  *Bristol-Myers

16   Squibb Co.*, 137 S. Ct. at 1779-80.  General jurisdiction permits a court to hear "*any* claim against that

17   defendant, even if all the incidents underlying the claim occurred in a different State."  *Id.* at 1780.  By

18   contrast, a court exercising specific jurisdiction may only hear suits that "arise[e] out of or relat[e] to

19   the defendant's contacts with the *forum*."  *Id.*

20        The plaintiff bears the burden of establishing that jurisdiction is proper, *Ranza v. Nike, Inc.*,

21   793 F.3d 1059, 1068 (9th Cir. 2015), and must make "a prima facie showing of jurisdictional facts to

---

[5] Of course, all of these contribution percentages would have to be further slashed if they were to represent BP p.l.c.'s purportedly *tortious* contribution to the Cities' claimed injuries.  The Cities do not allege that *all* fossil fuel production would have ceased in the late 1970s or early 1980s but for defendants' supposed efforts to cast doubt on climate science.  In view of built-in structural demand for fossil fuels (*e.g.*, internal combustion engines and industrial machinery) and the lack of ready alternatives, any drop in BP p.l.c.'s production would surely have been replaced by another producer.  Even if the Cities deny this, however, they still must concede that a very substantial share of the demand for fossil fuel production would have persisted even in the absence of any claimed tortious activity.  Thus, only a mere fraction of BP p.l.c.'s 0.037% and 0.287% imputed California and U.S. (respectively) contributions to global anthropogenic greenhouse gas emissions can even theoretically be regarded as a potentially *tortious* contribution.

1    withstand the motion to dismiss," *id.* (quoting *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d

2    1066, 1073 (9th Cir. 2011) (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124,

3    1127 (9th Cir. 2010))).  In evaluating whether the plaintiff has met this burden, the court may not take

4    as true "mere 'bare bones' assertions of minimum contacts with the forum or legal conclusions

5    unsupported by *specific factual allegations*."  *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007)

6    (emphasis added); *Mulato v. Wells Fargo Bank, N.A.*, 76 F. Supp. 3d 929, 943 (N.D. Cal. 2014).  Nor

7    may the court "assume the truth of allegations in a pleading which are contradicted by affidavit."

8    *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).  In those instances, the

9    plaintiff "cannot 'simply rest on the bare allegations of its complaint'" to meet its burden to establish

10   the essential jurisdictional facts.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th

11   Cir. 2004) (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)); *see*

12   *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 979 (N.D. Cal. 2016) (the plaintiff's prima facie

13   showing requires "producing admissible evidence which, if believed, would be sufficient to establish

14   the existence of personal jurisdiction").

15         Here, the Cities have not pleaded and cannot prove the facts needed to establish either general

16   or specific jurisdiction over BP p.l.c.  The amended complaints set forth a laundry list of purported

17   "[c]onnections" with California and other U.S. states, apparently in an effort to invoke alternative

18   jurisdictional theories.  (FAC at 10:18, ¶¶ 35-50.)  The first theory is that jurisdiction exists under

19   California's long-arm statute, which permits jurisdiction as broadly as due process allows.  *See Axiom*

20   *Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1067 (9th Cir. 2017) ("the jurisdictional analyses

21   under [California] state law and federal due process are the same" (quoting *Mavrix Photo, Inc.*, 647

22   F.3d at 1223)).  The second is that jurisdiction exists under the so-called federal long-arm statute of

23   Federal Rule of Civil Procedure 4(k)(2).  That Rule permits a federal court to exercise jurisdiction over

24   a foreign defendant for a claim arising under federal law, if the defendant is not subject to personal

25   jurisdiction in any state and the exercise of jurisdiction comports with due process.  *Id.* at 1072.  The

26   due process analysis under Rule 4(k)(2) is "nearly identical to traditional personal jurisdiction analysis

27   with one significant difference:  rather than considering contacts between [the defendant] and the

28   forum state, [the court] consider[s] contacts with the nation as a whole."  *Id.* (quoting *Holland Am.*

*Line Inc. v. Warstila N. Am., Inc.*, 485 F.3d 450, 462 (9th Cir. 2007)).  The rule applies only in "rare situations" where the defendant has "extensive contacts to the country."  *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1086 n.6 (C.D. Cal. 2010); *see Holland Am. Line Inc.*, 485 F.3d at 462 ("[I]n the fourteen years since Rule 4(k)(2) was enacted, none of our cases has countenanced jurisdiction under the rule.").

Exercising jurisdiction over BP p.l.c. in this case would be improper under either theory, for the same set of reasons, as shown below.

## A.      BP p.l.c. Is Not "At Home" (And Thus Subject To General Jurisdiction) In The Forum

A foreign corporation is not subject to general jurisdiction in a forum unless its "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State."  *Daimler AG*, 134 S. Ct. at 754 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  Except in "an exceptional case," a corporation is only "at home" in a forum where it is incorporated or has its principal place of business.  *Id.* at 760-62 & n.19; *Ranza*, 793 F.3d at 1069.  Thus, even a large corporation that operates—and records "sizable" sales—in many places "can scarcely be deemed at home in all of them," as that result would improperly convert "at home" into a "doing business" test.  *Daimler AG*, 134 S. Ct. at 761-62 & n.20.  Rather, a foreign corporation's affiliations with the forum must be "comparable to a domestic enterprise in that State" for it to be considered at home.  *Id.* at 758 n.11.  A plaintiff who invokes general jurisdiction "must meet an 'exacting standard' for the minimum contacts required," because of the "much broader" assertion of judicial authority the foreign defendant faces.  *Ranza*, 793 F.3d at 1069 (quoting *CollegeSource, Inc.*, 653 F.3d at 1074).

There can be no reasonable debate that BP p.l.c. is not at home in California or in the United States.  As the Cities admit, BP p.l.c. is a "multinational, vertically integrated oil and gas company" that is "registered in England and Wales with its headquarters in London, England."  (FAC ¶ 16.) Nothing in the amended complaints would justify treating this as an "exceptional case," moreover. The Cities do not allege, for example, that California or the United States has become BP p.l.c.'s

- 11 -

1   global nerve center.[6]  Nor could they in good faith so allege, because BP p.l.c. does not operate in the

2   United States.  (Sanker Decl. ¶ 3.)

3          Far from alleging facts that could establish that BP p.l.c. is at home in California or the United

4   States, the amended complaints merely allege that subsidiaries of BP p.l.c. have done or are doing

5   business here, precisely as the plaintiff in *Daimler AG* alleged.  For example, the Cities allege that

6   subsidiaries of BP p.l.c. produce and sell fossil fuel products to California and U.S. residents; operate

7   California port facilities where they receive crude oil; transport Alaskan crude oil to California;

8   promote gasoline sales by offering credit cards and discounts; license the ARCO trademark and brand

9   to California gasoline stations; and produce oil in the Gulf of Mexico.  (FAC ¶¶ 35-50.)  Even

10  imputing these subsidiaries' U.S. business activities to BP p.l.c. (as the Court assumed *arguendo* in

11  *Daimler AG*), they *at most* show that BP p.l.c. does substantial, continuous business in California and

12  other states, just as Daimler did as California's "largest supplier of luxury vehicles" and through its

13  multiple California-based facilities, *see* 134 S. Ct. at 752, and just as BNSF Railway Company did in

14  Montana, where its 2,000 workers and 2,000 miles of railroad track did not render it "at home," *see*

15  *BNSF Ry. Co.*, 137 S. Ct. at 1559; *see also Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir.

16  2014) ("This is not such an exceptional case," where foreign defendant had "no offices, staff, or other

17  physical presence in California, and it [was] not licensed to do business in the state").  More is needed

18  to render a foreign corporation at home.  The amended complaints here provide nothing more,

19  however.

20         The Cities have not met, and cannot meet, their "exacting" burden to show that BP p.l.c. is at

21  home in California or the United States.

22

23

24  _____

[6] In the case the Supreme Court points to as "exemplif[ying]" the "exceptional case," a Philippines
25  corporation was forced to cease operating in its home nation during the Japanese occupation in World
    War II, and its president moved to Ohio, where he kept an office, maintained the company's files, and
26  oversaw the company's operations.  *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 448 (1952);
    *see BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) (discussing *Perkins*).  General jurisdiction
27  in Ohio over the foreign corporation was proper in these unusual circumstances because it effectively
    had moved its principal place of business there, if only temporarily, making Ohio "the center of the
28  corporation's wartime activities."  *Daimler AG*, 134 S. Ct. at 756 & n.8.

**B.    Nor Is BP p.l.c. Subject To Specific Jurisdiction For This Claim**

In contrast with general jurisdiction, for a forum to assert specific jurisdiction over a nonresident, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780 (quoting *Goodyear Dunlop Tires Operations*, 564 U.S. at 919). More specifically, "'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*." *Id.* (quoting *Daimler AG*, 134 S. Ct. at 754). In accord with the Supreme Court's direction, the Ninth Circuit recognizes "three requirements for a court to exercise specific jurisdiction over a nonresident defendant":

> (1) the defendant must either "purposefully direct his activities" toward the forum or "purposefully avail[] himself of the privileges of conducting activities in the forum";
> (2) "the claim must be one which arises out of or relates to the defendant's forum-related activities"; and (3) "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."

*Axiom Foods, Inc.*, 874 F.3d at 1068 (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)); *accord Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017). The plaintiff bears the burden of satisfying the first two prongs of the test. *Schwarzenegger*, 374 F.3d at 802.

None of the requirements for exercising specific jurisdiction is met here.

**1.    The Claim Does Not Arise out of or Relate to BP p.l.c.'s Forum Activities, Even Imputing All Claim-Related Activities of Indirect Subsidiaries to BP p.l.c.**

A claim arises out of or relates to the defendant's forum-related activities only if the plaintiff "would not have sustained her injury, 'but for'" that activity. *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1051-52 (9th Cir. 1997); *Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir. 2001) ("the Court considers whether [the] plaintiffs' claims would have arisen but for [the defendant]'s contacts with California"); *Brackett v. Hilton Hotels Corp.*, 619 F. Supp. 2d 810, 818 (N.D. Cal. 2008) ("arises out of or relates to" prong "requires a showing of 'but for' causation—plaintiff must demonstrate that she would not have been injured but for defendants' conduct directed toward her in the forum"). Under this "but for" test, the plaintiff must present evidence showing that other contributing forces would not

still have produced his or her injury in the absence of the defendant's suit-related forum contacts. *Rashidi v. Veritiss, LLC*, No. 2:16-cv-04761-CAS (JPRx), 2016 WL 5219448, at *6 (C.D. Cal. Sept. 19, 2016).  Where the plaintiff presents "no evidence" that the defendant's forum activities were a "necessary" cause of that injury, the requirement is not met.  *Unocal Corp.*, 248 F.3d at 925; *accord Bristol-Myers Squibb Co.*, 137 S. Ct. at 1781 (where the defendant's California activities did not cause the plaintiffs' alleged injuries, no "adequate link" supported specific jurisdiction).

In *Doe v. Unocal Corp.*, for example, Burmese farmers alleged they suffered human rights violations at the hands of a French energy corporation (Total S.A.), among others, in furtherance of a gas pipeline project in Burma.  *Id.* at 920.  They claimed Total was subject to specific jurisdiction in California by virtue of Total's joint venture agreement with its co-venturer on the pipeline project, a California corporation (Unocal Corp.).  The court held the plaintiffs had failed to meet their burden under the but-for test because they "present[ed] no evidence . . . suggesting that the pipeline project would not have gone forward without Total's dealings with Unocal" in California.  *Id.* at 925.  Total's California contacts were, in short, "not necessary to the initiation of the project" that allegedly led to the plaintiffs' injuries.  *Id.*

Where the defendant conducts business on a national or global scale, the plaintiff must show that the defendant's *forum* activities, in particular, were a but-for cause of its injuries.  In *Sullivan v. Ford Motor Co.*, No. 16-cv-03505-JST, 2016 WL 6520174 (N.D. Cal. Nov. 3, 2016), for example, the court held that Ford was not subject to specific jurisdiction in California for a claim alleging injury from a defectively designed truck, despite Ford's "nationwide marketing, promotion, and distribution of cars and trucks," its active marketing of vehicles in California, and its sale of over 200,000 vehicles in the state in one year, because the specific truck that injured the plaintiff was not designed, made, or sold to a Ford dealership in California.  *Id.* at *2-3.  Given these facts, the court concluded, "there [was] every reason to think that [the plaintiff]'s injury would have occurred regardless of Ford's contacts with California.  In other words, [the plaintiff] cannot satisfy the Ninth Circuit's 'but for' test."  *Id.* at *3.  *Sullivan* is in accord with the Supreme Court's more recent holding in *Bristol-Myers Squibb Co.*, that BMS could not be subjected to specific jurisdiction in California for injury claims involving its drug Plavix, brought by patients who obtained Plavix through sources outside of

- 14-

California.  *See* 137 S. Ct. at 1778.  Even though BMS sold almost 187 million Plavix pills in California, taking in more than $900 million, and employed 250 sales reps in California, the Court held that there was no "adequate link between the State and the nonresidents' claims," because the specific pills that injured the plaintiffs were not developed, made, labelled, packaged, or sold to them in California.  *Id.* at 1778, 1781.  To permit jurisdiction over these claims merely because BMS also sold Plavix to patients in California would, the Court explained, "resemble[] a loose and spurious form of general jurisdiction" that could not be squared with its precedents.  *Id.* at 1781.

Forum activities also fail the but-for test when actors other than the defendant contributed to the plaintiff's injury and the plaintiff accordingly cannot show that its injury would have been avoided but for the forum-related conduct of the defendant.  In *Terracom v. Valley National Bank*, 49 F.3d 555 (9th Cir. 1995), for example, the court held that a Kentucky bank's act of signing a "certificate of sufficiency" without properly investigating the financial strength of a payment bond surety for a California public works project was not a but-for cause of the plaintiff's (a construction subcontractor) injury because a third party, the federal officer who awarded the contract, had "the sole responsibility of determining the acceptability of an individual surety," considered factors other than the bank's certificate in his evaluation, and might have approved the surety even if the bank had not signed the certificate.  *Id.* at 561.  Put simply, an actor other than the bank contributed to the plaintiff's injury, making it impossible to say that the plaintiff's injury would not have arisen but for the bank's contacts with California.  *Id.*   Similarly, in *Doe v. American National Red Cross*, the court held that the failure of a federal official charged with ensuring the safety of the blood supply to bar high-risk groups from donating blood, to publicize the risks of blood transfusions, and to encourage blood companies to implement certain blood safety tests was not a but-for cause of the plaintiff's injury because other actors had greater control over the flow of blood and blood products into the forum state.  112 F.3d at 1051 ("Therefore, it cannot be said that [the plaintiff] would not have sustained her injury, 'but for' [the official's] alleged misconduct.").

1

2

       **a.**      **The amended complaints do not allege BP p.l.c.'s California or**
                    **U.S. activities are a but-for cause of the Cities' claimed injury**

3           Here, the Cities have not alleged, either factually or even in conclusory terms, that BP p.l.c.'s

4   California or U.S. activities are a but-for cause of the "global warming-induced sea level rise" they say

5   is damaging their coastlines.  Indeed, not only is the concept of but-for causation entirely missing from

6   the amended complaints, but the Cities' allegations leave no doubt that their theory is that the alleged

7   public nuisance resulted from *all* human contributions to increased greenhouse gas levels in the

8   atmosphere, including but certainly not limited to the *worldwide* production of fossil fuels by

9   defendants and others.  (FAC ¶¶ 16-18 (alleging BP p.l.c. is "a multinational, vertically integrated oil

10   and gas company" that "is responsible for" all "past and current production and promotion of fossil

11   fuel products" by all of "its subsidiaries"); *id.* ¶ 10 (each defendant is a "substantial contributor[] to the

12   public nuisance of global warming" based on its global "cumulative production of fossil fuels").)  As

13   the Court has observed, "greenhouse gases emanating from overseas sources are equally guilty

14   (perhaps more so) of causing plaintiffs' harm" as are gases emanating from the consumption of

15   defendants' fuels in the United States.  (Order Denying Mots. To Remand at 7:11-13, ECF No. 134.)

16   But alleging that *all worldwide* fossil fuel production "substantially contributed" to the purported

17   nuisance is a far stretch from alleging that *BP p.l.c.'s California or U.S.* production is a but-for cause

18   of the nuisance.  In particular, the amended complaints do not allege, and the Cities cannot show, that

19   if BP p.l.c. had reduced or even halted its indirect subsidiaries' extraction activities in California or the

20   United States as a whole, worldwide greenhouse gas emissions would have decreased, curtailing

21   global warming and sea-level rise.  Nothing in the amended complaints negates the far more plausible

22   inference that other suppliers simply would have replaced BP p.l.c.'s limited U.S. production to satisfy

23   the durable demand for fossil fuels, which users would have combusted at the same rate.  The Cities'

24   causal theory is thus jurisdictionally deficient under *Bristol-Myers Squibb Co.* and *Sullivan*, which

25   teach that nationwide or global activities by a large corporation—even activities of the sort the

26   plaintiff complains of—do not establish the requisite but-for causal link between the defendant's in-

27   forum activities and the plaintiff's injury.

28

1    Also negating the essential but-for causation is the amended complaints' allegation that

2  innumerable other fossil fuel producers besides BP p.l.c. have contributed to the alleged nuisance.  The

3  Cities admit they have only sued a handful of the world's "largest cumulative producers of fossil fuels

4  worldwide."  (FAC ¶ 94.b.)  And they aver that global warming results not from the emissions

5  attributable to any single producer's production, but rather because greenhouse gases from fossil fuels

6  produced by *all* producers—defendant and non-defendant—combine in the global atmosphere where

7  they cannot be physically traced to an individual producer.  (*Id.* ¶ 140 ("emissions of greenhouse gases

8  from the fossil fuels [each defendant] produces combines [sic] with the greenhouse gas emissions from

9  fossil fuels produced by the other Defendants, *among others*, to result in dangerous levels of global

10  warming") (emphasis added).)  These allegations, too, are deficient to meet the Cities' burden to plead

11  that BP p.l.c.'s California or U.S. activities are a but-for cause of their claimed sea-level rise harm,

12  because, as in *Terracom* and *Doe v. American National Red Cross*, it cannot be said that contributions

13  of actors other than BP p.l.c. would not have been sufficient to cause that harm but for BP p.l.c.'s

14  California or U.S. activities.

15    In sum, the amended complaints allege BP p.l.c., the other defendants, and myriad others,

16  acting around the globe, have produced massive amounts of fossil fuels, yet nowhere allege that the

17  Cities "would not have sustained [their] injury" but for BP p.l.c.'s forum activities.  *See Am. Nat'l Red*

18  *Cross*, 112 F.3d at 1051-52.  From all that appears in the amended complaints, therefore, "there is

19  every reason to think that [the Cities'] injury would have occurred regardless of [BP p.l.c.'s] contacts

20  with California" and the United States.  *See Sullivan*, 2016 WL 6520174, at *3.  The amended

21  complaints accordingly fail to plead that the Cities' claims arise out of or relate to BP p.l.c.'s forum

22  activities.

23          **b.**  **If the Cities rely on "attribution science," that methodology likewise**
   **suggests that BP p.l.c.'s forum contacts are not a but-for cause of the**
24  **claimed injury**

25    The Cities cannot meet their burden on this motion because, as shown, the amended complaints

26  do not *plead* any jurisdictionally sufficient nexus between BP p.l.c.'s alleged in-forum activity and the

27  Cities' claimed injuries.  If the Cities try to overcome their pleadings' deficiencies by turning to

28  attribution science, that theory will not help them either.  Even imputing all California or U.S.

1   production by BP p.l.c.'s indirect subsidiaries since 1975 to BP p.l.c., the greenhouse gas emissions

2   attributable to that production made too insubstantial a contribution to the "global warming-induced

3   sea level rise" that is allegedly harming the Cities, to be deemed a but-for cause of that harm,

4   according to that attribution methodology.  As explained above, using those studies' emissions factors,

5   greenhouse gas emissions attributable to BP p.l.c.'s imputed California and U.S. production since

6   1975 contributed only 0.037% and 0.287%, respectively, of global $CO_2$-equivalent emissions from

7   industrial fossil fuel and cement production and certain other specified human emissions sources

8   (deforestation, agriculture, livestock), since the Industrial Revolution.  (*Supra* pp. 8-9.)  If the global

9   emissions denominator is artificially restricted to the two sources considered in the studies (fossil fuels

10  and cement production), this contribution grows only to 0.079% and 0.605%, respectively.  Either

11  way, the Cities do not and could not allege, and cannot show, that they would not have sustained their

12  claimed harm from sea-level rise but for this de minimis contribution.  To the contrary, there is every

13  reason to think the Cities' injury would be no different regardless of BP p.l.c.'s insubstantial forum-

14  related contribution.

15          Indeed, the Cities themselves have said as much.  They argued that far more massive amounts

16  of fossil fuel production are not a but-for cause of their injury, in opposing subject matter jurisdiction

17  under the Outer Continental Shelf Lands Act ("OCSLA").  In particular, the Cities argued offshore

18  production on the OCS, which has constituted up to one-third of *all* domestic oil and gas production,

19  "is not a but-for cause of the People's injuries."  (Pl.'s Reply Supp. Mot. Remand at 20-21, ECF No.

20  91.)  The Cities called OCS production, which dwarfs BP p.l.c.'s imputed forum production, "only a

21  small subset" of the activities on which their nuisance claim is based.  (*Id.* at 20.)  And they flatly

22  asserted that "the People *would* have a claim even absent any OCS conduct."  (*Id.* at 21.)  *A fortiori*,

23  the Cities would have a claim even absent BP p.l.c.'s California and U.S. conduct.

24          **c.      Permitting specific jurisdiction on the basis of these tenuous links with
                      the forum would subject BP p.l.c. to jurisdiction in every state, a result**
25          **that cannot be squared with recent Supreme Court decisions**

26          As discussed above, in two recent decisions the Supreme Court made abundantly clear that

27  large national or international businesses are not, by virtue of their sprawling operations, subject to

28  jurisdiction everywhere on claims lacking an adequate causal nexus to their forum activities.  First, in

1    *Daimler AG*, the Court held that Daimler's extensive national vehicle distribution operations (which

2    the Court imputed *arguendo* to Daimler), multiple California facilities, and California sales accounting

3    for 2.4% of its worldwide sales, did not render Daimler "at home" in California because, were the law

4    otherwise, "the same global reach would presumably be available in every other State in which

5    MBUSA's sales are sizable" and would destroy foreign companies' ability to structure their operations

6    to allow for reasonably predictable jurisdictional outcomes.  134 S. Ct. at 761-62.  Then, in *Bristol-*

7    *Myers Squibb Co.*, the Court held that BMS' sales of Plavix pills in every state, including over $900

8    million in California, which accounted for more than 1% of the company's nationwide sales revenue

9    from all products, did not subject BMS to specific jurisdiction in California for claims by patients who

10   obtained their medication outside California, because exercising specific jurisdiction in the absence of

11   "any adequate link between the State and the nonresidents' claims" would "resemble[] a loose and

12   spurious form of general jurisdiction."  137 S. Ct. at 1781.

13           Asserting jurisdiction over BP p.l.c. in this action would directly disregard the teachings of

14   these controlling decisions, because it would effectively authorize specific jurisdiction everywhere.

15   This is true even if some quantum or character of in-forum conduct less than a but-for cause could

16   ever satisfy the "arises out of or relates to" requirement, which, under controlling Ninth Circuit case

17   law, it cannot do.  Subsidiaries of integrated global energy businesses such as these defendants operate

18   around the nation and world.  If a contribution of just 0.037% or 0.287% to global greenhouse gas

19   emissions from BP p.l.c.'s imputed California or U.S. activities sufficed to require BP p.l.c. to defend

20   this claim in this Court, the same "global reach" would presumably be available everywhere BP

21   p.l.c.'s subsidiaries have operations, which would impermissibly "resemble[] a loose and spurious

22   form of general jurisdiction" even broader than pre-*Daimler AG* cases allowed.

23                  d.      **Describing the operational details of indirect subsidiaries is not a**
24                          **substitute for pleading and proving the required but-for causation**

25           In amending their complaints, the Cities added new allegations that describe operational details

26   of various California and U.S. activities of indirect subsidiaries of BP p.l.c.  For example, the amended

27   complaints describe certain California and U.S. refining operations; pipeline, distribution, and other

28   logistics operations; and production activities in the Gulf of Mexico and Alaska.  (FAC ¶¶ 33, 38-48.)

1   The Cities seemingly hope to obscure their inability to plead and prove necessary but-for causation by

2   layering on heavy embroidery about the operational facts of the California and U.S. connections upon

3   which they rely.  The Cities may not cure their deficient causation case merely by pointing to more or

4   different contacts, however; the Supreme Court squarely rejected such a "sliding scale approach"

5   under which "the strength of the requisite connection between the forum and the specific claims at

6   issue is relaxed if the defendant has extensive forum contacts."  *Bristol-Myers Squibb Co.*, 137 S. Ct.

7   at 1781.  Thus, whatever the nature and extent of BP p.l.c.'s imputed forum contacts, the Cities'

8   burden to satisfy the distinct requirement of proving an adequate but-for causal nexus remains the

9   same.  *Id.*

10          More fundamentally, dressing up the fossil fuel production that is the gravamen of these claims

11   with a hodgepodge of other supposed forum "connections" does not help the Cities meet their burden

12   to demonstrate that BP p.l.c.'s imputed forum activities are a but-for cause of their claimed harm.  This

13   is so because embroidery about logistics and marketing efforts—activities such as importing Alaskan

14   crude oil to California,[7] and maintaining a company Web site that promotes gasoline sales—does not

15   enhance in any way the Cities' own estimation of the contribution BP p.l.c.'s forum activities made to

16   climate change-induced sea-level rise, which rests entirely on BP p.l.c.'s extraction of oil and natural

17   gas.  Thus, even if it were true that, for example, BP p.l.c. operates California port facilities to receive

18   crude oil and advertises gasoline on its Web site accessible in California, the total contributions that *all*

19   of BP p.l.c.'s imputed California and U.S. activities made, under the Cities' attribution analysis, to

20   worldwide greenhouse gas emissions from human causes (0.037% and 0.287%, respectively) or to

21   worldwide industrial greenhouse gas emissions (0.079% and 0.605%, respectively) remain the same.

22   Those miniscule contributions are inadequate to constitute a but-for cause for all the reasons discussed

23   above; embellishing them with operational details cannot bring the Cities any closer to showing that

24   the claimed nuisance would have been avoided but for BP p.l.c.'s forum activity.

25

26   ───────────────

27   [7] BP p.l.c. has *included* the Alaskan crude oil that an indirect subsidiary produced for shipment to California in calculating its total production "in or for California."  (Lombardo Decl. ¶ 21.f; Decl. of William Jeffries, filed concurrently.)  Thus, BP p.l.c.'s purported California contribution of 0.037% to

28   global greenhouse gas emissions from human causes already accounts for this production activity.

1

2.      **Exercising Jurisdiction over BP p.l.c. Would Be Unreasonable**

2              Even if the first two requirements for specific jurisdiction are met, "in order to satisfy the Due

3      Process Clause, the exercise of personal jurisdiction must be reasonable." *Panavision Int'l, L.P. v.*

4      *Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998).  To be reasonable, jurisdiction "must comport with

5      'fair play and substantial justice.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476

6      (1985)).  The Ninth Circuit has identified several factors to be considered in addressing the question of

7      reasonableness, some of which are "no longer weighed heavily." *Id.* at 1323-24 (noting reduced

8      importance of "(5) the most efficient judicial resolution of the controversy" and "(6) the importance of

9      the forum to the plaintiff's interest in convenient and effective relief").

10             The Supreme Court, meanwhile, instructs that the "primary concern" in determining whether

11     jurisdiction is present is "the burden on the defendant." *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780

12     (quoting *World-Wide Volkswagen Corp.,* 444 U.S. at 292).  Relevant burdens include not only "the

13     practical problems resulting from litigating in the forum," but also "the more abstract matter of

14     submitting to the coercive power of a State that may have little legitimate interest in the claims in

15     question." *Id.*  Concern for the latter recognizes that restrictions on personal jurisdiction are in part "a

16     consequence of territorial limitations on the power of the respective States" and nations. *Id.*  These

17     "federalism" and "comity" interests at times "may be decisive." *Id.*  As the Court has explained,

18     "[e]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before

19     the tribunals of another State; even if the forum State has a strong interest in applying its law to the

20     controversy; even if the forum State is the most convenient location for litigation, the Due Process

21     Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its

22     power to render a valid judgment." *Id.* at 1780-81.  These recent Supreme Court analyses effectively

23     blend and elevate the importance of four of the Ninth Circuit's reasonableness factors:  "(2) the burden

24     on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the

25     defendant's state; (4) the forum state's interest in adjudicating the dispute"; and "(7) the existence of

26     an alternative forum." *See Panavision Int'l, L.P.*, 141 F.3d at 1323.

27             Jurisdiction over BP p.l.c. would be unreasonable under all of these factors because using U.S.

28     common law to regulate *worldwide* fossil fuel production by hailing an English parent company that

1    does not do business in the state or nation into a California forum would elevate the state's sovereignty

2    beyond any appropriate bounds.  The state admittedly has an interest in protecting its coastal property.

3    But the Cities' claims purportedly reach all worldwide fossil fuel production by BP p.l.c. and the other

4    defendants, and neither California nor the United States has any greater interest in applying its own

5    tort law to that production than any other state or nation would.  The sovereignty of the UK courts

6    with respect to this controversy, moreover, implies a limitation on the sovereignty of the California

7    and U.S. courts, *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780, particularly as UK courts resist

8    "uninhibited approach[es] to personal jurisdiction" that draw their local corporations into existential

9    litigation in multiple fora, *Daimler AG*, 134 S. Ct. at 763.

10        These concerns are real and practical, not merely theoretical.  If jurisdiction were reasonable in

11   this case, and this Court rendered a judgment effectively regulating defendants' worldwide fossil fuel

12   production, thereby reshaping global energy policy, that exercise might then be repeated in the courts

13   of every other state and nation that have similarly tenuous claims to jurisdiction over BP p.l.c., with

14   innumerable conflicting outcomes.  California and the United States do not have any unique interest in

15   this claim involving conduct and alleged effects dispersed throughout the globe.

<u>**Conclusion**</u>

17        For all the foregoing reasons, BP p.l.c. respectfully requests that the Court grant this motion

18   and dismiss the first amended complaints as against BP p.l.c. for lack of personal jurisdiction.

19

20   Dated:  April 19, 2018.                                   ARNOLD & PORTER KAYE SCHOLER LLP

21

22                                                            By:   /s/ Jonathan W. Hughes
                                                                   Jonathan W. Hughes
23                                                                  Matthew T. Heartney
                                                                   John D. Lombardo
24                                                                  Philip H. Curtis
                                                                   Nancy Milburn
25
                                                                   Attorneys for Defendant BP p.l.c.
26

27

28

BP P.L.C.'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR LACK
OF PERSONAL JURISDICTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
Case No. 3:17-cv-06011-WHA; Case No. 3:17-cv-06012-WHA