JEFFREY H. WOOD
Acting Assistant Attorney General

ALEX G. TSE
Acting United States Attorney

ERIC GRANT (CA Bar No. 151064)
Deputy Assistant Attorney General
JUSTIN D. HEMINGER (DC Bar No. 974809)
R. JUSTIN SMITH (DC Bar No. 453119)
CHRISTINE W. ENNIS (CA Bar No. 246101)
Telephone:  (202) 616-9473
Facsimile:   (202) 514-4231
christine.ennis@usdoj.gov
Attorneys
Environment and Natural Resources Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7415
Washington, D.C. 20044-7415

Counsel for Amicus Curiae United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF OAKLAND, a Municipal Corporation; THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Oakland City Attorney BARBARA J. PARKER; CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation; and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through San Francisco City Attorney DENNIS J. HERRERA, <br><br> Plaintiffs, <br><br> v. <br><br> BP P.L.C., a public limited company of England and Wales; et al., <br><br> Defendants. | No. 3:17-cv-06011-WHA <br> No. 3:17-cv-06012-WHA <br><br> **AMICUS CURIAE BRIEF OF UNITED STATES OF AMERICA IN SUPPORT OF DISMISSAL** <br><br><br><br><br><br><br><br><br><br><br> Date:       May 24, 2018 <br> Time:       8:00 a.m. <br> Courtroom: 12 (19th Floor) <br> Judge:      Hon. William H. Alsup |

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ...................................................................................... 1

INTERESTS OF THE UNITED STATES ....................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND............................................ 2

SUMMARY OF ARGUMENT ...................................................................... 5

ARGUMENT ........................................................................................... 6

I.      The federal common law of nuisance affords no relief to the Cities .................................. 6

II.     Federal statutory law displaces any federal common law public nuisance
        claims ....................................................................................... 11

        A.      The Clean Air Act displaces the Cities' federal common law
                claims ............................................................................. 11

        B.      The authorities and activities of Congress and the Executive
                Branch relating to international climate change displace the Cities'
                claims based on foreign emissions............................................. 16

        C.      Federal statutes governing the production of fossil fuels on federal
                lands and offshore displace the applicable portions of the Cities'
                claims .............................................................................. 20

III.    The Cities' claims violate constitutional principles of separation of powers .................. 22

CONCLUSION......................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ................................................................................... 7

*Allen v. Wright,*
468 U.S. 737 (1984) ................................................................................. 22

*American Electric Power Co. v. Connecticut,*
564 U.S. 410 (2011) ......................................................................... passim

*Barclays Bank PLC v. Franchise Tax Board,*
512 U.S. 298 (1994) ................................................................................. 20

*BMW of North America, Inc. v. Gore,*
517 U.S. 559 (1996) ......................................................................... 10, 14

*Bush v. Lucas,*
462 U.S. 367 (1983) ............................................................................... 7, 9

*City of Milwaukee v. Illinois,*
451 U.S. 304 (1981) ..................................................................... 6, 11, 13

*Connecticut v. American Electric Power Co.,*
582 F.3d 309 (2d Cir. 2009),
*rev'd,* 564 U.S. 410 (2011) .................................................................... 10

*Correctional Services Corp. v. Malesko,*
534 U.S. 61 (2001) ................................................................................... 7

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000) ................................................................................. 19

*Georgia v. Tennessee Copper Co.,*
206 U.S. 230 (1907) .............................................................................. 7-8

*Gilligan v. Morgan,*
413 U.S. 1 (1973) ................................................................................ 22-23

*Gulf Offshore Co. v. Mobil Oil Corp.,*
453 U.S. 473 (1981) ................................................................................. 22

*Healy v. Beer Institute, Inc.,*
491 U.S. 324 (1989) ................................................................................. 10

*Illinois v. City of Milwaukee,*
406 U.S. 91 (1972) ................................................................................. 6-8

*In re Debs,*
158 U.S. 564 (1895) ................................................................................. 9

| | Page |
|---|---|

*In re Philippine National Bank,*
   397 F.3d 768 (9th Cir. 2005)..................................................................... 18-19

*International Paper Co. v. Ouellette,*
   479 U.S. 481 (1987)...........................................................................2, 9-11

*Japan Line, Ltd. v. County of Los Angeles,*
   441 U.S. 434 (1979)............................................................................ 19-20

*Jesner v. Arab Bank, PLC,*
   138 S. Ct. 1386 (2018).............................................................................. 17

*Kiobel v. Royal Dutch Petroleum Co.,*
   569 U.S. 108 (2013)................................................................................. 17

*Lujan v. National Wildlife Federation,*
   497 U.S. 871 (1990)................................................................................. 21

*Massachusetts v. EPA,*
   549 U.S. 497 (2007)........................................................................... 12, 18

*Michelin Tire Corp. v. Wages,*
   423 U.S. 276 (1976)................................................................................. 20

*Middlesex County Sewerage Authority v. National Sea*
   *Clammers Association,* 453 U.S. 1 (1981)......................................... 14, 21

*Michigan v. U.S. Army Corps of Engineers,*
   667 F.3d 765 (7th Cir. 2011)................................................................... 13

*Mobil Oil Corp. v. Higginbotham,*
   436 U.S. 618 (1978)................................................................................. 12

*Morrison v. Nat'l Australia Bank Ltd.,*
   561 U.S. 247 (2010)............................................................................ 17-19

*Native Village of Kivalina v. ExxonMobil Corp.,*
   696 F.3d 849 (9th Cir. 2012)............................................................ passim

*North Carolina v. TVA,*
   615 F.3d 291 (4th Cir. 2010)...................................................8, 11, 22-23

*North Slope Borough v. Andrus,*
   642 F.2d 589 (1980)................................................................................. 22

*Norton v. Southern Utah Wilderness Alliance,*
   542 U.S. 55 (2004)................................................................................... 21

*Ohio v. Wyandotte Chemicals Corp.,*
   401 U.S. 493 (1973)............................................................................. 9, 16

*Rowe v. New Hampshire Motor Transport Association,*
   552 U.S. 364 (2008)................................................................................. 14

Page

*San Diego Building Trades Council v. Garmon*,
    359 U.S. 236 (1959)...............................................................................14-15

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)................................................................................9, 17

*Texas Industries v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981).....................................................................................3

*United States v. Pink*,
    315 U.S. 203 (1942)...................................................................................17

*United States v. Standard Oil Co.*,
    332 U.S. 301 (1947).....................................................................................9

*Washington Environmental Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013)......................................................................8

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)...............................................................................23-24

## Constitutional Provisions, Statutes, and Regulations

U.S. Const. art. I, § 8, cl. 3 ................................................................... 18, 20

U.S. Const. art. II, § 2, cl. 2 ......................................................................... 18

U.S. Const. art. III, § 2, cl. 2 ........................................................................ 9

5 U.S.C. § 553 ............................................................................................. 17

16 U.S.C. §§ 1600-1614 .............................................................................. 21

30 U.S.C. § 181 ........................................................................................... 21

30 U.S.C. § 1701 ......................................................................................... 21

42 U.S.C. § 7401 ........................................................................................... 2

42 U.S.C. § 7415 ......................................................................................... 19

42 U.S.C. § 7475 ......................................................................................... 12

42 U.S.C. § 7521 ......................................................................................... 12

42 U.S.C. § 7602 ......................................................................................... 15

43 U.S.C. § 1331 ......................................................................................... 21

43 U.S.C. § 1701 ......................................................................................... 21

43 U.S.C. § 1702 ......................................................................................... 21

| | Page |
|---|---|

Global Climate Protection Act of 1987, Pub. L. No. 100-204,
  tit. XI, § 1103, 101 Stat. 1331, 1409 ................................................................. 18

43 C.F.R. § 3160.0-3 .................................................................................................. 21

**Federal Register Notices**

Endangerment and Cause or Contribute Findings for Greenhouse Gases Under
  Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009) ......... 12, 15-16

Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring
  Rule, 75 Fed. Reg. 31,514 (June 3, 2010) ................................................................ 12

2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions
  and Corporate Average Fuel Economy Standards, 77 Fed. Reg. 62,624
  (Oct. 15, 2012) ......................................................................................................... 12

Standards of Performance for Greenhouse Gas Emissions from New, Modified,
  and Reconstructed Stationary Sources: Electric Utility Generating Units,
  80 Fed. Reg. 64,510 (Oct. 23, 2015) ........................................................................ 12

Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric
  Utility Generating Units, 80 Fed. Reg. 64,662 (Oct. 23, 2015) ............................... 12

Finding that Greenhouse Gas Emissions from Aircraft Cause or Contribute to
  Air Pollution That May Reasonably Be Anticipated to Endanger Public
  Health and Welfare, 81 Fed. Reg. 54,422 (Aug. 15, 2016) ...................................... 12

Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and
  Heavy-Duty Engines and Vehicles—Phase 2, 81 Fed. Reg. 73,478
  (Oct. 25, 2016) ......................................................................................................... 12

**Other Authorities**

Presidential Executive Order on Promoting Energy Independence and
  Economic Growth (Mar. 28, 2017) ....................................................................... 1-2

Energy Information Administration, Petroleum & Other Liquids:
  Exports, https://www.eia.gov/dnav/pet/
  pet_move_exp_dc_NUSZ00_mbbl_m.htm (last visited Apr. 19, 2018) ......................... 16

Energy Information Administration, Petroleum & Other Liquids:
  Product Supplied, https://www.eia.gov/dnav/pet/
  pet_cons_psup_dc_nus_mbbl_a.htm (last visited Apr. 18, 2018) .................................. 15

Energy Information Administration, Petroleum & Other Liquids:  U.S. Imports
  by Country of Origin, https://www.eia.gov/dnav/pet/pet_move_impcus_
  a2_nus_ep00_im0_mbbl_a.htm (last visited Apr. 19, 2018) ........................................ 16

Energy Information Administration, Sales of Fossil Fuels Produced from
  Federal and Indian Lands, FY 2003 through FY 2014 (July 2015), https://
  www.eia.gov/analysis/requests/federallands/pdf/eiafederallandsales.pdf
  (last visited Apr. 19, 2018) .................................................................................... 20

**INTRODUCTION**

The impact of human activity on climate change raises complex scientific questions and implicates sensitive national and foreign policy judgments with vast economic, legal, and social consequences.  As the Supreme Court recognized in *American Electric Power Co. v. Connecticut*, 564 U.S. 410 (2011) (*AEP*), the United States government has grappled with the issue of climate change for many years, both domestically and internationally.  In *AEP*, the Supreme Court dismissed federal common law claims asserted against power companies for greenhouse gas emissions because Congress gave the Executive Branch statutory authority to address those emissions.  In the present case, the Cities of Oakland and San Francisco seek to recover costs for combating the alleged effects of sea-level rise and other climate change-related impacts.  They have sued five fossil-fuel producing companies, alleging that Defendants created a "public nuisance" under federal and state common law by selling fossil-fuel products that, when combusted, create greenhouse gas emissions that contribute to climate change.  The Cities ask this Court to fashion a new judicial remedy to address the claimed nuisance of sea-level rise caused by emissions from the combustion of fossil-fuel products produced and sold by Defendants.  The Cities' approach is novel, but their goal is not:  by suing defendants that sell fossil fuels, rather than defendants that use them for combustion to create energy, the Cities hope to avoid the fate of the plaintiffs in *AEP*, while seeking the same goal through the same theory.

At the Court's invitation, the United States now offers its view as amicus curiae that this case should be dismissed because federal common law affords no relief to the Cities, because any such federal common law claim the Cities have is displaced, or because the case is not justiciable.

**INTERESTS OF THE UNITED STATES**

The United States has significant interests implicated by this case, which has the potential to shape and influence broader policy questions concerning domestic and international energy production and use.  The United States has strong economic and national security interests in promoting the development of fossil fuels, among other energy resources.  As a recent Executive Order states:  "It is in the national interest to promote clean and safe development of our Nation's vast energy resources."  Presidential Executive Order on Promoting Energy Independence and

Economic Growth, Section 1(a) (Mar. 28, 2017) (explaining that "the prudent development of these natural resources is essential to ensuring the Nation's geopolitical security").

This case also has the potential to interfere with the United States' ongoing attempts to address the impacts of climate change, both domestically and internationally. Domestically, the United States has the principal responsibility for implementing and enforcing the Clean Air Act, 42 U.S.C. § 7401 et seq., which provides the Executive Branch with authority to respond to climate-change effects by regulating greenhouse gas emissions. The United States Environmental Protection Agency (EPA) has primary responsibility for administering programs under the Act, including those that affect greenhouse gas emissions. Internationally, the United States is a party to the Paris Agreement on climate change but is also in the process of withdrawing from that agreement—issues that raise important and complex questions of diplomacy and foreign affairs. By suggesting a judicial remedy for climate change divorced from any statutory construct, this case has the potential to lead the judiciary to improperly disrupt and interfere with the proper roles, responsibilities, and ongoing work of the Executive Branch and Congress in this area.

## FACTUAL AND PROCEDURAL BACKGROUND

**Removal and Order Denying Remand.** On October 20, 2017, Defendants removed these cases to federal court, where they were designated as related. ECF No. 1.[1] On November 20, the Cities moved to remand, arguing that the federal common law of nuisance did not exist for their claims, which assertedly challenged Defendants' deception in the sale and production of fossil fuels rather than challenging emissions released by consumers.[2] ECF No. 81, at 2-3. As further evidence that no such claim exists, the Cities argued that no such claim could be squared with the Supreme Court's decision in *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987), which required interstate emissions to be prosecuted under the law of the source state. *Id*. at 3.

---

[1] Our review has not indicated any material differences between the First Amended Complaints in the related cases brought by Oakland and San Francisco, and so this brief will refer only to Oakland's complaint and other filings in Case No. 3:17-cv-06011-WHA.

[2] The Cities have since amended their complaints, adding new claims under the federal common law of nuisance, among other changes. *See* First Amended Complaint, ECF No. 199, ¶¶ 143-48; Plaintiffs' Response, ECF No. 202 (summarizing changes).

Defendants opposed remand.  Relying on the Supreme Court's consideration of such claims in *AEP* and the Ninth Circuit's later consideration in *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012), Defendants argued that the Cities were limited to pursuing a claim under the federal common law of nuisance.  Defendants' Joint Opposition, ECF No. 89, at 2-3.  Defendants further argued that, in light of *AEP*'s holding that similar claims were displaced by the Clean Air Act, the Cities could not state a claim at all.  *Id.* at 10-11.  According to Defendants, the Cities' claims were indistinguishable from those brought in *AEP* because they, too, "hinge on the collective effect of worldwide emissions." *Id.* at 11.

On February 27, 2018, the Court denied the motion to remand.  Order Denying Remand, ECF No. 134.  The Court held that the Cities' claims, although pled under state law, actually sounded in federal common law for two reasons.  First, the Court observed that the problem involves interstate air pollution, which is an area appropriate for the development of a federal rule of decision because it constitutes a "uniquely federal interest." *Id.* at 3 (quoting *Texas Industries v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)).  Second, the Court observed that resolving questions of liability for the effects of climate change requires both a "uniform standard" and the "comprehensive view" offered by federal courts.  *Id.* at 4-5.

After deciding that the claims belong in federal court, the Court concluded that the Cities' public nuisance claims under federal common law were not displaced by the Clean Air Act.  In contrast to the claims before the Supreme Court in *AEP*, the Court held that the issue presented by the Cities was not the domestic *emissions* of greenhouse gases.  Rather, the Cities' claims focused on the *production and sale* of fossil fuels, not their combustion.  *Id.* at 6.  The Court determined that the Cities had targeted conduct that was extraterritorial and "out of the EPA and Clean Air Act's reach," and the Court held that the Clean Air Act is an insufficient legislative solution to the nuisance to displace the Cities' federal common law claims.  *Id.* at 7.

**The Court's Amicus Invitation to the United States.**  On March 1, 2018, in a scheduling order regarding motions to dismiss, the Court invited the United States to

> read the complaints, motions to dismiss, and oppositions and to submit an amicus brief on the question of whether (and the extent to which) federal common law should afford relief of the type requested by the complaints.

1    Order Setting Deadline, ECF No. 136.  The Court first requested the amicus brief by April 20 but

2    later extended that deadline to May 10.

3        **Other Similar Proceedings.**  The United States is aware of several similar cases that raise

4    questions closely related to those under consideration by this Court.  Since July 2017, ten other

5    municipalities have filed actions alleging that various fossil-fuel producing companies (including

6    each of Defendants here) have violated state public nuisance laws.  Two of these actions are

7    currently being litigated in federal court and one in state court.  One of these is a diversity action

8    in the United States District Court for the Southern District of New York.  *See City of New York*

9    *v. BP P.L.C.*, 1:18-cv-00182 (Keenan, J.).  In *City of New York*, briefing on the defendants' motion

10   to dismiss closed on May 4, 2018.

11       In addition, six other actions by California cities and counties were removed from various

12   California state courts to a separate proceeding that is also pending in the Northern District of

13   California.  *See County of San Mateo v. Chevron Corp.*, No. 3:17-cv-04929-VC (removed Aug. 24,

14   2017) (Chhabria, J.).  In *County of San Mateo*, the court has remanded the plaintiffs' claims to

15   state court.  Order Granting Remand, ECF No. 223 (Mar. 16, 2018).  Having concluded that

16   plaintiffs' claims would be displaced by the Clean Air Act pursuant to *AEP*, the court in *County*

17   *of San Mateo* ruled that no federal common law claim remained to justify removal.  *Id*. at 1-2.  In

18   response to the argument that the plaintiffs' claims concerned the production and sale of fossil

19   fuels as opposed to their combustion, the court opined that *AEP* "did not confine its holding about

20   the displacement of federal common law to particular sources of emissions."  *Id*. at 2.  Defendants

21   (and additional companies who are sued in *County of San Mateo*) have appealed the order, *see*

22   Defendants' Notice of Appeal, ECF No. 232 (Mar. 26, 2018), and the court has stayed remand

23   pending that appeal, *see* Order Granting Stay, ECF No. 240 (Apr. 9, 2018).

24       Most recently, three municipalities filed a similar action in Colorado state court.  *See Board*

25   *of County Commissioners of Boulder County v. Suncor Energy (U.S.A)., Inc.*, 2018CV030349,

26   (Colo. D. Ct. filed Apr. 18, 2018) (alleging claims on behalf of Boulder and San Miguel Counties

27   and the City of Boulder).

28

**SUMMARY OF ARGUMENT**

The Court invited the United States to file an amicus brief addressing "whether (and the extent to which) federal common law should afford relief of the type requested by the complaints." Order, ECF No. 136.  Because the Court's invitation references federal common law, the United States has focused on the Cities' federal common law claims.  We make three points.

**Argument Point I.**  This Court has determined that this case is governed by federal common law.  But recognition of a remedy under the federal common law of public nuisance in this context implicates critical policy judgments best made in the first instance by Congress.  Judicial creation of a novel remedy with no statutory basis is even more problematic here, where the parties involved are individual cities rather than states.  In *AEP*, the Supreme Court expressly reserved the question of whether federal common law would afford relief; falling within *AEP*'s shadow, this case likewise calls for a cautious approach.  That is not to suggest that the Cities' state law claim is a better vehicle for seeking to address the alleged effects of climate change.  If federal common law is a poor fit, then state law is even less suited to address the international scope of the climate change problem.

**Argument Point II.**  Any federal common law claim that might exist is displaced.  Although the Cities cast their allegations in terms of the *production* of fossil fuels, their claim of injury is legally and factually tenable only to the extent that it is predicated on *emissions* of greenhouse gases from the combustion of fossil fuels.  Through the Clean Air Act, Congress has directly addressed the issue of climate change by granting authority to address greenhouse gas emissions under federal law to the Executive Branch, thereby displacing any remedy that this Court might otherwise create.  *AEP*, 564 U.S. at 424; *Kivalina*, 696 F.3d at 856-58.  That Congress and the Executive Branch also have authority over foreign relations, including the power to negotiate with other nations to address climate change on a global scale, provides further reason to dismiss the Cities' claims as unsuited to adjudication under federal common law.  Federal statutes authorizing the production of fossil fuels on federal public lands also counsel in favor of concluding that any federal common law remedy in this case has been displaced.

1    **Argument Point III.**  The Cities' claims should in the alternative be dismissed because

2    they violate constitutional separation of powers principles and because they are non-justiciable.

3    Virtually every individual, organization, company, and government across the globe emits

4    greenhouse gases.  If these Cities may properly allege injuries from climate change, then so can

5    every person on the planet.  Federal courts are poorly equipped to handle this multitude of cases

6    and the associated complex scientific, economic, and technical issues.  Nor should courts be the

7    institutions to resolve the policy questions raised by such cases.  Moreover, balancing the Nation's

8    energy needs and economic interests against the risks posed by climate change should be left to

9    the political branches of the federal government in the first instance.  This Court should dismiss

10   the Cities' claims in their entirety on this alternative basis.

11                                                **ARGUMENT**

12   **I.      The federal common law of nuisance affords no relief to the Cities.**

13          The United States recognizes that the Court already has ruled that this case is governed by

14   federal common law.  Order Denying Remand, ECF No. 134, at 3-5.  The United States agrees

15   with the Court's underlying reasoning that if a common law tort remedy to address problems posed

16   by climate change does exist, then it should be governed by *federal* law, not state law.  *Id.* at 4-5.

17   But as the Supreme Court cautioned in *AEP*:  "Recognition that a subject is meet for federal law

18   governance, however, does not necessarily mean that federal *courts* should create the controlling

19   law."  564 U.S. at 421 (emphasis added).  In the United States' view, any judicial relief of the type

20   that the Cities seek to pursue should be authorized—if at all—by Congress.

21          To be sure, the Supreme Court has identified limited situations in which states may bring

22   actions under the federal common law of nuisance to redress interstate environmental harms.

23   *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) (*Milwaukee I*).  In the *Milwaukee* litigation itself,

24   however, the Supreme Court ultimately found that the federal common law remedy previously

25   identified by the Court in 1972 had been displaced by the enactment of the Clean Water Act later

26   that year.  *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) (*Milwaukee II*).  And since

27   deciding *Milwaukee II* in 1981, the Court has not recognized a federal common law of nuisance

28   claim in any context.

Moreover, in the past several decades, the Supreme Court has stressed that it is Congress's prerogative to create federal remedies expressly by statute, and that federal courts accordingly will rarely recognize implied or non-statutory rights to sue.  *See*, *e.g.*, *AEP*, 564 U.S. at 422 (stating that "the Court remains mindful that it does not have creative power akin to that vested in Congress"); *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring) (observing that the judicially fashioned *Bivens* action "is a relic of the heady days in which this Court assumed common-law powers to create causes of action"); *Alexander v. Sandoval*, 532 U.S. 275 (2001) (declining to recognize a private cause of action under Title VI of the Civil Rights Act); *Bush v. Lucas*, 462 U.S. 367, 388-90 (1983) ("The question is not what remedy the court should provide for a wrong that would otherwise go unredressed.  It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue.").  More recently, in *AEP*, the Supreme Court expressly left open two issues:  (1) whether federal common law claims are available to redress climate-related claims, and (2) whether non-state plaintiffs, including political subdivisions of a state, may bring federal common law of nuisance claims at all.  564 U.S. at 422-23.  This case implicates both open questions, which we address in turn.

*First*, the Cities' federal common law public nuisance claim for climate change harms is unlike the nuisance claim the Supreme Court recognized in *Milwaukee I*.  In that case, a single defendant's activities had caused the discrete transport of pollution across state lines.  406 U.S. at 93; *see also Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 238 (1907) (enjoining noxious gases traveling from the defendant's plants across the state line and over "great tracts of Georgia land").  By contrast, the present litigation concerns the production and sale of fossil fuels in numerous states and foreign countries—products that are intermingled in complex, interdependent streams of international commerce.  And the Cities' claim for damages depends on the combustion of those products and the subsequent emissions of greenhouse gases by countless sources in every corner of the globe.  *See AEP*, 564 U.S. at 422 ("Greenhouse gases once emitted become well mixed in the atmosphere; emissions in New Jersey may contribute no more to flooding in New York than

1   emissions in China." (internal quotation marks and citation omitted)); *Washington Environmental*

2   *Council v. Bellon*, 732 F.3d 1131, 1143 (9th Cir. 2013) ("Greenhouse gases, once emitted from a

3   specific source, quickly mix and disperse in the global atmosphere and have a long atmospheric

4   lifetime. . . .   [T]here is limited scientific capability in assessing, detecting, or measuring the

5   relationship between a certain GHG emission source and localized climate impacts in a given

6   region."). Thus, under the Cities' own theory, innumerable foreign, federal, state, and local

7   governments—including the Cities themselves—have contributed to the alleged harms.  So has

8   anyone who has ever driven a car.

9       The worldwide scope of this case raises complex scientific issues of causation that

10  implicate the global atmosphere and climate system and that bear little resemblance to the more

11  localized harms at issue in *Milwaukee I* and *Tennessee Copper*.  This claim also presents thorny,

12  multijurisdictional legal questions, such as whether activities expressly authorized by law could

13  ever be a nuisance.  *See North Carolina v. TVA*, 615 F.3d 291, 309 (4th Cir. 2010) (with respect

14  to public nuisance law, "[t]here is a distinction between an activity that is merely not illegal versus

15  one that is explicitly granted a permit to operate in a particular fashion").  This Court found that

16  "the scope of the worldwide predicament demands the most comprehensive view available, which

17  in our American court system means our federal courts and our federal common law."  Order

18  Denying Remand, ECF No. 134, at 5.  But the likely outcome of recognizing such a remedy is a

19  multiplicity of claims filed against a host of defendants in numerous federal courts; the multiple

20  federal district courts are unlikely to arrive at uniform standards for causation and liability under

21  an amorphous, judge-made federal common law doctrine.  *See AEP*, 564 U.S. at 428 (explaining

22  that "federal district judges, sitting as sole adjudicators, lack authority to render precedential

23  decisions binding other judges, even members of the same court").

24      So, too, the ubiquitous nature of the alleged violations and the purported harms raise

25  questions about the workability of a nuisance remedy.  The abatement remedy proposed by the

26  Cities, for example, would entail the development of a fee structure to be imposed retroactively on

27  the defendants' worldwide energy production over the course of the past century.  That would

28  leave courts to decide which alleged harms should be abated and which should not.  Any federal

common law remedy would accordingly delve into policy judgments of the type that should be made by Congress, not by the courts. *See Bush,* 462 U.S. at 389-90; *United States v. Standard Oil Co.,* 332 U.S. 301, 316-17 (1947).

*Second*, the Supreme Court has allowed only states and the United States to assert federal common law of nuisance claims. Rightly so. Claims by private parties and by political subdivisions of states raise distinctive concerns. States may act with greater restraint than non-state actors, and they are therefore likely to impose fewer burdens on the judiciary and on defendants. *Cf. Sosa v. Alvarez-Machain,* 542 U.S. 692, 727 (2004) ("The creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion."). Historically, federal common law of nuisance remedies were actions by states invoking the Supreme Court's original jurisdiction. Although the Supreme Court has allowed states to bring these claims in other federal courts, *see Ohio v. Wyandotte Chemicals Corp.,* 401 U.S. 493 (1973), it has never authorized any party other than a state to bring such a claim. *See AEP,* 564 U.S. at 422 ("We have not yet decided whether private citizens . . . or political subdivisions . . . of a State may invoke the federal common law of nuisance to abate out-of-state pollution.").[3] In the one case where the Supreme Court did address private party claims for interstate environmental harms, it treated those claims as properly arising under state law, subject to limitations implied by the cooperative federalism scheme of the federal environmental statutes. *Ouellette,* 479 U.S. at 487 (holding that state courts must apply the nuisance law of the state in which pollution originates).

The Constitution's jurisdictional provisions governing states—particularly the Supreme Court's original jurisdiction over disputes "in which a State shall be Party," U.S. Const. art. III, § 2, cl. 2—provides a textual basis for the development of federal common law to govern interstate

---

[3] The Supreme Court has recognized that the United States may bring an action to abate a nuisance in certain circumstances. *See, e.g., In re Debs,* 158 U.S. 564 (1895) (authorizing a suit brought to abate a labor action that interfered with interstate commerce). In recent decades, the United States has brought these actions infrequently, typically with the goal of redressing localized harms such as trespassing on public lands.

disputes over issues like water pollution.  By contrast, federal courts lack any basis in the text of the Constitution or in any statute for recognizing a federal common law claim in favor of non-state parties.  As a result, no existing federal authority defines the contours of such a claim, or even who is or is not a proper claimant.  Some federal environmental statutes do authorize private claims, but only subject to express limitations defined by Congress.  A court recognizing a federal common law claim lacks a basis in positive law to define the scope and other limits of that claim.

Two federal courts of appeals—the Second and Ninth Circuits—have addressed whether federal common law of nuisance claims are available to redress climate harms, and whether non-state plaintiffs may assert such claims.  In *Kivalina*, the Ninth Circuit did not reach the issue of whether federal common law of nuisance claims are available to redress climate harms.  Instead, the court hewed closely to the Supreme Court's approach in *AEP*.  It found only the *possibility* of such claims, observing that "federal common law can apply to transboundary pollution suits" and explaining that federal statutes can displace potential common law claims.  696 F.3d at 855.  The Court then followed *AEP* and found the Clean Air Act displaced any such claim.  *Id*. at 856-58.  The Second Circuit analyzed these issues in detail in *Connecticut v. American Electric Power Co*., 582 F.3d 309 (2d Cir. 2009), but the Supreme Court subsequently vacated that decision and declined to reach the issues.  *Compare id.* at 349-58 (recognizing claim based on climate injury) *and id*. at 358-67 (recognizing claim brought by municipality) *with AEP*, 564 U.S. at 420-23 (declining to decide whether a federal common law claim existed).

The Cities also assert a separate claim for public nuisance under California law.  But if federal common law is a poor fit for the Cities' allegations, then state law is even less suited to the task.  States are constrained in their power to impose burdens outside their borders by the need to respect the interests of other states.  *See, e.g., BMW of North America, Inc. v. Gore*, 517 U.S. 559, 571 (1996); *cf. Healy v. Beer Institute, Inc.*, 491 U.S. 324, 337 (1989) (holding that state regulatory action with "the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State" is displaced by the dormant commerce clause).  Moreover, the Cities' claim under California law claim flies directly into the headwinds of *Ouellette*, in which the Supreme Court rejected an attempt by private citizens of Vermont to apply Vermont law to an out-of-state

pollution source.  479 U.S. at 497.  The problems identified in *Ouellette* are magnified here, where the sources of emissions alleged to have contributed to climate change span the globe.  *See North Carolina*, 615 F.3d at 298-304 (applying *Ouellette* to state nuisance law).  Although this is not a focus of the Court's invitation to the United States, we mention this point because when the Court does address the Cities' claims under California law, they must fail as well.

## II.  Federal statutory law displaces any federal common law public nuisance claims.

Even if federal common law might conceivably afford the Cities relief here, any claim under such law must be dismissed because it is displaced by federal statute.  *First*, the Clean Air Act displaces all of the Cities' claims because it speaks directly to the question of domestic greenhouse-gas regulation.  *Second*, the Constitution's foreign affairs powers displace any of the Cities' claims regarding international greenhouse-gas emissions because they assign authority to make international commitments concerning these matters to Congress and the Executive Branch, not to the courts.  *Third*, to the extent that the Cities' claims target the sale and production of fossil fuels extracted from federal land, they are displaced by federal laws concerning energy production on federal land.  We discuss these arguments in turn.

### A.  The Clean Air Act displaces the Cities' federal common law claims.

The Cities seek to evade *AEP* by suing producers of fossil fuels instead of consumers.  But the Cities' claims depend on the same fundamental theory of liability that the plaintiffs invoked in *AEP*:  that the defendants should be held responsible for greenhouse gas emissions.  As in *AEP*, here too the Clean Air Act displaces the Cities' federal common law claim of public nuisance.

In *AEP*, several states and three non-profit land trusts sued electric power companies under the federal common law of nuisance; as relief, the states sought a cap on carbon-dioxide emissions.  The Supreme Court divided equally as to whether such claims were justiciable.  Without deciding whether a federal common law claim existed, however, the Court held unanimously that the Clean Air Act displaced "any federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants."  564 U.S. at 424.  The Court held that "displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law," *id.* at 423 (quoting *Milwaukee II*, 451 U.S. at

317), because "it is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest," *id*. at 424.  Instead, the test for whether legislation excludes federal common law is simply whether the statute "speak[s] directly to [the] question." *Id*. (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)).

As recognized by the Order Denying Remand (at 7-8), the Supreme Court has held that the Clean Air Act speaks directly to greenhouse gas emissions from fossil-fuel combustion.  *See AEP*, 564 U.S. at 424.  *Massachusetts v. EPA*, 549 U.S. 497, 528-29 (2007), held that greenhouse gases were within the Act's definition of "air pollutant" and thus could be regulated under the Act.  EPA has since concluded that greenhouse gas emissions from motor vehicles "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."  74 Fed. Reg. 66,496 (Dec. 15, 2009); *see also* 42 U.S.C § 7521.  Notably, the concerns considered by EPA in this context overlap with those in the Cities' complaints, including "coastal inundation and erosion caused by melting icecaps and rising sea levels."  *AEP*, 564 U.S. at 416 (citing 74 Fed. Reg. at 66,533).[4]  Consistent with this conclusion, EPA has promulgated regulations concerning greenhouse gas emissions from mobile sources;[5] new or modified "[m]ajor [greenhouse gas] emitting facilities";[6] and new, modified, and existing fossil-fuel fired power plants.[7]  As the

---

[4] Other effects were "more frequent and intense hurricanes, floods, and other 'extreme weather events' that cause death and destroy infrastructure; drought due to reductions in mountain snowpack and shifting precipitation patterns; destruction of ecosystems supporting animals and plants; and potentially 'significant disruptions' of food production."  *AEP*, 564 U.S. at 417 (quoting 74 Fed. Reg. at 66,524-35).

[5] *See, e.g.*, 2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards, 77 Fed. Reg. 62,624 (Oct. 15, 2012); Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2, 81 Fed. Reg. 73,478 (Oct. 25, 2016); *cf*. Finding that Greenhouse Gas Emissions from Aircraft Cause or Contribute to Air Pollution That May Reasonably Be Anticipated to Endanger Public Health and Welfare, 81 Fed. Reg. 54,422 (Aug. 15, 2016).

[6] *See AEP*, 564 U.S. at 417 (quoting 42 U.S.C. § 7475(a)(4)); Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule, 75 Fed. Reg. 31,514 (June 3, 2010).

[7] Standards of Performance for Greenhouse Gas Emissions from New, Modified, and Reconstructed Stationary Sources:  Electric Utility Generating Units, 80 Fed. Reg. 64,510 (Oct. 23, 2015); Carbon Pollution Emission Guidelines for Existing Stationary Sources:  Electric Utility Generating Units, 80 Fed. Reg. 64,662 (Oct. 23, 2015).

1   Supreme Court determined in *AEP*, because the Clean Air Act covers regulation of the same

2   greenhouse gas emissions that are the basis of the Cities' federal common law claim, there is "no

3   room for a parallel track."  564 U.S. at 425.

4        That EPA has taken steps to reconsider certain of the foregoing agency decisions is

5   irrelevant to the displacement analysis.  The linchpin of *AEP* was Congress' delegation of authority

6   to EPA to regulate greenhouse-gas emissions; the Court emphasized that displacement did not turn

7   on how EPA exercised that authority:  "the relevant question for purposes of displacement is

8   'whether the field has been occupied, not whether it has been occupied in a particular manner.' "

9   564 U.S. at 426 (quoting *Milwaukee II*, 451 U.S. at 324)).  "Indeed," the Court explained, "were

10  EPA to decline to regulate carbon-dioxide emissions altogether . . . , the federal courts would have

11  no warrant to employ the federal common law of nuisance to upset the Agency's expert

12  determination."  *Id.*  Congress has charged EPA with addressing the same category of emissions

13  that are at issue in the Cities' claims; that fact alone suffices to displace any potential claims under

14  federal common law.

15       The Ninth Circuit reached a similar conclusion in *Kivalina*, in which a federally recognized

16  tribal village joined a city in alleging that storm waves and surges were destroying the land it

17  occupied; the plaintiffs there sued four of the same Defendants here for damages, asserting a

18  federal common law claim of public nuisance.  696 F.3d at 853.  As framed by the Ninth Circuit,

19  the displacement analysis was "whether Congress has provided a sufficient legislative solution to

20  the particular [issue] to warrant a conclusion that [the] legislation has occupied the field to the

21  exclusion of federal common law."  696 F.3d at 856 (quoting *Michigan v. U.S. Army Corps of*

22  *Engineers*, 667 F.3d 765, 777 (7th Cir. 2011)).  In holding that the village's claim was displaced,

23  the court held that "Congressional action, not executive action, is the touchstone of displacement

24  analysis."  *Id.* at 858; *see also id.* at 857 ("The doctrine of displacement is an issue of separation

25  of powers between the judicial and legislative branches, not the judicial and executive branches.").

26       The Cities argue that they seek to have the Court impose an abatement fund to pay for sea

27  walls and other infrastructure, a remedy that is not available under the Clean Air Act.  But the

28  Supreme Court has found displacement applicable even where a federal statute does not provide

precisely the same remedies as a putative federal common law claim. For example, in *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 21-22 (1981), the Supreme Court held that the "comprehensive scope" of the Clean Water Act sufficed to displace even federal common law remedies that have no analogue in that statute, such as claims for compensatory and punitive damages. Likewise in *Kivalina*, the plaintiffs sought damages, a remedy not provided by the Clean Air Act. Nevertheless, the Ninth Circuit ruled that "the type of remedy asserted is not relevant to the applicability of the doctrine of displacement." 696 F.3d at 857.

The Cities also disavow any attempt to regulate *emissions*, arguing that their claim is fundamentally different from the claims displaced in *AEP* and *Kivalina* because they are targeting an earlier point in the stream of commerce—the sellers of a product, rather than users. Motion for Remand, ECF No. 81, at 7 (The "nuisance claim here is brought not against *dischargers*, but against sellers of a *product*."). The purported distinction is illusory: the Cities seek to hold the Defendants liable for exactly the same conduct (greenhouse gas emissions) and exactly the same alleged harm (sea level rise) at issue in *AEP* and *Kivalina*. And the Cities' complaints confirm that this case is not about production of fossil fuels; rather, it is about emissions of greenhouse gases from the combustion of fossil fuels. *E.g.*, First Amended Complaint, ECF No. 199, ¶¶ 92-94, 133, 140, 145. The Cities allege that for "many years, Defendants have produced massive quantities of fossil fuels that, when combusted, emit carbon dioxide, the most important greenhouse gas." *Id.* ¶ 92. They further allege that the "cumulative greenhouse gases in the atmosphere attributable to each Defendant has increased the global temperature and contributed to sea level rise." *Id.* Thus, the Cities' complaints reveal the fundamental identity of their case with *AEP*, as they seek relief based on emissions, not sales. *Id.* ¶ 94(c).[8]

---

[8] To the extent that sellers and purchasers of fossil fuels are part of an integrated market, the Cities' abatement fund would have the same coercive regulatory effect rejected in *AEP* and *Kivalina*. *See Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364, 372 (2008) (declining to distinguish between restrictions on sales and restrictions on purchases in preemption analysis). If the Cities succeed in their suit, they would have the Court impose an abatement fund consisting of money damages. First Amended Complaint at 55. Damages, whether punitive or compensatory, can constitute a form of regulation. *See Gore*, 517 U.S. at 569 (punitive damages); *San Diego*

For the Court to consider the alleged effect of Defendants' production and sale of fossil fuels on sea-level rise, it will necessarily have to consider the combustion of those fuels and the resulting emissions of greenhouse gases.  The Cities' complaints focus entirely on the impact of greenhouse gas emissions on sea-level rise and identify no alternative path, beyond combustion, by which the production and sale of fossil fuels could affect climate change—because, of course, there is no such alternative path.  But not all fossil fuels are used for combustion; petroleum products have other useful applications, including as an ingredient in chemicals and plastics.[9]  In addition, fossil fuels generate varying amounts of greenhouse gas emissions.  To analyze liability or allocate damages among Defendants, therefore, the Court would not be able to rest its analysis on the fossil fuels that Defendants have produced and sold, but would need to consider how those fuels were *used* and the relative contribution of those uses to total global greenhouse gas emissions.

The Clean Air Act even discusses the kinds of harmful effects cited by the Cities as the basis for their legal action.  For instance, the Act provides that "effects on welfare" include but are not limited to "effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property."  42 U.S.C. § 7602(h).  Consistent with this definition, EPA considered the "adverse effects . . . from sea level rise and more intense storms," 74 Fed. Reg. at 66,498—the very harms alleged by the Cities—in determining that six greenhouse gases should be considered air pollutants under Section 202(a) of the Clean Air Act because they are associated with "all current and future risks due to human-induced climate change . . . [including] a rise in sea levels," *id*. at 66,519, and therefore endanger public health and welfare.  *See id*. at 66,498 (observing that "evidence concerning adverse impacts in the areas of water resources and sea level rise and coastal areas provides the clearest and

---

*Building Trades Council v. Garmon*, 359 U.S. 236, 247 (1959) ("The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.").  Requiring Defendants to pay such damages would have an unmistakably coercive effect.  The Cities cannot avoid displacement by seeking to reassign enforcement of emission standards to the seller of a product when the Clean Air Act assigns it to the user.

[9] Energy Information Administration, Petroleum & Other Liquids:  Product Supplied, https://www. eia.gov/dnav/pet/pet_cons_psup_dc_nus_mbbl_a.htm (last visited Apr. 18, 2018) (identifying uses of petroleum products).

strongest support for an endangerment finding"). EPA's endangerment finding links greenhouse gas emissions with the very injuries identified by the Cities. And when greenhouse gases are recognized as a pollutant, the Clean Air Act authorizes EPA to regulate their emission. Rather than impose a liability scheme for the cost of adaptation, Congress has given the Executive Branch authority to regulate the underlying emissions within the confines of the Clean Air Act, thereby speaking directly to the effects of climate change like sea level rise.

> **B.      The authorities and activities of Congress and the Executive Branch relating to international climate change displace the Cities' claims based on foreign emissions.**

During remand briefing, the Cities argued—counterintuitively, but correctly—that federal common law claims for a putative public nuisance arising from greenhouse gas emissions were displaced by the Clean Air Act. *See* ECF No. 81, at 10-13. In rejecting that argument, the Court observed that "greenhouse gases emanating from overseas sources are equally guilty (perhaps more so) of causing plaintiffs' harm," but "those foreign emissions are out of EPA's and the Clean Air Act's reach." Order Denying Remand, ECF No. 134, at 7.[10] Overseas emissions of greenhouse gases, the Court reasoned, mean that the Clean Air Act "does not provide a sufficient legislative solution to the nuisance alleged to warrant a conclusion that this legislation has occupied the field to the exclusion of federal common law." *Id.* Although we agree that the international dimensions of climate change support the conclusion that federal law rather than state law governs, those international dimensions render the Cities' federal common law claims especially unsuited for adjudication under the federal common law of nuisance as it has been understood by federal courts.

The federal common law of nuisance originated in disputes between the states—disputes that are inherently domestic in scope. *Wyandotte*, 401 U.S. at 495-96. The extraterritorial reach

---

[10] The Court's Remand Order appears to presume that one can easily distinguish between "foreign emissions" from foreign production of fossil fuels and "domestic emissions" from domestic production. But the opposite is true: the United States exports a significant amount of fossil fuels to other countries and imports fossil fuels as well. *See* Energy Information Administration, Petroleum & Other Liquids: Exports, https://www.eia.gov/dnav/pet/pet_move_exp_dc_NUS-Z00_mbbl_m.htm (last visited Apr. 19, 2018); Energy Information Administration, Petroleum & Other Liquids: U.S. Imports by Country of Origin, https://www.eia.gov/dnav/pet/pet_move_impcus_a2_nus_ep00_im0_mbbl_a.htm (same). This intermingled stream of global commerce is yet another reason why federal common law is a poor fit to address climate change.

1   of the proposed claims is another reason not to create a federal common law remedy here.  To the

2   United States' knowledge, no federal common law of nuisance claim with an international

3   component has ever been sustained by the federal courts.  Congress must state expressly when a

4   federal statute is to have extraterritorial application; courts may not divine what "Congress would

5   have wished" if it had addressed the problem.  *Morrison v. National Australia Bank Ltd.*, 561 U.S.

6   247, 260 (2010) (internal quotation marks omitted).  Yet the Cities ask the Court to create a federal

7   common law claim that stretches across oceans to attach liability to conduct occurring entirely on

8   foreign soil—all without any hint of the requisite express authorization from Congress.

9       As the Supreme Court recently reaffirmed in *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386

10  (2018), non-statutory remedies like those sought by the Cities are all the more out of place in the

11  international context, where the risk that courts and litigants will encroach on the proper functions

12  of Congress and the Executive Branch is acute.  The *Jesner* plurality concluded that it would be

13  inappropriate to extend liability under the Alien Tort Statute to corporations because "judicial

14  caution . . . 'guards against our courts triggering . . . serious foreign policy consequences, and

15  instead defers such decisions, quite appropriately, to the political branches.'" *Id.* at 1407 (quoting

16  *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013)); *accord id.* at 1408 (Alito, J.,

17  concurring in the judgment) (endorsing plurality's "judicial caution" rationale); *id.* at 1412

18  (Gorsuch, J., concurring in the judgment) (agreeing that "the job of creating new causes of action

19  and navigating foreign policy disputes belongs to the political branches"); *Sosa v. Alvarez-*

20  *Machain*, 542 U.S. 692, 727 (2004) (in crafting new private rights of action, courts must be

21  "particularly wary of impinging on the discretion of the Legislative and Executive Branches in

22  managing foreign affairs").  *Cf.* 5 U.S.C. § 553(a)(1) (exempting from APA rulemaking provisions

23  any matter involving a "foreign affairs function of the United States").

24      Even if the federal common law of nuisance could extend to conduct outside of the United

25  States, such a nuisance claim would be displaced by the broad powers possessed by Congress and

26  the Executive Branch in this arena:  "the conduct of foreign relations is committed by the

27  Constitution to the political departments of the Federal Government." *United States v. Pink*, 315

28  U.S. 203, 222 (1942).  The Constitution expressly grants power to Congress to "regulate commerce

with foreign nations" and power to the President to "make Treaties."  U.S. Const. art. I § 8, cl. 3; *id.* art. II, § 2, cl. 2.  Of course, congressional action is the touchstone of displacement analysis. *Kivalina*, 696 F.3d at 858.  Congress has recognized the role of the Executive Branch to negotiate with respect to the international effects of greenhouse gases.  *See, e.g., Massachusetts*, 549 U.S. at 508 (observing that Congress "ordered the Secretary of State to work 'through the channels of multilateral diplomacy' and coordinate diplomatic effects to combat global warming" (quoting Global Climate Protection Act of 1987, Pub. L. No. 100-204, tit. XI, § 1103(c), 101 Stat. 1331, 1409)).  Congress delegated the decision whether and how to address international greenhouse gas emissions to the Executive Branch in the first instance, and "delegation is what displaces federal common law." *AEP*, 564 U.S. at 426.

Given the global nature of climate risks, the United States and other countries are actively involved in discussions as to whether and how to address climate change through a coordinated framework, most recently in the Paris Agreement.  The decision as to the role of the United States in such international arrangements is one for the Executive Branch and Congress.  *See, e.g., In re Philippine Nat'l Bank*, 397 F.3d 768, 772 (9th Cir. 2005) (endorsing "the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs" (internal quotation marks omitted)).  Judicial attempts to craft a compensation scheme based on conduct occurring outside the United States will inevitably intrude on the authorities of those branches.

Moreover, allowing the Cities' claims to extend beyond the borders of the United States would necessarily mean disregarding the laws of other nations that produce (and burn) fossil fuels. But the Supreme Court has sought to avoid conflicts with foreign legal systems because

> regulation of other countries often differs from ours as to what constitutes [a violation], what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters.

*Morrison*, 561 U.S. at 269.  Many foreign governments actively support the production activities for which the Cities now suggest imposing damages—in some instances through a state-backed energy company.  Foreign governments may have their own legal framework for addressing

1    climate change or climate-related injuries and may have distinct views as to the appropriateness of

2    international compensation for alleged climate injuries.

3        A federal district court applying federal common law would necessarily disregard these

4    foreign governments' policy views. *See, e.g.*, *Philippine Nat'l Bank*, 397 F.3d at 774 (reinstating

5    judgment of the Philippine Supreme Court because to invalidate it would "frustrate the procedure

6    chosen by the Swiss and Philippine governments to adjudicate the [Philippines'] entitlement . . .

7    to [bank] assets"). If those governments view this judicial action as interference in their internal

8    affairs, they could respond by seeking to prevent the imposition of these costs, by seeking payment

9    of reciprocal costs, or by taking other action. *See, e.g.*, *Morrison*, 561 U.S. at 269 (noting that

10   briefs from several foreign states "complain[ed] of . . . interference with foreign . . . regulation");

11   *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 450 (1979) (explaining that affected

12   foreign nations "may retaliate against American-owned instrumentalities present in their

13   jurisdictions," causing the Nation as a whole to suffer). Decisions as to whether and how to initiate

14   these negotiations with foreign governments should be made by the Executive Branch and

15   Congress, not by the judiciary. For a court to recognize such an intrusive judicial remedy would

16   "compromise the very capacity of the President to speak for the Nation with one voice in dealing

17   with other governments." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 381 (2000).

18       Separately, in Section 115 of the Clean Air Act, Congress authorized EPA to address, under

19   certain scenarios, the effects in a foreign country of air pollution from sources inside the United

20   States. 42 U.S.C. § 7415(a). Under Section 115, EPA has some authority to use the Clean Air

21   Act's state implementation plan process to address international pollution based on a finding that

22   the "foreign country . . . has given the United States essentially the same rights with respect to the

23   prevention or control of pollution as is given that country by this section." *Id*. § 7415(c). This

24   provision, with its reciprocity requirement, further demonstrates that Congress intends the

25   Executive Branch to determine how to address appropriately air pollution with international effects

26   as part of its conduct of foreign affairs. Indeed, the unilateral approach to regulating foreign

27   conduct urged by the Cities cannot be reconciled with the statute's preference for reciprocity.

28

1    As noted above, the Constitution also assigns to Congress the power to "regulate

2  Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3.  The Supreme Court has interpreted

3  that grant of power to mean that "the Federal Government must speak with one voice when

4  regulating commercial relations with foreign governments." *Michelin Tire Corp. v. Wages*, 423

5  U.S. 276, 285 (1976).  Accordingly, the Court applies substantial scrutiny, for example, to state

6  laws imposing taxes on overseas conduct, seeking to ensure that the tax has a substantial nexus to

7  the taxing state, does not lead to double taxation, and meets several other requirements. *See, e.g.*,

8  *Barclays Bank PLC v. Franchise Tax Board*, 512 U.S. 298, 311 (1994).  The damages remedy

9  sought by the Cities here would function as a sweeping, retroactive tax on Defendants' overseas

10  operations.  Such relief, even if "fairly apportioned" by the Court to reflect Defendants' activities

11  in each country in which they operate, creates an unacceptable risk of double taxation with respect

12  to Defendants who also produce fossil fuels abroad. *Japan Line*, 441 U.S. at 448.  Because "the

13  country of domicile may have the right . . . to impose a tax on [the product's] full value," *id*. at

14  447, "neither [federal courts] nor this Nation can ensure full apportionment when one of the taxing

15  entities is a foreign sovereign." *Id*. at 447-48 (refusing to subject foreign commerce to the risk of

16  a double-tax burden "which the commerce clause forbids").  Because this double-taxation scenario

17  would violate the Supreme Court's foreign commerce clause jurisprudence, the Court should not

18  seek to impose such a remedy under federal common law.

19
20   **C.    Federal statutes governing the production of fossil fuels on federal lands
        and offshore displace the applicable portions of the Cities' claims.**

21    Even if one accepts the Cities' characterization of their claims as creating product liability,

22  the portion of their federal common law claims asserting that Defendants are liable for the

23  production and sale of fossil fuels on federal lands or offshore would be displaced.[11]  Congress

24  directly addressed how to balance energy production on federal public lands with other uses by

25  _____

26  [11] A considerable amount of oil, gas, and coal development takes place on federal land. *See* Energy
      Information Administration, Sales of Fossil Fuels Produced from Federal and Indian Lands, FY
27  2003 through FY 2014 (July 2015), https://www.eia.gov/analysis/requests/federallands/pdf/eia-
      federallandsales.pdf (last visited Apr. 19, 2018) (documenting barrels of fossil fuels developed on
28  federal lands).

placing federal land-management agencies in charge of assessing and regulating mineral and other resources on such lands; this direct congressional command is enough to displace any applicable federal common law remedy.  Whereas the Cities' claims would have this Court decide whether fossil-fuel production must be abated as a public nuisance under federal common law, Congress gave the Department of the Interior broad authority to manage onshore mineral resources in the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 et seq.  FLPMA "established a policy in favor of retaining public lands for multiple use management."  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004) (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 877 (1990)).  As the Supreme Court described it, "multiple use management is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put."  *Id.* (observing that such uses include but are not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific, and historical values" (quoting 43 U.S.C. § 1702(c))).  The Bureau of Land Management must manage lands for "sustained yield," which requires controlling resources that deplete over time to ensure a high level of valuable uses in the future.  43 U.S.C. § 1702(h).  The National Forest Management Act (NFMA), 16 U.S.C. §§ 1600-1614, gives similar authority to the U.S. Forest Service to manage mining on federal forest lands.[12]

Thus, Congress considered how to balance fossil-fuel production on federal land with other uses and created the multiple-use, sustained-yield approach established by FLPMA and NMFA.  Plaintiffs' federal common law claim would effectively second-guess Congress' decision to authorize resource production on these lands; consequently, that claim is displaced.  *See Middlesex County Sewerage Authority*, 453 U.S. at 21-22.

Under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331 et seq., Congress has tasked the Interior Department's Bureau of Ocean Energy Management (BOEM) with

---

[12] Other federal statutes govern mineral leasing and royalties from the extraction of minerals on federal lands.  *See* Mineral Leasing Act of 1920, 30 U.S.C. § 181 et seq.; Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. § 1701 et seq.  For a list of authorities that govern leasing and regulating oil and gas operations on federal lands, see 43 C.F.R. § 3160.0-3.

1   responsibility for licensing offshore oil and gas production on most of the Outer Continental Shelf.

2   OCSLA's "congressional mandate establishes a clear program for thoughtful, graduated, and

3   tightly controlled development of oil lands on the outer continental shelf." *North Slope Borough*

4   *v. Andrus*, 642 F.2d 589, 594 (D.C. Cir. 1980).  Environmental concerns are "mitigated by intricate

5   constraints imposed by Congress and the Secretary, and enforced carefully by the Secretary." *Id*.

6   It is well established that OCSLA preempts state law.  *See, e.g., Gulf Offshore Co. v. Mobil Oil*

7   *Corp.*, 453 U.S. 473 (1981).  Because displacement of federal common law is established more

8   readily than preemption of state common law, OCSLA necessarily displaces any federal common

9   law claim by the Cities to the extent that the Cities' claims concern production and sale of fossil

10  fuels from the Outer Continental Shelf.  The Cities have no room to seek alternative relief from

11  the federal common law of nuisance because OCSLA speaks directly to the same question—"the

12  development of national [offshore] oil resources, consistent with the will of Congress and mindful

13  of the environment." *North Slope Borough*, 642 F.2d at 598.

14  **III.     The Cities' claims violate constitutional principles of separation of powers.**

15          If the Court does not dismiss the Cities' claims on other grounds, then it should dismiss

16  them as not "consistent with a system of separated powers." *Allen v. Wright*, 468 U.S. 737, 752

17  (1984).  The Cities' claims would require that federal district courts take the exceptional step of

18  creating a cause of action that would apply to virtually everyone and that would demand complex

19  scientific and policy judgments more appropriately made by the political branches.  But courts

20  lack judicially discoverable and manageable standards to resolve such "complex[,] subtle" issues

21  where "courts have less competence" than the Legislative and Executive Branches. *See Gilligan*

22  *v. Morgan*, 413 U.S. 1, 10 (1973) (deeming too complex relief that would require the court to

23  initiate standards for military training and standing orders).  With respect to regulation of

24  greenhouse gases, the Supreme Court has cautioned that "[f]ederal judges lack the scientific,

25  economic, and technological resources an agency can utilize in coping with issues of this order."

26  *AEP*, 564 U.S. at 428.  This warning is magnified here, where the Cities are pursuing parties that

27  are even further down the chain of causation than the claims addressed in *AEP*.   *Cf. North*

28  *Carolina*, 615 F.3d at 296 (observing, in a suit involving a state common law claim, that

1   "encourag[ing] courts to use vague public nuisance standards to scuttle the nation's carefully

2   created system for accommodating the need for energy production and the need for clean air"

3   would result in "a balkanization of clean air regulations and a confused patchwork of standards, to

4   the detriment of industry and the environment alike").

5      Moreover, the Cities' theory of liability would grant virtually every individual,

6   organization, company, or government who can allege injury from climate change a claim that

7   could be leveled against a multiplicity of defendants.  *See AEP*, 564 U.S. at 428-29 (disapproving

8   of the notion that similar suits could be mounted against "thousands or hundreds or tens" of other

9   large emitters).  Each successive court would be required to make still more difficult predictive

10  judgments in determining whether and to what extent each defendant should be deemed liable

11  under general principles of nuisance law for some share of the injuries associated with global

12  climate change.  "[C]onfined by a record comprising the evidence the parties present," district

13  court judges would be compelled to issue overlapping rulings that, like the competing orders

14  already issued in the Northern District of California, lack precedential effect even on members of

15  the same court.  *See id*.

16     To decide this case would also intrude impermissibly on the function of the political

17  branches to determine what level of greenhouse gas regulation is reasonable.  Identifying a public

18  nuisance under federal common law requires determining that a "harm . . . unreasonably

19  interfere[s] with a right common to the general public."  *Kivalina*, 696 F.3d at 855.  As the Supreme

20  Court observed in *AEP*, the "appropriate amount of regulation in any particular greenhouse gas-

21  producing sector cannot be prescribed in a vacuum."  564 U.S. at 427.  "Along with the

22  environmental benefit potentially achievable," the Court continued, "our Nation's energy needs

23  and the possibility of economic disruption must weigh in the balance."  *Id*.  Such a sensitive and

24  central determination "is appropriately vested in branches of the government which are

25  periodically subject to electoral accountability."  *Gilligan*, 413 U.S. at 10.[13]

26  _____

27  [13] Any remedy under the federal common law of nuisance would be unavailable for yet another
    reason.  Claims arising under the federal common law of nuisance sound in equity, *Milwaukee I*,

28  406 U.S. at 107-08, and any remedy is within the equitable discretion of the court, *Weinberger v.*

1    For these reasons, the Cities' claims should be dismissed as fundamentally inconsistent

2    with the constitutional separation of powers.

3                                      **CONCLUSION**

4    Thus, the Court should dismiss the Cities' claims because no remedy under the federal

5    common law of nuisance is available here, and because the Cities' suit would violate principles of

6    the constitutional separation of powers.

7    Dated:  May 10, 2018.

8                                          Respectfully submitted,

9                                          JEFFREY H. WOOD
                                           Acting Assistant Attorney General
10
                                           /S/ *Christine W. Ennis*
11                                         ERIC GRANT
                                           Deputy Assistant Attorney General
12                                         JUSTIN D. HEMINGER
                                           R. JUSTIN SMITH
13                                         CHRISTINE W. ENNIS
                                           Attorneys
14                                         Environment and Natural Resources Division
                                           U.S. Department of Justice
15
                                           Counsel for Amicus Curiae
16                                         United States of America

17

18

19

20

21

22

23

24

25

26
     _____

27   *Romero-Barcelo*, 456 U.S. 305, 311-20 (1982).  In view of the risk of intrusion on decisions to be
     made by the political branches, as well as the cacophony of overlapping judicial orders that could
     result from efforts to grant relief in this category of cases, a federal court would be well advised to
28   exercise its equitable discretion to withhold relief in this matter.