Theodore J. Boutrous, Jr., SBN 132099
tboutrous@gibsondunn.com
Andrea E. Neuman, SBN 149733
aneuman@gibsondunn.com
William E. Thomson, SBN 187912
wthomson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Defendant CHEVRON
CORPORATION
(*Additional counsel on signature page*)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF OAKLAND, a Municipal Corporation, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Oakland City Attorney BARBARA J. PARKER,<br><br>     Plaintiffs,<br><br>     v.<br><br>BP P.L.C., a public limited company of England and Wales; CHEVRON CORPORATION, a Delaware corporation; CONOCOPHILLIPS COMPANY, a Delaware corporation; EXXON MOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10,<br><br>     Defendants. | First-Filed Case No. 3:17-cv-6011-WHA<br>Related to Case No. 3:17-cv-6012-WHA<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO REMAND** |
| CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the San Francisco City Attorney DENNIS J. HERRERA,<br><br>     Plaintiffs,<br><br>     v.<br><br>BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, | |

CONOCOPHILLIPS COMPANY, a Delaware
corporation, EXXONMOBIL
CORPORATION, a New Jersey corporation,
ROYAL DUTCH SHELL PLC, a public
limited company of England and Wales, and
DOES 1 through 10,

                Defendants.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND AND PROCEDURAL STATUS ........................................... 4

III.  LEGAL STANDARD ...................................................................................... 4

IV.   ARGUMENT ................................................................................................... 4

    A.    This Action Is Removable Under The Outer Continental Shelf Lands Act. ................. 4

    B.    The Action Is Removable Under The Federal Officer Removal Statute. ..................... 7

        1.    Defendants "Acted Under" Federal Officers. ................................................ 10

            a.    Removal Is Appropriate On Grounds Addressed By The Ninth Circuit Because Defendants Provide Additional Evidence In Support. ................................................................................ 11

            b.    Removal Is Also Appropriate On Grounds Not Before Or Considered By The Ninth Circuit. ..................................... 15

        2.    Plaintiffs' Claims Have A Causal Nexus To These Acts Under Federal Officers. ..................................................................... 21

        3.    Defendants Raise "Colorable Federal Defenses." ........................................ 22

    C.    The Court Has Jurisdiction Because Plaintiffs' Claims Arise On Federal Enclaves. ................................................................................ 23

    D.    Plaintiffs' Claims Raise Disputed And Substantial Federal Issues Under *Grable*. ................................................................................ 23

V.    CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Amoco Prod. Co. v. Sea Robin Pipeline Co.*,
    844 F.2d 1202 (5th Cir. 1988)................................................................................7

*Azhocar v. Coastal Marine Servs., Inc.*,
    2013 WL 2177784 (S.D. Cal. May 20, 2013)......................................................23

*B.P. P.L.C. v. Mayor & City Council of Baltimore*,
    No. 19-1189 (U.S.)..........................................................................1, 4, 8, 15, 16

*Baker v. Atl. Richfield Co.*,
    962 F.3d 937 (7th Cir. 2020)..................................................................19, 20, 22

*Boyle v. United Tech. Corp.*,
    487 U.S. 500 (1988)..............................................................................................22

*BP P.L.C. v. City of Oakland*,
    No. 20-1089 (U.S.)............................................................................................1, 4

*Campbell-Ewald Co. v. Gomez*,
    577 U.S. 153 (2016)..............................................................................................22

*Chevron Corp. v. San Mateo County*,
    No. 20-884 (U.S.)...................................................................................................4

*Cipollone v. Liggett Grp., Inc.*,
    505 U.S. 504 (1992)................................................................................................7

*City of Oakland v. BP P.L.C.*,
    No. 3:17-cv-0611-WHA (N.D. Cal.) ....................................................................1

*City of Oakland v. BP PLC*,
    960 F.3d 570 (9th Cir. 2020)..................................................................................4

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender
    Ass'n of Philadelphia*,
    790 F.3d 457 (3d Cir. 2015)..................................................................................22

*Corley v. Long-Lewis, Inc.*,
    688 F. Supp. 2d 1315 (N.D. Ala. 2010) ..............................................................23

*County of San Mateo v. Chevron Corp.*,
    960 F.3d 586 (9th Cir. 2020).............................................4, 8, 9, 10, 11, 12, 13, 14, 15

*Davis v. Metro Productions, Inc.*,
    885 F.2d 515 (9th Cir. 1989)..................................................................................9

*In re Deepwater Horizon*,
  745 F.3d 157 (5th Cir. 2014) ................................................................................6

*Dejong v. Production Associates, Inc.*,
  2015 WL 1285282 (C.D. Cal. Mar. 19, 2015) .....................................................8

*Durham v. Lockheed Martin Corp.*,
  445 F.3d 1247 (9th Cir. 2006) .............................................................................23

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  511 F. Supp. 2d 742 (S.D. Tex. 2005) ................................................................24

*EP Operating Ltd. v. Placid Oil Co.*,
  26 F.3d 563 (5th Cir. 1994) ..............................................................................5, 7

*Estes v. Wells Fargo Home Mortgage*,
  2015 WL 362904 (W.D. Wash. Jan. 27, 2015) ..................................................24

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005) ..............................................................................................4

*Exxon Mobil Corp. v. United States*,
  2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) *appeal docketed*, No. 20-20590 (5th
  Cir. Nov. 13, 2020) ..................................................................................16, 17, 18

*Goncalves By and Through Goncalves v. Rady Children's Hosp. San Diego*,
  865 F.3d 1237 (9th Cir. 2017) ....................................................7, 15, 17, 21, 22

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
  545 U.S. 308 (2005) ..........................................................................1, 23, 24, 25

*Honolulu v. Chevron U.S.A. Inc.*,
  2021 WL 531237 (D. Haw. Feb. 12, 2021) ..........................................................6

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988) ..............................................................................................24

*Isaacson v. Dow Chem. Co.*,
  517 F.3d 129 (2d Cir. 2008) ...............................................................................21

*Jefferson Cnty. v. Acker*,
  527 U.S. 423 (1999) .........................................................................................8, 22

*Jimenez v. Haxton Masonry, Inc.*,
  2020 WL 3035797 (N.D. Cal. June 5, 2020) ......................................................23

*Jones v. John Crane-Houdaille, Inc.*,
  2012 WL 1197391 (D. Md. Apr. 6, 2012) ...........................................................23

v

*Kamilche Co. v. United States*,
53 F.3d 1059 (9th Cir. 1995)......................................................................................................9

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984)....................................................................................................................25

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*,
754 F.2d 1223 (5th Cir. 1985)....................................................................................................5

*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020)............................................................................................21, 22

*Legg v. Wyeth*,
428 F.3d 1317 (11th Cir. 2005)..................................................................................................4

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014)..............................................................................................7, 22

*McMann v. Air & Liquid Sys. Corp.*,
2014 WL 1794694 (W.D. Wash. May 6, 2014)......................................................................8

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990)........................................................................................................................24

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)....................................................................................................................24

*Nat'l Review, Inc. v. Mann*,
140 S. Ct. 344 (2019) (Alito, J., dissenting from denial of certiorari)..........................25

*Paramount Pictures Corp. v. Int'l Media Films, Inc.*,
2012 WL 12884852 (C.D. Cal. Apr. 6, 2012) ......................................................................9

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979)......................................................................................................................9

*Phila. Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986)..............................................................................................................24, 25

*Quackenbush v. Allstate Ins. Co.*,
517 U.S. 706 (1996)..............................................................................................................3, 10

*Resolution Trust Corp. v. Keating*,
186 F.3d 1110 (9th Cir. 1999)....................................................................................................8

*San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*,
359 U.S. 236 (1959)......................................................................................................................7

*Shell Oil Co. v. United States*,
751 F.3d 1282 (Fed. Cir. 2014)................................................................................................17

*Shell Oil Prods. Co. v. Rhode Island*,
    No. 20-900 (U.S.)................................................................................................................4

*Stross v. NetEase, Inc.*,
    2020 WL 5802419 (C.D. Cal. Aug. 20, 2020) ...................................................................9

*Stucky v. Hawaii*,
    2010 WL 1372317 (D. Haw. Mar. 31, 2010) ....................................................................9

*Suncor Energy (U.S.A.) Inc. v. Board of County Commissioners of Boulder County*,
    No. 20-783 (U.S.)................................................................................................................4

*Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*,
    87 F.3d 150 (5th Cir. 1996)................................................................................................7

*United Offshore Co. v. S. Deepwater Pipeline Co.*,
    899 F.2d 405 (5th Cir. 1990)..............................................................................................7

*United States v. Shell Oil Co.*,
    294 F.3d 1045 (9th Cir. 2002)..........................................................................................16

*Watson v. Philip Morris Cos.*,
    551 U.S. 142 (2007) ........................................................8, 10, 13, 15, 17, 19, 20, 21

*Winters v. Diamond Shamrock Chem. Co.*,
    149 F.3d 387 (5th Cir. 1998)............................................................................................20

*Yee v. City of Escondido*,
    503 U.S. 519 (1992)..........................................................................................................24

**Statutes**

28 U.S.C. § 1331 ...............................................................................................................1, 23

28 U.S.C. § 1441(a) ...............................................................................................................4

28 U.S.C. § 1442(a)(1)..........................................................................................................21

28 U.S.C. § 1446.....................................................................................................................8

30 U.S.C. § 226(i)................................................................................................................20

43 U.S.C. § 1332(3) ............................................................................................................12

43 U.S.C. § 1349(b) ..........................................................................................................4, 6

43 U.S.C. § 1802(1)–(2)......................................................................................................13

1975 Energy Policy Conservation Act, Pub. L. No. 94-163, 89 Stat. 871.........................21

Defense Production Act of 1950, Pub. L. No. 81-774, 64 Stat. 798 ......................................................11

**Other Authorities**

121 Cong. Rec. 4490 (daily ed. Feb. 26, 1975) ......................................................................13

Report of the Activities of the Joint Committee on Defense Production, H. Rep. No.
    84-1 (Jan. 5, 1955, 1st Sess.)......................................................................................18

**Regulations**

43 C.F.R. § 3103.4-4 ......................................................................................................20

19 Fed. Reg. § 250.11, 2656 ..........................................................................................12

**Constitutional Provisions**

First Amendment........................................................................................................24, 25

DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO REMAND – Nos. 17-cv-6011-WHA AND
17-cv-6012-WHA

## I.   **INTRODUCTION**

This case belongs in federal court because of its sweeping implications for national energy policy, national security, foreign policy, and other uniquely federal interests.  Plaintiffs seek to use state tort law and state courts to impose liability on the energy industry for the full extent of the alleged present and future harms resulting from global climate change, functionally levying an illegitimate worldwide tax on lawful and productive conduct.  Production of oil and gas has long been encouraged by the United States government, state and municipal governments, and foreign governments alike, and it remains essential to the health of the economy and the security, stability, and economic interests of the United States.  Indeed, as this Court has recognized, "our industrial revolution and the development of our modern world has literally been fueled by oil and coal."  Dkt. 283 at 8.[1]

Plaintiffs' renewed motion to remand is not only without merit, but also premature, and would be better decided after the Supreme Court rules on Defendants' pending certiorari petition, which could eliminate any need for further proceedings here.  This Court denied Plaintiffs' initial motion to remand, correctly concluding that "[i]f ever a problem cried out for a uniform and comprehensive solution, it is the geophysical problem described by the complaints."  Dkt. 134 at 4.  While the Ninth Circuit reversed this Court's determination, Defendants have filed a certiorari petition with the Supreme Court presenting the questions whether jurisdiction exists either because Plaintiffs' claims "arise under" federal law or because Plaintiffs amended their Complaints to plead federal claims and litigated the case to a judgment.  *BP P.L.C. v. City of Oakland*, No. 20-1089 (U.S.).  Related questions are also before the Supreme Court in *B.P. P.L.C. v. Mayor & City Council of Baltimore*, No. 19-1189 (U.S.), which was argued last month.  Accordingly, Defendants respectfully submit that this Court should not rule on Plaintiffs' Motion until the Supreme Court has decided these matters.[2]

If the Court does elect to proceed before that time, removal is still appropriate on several grounds that neither this Court nor the Ninth Circuit has considered, including Outer Continental Shelf Lands Act ("OCSLA") and federal enclaves jurisdiction.  OCSLA confers jurisdiction here because

---

[1]  All docket references are to *City of Oakland v. BP P.L.C.*, No. 3:17-cv-0611-WHA (N.D. Cal.).

[2]  Although the Ninth Circuit concluded that Plaintiffs' state-law claims for public nuisance do not arise under federal law for purposes of 28 U.S.C. § 1331, Defendants raise federal common law, *Grable*, and complete preemption to preserve those grounds for appellate review.

Plaintiffs expressly allege that the cumulative impact of Defendants' overall production activities over the past several decades—which necessarily include their substantial operations on the Outer Continental Shelf ("OCS")—contributed to the global greenhouse gas emissions that Plaintiffs claim caused their alleged injuries. And there is federal enclave jurisdiction because Defendants produced and sold oil and gas on countless federal enclaves, including multiple military bases and reserves.

In addition, in the three years since this Court denied Plaintiffs' first remand motion, Defendants have developed a more fulsome factual record supporting federal officer removal, including:

- New evidence, including declassified documents, showing that Standard Oil, a predecessor of Defendant Chevron, acted under federal officers by operating the Elk Hills reserve under the control of the U.S. Navy, and that Standard Oil was "*in the employ* of the Navy Department and [was] responsible to the Secretary thereof," Dick Decl. Ex. 1, at 3 (emphasis added);

- New evidence that Defendants acted under federal officers in performing operations on the OCS to fulfill basic government duties that the federal government would otherwise have to perform itself. In fact, in response to the OPEC oil embargo, the federal government considered creating a *national* oil company to facilitate the production of oil and gas on the OCS, but ultimately decided to use private companies to accomplish this objective, Dick Decl. Exs. 2–3;

- New evidence Defendants acted under federal officers by supplying oil for and managing the Strategic Petroleum Reserve, including during emergency drawdowns, Dick Decl. Ex. 4, at 17;

- New evidence that the federal government controlled Defendants' production activities during World War II and the Korean War. Indeed, as senior government officials have explained: "No one who knows even the slightest bit about what the petroleum industry contributed to the war can fail to understand that it was, without the slightest doubt, one of the most effective *arms of this Government* . . . in bringing about a victory," Dick Decl. Ex. 5 at 1 (emphasis added);

- New evidence that Defendants acted under federal officers by producing and supplying highly specialized, non-commercial grade fuels for the military that continue to be the "lifeblood of the full range of Department of Defense ["DOD"] capabilities," Dick Decl. Ex. 6 at 10.

Defendants also submit declarations from two prominent professors of history that explain in detail how Defendants acted under the direction, guidance, supervision, and control of federal officers. Professor Mark Wilson, from the University of North Carolina, explains how "the U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime," by employing "direct orders, government ownership, and national controls." Wilson Decl. ¶ 2. Professor Tyler Priest, from the University of Iowa, explains that for "more than six decades, the U.S. federal [OCS] program filled a national government need," and federal officials "supervised, directed, and controlled the rate of oil

2

and gas production." Priest Decl. ¶¶ 7(1), 48. These leases are "not merely commercial transactions between the federal government and the oil companies"; rather, "[f]ederal officials viewed these firms as agents of a larger, more long-range energy strategy to increase domestic oil and gas reserves." *Id.* ¶¶ 7(1), 7(2).

None of this evidence was before the Ninth Circuit. This Court clearly has discretion to consider this evidence in support of Defendants' opposition to a renewed motion to remand. And its consideration is particularly warranted given the substantial passage of time since remand was first decided and the fact that "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996).

At the same time that Plaintiffs argue against considering additional evidence supporting federal jurisdiction, they try to avoid removal by spinning their Complaint in a new direction, one that conflicts both with their actual pleadings and their prior representations to this Court. Plaintiffs now argue that their claims are based not on the production and sale of oil and gas, but rather on what they label "Defendants' 50-year campaign of deception" and "wrongful promotion." Mot. at 4. They assert that this is unconnected to Defendants' conduct on the OCS and federal enclaves, or to Defendants' actions taken under direction of the federal government. *Id.* at 10–20. But this argument flatly contradicts the position that Plaintiffs have taken throughout this litigation. For example, in opposing Defendants' motion to dismiss for failure to state a claim, Plaintiffs admitted that "the *primary conduct giving rise to liability remains Defendants' production and sale of fossil fuels*." Dkt. 235 at 13 (emphasis added). And again at oral argument they conceded: "Sure, the primary conduct here that gives rise to the nuisance is the production of fossil fuels." Hr'g Tr. (May 24, 2018) at 63:2–21. This Court already noted that "plaintiffs' counsel clarified that any such promotion remained merely a 'plus factor.'" Dkt. 283 at 6. And *every* climate change case Plaintiffs cite to try to bolster their argument that this case is "really" about alleged deception involved an express claim directly targeting such deception, including failure to warn and consumer protection claims. But here, Plaintiffs assert only a single claim for public nuisance that they allege is caused by Defendants' production of oil and gas: "Production of fossil fuels for combustion causes global warming." First Amended Complaint ("FAC") ¶ 74.

Because Plaintiffs allege climate change is caused by worldwide production and emissions—a

3

1   substantial portion of which occurred on the OCS, federal enclaves, and under the direction of federal

2   officers—Plaintiffs' claims necessarily challenge that conduct and removal is proper.[3]

3   ## II.      BACKGROUND AND PROCEDURAL STATUS

4       Plaintiffs brought nominally state-law claims for public nuisance against Defendants in

5   California state court, seeking to hold them liable for the effects of global climate change.  Defendants

6   removed this action on October 20, 2017.  This Court denied Plaintiffs' motion to remand, holding that

7   Plaintiffs' claims necessarily arose under federal common law.  Dkt. 134 at 4–5.  The Ninth Circuit

8   reversed, *City of Oakland v. BP PLC*, 960 F.3d 570 (9th Cir. 2020) ("*Oakland*"), and Defendants filed

9   a petition for a writ of certiorari, *Chevron Corp. v. City of Oakland*, No. 20-1089 (U.S.).

10      In a similar case, the Ninth Circuit also held that federal jurisdiction did not exist under the

11  federal officer removal statute.  *County of San Mateo v. Chevron Corp.*, 960 F.3d 586, 598–603 (9th

12  Cir. 2020) ("*San Mateo*").  A petition for a writ of certiorari has been filed in that case as well.  *See*

13  *Chevron Corp. v. San Mateo County*, No. 20-884 (U.S.).[4]

14  ## III.      LEGAL STANDARD

15      Removal from state court is proper if the federal court would have had original jurisdiction of

16  the action.  28 U.S.C. § 1441(a).  "The removal process was created by Congress to protect defendants."

17  *Legg v. Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005).  The removing party need show only that there

18  is federal jurisdiction over a single claim to remove the entire action.  *Exxon Mobil Corp. v. Allapattah*

19  *Servs., Inc.*, 545 U.S. 546, 559, 563 (2005).

20  ## IV.      ARGUMENT

21  **A.     This Action Is Removable Under The Outer Continental Shelf Lands Act.**

22      OCSLA grants jurisdiction over actions "arising out of, or in connection with . . . any operation

23  conducted on the [OCS] which involves exploration, development, or production of the minerals, of

24  the subsoil and seabed of the [OCS]."  43 U.S.C. § 1349(b)(1).  OCSLA was enacted "to establish

25  _____

26  [3]  This Court has already found that several Defendants are not subject to personal jurisdiction.  Those
    Defendants submit this remand opposition subject to, and without waiver of, that jurisdictional finding.

27  [4]  Certiorari petitions have also been filed in other cases cited by Plaintiffs.  *See Shell Oil Prods. Co. v.*
    *Rhode Island*, No. 20-900 (U.S.); *Suncor Energy (U.S.A.) Inc. v. Board of County Commissioners of*
    *Boulder County*, No. 20-783 (U.S.).  A separate certiorari petition was granted in *BP p.l.c. v. Mayor &*

28  *City Council of Baltimore*, No. 19-1189 (U.S.), which was argued on January 19, 2021.

federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources." *EP Operating Ltd. v. Placid Oil Co.*, 26 F.3d 563, 566 (5th Cir. 1994). To promote this broad aim, Congress extended federal jurisdiction "to the entire range of legal disputes that it knew would arise relating to resource development on the [OCS]." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985). Accordingly, the phrase "arising out of, or in connection with" is "undeniably broad in scope." *EP Operating*, 26 F.3d at 569.

Plaintiffs do not dispute that Defendants engage in an "operation conducted on the [OCS]" that entails the "exploration" and "production" of "minerals." *See* Notice of Removal ("NOR") ¶¶ 8, 48. Nor could they. Defendants operate a large share of the "more than 5,000 active oil and gas leases on nearly 27 million OCS acres" that the Department of Interior ("DOI") administers under OCSLA. *Id.* ¶ 52. According to data published by the DOI for the period 1947 to 1995, 16 of the 20 largest OCS operators in the Gulf of Mexico, measured by oil volume, were either a Defendant or a Defendant's predecessor or subsidiary. Dick Decl. Ex. 7. Since then, at least three of the top five OCS operators in this area have been a Defendant or a Defendant's predecessor or subsidiary. Dick Decl. Ex. 8.[5]

Defendants also satisfy the remaining element of OCSLA jurisdiction because Plaintiffs' claims "aris[e] out of *or in connection with*" Defendants' operations on the OCS. Plaintiffs allege that the cumulative impact of Defendants' global production over the past several decades—which includes extensive production from the OCS—contributed to global greenhouse gas emissions. *See, e.g.*, FAC ¶ 3 ("[M]ost of the carbon dioxide now in the atmosphere as a result of the combustion of Defendants' fossil fuels is likely attributable to their recent production – *i.e.*, to fossil fuels produced by Defendants since 1980."); *id.* ¶ 10 ("Defendants' cumulative production of fossil fuels over many years places each of them among the top sources of global warming pollution."). Defendants' production on the OCS is substantial. In fact, oil produced from the OCS accounts for approximately *30% of all domestic production*. Dick Decl. Ex. 9, at 1–4. "Between 1954 and 2016 . . . production from offshore leases totaled more than 20 billion barrels of oil," and "the federal government collected an estimated $80

---

[5] The FAC improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. Defendants reject Plaintiffs' erroneous attributions, but describe the conduct of certain predecessors, subsidiaries, and affiliates to show that the FAC, as pleaded, should remain in federal court.

billion in signature bonuses and $150 billion in royalties."  Priest Decl. ¶ 7(1).

Plaintiffs try to evade OCSLA jurisdiction by arguing that the complained-of conduct is not production—on the OCS or anywhere else—but rather the "concealment and misrepresentation of products with known dangers," which did not occur on the OCS.  Mot. at 15.  But Plaintiffs' claims are not limited to alleged misrepresentations.  In fact, as this Court noted, "[t]he scope of plaintiffs' theory is breathtaking.  It would reach the sale of fossil fuels anywhere in the world, including all past and otherwise lawful sales, where the seller knew that the combustion of fossil fuels contributed to the phenomenon of global warming."  Dkt. 287, at 6.  Plaintiffs' admissions on this point are dispositive.  As noted above, Plaintiffs have repeatedly conceded that the "primary conduct here that gives rise to the nuisance is *the production of fossil fuels*."  Dkt. 238 at 13.  The FAC also makes clear that Plaintiffs' theory is that its alleged injuries flow directly from the production and combustion of fossil fuels:

- "Production of fossil fuels for combustion causes global warming. . . .  [C]arbon dioxide is by far the most important greenhouse gas because of the combustion of massive amounts of fossil fuels."  FAC ¶ 74.

- "Today, due primarily to the combustion of fossil fuels produced by the Defendants and others, the atmospheric level of carbon dioxide . . . is . . . higher than at any time during human civilization."  *Id.* ¶ 88.

In other words, Plaintiffs' central theory is that Defendants' production and sale of fossil fuels led to increased combustion, which led in turn to increased greenhouse gas emissions, which led to climate change, which resulted in their alleged injuries.[6]

Plaintiffs' assertion that "but-for" causation is required for removal under OCSLA is also mistaken.  *See* Mot. at 13–14.  This is contrary to the text of the statute, which requires only a "connection."  43 U.S.C. § 1349(b).  Moreover, Plaintiffs' cases have simply held that but-for causation is *sufficient* to establish jurisdiction in the course of rejecting *higher* causation standards.  *See In re*

---

[6]  Plaintiffs may cite a recent order granting remand from the District Court of Hawaii, but that order was largely predicated on the court's erroneous view that plaintiffs' claims centered on defendants' alleged misrepresentations and failure to warn, not defendants' production and sale of fossil fuels.  *Honolulu v. Chevron U.S.A. Inc.*, 2021 WL 531237, at *3, 5 (D. Haw. Feb. 12, 2021) ("assum[ing that] Defendants acted under a federal officer" in at least three ways, but finding that the "alleged conduct of Defendants targeted in the Complaints" is "their alleged *failure to warn* about the hazards of using their fossil fuel products and *disseminating* misleading information").  Defendants have appealed this order.  *Maui v. Chevron U.S.A. Inc.*, No. 21-15318 (9th Cir. filed Feb. 18, 2021); *Honolulu v. Chevron U.S.A. Inc.*, 21-15313 (9th Cir. filed Feb. 18, 2021).

*Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (rejecting argument that more than a "'but-for' connection" is required for jurisdiction); *Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996) (declining to require more than but-for causation because of the "broad jurisdictional grant under § 1349"). None of Plaintiffs' cases holds that OCSLA jurisdiction cannot exist absent but-for causation. To the contrary, courts routinely hold that OCSLA jurisdiction is proper without but-for causation—for example, where the claims threaten to "impair" the "recovery" of minerals from the OCS. *See, e.g.*, *EP Operating*, 26 F.3d at 570 (applying "impaired recovery" test); *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 407 (5th Cir. 1990) (same).

OCSLA jurisdiction is proper here under that rationale as well. Congress intended OCSLA jurisdiction to cover "any dispute that alters the progress of production activities on the OCS and thus threatens to impair the total recovery of the federally-owned minerals." *EP Operating*, 26 F.3d at 570. Plaintiffs seek billions of dollars in damages, together with abatement and an order enjoining the alleged nuisance, *see* FAC ¶¶ 131, 142, which would necessarily threaten the viability of Defendants' future OCS production either by making it prohibitively costly or by forbidding it altogether. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief."); *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 247 (1959) (same). Plaintiffs' claims would substantially interfere with OCSLA's congressionally mandated goal of obtaining the largest "total recovery of the federally-owned minerals" underlying the OCS, and are thus "in connection with" OCS operations. *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).

**B.    The Action Is Removable Under The Federal Officer Removal Statute**.

The federal officer removal statute authorizes removal where "(1) [defendant] is a 'person' within the meaning of the statute, (2) a causal nexus exists between the plaintiffs' claims and the actions . . . [taken] pursuant to a federal officer's direction, and (3) it has a 'colorable' federal defense to plaintiffs' claims." *Leite v. Crane Co.*, 749 F.3d 1117, 1120 (9th Cir. 2014). "Defendants enjoy much broader rights under the federal officer removal statute than they do under the general removal statute." *Id.* at 1122; *see also Goncalves By and Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) ("Throughout our analysis, we pay heed to our duty to 'interpret

7

Section 1442 broadly in favor of removal.'") (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999)).  "[T]he statute must be liberally construed" and, in particular, "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

Defendants present extensive evidence supporting their contention that they acted under federal officers—including declassified documents, expert evidence from two distinguished professors of history, and more. *See infra* Section IV.B.1. Although Plaintiffs urge the Court to disregard this evidence on the ground that "a notice of removal may only be amended with leave of court," Mot. at 6 n.3, Defendants' evidence does not seek to *amend* the notice of removal, but simply to *substantiate* the notice's allegation that "Defendants were acting under a federal official." NOR ¶ 58 (internal quotations omitted). This is entirely proper. After all, a notice of removal need only "contain[] a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a); *see Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84, 87 (2014). Requiring a removing party to present all of its evidence at the time of removal finds no support in the statute or case law and would impose substantial and unnecessary burdens on the removing party (who would have to produce this evidence within the 30 days permitted for removal, 28 U.S.C. § 1446(b)), and the courts (which would be flooded with evidence before the parties have even conferred about the issues in dispute). It is therefore unsurprising that courts in the Ninth Circuit routinely hold that "[t]he statute governing removal of civil actions does not require a defendant to attach jurisdictional evidence to its removal notice," and that "defendants are required to produce competent proof" only "when their § 1442 jurisdictional allegations are challenged." *McMann v. Air & Liquid Sys. Corp.*, 2014 WL 1794694, at *3 (W.D. Wash. May 6, 2014); *accord Dejong v. Production Associates, Inc.*, 2015 WL 1285282, at *3 (C.D. Cal. Mar. 19, 2015) ("[C]ourts in the Ninth Circuit regularly find this practice—i.e., supplementing allegations in the notice of removal with evidence demonstrating the parties' citizenship—permissible.").

This additional evidence fatally undermines Plaintiffs' argument that Defendants are collaterally estopped from asserting jurisdiction under the federal officer removal statute in light of *San Mateo*, *Rhode Island*, and *Baltimore*. Mot. at 7–10. As the Ninth Circuit has made clear, "collateral estoppel, or issue preclusion, prevents parties from relitigating an issue of fact or law if the *same issue*

8

was determined in prior litigation." *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1114 (9th Cir. 1999) (emphasis added). And whether "the same issue" was decided in the previous action turns on whether "there [is] a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first." *Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995). The answer to this question here is plainly "no."

There is not a substantial overlap between the evidence in this action and that in the cases cited by Plaintiffs because the record supporting federal officer removal here is materially different. *See Stross v. NetEase, Inc.*, 2020 WL 5802419, at *6 (C.D. Cal. Aug. 20, 2020) (finding "there is not a substantial overlap between the evidence and argument advanced in the two cases" because "Defendant offers several new factual allegations"); *cf. Stucky v. Hawaii*, 2010 WL 1372317, at *14 (D. Haw. Mar. 31, 2010) ("[T]he Court finds that the issues in Plaintiff's instant suit are identical to those litigated in her prior action" because "Plaintiff must necessarily rely on the *same* evidence.") (emphasis added). Indeed, the record in this case contains new evidence that the *San Mateo* court found lacking in that case, including evidence establishing that a Chevron predecessor *was acting* "as the Navy's 'agent'" in operating the Elk Hills reserve and that Defendants' OCSLA leases *do* "fulfill basic governmental duties" that the federal government would otherwise have had to perform. *County of San Mateo v. Chevron Corp.*, 960 F.3d at 602, 603 (9th Cir. 2020).[7]

Even if the predicates for collateral estoppel were satisfied here (they are not), the doctrine would still be inapplicable given the risks that attend the use of nonmutual offensive collateral estoppel. As the Supreme Court has acknowledged, "offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does" and "may be unfair to a defendant," especially "where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329–31 (1979). While the Court rejected a categorical rule precluding nonmutual offensive collateral estoppel, it "grant[ed] trial courts broad discretion to determine when it should be applied." *Id.* at 331;

---

[7]   In addition, Plaintiffs cite no case in which a federal court has permitted non-mutual offensive preclusion on an issue of subject matter jurisdiction—and Defendants are aware of none. *Cf. Davis v. Metro Productions, Inc.*, 885 F.2d 515, 518–19 (9th Cir. 1989) (declining to apply non-mutual offensive issue preclusion to prior determinations of personal jurisdiction).

*see also Paramount Pictures Corp. v. Int'l Media Films, Inc.*, 2012 WL 12884852, *2 (C.D. Cal. Apr. 6, 2012) ("Nonmutual collateral estoppel is not available as a matter of right.").

Exercise of that broad discretion against applying collateral estoppel would be appropriate here given the importance of the issues at hand. While parties may waive arguments on the merits, federal courts have a "strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush*, 517 U.S. at 716. And this Court's exercise of its jurisdiction under the federal officer removal statute is especially critical because that statute protects not only the interests of the parties, but of the federal government as well. *See Watson*, 551 U.S. at 150. This Court has already recognized that these federal interests are not merely hypothetical in this case: "The dangers raised in the complaints are very real. But those dangers are worldwide. Their causes are worldwide. The benefits of fossil fuels are worldwide. The problem deserves a solution on a more vast scale than can be supplied by a district judge or jury in a public nuisance case." Dkt. 283 at 15. To send this case back to state court *without even considering* the substantial new evidence Defendants have produced would be a serious misapplication of nonmutual offensive collateral estoppel. This is especially so given the significance of Defendants' evidence in support of federal officer removal, as explained below.

> **1.   Defendants "Acted Under" Federal Officers.**

Plaintiffs rely heavily on *San Mateo* to argue that Defendants do not meet the "acting under" element of federal officer removal, which was the only issue the Ninth Circuit considered. Mot. at 11. The defendants in *San Mateo* principally argued that they acted under federal officers in activities conducted on the Elk Hills reserve and the OCS. The court disagreed, concluding defendants did not provide sufficient evidence that they were acting "on behalf of the federal government" in conducting these activities. *San Mateo*, 960 F.3d 602–03. Defendants here have provided substantial additional evidence that overcomes the shortcomings identified by the Ninth Circuit and establishes that Defendants were acting "on behalf of the federal government, under its close direction, [and] to fulfill basic governmental duties." *Id.* at 603. Defendants also provide evidence that they "acted under" federal officers in several other ways that were not before the Ninth Circuit, including by extracting oil and gas from federal land through onshore leases administered by the Bureau of Land Management; supplying fuel for and managing the Strategic Petroleum Reserve; producing oil and gas and

10

constructing pipelines during World War II at the direction of the Petroleum Administration for War ("PAW"); supplying petroleum to the federal government under directives issued pursuant to the Defense Production Act of 1950, Pub. L. No. 81-774, 64 Stat. 798 ("DPA"); and producing and supplying large quantities of specialized, noncommercial-grade fuel for the U.S. military.

### a. Removal Is Appropriate On Grounds Addressed By The Ninth Circuit Because Defendants Provide Additional Evidence In Support.

*OCS Leases.* In *San Mateo* the Ninth Circuit held that defendants failed to show that the OCS leases "require that lessees act on behalf of the federal government, under its close direction, or to fulfill basic governmental duties." *San Mateo*, 960 F.3d 602–03. But Defendants now provide substantial evidence that the OCS leasing program requires exactly that. Defendants acted on behalf of the federal government to extract federally owned mineral resources under close direction and supervision of the federal government, to assist the government in fulfilling the basic (and critical) government objectives of ensuring sufficient domestic supplies of oil and gas to protect the nation's economic, security, and foreign policy interests. As Professor Priest explains, these OCS leases are "*not merely commercial transactions* between the federal government and the oil companies. They reflect the creation of a valuable national security asset for the United States over time." Priest Decl. ¶ 7(1). The development of the OCS was a "political and policy-driven project to incorporate [] the OCS into the nation's public lands and manage OCS resources in the long-term interest of U.S. energy security." *Id.*; *see also* NOR ¶¶ 48–54.

The federal OCS program "procured the services of oil and gas firms to develop urgently needed energy resources on federal offshore lands that the federal government was unable to do on its own." Priest Decl. ¶ 7(1). The federal government "had no prior experience or expertise" with such production, and so "had little choice but to enlist the service of the oil firms who did." *Id.* ¶ 18. The federal government therefore contracted Defendants, as its agents, to extract the federal government's oil and gas out of the ground and supply the domestic market to serve a federal government interest. As Professor Priest explains, "*[f]ederal officials viewed these firms as agents* of a larger, more long-range energy strategy to increase domestic oil and gas reserves." Priest Decl. ¶ 7(2) (emphasis added). Put differently, the federal government owns and controls substantial amounts of oil and gas that are

11

contained in the OCS.  The government could either extract and sell (or use) the oil and gas itself or hire third parties to perform that task on its behalf.  Since the federal government had "no experience or expertise," it chose the second option.  This is precisely the type of agency relationship that the Ninth Circuit found would support federal officer removal.  *San Mateo*, 960 F.3d at 599 ("the Court considers whether the person is acting on behalf of the officer in a manner akin to an agency relationship").

In 1953, Congress passed OCSLA for the express purpose of making oil and gas on the OCS "available for expeditious and orderly development" in keeping with "national needs."  43 U.S.C. § 1332(3).  The initial regulations "went well beyond those that governed the average federally regulated entity at that time."  Priest Decl. ¶ 19.  As Professor Priest explains, "[a]n OCS lease was a contractual obligation on the part of lessees to ensure that all operations *'conform to sound conservation practice'* . . . and *effect the 'maximum economic recovery'* of the natural resources on the OCS."  *Id.* (citing 19 Fed. Reg. § 250.11, 2656) (emphasis added).  And the federal government retained the power to "direct how oil and gas resources would be extracted and sold from the OCS."  Priest Decl. ¶ 20.

Professor Priest further explains that federal officials in DOI—whom the Code of Federal Regulations called "supervisors"—exerted substantial control over Defendants' operations on the OCS from the earliest times.  *Id.* ¶¶ 19–20.  Federal supervisors had complete authority to control and dictate the "rate of production from OCS wells," *id.* ¶ 26; NOR ¶ 59, and had authority to suspend operations in certain situations, Priest Decl. ¶ 20.  The supervisors also "had the final say over methods of measuring production and computing royalties," which were based on "the estimated reasonable value of the product as determined by the supervisor."  Priest Decl. ¶ 20 (internal quotation marks omitted).  As Professor Priest explains, these federal officials "did not engage in perfunctory, run-of-the-mill permitting and inspection."  *Id.* ¶ 22.  Rather, they "provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee" of federal lands.  *Id.* ¶ 28.

In addition, federal officials exerted control by issuing highly specific and technical orders, known as "OCS Orders," which, among other things, "specified how wells, platforms, and other fixed structures should be marked"; "dictated the minimum depth and methods for cementing well conduct casing in place"; "prescribed the minimum plugging and abandonment procedures for all wells"; and

1   "required the installation of subsurface safety devices . . . on all OCS wells." *Id.* ¶ 24.  Professor Priest

2   observes that through these OCS Orders, federal officials "exercised active control on the federal OCS

3   over the drilling of wells, the production of hydrocarbons, and the provision of safety." *Id.* ¶ 25.

4       Federal officials have repeatedly recognized the importance of OCS development to support

5   the nation's need for energy.  In response to the 1973 OPEC oil embargo, for example, President Nixon

6   "called for a national effort . . . to develop the 'potential to meet our own energy needs without

7   depending on any foreign energy sources' by 1980." *Id.* ¶ 50.  Congress mandated "expedited

8   exploration and development of the [OCS] in order to achieve national economic and energy policy

9   goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance

10  of payments." 43 U.S.C. § 1802(1)–(2).  Multiple proposals in Congress sought to address the nation's

11  oil and gas needs by creating a national oil company.  *See* Priest Decl. ¶¶ 52–53; 121 Cong. Rec. 4490

12  (daily ed. Feb. 26, 1975); Dick Decl. Ex. 3.  One proposal, by Senator Hollings, would have

13  "authorize[d] and direct[ed] the Secretary of the Interior to initiate a major program of offshore oil

14  exploration."  Dick Decl. Ex. 2 at 4665.  This proposal, as Professor Priest explains, "called for the

15  creation of a national oil company."  Priest Decl. ¶ 52 (citing S903-911, 121st Congress, (Jan. 27,

16  1975)).  A second proposal "would have formally established a 'Federal Oil and Gas Corporation'"

17  that would be "'owned by the federal government' and 'in case of any shortage of natural gas or oil

18  and serious public hardship, could itself engage in production on Federal lands in sufficient quantities

19  to mitigate such shortage and hardship.'" Priest Decl. ¶ 53.  Yet another proposal "would provide for

20  the establishment of a National Energy and Conservation Corporation—to be called Ampower—

21  similar to the Tennessee Valley Authority."  121 Cong. Rec. 4490 (daily ed. Feb. 26, 1975).

22  Representative Harris explained:  "The creation of a quasi-public corporation such as Ampower can

23  and should perform these functions on public lands" to "[e]nsure that the public's oil and gas is

24  developed in the public interest."  Dick Decl. Ex. 3, at 9275–76.  These proposals were ultimately

25  rejected in favor of an arrangement by which the government would contract with private companies,

26  including Defendants, to perform this work on the OCS on its behalf with expanded federal supervision

27  and control.  *See* Priest Decl. ¶ 55.  The legislative history thus confirms that the federal government

28  uses OCS lessees to meet a "basic governmental task" that the Ninth Circuit found lacking in *San*

13

*Mateo*. 960 F.3d at 599; *Watson*, 551 U.S. at 154 (Defendants "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.").

To be sure, the Ninth Circuit concluded that "the willingness to lease federal property or mineral rights to a private entity for the entity's own commercial purposes, *without more*" cannot be "characterized as the type of assistance that is required" to show that the private entity is "acting under a federal officer." *Id.* at 603. But Defendants here have provided the "more" that the Ninth Circuit thought was lacking in *San Mateo*—Defendants' operations on the OCS were conducted under close supervision of federal officers to help the government meet critical national policy objectives.

**Operation of the Elk Hills Reserve.** The Ninth Circuit found that Standard Oil was not "acting under" federal officers in connection with its activities under a 1944 unit agreement with the U.S. Navy for the petroleum reserves at Elk Hills because the agreement allowed the parties "to coordinate their use of the oil reserve in a way that would benefit both parties" and accorded "Standard . . . the right to produce a specified amount of oil per day." *San Mateo*, 960 F.3d at 602. As a result, the Court concluded that "Standard was not acting on behalf of the federal government in order to assist the government perform a basic government function." *Id.* But Defendants here do not argue that removal is proper based on the 1944 unit agreement. Rather, Standard acted under federal officers pursuant to a separate agreement wherein the Navy hired Standard to *operate* the Navy's portion of the reserve on its behalf for 31 years, such that Standard was "<u>in the employ</u>" of the Navy during this period.

The unit agreement gave the Navy the right to operate the reserve, but it had to decide whether it wanted to produce oil on its own or hire a contractor. "The Navy chose to operate the reserve through a contractor rather than with its own personnel." Dick Decl. Ex. 10, at 15. Standard "was awarded the contract, and continued to operate NPR-1 [for the Navy] for the next 31 years." *Id.* Standard's operation and production of Elk Hills for the Navy were subject to substantial supervision by Navy officers. NOR ¶ 60. The Operating Agreement provided that "OPERATOR [Standard Oil] is *in the employ of the Navy Department* and is *responsible to the Secretary thereof*." *See* Dick Decl. Ex. 1, at 3 (emphases added). And naval officers directed Standard Oil to conduct operations to further national policy. For example, in November 1974, the Navy directed Standard Oil to increase production to 400,000 barrels per day to meet the unfolding energy crisis, warning Standard Oil that "*you are in the*

14

*employ of the Navy* and *have been tasked with performing a function which is within the exclusive control of the Secretary of the Navy*." Dick Decl. Ex. 11 at 3 (emphases added); Ex. 12 (Brief for the American Petroleum Institute as Amicus Curiae Supporting Reversal, *BP p.l.c. v. Mayor & City Council of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020)).

The Operating Agreement thus disproves that Standard was "acting independently, not as the Navy's 'agent.'" *San Mateo*, 960 F.3d at 602. In fact, Standard Oil's conduct went far beyond acting as a mere agent—it acted in "the *employ* of the Navy." *See id*. at 599 (noting that the 1948 amendments to the federal officer removal statute were "understood as extending this section [of the statue] to *apply to employees*, as well as officers" (emphasis added)).

There can be no doubt that, "in the absence of [this] contract with [Standard], the Government itself would have had to perform" these tasks itself. *Id.* at 600 (quoting *Watson*, 551 U.S. at 154). Indeed, declassified documents, which were also not before the Ninth Circuit or the other courts cited by Plaintiffs, demonstrate that a "substantial increase in production at the earliest possible date was urgently requested by the Joint Chiefs of Staff to meet the critical need for petroleum on the West Coast to supply the armed forces in the Pacific theatre," and that Standard was "chosen as operator because it was the only large company capable of furnishing the facilities for such a development program." Dick Decl. Ex. 13, at 1. Nor can there be any dispute that those efforts paid off—indeed, the Reserve was ready and produced up to 65,000 barrels a day in 1945 "to address fuels shortages and World War II military needs." GAO Report at 3, 15. And when the country faced an energy shortage in 1974, the government once again directed Standard Oil to produce 400,000 barrels per day. Dick Decl. Ex. 11.

Standard's operation of Elk Hills is quintessential "acting under" activity. It was "an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152; *see also Goncalves*, 865 F.3d at 1245. Standard Oil operated Elk Hills for decades "in the employ of," and under the "subjection, guidance, or control" of the Navy, and in an "unusually close [relationship] involving detailed regulation, monitoring, or supervision." *Watson,* 551 U.S. at 151, 153.

**b.   Removal Is Also Appropriate On Grounds Not Before Or Considered By The Ninth Circuit.**

***Defendants Acted Under Federal Officers During World War II and the Korean War***.

15

Professor Wilson explains that "[o]ver the last 120 years, the U.S. government has relied upon and controlled the oil and gas industry to obtain oil and gas supplies and expand the production of petroleum products, in order to meet military needs and enhance national security." Wilson Decl. ¶ 1. The "U.S. government has controlled and directed oil companies in order to secure and expand fuel supplies for its military forces and those of its allies, both in wartime and in peacetime." Wilson Decl. ¶ 2. As two former Chairmen of the Joint Chiefs of Staff explained, the "history of the Federal Government's control and direction of the production and sale of gasoline and diesel to ensure that the military is 'deployment-ready'" spans "more than a century," and during their tenure, petroleum products were "crucial to the success of the armed forces." Dick Decl. Ex. 14, at 2–3 (Amici Curiae Brief of General (Retired) Richard B. Myers and Admiral (Retired) Michael G. Mullen, in Support of Petitioners, *BP p.l.c. v. Mayor and City Council of Baltimore*, No. 19-1189 (U.S. Nov. 23, 2020)).

During World War II, the United States pursued full production of its oil reserves and created agencies to *control* the petroleum industry, including Defendants' predecessors and affiliates. It built refineries and directed the production of certain products, and it managed scarce resources for the war effort. As Senator O'Mahoney, Chairman of the Special Committee Investigating Petroleum Resources, put it in 1945, "No one who knows even the slightest bit about what the petroleum industry contributed to the war can fail to understand that it was, without the slightest doubt, one of the most effective *arms* of this Government . . . in bringing about a victory." Dick Decl. Ex. 5 (emphasis added). As this Court noted, "[w]e won the Second World War with fossil fuels." May 24, 2018 Tr. at 68:8.

Multiple courts have found that the federal government exerted extraordinary control over Defendants during World War II and the Korean War to guarantee the supply of oil and gas for wartime efforts, such as high-octane avgas. "Because avgas was critical to the war effort, the United States government exercised significant control over the means of its production during World War II." *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir. 2002). Put simply, "[t]he government [] used [its] authority to control many aspects of the refining process and operations." *Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *14 (S.D. Tex. Sept. 16, 2020) *appeal docketed*, No. 20-20590 (5th Cir. Nov. 13, 2020).

These cases show the nature and extent of the control exerted by the federal government through

16

agencies such as the PAW, which directed construction of new oil exploration and manufacturing facilities and allocation of raw materials, issued production orders, entered into contracts giving extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1286 (Fed. Cir. 2014). "PAW told the refiners what to make, how much of it to make, and what quality." *Id.*

The government dictated where and how to drill, rationed essential materials, and set statewide minimum levels for production. Dick Decl. Ex. 16, at 28, 171, 177–79, 184 & n.18. As Professor Wilson explains: "PAW instructed the oil industry about exactly which products to produce, how to produce them, and where to deliver them." Wilson Decl. ¶ 11. Professor Wilson establishes that "[s]ome directives restricted the use of certain petroleum products for high-priority war programs; others dictated the blends of products; while others focused on specific pieces of the industry, such as the use of individual pipelines." *Id.* PAW's directives to Defendants were mandatory and were enforceable by law. *Exxon Mobil*, 2020 WL 5573048, at *11 (rejecting argument that private refiners "voluntarily cooperated"; instead finding they had "no choice" but to comply with the federal officers' direction). PAW's message to the oil and gas industry was clear: the government would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other way." Dick Decl. Ex. 18, at 8. PAW also maintained "disciplinary measures" for noncompliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance." Dick Decl. Ex. 19 at 1. In sum, the federal government deployed an array of coercive actions, threats, and sanctions to ensure Defendants assented to PAW's directives. Controlling production of petroleum products by setting production levels, dictating where and how to explore for petroleum, micromanaging operations, and rationing materials in order to help conduct a war are not the stuff of mere "regulation"; they are instead the kind of special relationship described in *Watson* and *Goncalves*.[8]

---

[8]  Defendants also acted under federal officers in constructing and operating the Inch Lines (pipelines extending from Texas to New Jersey) "under contracts" and "as agent[s]" for the federal government, bringing hundreds of millions of barrels of oil and refined products for use and combustion on the cross-Atlantic fronts during World War II. *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949); 8 Fed. Reg. 1068–69 (Jan. 20, 1943) (Petroleum Directive 63); 8 Fed. Reg. 13343 (Sept. 30, 1943) (Petroleum Directive 73); Dick Decl. Ex. 15, at 1–2; Ex. 17, at 108; Ex. 18, at 3.

17

Defendants also acted under the federal government by operating government-owned and/or government-funded petroleum production facilities.  During World War II, the government built "dozens of large government-owned industrial plants" that were "*managed by private companies under government direction*."  Wilson Decl. ¶ 14 (emphasis added).  "The U.S. government enlisted oil companies to operate government-owned industrial equipment . . . [in order] to comply with urgent government orders."  *Id.* ¶ 15.  These "oil companies were not merely top World War II prime contractors, but also served as government-designated operators of government-owned industrial facilities" or government-owned equipment within industrial facilities.  *Id.* ¶ 19.  Among the largest facilities was a refinery in Richmond, California, operated by Standard Oil (a Chevron predecessor), which was "the second-largest of all the facilities focused on aviation gasoline production, providing 10 percent of total global output of aviation fuel" by 1945.  *Id.*  Several other Defendants or their predecessors operated similar production facilities and equipment for the government.  *Id.* ¶ 20.

Defendants further acted under federal officers as contractors to build plants and manufacture war products for the Allied effort.  For example, "[o]n January 22, 1942, Shell entered into a contract with the United States on behalf of the Army Ordnance Department for the purchase of 20 million to 25 million gallons of nitration grade toluene over a two-year period.  The contract provided that Shell would construct a toluene plant at Shell['s] Wilmington, California refinery and that the Government would advance 30% of the contract price or $2,040,000 for construction of the plant. . . .  Shell completed a toluene plant in 1943 and produced toluene for the remainder of the war" "to manufacture TNT" and later "as a blending agent" to make "avgas."  Dick Decl. Ex. 20; *see also* Wilson Decl. ¶ 23.

At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the DPA.  PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate quantities of avgas for military use.  *See* Dick Decl. Ex. 21 (Fourth Annual Report of the Activities of the Joint Committee on Defense Production, H. Rep. No. 84-1, at 122 (Jan. 5, 1955, 1st Sess.)); *see also Exxon Mobil*, 2020 WL 5573048, at *15 (detailing government's use of DPA "to force" petroleum industry to "increase their production of wartime . . . petroleum products").  As Professor Wilson explains, the DPA "gave the U.S. government broad powers to direct industry for national security purposes," and "PAD

18

directed oil companies to expand production during the Korean War, for example, by calling on industry to drill 80,000 wells inside the United States, and more than 10,000 more wells abroad, in 1952." Wilson Decl. ¶ 28.

*Defendants Have Continued to Produce and Supply Large Quantities of Specialized Fuel Under Military Direction.* To this day, Defendants continue to produce and supply large quantities of highly specialized fuels that are required to conform to exact DOD specifications to meet the unique operational needs of the U.S. military. Professor Wilson explains that "[b]y 2010, the U.S. military remained the world's biggest single purchaser and consumer of petroleum products" and, "[a]s it had for decades, the military continued to rely on oil companies to supply it under contract with specialty fuels, such as JP-5 jet aviation fuel and other jet fuels, F-76 marine diesel, and Navy Special Fuel." Wilson Decl. ¶ 40. "[I]n the absence of . . . [these] contract[s] with [the Defendants], the Government itself would have had to perform" these essential tasks to meet the critical DOD fuel demands. *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 942 (7th Cir. 2020) (quoting *Watson*, 551 U.S. at 154).

For example, during the Cold War, Shell Oil Company developed and produced specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs. Dick Decl. Exs. 22–24. For the U-2, it produced fuel known as JP-7, which required special processes and a high boiling point to ensure the fuel could perform at very high altitudes and speeds. "The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . . A new fuel and a chemical lubricant had to be developed to meet the temperature requirements." Dick Decl. Ex. 24, at 23. For OXCART, Shell Oil Company produced millions of gallons of specialized fuel under contracts with specific testing and inspection requirements. Dick Decl. Exs. 25–33.

Similarly, BP entities contracted with the Defense Logistics Agency ("DLA") to provide approximately 1.5 billion gallons of specialized military fuels for the DOD's use in *the past four years alone*. Dick Decl. Ex. 34, at 6. Since 2016, BP entities entered into approximately 25 contracts to supply various military-specific fuels, such as JP-5, JP-8, and F-76, together with fuels containing specialized additives, including fuel system icing inhibitor ("FSII"), corrosion inhibitor/lubricity improver ("CI/LI") and, for F-76 fuels, lubricity improver ("LIA"). *Id.* at 1–6. Such additives are

essential to support the high performance of the military engines they fueled. FSII is required to prevent freezing caused by the fuels' natural water content when military jets operate at ultra-high altitudes, potentially leading to engine flameout, while CI/LI and LIA are used to avoid engine seizures and to ensure fuel handling system integrity when military fuels are stored for long periods, as on aircraft carriers. Dick Decl. Exs. 36–37. DOD specifications also required BP entities to conform the fuels to other specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, and thermal stability, all of which are essential and unique to performance of the military function. Dick Decl. Exs. 35, 38–46.

As another example, from at least 2010–2013, Shell Oil Company or its affiliates entered into billion-dollar contracts with DLA to supply specialized JP-5 and JP-8 military jet fuel. *See* Dick Decl. Exs. 47–55. The DOD's detailed specifications for the makeup of the military jet fuels require that they "shall be refined hydrocarbon distillate fuel oils" made from "crude oils" with special additives. *See* Dick Decl. Ex. 35, at 5, 7, 10; *id.* Ex. 56. Those requirements and "the compulsion to provide the product to the government's specifications," demonstrate the necessary "acted under" special relationship between Defendants and the government. *Baker*, 962 F.3d at 943 (quoting *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 400 (5th Cir. 1998)). These unique jet fuels are designed for military use and thus fall into the category of specialized military products that support federal officer jurisdiction. *Watson*, 551 U.S. at 154 ("providing the Government with a product that it used to help conduct a war" supports removal); *Baker*, 962 F.3d at 943.

**BLM Leases.** In addition to leases on the OCS, the DOI's Bureau of Land Management ("BLM") onshore leases similarly direct and control Defendants' production activities. For example, the BLM leases provide that the United States "reserves the right to specify rates of development and production in the public interest." Dick Decl., Ex. 57 § 4. BLM may also unilaterally suspend onshore operations. 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.[9]

---

[9] Onshore leases constitute a significant portion of U.S. oil and gas production. "Oil and gas produced from the Federal and Tribal mineral estate are significant parts of the nation's energy mix. For fiscal year (FY) 2018, sales of oil, gas, and natural gas liquids produced from the Federal and Tribal mineral estate accounted for approximately 8 percent of all oil, 9 percent of all natural gas, and 6 percent of all natural gas liquids produced in the United States." Dick Decl. Ex. 58.

***Strategic Petroleum Reserve.*** In response to the 1970s oil embargoes, Congress created the Strategic Petroleum Reserve to reduce the impact of any disruptions in oil supply.[10] Defendants "acted under" federal officers by supplying federally owned oil for and managing the Strategic Petroleum Reserve for the government. From 1999 to 2009, "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the [royalty-in-kind ('RIK')] program" valued at over $6 billion. Dick Decl. Ex. 59, at 18, 39 tbl. 13. The government also contracted with Defendants to assist in the physical delivery of these RIK payments to the Strategic Petroleum Reserve. *Id.* Ex. 60.

The Strategic Petroleum Reserve subjects Defendants to the federal government's supervision and control, including in the event that the President calls for an emergency drawdown, under which the reserve oil can be used to address national crises. *See* Dick Decl. Ex. 4, at 17, 34. The United States exercised this emergency control to draw down the reserve in response to Hurricane Katrina in 2005 and disruptions to the oil supply in Libya in 2011. *Id.* Ex. 4 at 18, Ex. 63. Thus, the hundreds of millions of barrels of oil flowing through these facilities were subject to federal control and supervision, and Defendants engaged in "an effort to assist, or to help carry out," the federal government in ensuring the nation's energy security. *Watson*, 551 U.S. at 152; *Goncalves*, 865 F.3d at 1245.

\*     \*     \*

Each of the above examples demonstrates that Defendants produced oil and gas at the direction of the federal government. Any of these would be sufficient to support federal officer removal, and each demonstrates the strong federal interest in oil production, which Plaintiffs now seek to disrupt.

**2.     Plaintiffs' Claims Have A Causal Nexus To These Acts Under Federal Officers.**

By including the words "for *or relating to*" in the federal officer statute, 28 U.S.C. § 1442(a)(1) (emphasis added), Congress "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office," *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (emphasis added). The "'hurdle erected by [the connection] requirement is quite low.'" *Goncalves*, 865 F.3d at 1244 (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)). Plaintiffs deny this requirement is met because they now say their claims are limited to Defendants' alleged "campaign of disinformation." Mot. at 12. But

---

[10] 1975 Energy Policy Conservation Act, Pub. L. No. 94-163, 89 Stat. 871

as explained above, Plaintiffs' claims necessarily—and "primarily"—target Defendants' production of oil and gas.  *See, e.g.*, Dkt. 235 at 13 ("[T]he primary conduct giving rise to liability remains Defendants' production and sale of fossil fuels."); *see supra*, Part IV.A.  Even putting aside Plaintiffs' admissions that this case is about Defendants' production of fossil fuels, removal is proper because "[i]n assessing whether a causal nexus exists, [courts] credit the *defendant's theory* of the case." *Leite*, 749 F.3d at 1124 (citation omitted) (emphasis added); *see also Baker*, 962 F.3d at 941, 947 ("Both the [plaintiffs] and the [defendants] have reasonable theories of this case.  Our role at this stage of the litigation is to credit only the [defendants]' theory."); *Acker*, 527 U.S. at 432–33 ("Accordingly, we credit the [defendants]' theory of the case for purposes of . . . our jurisdictional inquiry.").  "Such a nexus exists [where, as here] the very act that forms the basis of plaintiff's claims"—here, Defendants' production of fossil fuels—"is an act that [defendant] contends it performed under the direction of the [federal government]."  *Leite*, 749 F.3d at 1124.  Such a nexus also exists where there is simply a "'connection' or 'association' between the act in question and the federal office."  *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*, 790 F.3d 457, 471 (3d Cir. 2015); *see also Latiolais*, 951 F.3d at 296 (holding that "for or relating to" standard was met where claim was "connected with" the conduct under federal officer direction).

Plaintiffs' contrary position should be recognized for what it is: an attempt to evade the jurisdiction of the federal courts.  Plaintiffs' claims rise and fall on a chain of causation linking all of Defendants' production and sale of oil and gas to global climate change and the alleged resulting harms for which Plaintiffs seek relief.  But it cannot be disputed that a significant portion of that allegedly injurious production occurred at the direction of the federal government in furtherance of federal objectives.  *Baker*, 962 F.3d at 945 (finding even a "small, yet significant, portion of [Defendants'] relevant conduct" sufficient to support federal officer removal).  This satisfies the "low" nexus requirement for federal officer removal.  *Goncalves*, 865 F.3d at 1244.

### 3.    Defendants Raise "Colorable Federal Defenses."

Plaintiffs do not dispute that Defendants have colorable federal defenses.  These include, but are not limited to, the government contractor defense, *see Boyle v. United Tech. Corp.*, 487 U.S. 500, 512–13 (1988), and federal immunity, *see Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166–68

(2016).

**C.    The Court Has Jurisdiction Because Plaintiffs' Claims Arise On Federal Enclaves.**

"Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'" *Durham v. Lockheed Martin Corp*., 445 F.3d 1247, 1250 (9th Cir. 2006). "A suit based on events occurring in a federal enclave . . . necessarily arise[s] under federal law and implicates federal question jurisdiction under § 1331." *Jones v. John Crane-Houdaille, Inc.*, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012).

Plaintiffs do not deny that a portion of Defendants' production and sale of oil and gas occurred on federal enclaves.  Nor could they.  Defendants maintained production operations on federal enclaves and sold fossil fuels on military bases and other federal enclaves.  For example, as discussed above, Chevron's predecessor Standard Oil operated Elk Hills Naval Petroleum Reserve, which was a federal enclave, for most of the twentieth century. *See* NOR Decl. Ex. H, Dick Decl. Exs. 11, 61–62; *Azhocar v. Coastal Marine Servs., Inc.*, 2013 WL 2177784, at *1 (S.D. Cal. May 20, 2013) ("[Federal] enclaves include . . . military bases [and] federal facilities." (citation omitted)).  Moreover, given that Plaintiffs' claims encompass all of Defendants' production and sales activities and its alleged injuries arise from global climate change, Plaintiffs necessarily complain about the federal government's emissions from jet fuel supplied by Defendants on U.S. military bases.[11]  In response, Plaintiffs argue that only the place of *injury* determines federal enclave jurisdiction, Mot. at 18, and that "the Complaints expressly disclaim relief for any harm to federal property" and "injuries on federal land." Mot. at 19.  But federal jurisdiction exists where, as here, at least "*some of the events* alleged . . . occurred on a federal enclave." *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1336 (N.D. Ala. 2010) (emphasis added).

**D.  Plaintiffs' Claims Raise Disputed And Substantial Federal Issues Under *Grable*.**

Suits alleging only state-law causes of action may still "arise under" federal law where the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg*., 545 U.S.

---

[11] *Jimenez v. Haxton Masonry, Inc.*, 2020 WL 3035797 (N.D. Cal. June 5, 2020) (applying doctrine to Marine Corps Base Camp Pendleton, Naval Base Ventura County, Navy Base Coronado, Navy Base Point Loma, Seal Beach Naval Weapons Station, and Marine Corps Air Station Miramar).

308, 314 (2005) ("*Grable*").  Here, even if the Court were to construe Plaintiffs' claims as Plaintiffs now contend—as limited to misrepresentations regarding the effect of Defendants' oil and gas (rather than their production and sale of those products)—those claims would still arise under federal law for purposes of *Grable* jurisdiction because they necessarily incorporate affirmative federal constitutional elements imposed by the First Amendment.[12]

The Supreme Court has made clear that where nominally state-law tort claims target speech on matters of public concern, the First Amendment injects affirmative federal-law elements into the plaintiff's cause of action, including factual falsity, actual malice, and proof of causation of actual damages.  *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774–76 (1986) (State common-law standards "must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages."); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (Public officials have the burden of proving with "convincing clarity" that "the statement was made with 'actual malice.'"); *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.").

These First Amendment issues are not "defenses," but rather constitutionally required elements of the claim on which the plaintiff bears the burden of proof—by clear and convincing evidence—*as a matter of federal law.  See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53, 56 (1988) (extending First Amendment substantive requirements beyond the defamation context to other state-law attempts to impose liability for allegedly harmful speech); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 811 (S.D. Tex. 2005) ("First Amendment protections and the actual malice

---

[12]  The Ninth Circuit rejected *Grable* jurisdiction on certain grounds, but it did *not* address jurisdiction premised on the First Amendment.  This ground is properly before the Court because Defendants raised *Grable* in their Notice of Removal.  *See Yee v. City of Escondido*, 503 U.S. 519, 534–35 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim.").  And while Defendants did not assert this basis for *Grable* jurisdiction in the original remand proceedings, that is only because Plaintiffs' theory of the case plainly rested on Defendants' production and sale of fossil fuels.  To the extent this Court credits Plaintiffs' attempt to abandon the theory articulated in the FAC in favor of an entirely new theory founded on promotion—and it should not, *see supra*, Part IV.A—Defendants have a due process right to respond to this new theory.  *See Estes v. Wells Fargo Home Mortgage*, 2015 WL 362904, at *5 (W.D. Wash. Jan. 27, 2015) ("[I]t is a violation of due process to include new arguments in a reply brief because Estes does not have an opportunity to respond.").

24

1   standard . . . have been expanded to reach . . . breach of contract, misrepresentation, and tortious
2   interference with contract or business.").

3       To be sure, most state-law misrepresentation claims are not subject to removal because they do
4   not implicate the broader federal interests at issue in this case.  Those federal interests are themselves
5   unquestionably "substantial" under *Grable*; so is the speech that Plaintiffs are trying to suppress,
6   because it addresses a subject of national and international importance that falls within the purview of
7   federal authority over foreign affairs and domestic economic, energy, and security policy.  Moreover,
8   Plaintiffs are public entities seeking to use the machinery of their own state courts to impose *de facto*
9   regulations on Defendants' nationwide speech on issues of national public concern.  First Amendment
10  interests are at their apex where, as here, it is a governmental entity that seeks to use state-law claims
11  to regulate speech on issues of "public concern."  *Hepps*, 475 U.S. at 774.  Given the uniquely
12  compelling federal interests at stake here, federal courts may entertain the claims at issue in this case
13  "without disturbing any congressionally approved balance of federal and state judicial responsibilities,"
14  making removal appropriate.  *Grable*, 545 U.S. at 314.

15      Indeed, the freedom of speech is "most seriously implicated . . . in cases involving disfavored
16  speech on important political or social issues," chief among which in the contemporary context is the
17  question of "[c]limate change," which "has staked a place at the very center of this Nation's public
18  discourse."  *Nat'l Review, Inc. v. Mann*, 140 S. Ct. 344, 347–48 (2019) (Alito, J., dissenting from denial
19  of certiorari) (noting recourse to a federal forum is especially warranted in suits "concern[ing] a
20  political or social issue that arouses intense feelings," because "a plaintiff may be able to bring suit in
21  whichever jurisdiction seems likely to have the highest percentage of jurors who are sympathetic to the
22  plaintiff's point of view" (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984))).
23  Plaintiffs' attempt to regulate Defendants' speech through litigation thus necessarily raises substantial
24  First Amendment questions that belong in federal court.

25  ## V.    CONCLUSION

26      Defendants respectfully submit that it would be most efficient for this Court to await guidance
27  from the Supreme Court before ruling on Plaintiffs' Motion.  If and when it does rule on that Motion,
28  however, it should deny remand of this uniquely federal action and the host of federal issues it raises.

25

1

2                                          Respectfully submitted,

3    Dated: February 25, 2021              By:  _/s/ Theodore J. Boutrous, Jr._____

4                                          Theodore J. Boutrous, Jr.
                                           GIBSON, DUNN & CRUTCHER LLP
5                                          333 South Grand Avenue
                                           Los Angeles, CA 90071-3197
6                                          Telephone: (213) 229-7000
                                           Email: tboutrous@gibsondunn.com
7
                                           Andrea E. Neuman
8                                          William E. Thomson
                                           GIBSON, DUNN & CRUTCHER LLP
9                                          333 South Grand Avenue
                                           Los Angeles, CA 90071
10                                         Telephone: (213) 229-7000
                                           Facsimile: (213) 229-7520
11                                         Email: aneuman@gibsondunn.com
                                           Email: wthomson@gibsondunn.com
12
13                                         Joshua D. Dick
                                           GIBSON, DUNN & CRUTCHER LLP
14                                         555 Mission Street, Suite 3000
                                           San Francisco, CA  94105-0921
15                                         Telephone: 415.393.8331
                                           Facsimile: 415.374.8451
16                                         Email: jdick@gibsondunn.com

17                                         Joshua S. Lipshutz
                                           GIBSON, DUNN & CRUTCHER LLP
18                                         1050 Connecticut Avenue, N.W.
                                           Washington, DC 20036-5306
19                                         Telephone: (202) 955-8500
                                           Email: jlipshutz@gibsondunn.com
20
21                                         Neal S. Manne (*pro hac vice*)
                                           Johnny W. Carter (*pro hac vice*)
22                                         Erica Harris (*pro hac vice*)
                                           Steven Shepard (*pro hac vice*)
23                                         SUSMAN GODFREY LLP
                                           1000 Louisiana, Suite 5100
24                                         Houston, TX 77002
                                           Telephone: (713) 651-9366
25                                         Facsimile: (713) 654-6666
                                           Email: nmanne@susmangodfrey.com
26                                         Email: jcarter@susmangodfrey.com
                                           Email: eharris@susmangodfrey.com
27                                         Email: shepard@susmangodfrey.com
                                           Herbert J. Stern (*pro hac vice*)
28
                                                           26

1

2      Joel M. Silverstein (*pro hac vice*) STERN &
       KILCULLEN, LLC

3      325 Columbia Turnpike, Suite 110
       Florham Park, NJ 07932-0992

4      Telephone: (973) 535-1900
       Facsimile: (973) 535-9664

5      Email: hstern@sgklaw.com
       Email: jsilverstein@sgklaw.com

6
       *Attorneys for Defendant CHEVRON*

7      *CORPORATION*

8

9      By: **/s/ Jonathan W. Hughes_            By: **/s/ Megan R. Nishikawa_
       Jonathan W. Hughes                       Megan R. Nishikawa (SBN 271670)

10     ARNOLD & PORTER KAYE SCHOLER             KING & SPALDING LLP
       LLP                                      50 California Street, Suite 3300

11     Three Embarcadero Center, 10th Floor     San Francisco, CA 94111
       San Francisco, California 94111-4024     Telephone: (415) 318-1200

12     Telephone: (415) 471-3100                Facsimile: (415) 318-1300
       Facsimile: (415) 471-3400                Email: mnishikawa@kslaw.com

13     Email: jonathan.hughes@apks.com
                                                Sean C. Grimsley (SBN 216741)

14     Matthew T. Heartney                      Jameson R. Jones (pro hac vice)
       John D. Lombardo                         Daniel R. Brody (pro hac vice)

15     ARNOLD & PORTER KAYE SCHOLER             BARTLIT BECK LLP
       LLP                                      1801 Wewatta Street, Suite 1200

16     777 South Figueroa Street, 44th Floor    Denver, CO 80202
       Los Angeles, California 90017-5844       Telephone: (303) 592-3100

17     Telephone: (213) 243-4000                Facsimile: (303) 592-3140
       Facsimile: (213) 243-4199                Email: sean.grimsley@bartlitbeck.com

18     E-mail: matthew.heartney@apks.com        Email: jameson.jones@bartlitbeck.com
       E-mail: john.lombardo@apks.com           Email: dan.brody@bartlitbeck.com

19

20     Philip H. Curtis                         *Attorneys for Defendant CONOCOPHILLIPS*
       Nancy Milburn

21     ARNOLD & PORTER KAYE SCHOLER
       LLP

22     250 West 55th Street
       New York, NY 10019-9710

23     Telephone: (212) 836-8383
       Facsimile: (212) 715-1399

24     Email: philip.curtis@apks.com
       Email: nancy.milburn@apks.com

25     *Attorneys for Defendant BP P.L.C.*

26

27     By: **/s/ Dawn Sestito_                  By: **/s/ Gary T. Lafayette_
       M. Randall Oppenheimer                   Gary T. Lafayette (SBN 88666)

28     Dawn Sestito                             LAFAYETTE KUMAGAI LLP

                                    27

O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
Email: roppenheimer@omm.com
Email: dsestito@omm.com

Theodore V. Wells, Jr.
Daniel J. Toal
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: twells@paulweiss.com
Email: dtoal@paulweiss.com

Kannon K. Shanmugam
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street NW
Washington, DC 20006-1047
Telephone: (202) 223-7325
Email: kshanmugam@paulweiss.com
*Attorneys for Defendant*
*EXXON MOBIL CORPORATION*

1300 Clay Street, Suite 810
Oakland, California 94612
Telephone: (415) 357-3600
Facsimile: (415) 357-4605
Email: glafayette@lkclaw.com

David C. Frederick (pro hac vice)
Brendan J. Crimmins (pro hac vice)
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999
Email: frederick@kellogghansen.com
Email: crimmins@kellogghansen.com
*Attorneys for Defendant ROYAL DUTCH*
*SHELL PLC*

** Pursuant to Civ. L.R. 5-1(i)(3), the electronic
signatory has obtained approval from
this signatory

DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION TO REMAND – Nos. 17-cv-6011-WHA and
17-cv-6012-WHA