United States District Court
Northern District of California

1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7

8                          NORTHERN DISTRICT OF CALIFORNIA

9

10   CITY OF OAKLAND, a Municipal
     Corporation, and THE PEOPLE OF THE
11   STATE OF CALIFORNIA, acting by and          No.  C 17-06011 WHA
     through Oakland City Attorney BARBARA       No.  C 17-06012 WHA
12   J. PARKER,

13              Plaintiffs,

14         v.                                    **ORDER GRANTING RENEWED
                                                 MOTION TO REMAND AND
15   BP P.L.C., a public limited company of      VACATING ORDER DISMISSING
     England and Wales, CHEVRON                  CERTAIN DEFENDANTS**
16   CORPORATION, a Delaware corporation,
     CONOCOPHILLIPS COMPANY, a
17   Delaware corporation, EXXON MOBIL
     CORPORATION, a New Jersey corporation,
18   ROAYL DUTCH SHELL PLC, a public
     limited company of England and Wales, and
19   DOES 1 through 10,

20              Defendants.

21
     AND RELATED CASE.
22

23

24         These two complaints, filed in state court in San Francisco and Oakland before removal

25   here, allege that six oil companies, on a worldwide basis, produced and promoted gasoline and

26   other fossil fuel products as safe for the environment while concealing that their combustion

27   would accelerate global warming, would melt the polar caps, would cause a rising of sea

28   levels, and would eventually flood parts of those cities.  The extent to which the complaints

1    state a claim under California's public nuisance law will be for the California courts to decide.

2    The immediate issue is whether or not there are proper federal grounds for removal

3    jurisdiction.  A prior order said there was, but that order was reversed.  Our court of appeals

4    has remanded for consideration of certain other possible theories of removal jurisdiction.

5         The panel held that, under the well-pleaded complaint rule, plaintiffs asserted only a state

6    law public nuisance claim.  *City of Oakland v. BP PLC*, 969 F.3d 895, 908 (9th Cir. 2020), *as*

7    *amended*.  The panel then considered whether either of the two exceptions to the well-pleaded

8    complaint rule applied.  For the *Grable* exception, the panel found that the public nuisance

9    claim did not raise a substantial federal issue.  *Id.* at 907.  On the "complete preemption"

10   exception, the panel reasoned that the Clean Air Act is not one of the three statutes the

11   Supreme Court has determined has extraordinary preemptive force to justify removal based

12   upon complete preemption of state-law claims.  The panel consequently concluded that federal

13   common law did not apply and that there was no federal question jurisdiction pursuant to 28

14   U.S.C. Section 1331 at the time of removal, as this Court had discerned.  *Id.* at 908.  In an

15   amended footnote, the panel stated that defendants had waived any argument for removal

16   based on admiralty jurisdiction.  *Id.* at 911 n.12.

17        The panel "remand[ed] these cases to the district court to determine whether there was an

18   alternative basis for jurisdiction," namely whether the claims:  (1) arose out of operations on

19   the outer Continental Shelf and thus implicated the Outer Continental Shelf Lands Act; (2)

20   implicated actions performed at the behest of a federal officer; (3) arose on federal enclaves; or

21   (4) were related to bankruptcy cases.  *Id.* at 902 n.2, 911.  The Supreme Court denied a writ of

22   certiorari.

23        In the meantime, our court of appeals has issued two further comprehensive treatments

24   on remand of global-warming actions asserting claims for public nuisance.  In *County of San*

25   *Mateo v. Chevron Corp.* (*San Mateo III*), 32 F.4th 733 (9th Cir. 2022), our court of appeals

26   reviewed and rejected the other four bases for federal jurisdiction not addressed in our appeal.

27   (It also substantively addressed and rejected admiralty jurisdiction.)  All of our defendants are

28   also parties in *San Mateo*.  Less than three months after *San Mateo III*, our court of appeals

United States District Court
Northern District of California

2

1    issued another opinion affirming remand to state court in *City & County of Honolulu v. Sunoco*

2    *LP* (*Honolulu II*), 39 F.4th 1101 (9th Cir. 2022).[1]

3        This order now takes up the cities' renewed motions to remand in light of this lineup of

4    appellate authority.  Defendants continue to assert jurisdiction based on the Outer Continental

5    Shelf Lands Act, federal enclaves, *Grable*, and the federal officer removal statute.  (They did

6    not re-raise bankruptcy jurisdiction here, so this order deems that theory waived as well as

7    insufficient in light of *San Mateo III*.)  This order follows full briefing and oral argument.

8        **1.    OUTER CONTINENTAL SHELF LANDS ACT.**

9        The Outer Continental Shelf Lands Act (OCSLA), in relevant part, gives federal courts

10   jurisdiction over actions "arising out of, or in connection with" operations on the outer

11   Continental Shelf "involv[ing] exploration, development, or production."  43 U.S.C. §

12   1349(b)(1).  The phrase "arising out of, or in connection with" permits federal jurisdiction

13   "over tort claims only when those claims arise from actions or injuries occurring on the outer

14   Continental Shelf."  *San Mateo III*, 32 F.4th at 753.

15       The complaints emphasize production of fossil fuels as a basis for the theory of liability.

16   Here are some examples:

17       • "The global warming-induced sea level rise from <u>past</u> fossil fuel usage is an

18       irreversible condition on any relevant time scale:  it will last hundreds or even

19       thousands of years.  Defendants' planned production of fossil fuels into the <u>future</u>

20       will exacerbate global warming, accelerate sea level rise even further, and require

21       greater and more costly abatement actions to protect [Oakland / San Francisco]"

22       (Oakl. Compl. ¶ 4; SF Compl. ¶ 4, emphasis in original).

23

24

25   [1] Our court of appeals issued its first decision in *San Mateo* the same day it first ruled on our
26   appeal.  *See Cnty. of San Mateo v. Chevron Corp.* (*San Mateo II*), 960 F.3d 586 (9th Cir. 2020),
     *vacated and remanded on other grounds*, 141 S. Ct. 2666 (2021).  In light of the Supreme Court's
27   decision in *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021), our court of
     appeals next decision in *San Mateo* ruled on all of the energy companies' bases for removal.  *San*
28   *Mateo III*, 32 F.4th at 745–46.  Our court of appeals separately amended its original opinion in our
     appeal, which originally appeared at 960 F.3d 570 (9th Cir. 2020), to replace footnote 12.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- "Defendants are substantial contributors to the public nuisance of global warming that is causing injury to the People and thus are jointly and severally liable. Defendants' cumulative production of fossil fuels over many years places each of them among the top sources of global warming pollution in the world" (Oakl. Compl. ¶ 10; SF Compl. ¶ 10).

- "Production of fossil fuels for combustion causes global warming. . . . Carbon dioxide is by far the most important greenhouse gas because of the combustion of massive amounts of fossil fuels" (Oakl. Compl. ¶ 38; SF Compl. ¶ 38).

- "Today, due primarily to the combustion of fossil fuels produced by Defendants and others, the atmospheric level of carbon dioxide is 410 ppm, higher than at any time during human civilization and likely higher than any level in millions of years. The result has been dramatic planetary warming" (Oakl. Compl. ¶ 48; SF Compl. ¶ 49).

- "Defendants to this day maintain high levels of fossil fuel production. This production will intensify future warming and [exacerbate Oakland's / San Francisco's] injuries from sea level rise" (Oakl. Compl. ¶ 54; SF Compl. ¶ 55).

In each complaint, at least 40 paragraphs address "production" of fossil fuels by defendants, of which the foregoing are just examples.

A substantial portion of defendants' production of fossil fuels arises out of extraction that takes place on the outer Continental Shelf. From 1947 to 1995, sixteen of the twenty largest outer Continental Shelf operators in the Gulf of Mexico, measured by oil volume, were either a defendant or one of their predecessors or subsidiaries. Since 1995, three of the top five outer Continental Shelf operators have been either a defendant or one of their predecessors or subsidiaries (Dick Decl. Exhs. 7, 8). And, oil produced from the outer Continental Shelf has accounted for as much as 30% of domestic production (*id.* Exh. 9 at 1-4). In all, between 1954 and 2016, production from offshore leases "totaled more than 20 billion barrels of oil and nearly 175 trillion cubic feet of natural gas" (Priest Decl. ¶ 7).

United States District Court
Northern District of California

1    If we were writing on a clean slate, these allegations in the complaints would seem to

2    sustain removal jurisdiction, given their sustained emphasis and attacks on production and sale

3    of fossil fuels and given the central role of the outer Continental Shelf in America's oil

4    production.  The problem, however, is that very similar allegations appeared in the *San Mateo*

5    pleadings and our court of appeals discounted those allegations on the theory they were too

6    remote from the public nuisance theory plaintiffs presented on appeal.  *E.g.*, *Cnty. of San*

7    *Mateo v. Chevron Corp.*, No. C 17-04929 VC, Dkt. No. 1-2 at ¶ 181 (N.D. Cal. Aug. 24,

8    2017).  Accordingly, *San Mateo III* rejected OSCLA removal jurisdiction premised on fossil-

9    fuel extraction from the outer Continental Shelf:

10                    We reject this argument, because the connection between such
                     conduct and the injuries alleged by the plaintiffs here is too
11                   attenuated to give rise to jurisdiction.  First, the Counties'
                     complaints allege injuries occurring exclusively within their local
12                   jurisdictions, not on the outer Continental Shelf.  Second, instead
                     of alleging wrongful actions on the outer Continental Shelf, the
13                   Counties' claims focus on the defective nature of the Energy
                     Companies' fossil fuel products, the Energy Companies'
14                   knowledge and awareness of the harmful effects of those products,
                     and their "concerted campaign" to prevent the public from
15                   recognizing those dangers.

16    32 F.4th at 754–55.  In that decision, our court of appeals expressly found that plaintiffs here

17    have proffered the *same theory of liability*:  "[T]he substance of [plaintiffs'] claims is the same

18    as in *Oakland*:  tortious conduct by the Energy Companies in the course of producing, selling,

19    and promoting the use of fossil fuels contributed to global warming and sea-level rise, which

20    led to property damage and other injuries to the Counties."  *Id.* at 747–48.  We are all bound by

21    the court of appeals' ruling.

22    Put differently, the complaints here also invoke *promotion* as a basis for liability, which

23    at least 45 paragraphs reference.  Here are some examples:

24        •   "Defendants, notably, did not simply produce fossil fuels.  They engaged in large-

25            scale, sophisticated advertising and public relations campaigns to promote

26            pervasive fossil fuel usage and to portray fossil fuels as environmentally

27            responsible and essential to human well-being — although they knew that their

28            fossil fuels would contribute, and subsequently were contributing, to dangerous

5

global warming and associated accelerated sea level rise" (Oakl. Compl. ¶ 5; SF

Compl. ¶ 5).

- "Defendants' promotion of fossil fuels has also entailed denying mainstream climate science or downplaying the risks of global warming.  During the 1990s and early 2000s, Defendants stole a page from the Big Tobacco playbook and sponsored public relations campaigns, either directly or through the API or other groups, to deny and discredit the mainstream scientific consensus on global warming, downplay the risks of global warming, and even to launch unfounded attacks on the integrity of leading climate scientists" (Oakl. Compl. ¶ 6; SF Compl. ¶ 6).

- "The purpose of all this promotion of fossil fuels and efforts to undermine mainstream climate science was, like all marketing, to increase sales and protect market share.  It succeeded" (Oakl. Compl. ¶ 7; SF Compl. ¶ 7).

- "The People do not seek to impose liability on Defendants for their direct emissions of greenhouse gases and do not seek to restrain Defendants from engaging in their business operations" (Oakl. Compl. ¶ 11; SF Compl. ¶ 11, emphasis in original).

- "Defendants have extensively promoted fossil fuel use in massive quantities through affirmative advertising for fossil fuels and downplaying global warming risks" (Oakl. Compl. ¶ 62; SF Compl. ¶ 63).

Although the complaints made no reference to it, the lead-paint decision by the intermediate state court of appeal was much discussed by plaintiffs on appeal.  *E.g.*, Plaintiffs-Appellants' Opening Brief, *Oakland*, No. 18-16663, Dkt. No. 30 at 1, 24, 35, 42 (9th Cir. Mar. 13, 2019).  That decision, *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 65–66 (2017), affirmed a trial court's judgment that required defendant lead-paint companies to create a fund to abate the public nuisance created by interior residential lead paint used in residences built before 1950.  It held, in relevant part, that affirmative and misleading promotion is one way a defendant can create or assist in creating a public nuisance:  "the alleged basis for

United States District Court
Northern District of California

United States District Court
Northern District of California

1    defendants' liability for the public nuisance created by lead paint is their affirmative promotion

2    of lead paint for interior use, not their mere manufacture and distribution of lead paint or their

3    failure to warn of its hazards." *Id.* at 91 (emphasis and citation omitted).

4    Our court of appeals, therefore, discounted the extensive production and sale allegations

5    in the removed complaints, treating those allegations as surplusage and as too attenuated under

6    *ConAgra* to sustain federal removal jurisdiction. Nothing on the face of the complaints

7    discounted these production and sale allegations or otherwise narrowed the claim to promotion,

8    but our court of appeals permitted this repackaging of the public nuisance claim. *See San*

9    *Mateo III*, 32 F.4th at 746, 751, 754–55; *Honolulu II*, 39 F.4th at 1111–12.[2]

10   Given the closeness of this precedent to our own case at hand, defendants must address

11   their arguments to our court of appeals. In the meantime, this order will follow the direct

12   holdings of our court of appeals. This order accordingly rejects OCSLA jurisdiction.

13   **2.    FEDERAL ENCLAVES.**

14   "[B]ecause conduct on a federal enclave is generally subject to federal law, a claim based

15   on injuries stemming from such conduct arises under federal law, and a [federal] court has

16   jurisdiction over such a claim under § 1331." *San Mateo III*, 32 F.4th at 748–49 (citing U.S.

17   Const. art. I, § 8, cl. 17).

18   Defendants assert that a portion of defendants' production and sale of oil and gas

19   occurred on federal enclaves. They point, for example, to Standard Oil (Chevron's

20   predecessor) and its operation of the Elk Hills Naval Petroleum Reserve, which was a federal

21   enclave during the relevant period. They also note that plaintiffs' claims encompass the

22   federal government's emissions from jet fuel supplied by defendants on military bases (Supp.

23   Opp. 15).

24

25   [2] Defendants emphasize that, while opposing an earlier motion to dismiss, plaintiffs stated that "the primary conduct giving rise to liability remains defendants' production and sale of fossil fuels," and described promotion as merely a "plus factor" (Dkt. No. 235 at 13; May 30, 2018 Hrg. Tr. 63–65, Dkt. No. 265; Dkt. No. 283 at 6). The problem for defendants is that these "plus factor" comments were made in connection with an amended complaint directed at federal common law (after this Court had retained jurisdiction on a federal common law theory). The operative complaints for purposes of evaluating remand are those filed at the time of removal, "without reference to subsequent amendments." *Oakland*, 969 F.3d at 903.

7

United States District Court
Northern District of California

1    Once again, however, our court of appeals has considered and rejected these same

2    contentions in intervening decisions in the other actions. *San Mateo III* specifically considered

3    arguments regarding Elk Hills and the distribution of gasoline and diesel fuel to naval

4    installations on federal enclaves. But it rejected removal jurisdiction — despite recognizing

5    the tortious conduct by the energy companies at issue included producing and selling fossil

6    fuels (32 F.4th at 747–48) — because the pleadings "raise[d] state-law claims arising from

7    injuries to real property and infrastructure within their local jurisdictions." *Id.* at 749–50. Our

8    court of appeals concluded that any connection between conduct on federal enclaves and the

9    alleged injuries was "too attenuated." *Ibid.*

10    *Honolulu II* confirmed and expanded upon the reasoning in *San Mateo*: "Federal enclave

11    jurisdiction needs a direct connection between the injury and conduct. As in *San Mateo* [*III*],

12    there is no link. Even if much of Defendants' oil and gas operations occurred on federal

13    enclaves, that still does not transform Plaintiffs' claims about deceptive practices into claims

14    about the conduct itself." 39 F.4th at 1111–12 (citations omitted).

15    The alleged facts here are all materially similar to those previously considered by *San

16    Mateo III*. The reasoning of *Honolulu II* applies here with equal force, especially because our

17    court of appeals has recognized the theory of liability here is the same as that in *San Mateo*.

18    Consequently, defendants' arguments for federal enclave jurisdiction must fail.

19    **3.    SUBSTANTIAL FEDERAL QUESTION JURISDICTION (*GRABLE*).**

20    Defendants next assert that plaintiffs' public nuisance claims arise under federal law

21    pursuant to *Grable* substantial federal question jurisdiction. Specifically, defendants now

22    contend that the cities' claims incorporate affirmative federal constitutional elements imposed

23    by the First Amendment.

24    A "special and small category" of state law claims arise under federal law where federal

25    law is a necessary element of the claim. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547

26    U.S. 677, 699 (2006). Under *Grable*, federal jurisdiction over a of state law claim will lie if a

27    federal issue is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of

28    resolution in federal court without disrupting the federal-state balance approved by Congress.

8

United States District Court
Northern District of California

1    *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005); *see*

2    *also Gunn v. Minton*, 568 U.S. 251, 258 (2013).

3        If promotion is now to be the crux of the public nuisance claim, then it will by definition

4    involve commercial speech (when it comes to advertisements) and involve petition for redress

5    of grievance (when it comes to lobbying and statements before Congress or legislatures), both

6    protected by the First Amendment.  That, however, does not give rise to removal jurisdiction

7    under *Grable* according to our court of appeals.  Once again, defendants should raise their

8    concerns on appeal but, meanwhile, this order will follow *San Mateo III* and *Honolulu II*.  *See*

9    *San Mateo III*, 32 F.4th at 747–48.

10       Defendants support their First Amendment theory with opinions that address the

11   constitutional boundaries for remedies available under a state law claim for defamation or libel.

12   *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990); *Hustler Magazine, Inc. v. Falwell*, 485

13   U.S. 46, 53, 56 (1988); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774–76 (1986); *N.Y.*

14   *Times Co. v. Sullivan*, 376 U.S. 254, 285–86 (1964).  They argue that the First Amendment

15   issues in these decisions are not mere defenses "but constitutionally required elements of the

16   claim on which the plaintiff bears the burden of proof *as a matter of federal law*" (Supp. Opp.

17   16, emphasis in original).

18       Defendants, however, "cite no authority for the proposition that the First Amendment —

19   through *Grable* jurisdiction — converts state law causes of action involving speech into federal

20   causes of action for purposes of assessing jurisdiction." *Delaware v. BP Am. Inc.*, 578 F.

21   Supp. 3d 618, 632–33 (D. Del. 2022) (Judge Leonard P. Stark) (reviewing same caselaw).  In

22   another global-warming action, the Court of Appeals for the Third Circuit rejected this same

23   theory:  "But though the First Amendment limits state laws that touch speech, those limits do

24   not extend federal jurisdiction to every such claim.  State courts routinely hear libel, slander,

25   and misrepresentation cases involving matters of public concern." *City of Hoboken v. Chevron*

26   *Corp.*, 45 F.4th 699, 709 (3d Cir. 2022).

27       Defendants argue there are "uniquely compelling federal interests at stake here" (Supp.

28   Opp. 17), but that contention has already been rejected.  As our court of appeals previously

1      stated in this action, this litigation may raise "important policy question[s]," but adjudicating

2      these public nuisance claims "does not require resolution of a substantial question of federal

3      law." *Oakland*, 969 F.3d at 906–07.  Our court of appeals has explained that state law

4      "primarily" governs common law defamation and libel, and described the First Amendment as

5      setting the metes and bounds of such a claim, not as an affirmative element thereof.  *See*

6      *Knievel v. ESPN*, 393 F.3d 1068, 1073 (9th Cir. 2005); *Lieberman v. Fieger*, 338 F.3d 1076,

7      1079 (9th Cir. 2003); *Church of Scientology of Cal. v. Adams*, 584 F.2d 893, 899 (9th Cir.

8      1978).  Defendants also provide no support for the proposition that the constitutional limits in

9      the defamation and libel decisions they cite apply with equal force to public nuisance claims.

10     The three other district courts that have considered this argument have also rejected it.  This

11     theory of jurisdiction fails.[3]

12                    **4.      FEDERAL OFFICER REMOVAL STATUTE.**

13          Pursuant to the federal officer removal statute, 28 U.S.C. Section 1442(a), litigation

14     commenced in state court is removable when it is against, in relevant part:  "The United States

15     or any agency thereof or any officer (or any person acting under that officer) of the United

16     States or of any agency thereof, in an official or individual capacity, for or relating to any act

17     under color of such office or on account of any right, title or authority claimed under any Act

18     of Congress for the apprehension or punishment of criminals or the collection of the revenue."

19          Our court of appeals has held that for a private concern to invoke federal officer

20     jurisdiction, the defendant "must show that (a) it is a person within the meaning of the statute;

21     (b) it can assert a colorable federal defense; and (c) there is a causal nexus between its actions,

22     taken pursuant to a federal officer's directions, and the plaintiff's claims."  *Honolulu II*, 39

23     F.4th at 1107 (cleaned up).  Respecting the third prong, to demonstrate a causal nexus, the

24     private person must show:  "(1) that the person was 'acting under' a federal officer in

25

26     _____

27     [3] The three prior district court decisions that have considered this jurisdictional basis are:
       *Delaware*, 578 F. Supp. 3d at 632–33; *City of Hoboken v. Exxon Mobil Corp.*, 558 F. Supp. 3d
       191, 204 (D.N.J. 2021) (Judge John Michael Vazquez), *affirmed* 45 F. 4th 699 (3d Cir. 2022);

28     *Connecticut v. Exxon Mobil Corp.*, 2021 WL 2389739, at *10 (D. Conn. June 2, 2021) (Judge
       Janet C. Hall).

*United States District Court*
*Northern District of California*

10

United States District Court
Northern District of California

1    performing some 'act under color of federal office,' and (2) that such action is causally

2    connected with the plaintiff's claims against it." *San Mateo III*, 32 F.4th at 755.  The "acting

3    under" prong, in turn, considers several factors that gauge the nature of the relationship.  *Id.* at

4    756–57.

5         In their initial opposition to the renewed remand motion, filed prior to *San Mateo III* and

6    *Honolulu II*, defendants proffered theories addressing:  (1) the Second World War; (2)

7    specialized fuel sales to the United States military; (3) outer Continental Shelf leases and

8    Bureau of Land Management onshore leases of mineral rights on federal land; (4) activities at

9    the Elk Hills Petroleum Reserve; (5) activities during the Korean War; and (6) activities

10   involving the strategic petroleum reserve (Opp. 11–21).  In their supplemental opposition,

11   however, defendants acknowledge that *San Mateo III* and *Honolulu II* rejected the latter four

12   theories, and that *Honolulu II* did so despite an augmented factual record like the one here.

13        This order accordingly concludes there is no federal officer jurisdiction under the latter

14   four theories for the reasons stated in *Honolulu II* and *San Mateo III* and turns to defendants'

15   remaining arguments related to the Second World War and specialized fuel sales to the United

16   States military.  In light of our court of appeals' recent decisions, this order finds defendants

17   have not satisfied the "acting under" prong of the causal nexus requirement for federal officer

18   jurisdiction.

19        Defendants provide an extensive record of their activities regarding the Second World

20   War to support their argument that "the federal government controlled production of petroleum

21   products by setting production levels, dictating where and how to explore for petroleum,

22   managing operations, and rationing materials in order to help conduct a war" (Supp. Opp. 10).

23   A defendant "acting under" a federal officer sufficient for federal jurisdiction is subject to

24   "unusually close" direction or supervision.  *See Watson v. Philip Morris Cos. Inc.*, 551 U.S.

25   142, 153 (2007).  So, defendants focus on the "nature and extent of federal control exerted

26   through agencies such as the Petroleum Administration for War ('PAW')" (Supp. Opp. 9; *see*

27   *also* Dick Decl. Exh. 18 at 8).  PAW's own description of its relationship with the oil industry

28

                                              11

United States District Court
Northern District of California

1    — which defendants cite for support — provides a more qualified understanding.  PAW's

2    Deputy Petroleum Administrator Ralph K. Davies stated:

3            In all the functional fields that cover the vast and complex business
         of supplying oil for an oil-powered war — production, natural gas,
4        refining, transportation, and marketing — measures of control
         were necessary to assure coordination, efficiency, and success.  We
5        kept these controls at a minimum; so far as possible we relied on
         the cooperation of the industry rather than on orders and directives.
6

7     United States Petroleum Administration for War, *Petroleum in War and Peace:  Papers*

8    *Presented by the Petroleum Administration for War Before the United States Senate Special*

9    *Committee to Investigate Petroleum Resources* 22 (1945), https://tinyurl.com/y9kr8hcv.

10          Defendants also rely on *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049 (9th Cir.

11   2002), which held:  "Because avgas was critical to the war effort, the United States

12   government exercised significant control over the means of its production during World War

13   II."  But, as plaintiffs point out, the opinion went on to clarify:

14           Although the WPB, PAW, and other government agencies had the
         authority to require production of goods at refineries owned by the
15       Oil Companies, and even to seize refineries if necessary, in fact
         they relied almost exclusively on contractual agreements to ensure
16       avgas production.  In particular, the government entered into long-
         term contracts to purchase avgas, and offered low-cost loans to
17       refineries to help finance the construction of avgas-producing
         plants.
18

19   *Id.* at 1049–50.  As our court of appeals recently held, a private person "is not 'acting under' a

20   federal officer when the person enters into an arm's-length business arrangement with the

21   federal government or supplies it with widely available commercial products or services." *San*

22   *Mateo III*, 32 F.4th at 757.

23          Defendants reference other activities, including:

24          •   Construction and operation of the Inch Lines (oil pipelines extending from Texas to

25              New Jersey), which they did "under contract[]" and "as agent[s]" of the federal

26              government.  *See Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th

27              Cir. 1949).

28

12

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- Directives to the industry, such as Petroleum Directive 63.  *See* 8 Fed. Reg. 1068, 1068–69 (Jan. 23, 1943).

- PAW's threats of disciplinary measures, such as "restricting transportation, reducing crude oil supplies, and withholding priority assistance" (Dick Decl. Exh. 19).

Again, if we were writing on a clean slate, all of the evidence discussed above would present a colorable showing that defendants' activities during the Second World War were highly regulated and controlled such that it would meet the statutory standard for removal.  We are not, however, writing on a clean slate, and our court of appeals' recent rulings leave no room to conclude that the activities recited above give rise to federal officer jurisdiction.  As stated in *San Mateo III*, "a person's *compliance* with the law (or *acquiescence* to an order) [does not] amount to 'acting under' a federal official who is giving an order or enforcing the law.  This is true even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored."  32 F.4th at 757 (cleaned up, emphasis in original).

The alleged deceptive promotion, moreover, started well *after* the Second World War and therefore the wartime activities cannot be a plausible basis to hold any defendant liable for global warming, as even plaintiffs concede: "So, our assertion is that by the late 1980's, they [defendants] had launched their affirmative deception campaign. . . .  I would say that we will not be able to show any liability prior to the 1960's, which is when the first should have [] known information starts coming out and should-have-warned information" (Tr. 30–31, Dkt. No. 425).

The alternative ground for federal officer jurisdiction is based upon specialized fuel contracts.  This theory is not time burdened like the Second World War theory, especially as these contracts continue even to this day.  Nevertheless, the issue is constrained by *San Mateo III*.

While *San Mateo III* did not consider "specialized" fuel contracts, it did consider fuel supply agreements with Navy Exchange Service Command (NEXCOM) that had specific fuel

13

United States District Court
Northern District of California

1    specifications and required qualified independent compliance reviews.  The panel found this

2    did not satisfy the "acting under" prong as the contract supplied the government "with

3    generally available commercial products" pursuant to an arm's length business arrangement.

4    *San Mateo III*, 32 F.4th at 758.  The products here, in comparison, are arguably not generally

5    commercially available.  They are specially designed for the requirements of, *e.g.*, the U-2 spy

6    plane, OXCART, and SR-71 Blackbird programs (Dick Decl. Exhs. 22–24, 34).  Defendants

7    would have this order follow *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th

8    Cir. 1998), *overruled on other grounds*, which the Supreme Court cited with approval in

9    *Watson*.  *Winters* affirmed federal officer jurisdiction for Dow Chemical, which supplied the

10   federal government with Agent Orange, a carcinogenic herbicide used as part of the war

11   strategy in Vietnam.

12       In light of *San Mateo III*, this order cannot follow *Winters.*  Defendants make the

13   argument that, like Dow Chemical, they "at least arguably . . . performed a job that, in the

14   absence of a contract with a private firm, the Government itself would have had to perform."

15   *Watson*, 551 U.S. at 153–54.  However, Dow Chemical risked criminal prosecution should it

16   have failed to supply Agent Orange.  Defendants here faced nothing.  Arm's length business

17   agreements with the federal government for highly specialized products remain arm's length

18   business agreements.  *San Mateo III* holds against a finding of the causal nexus required for

19   federal officer jurisdiction.

20       The foregoing addresses all of the remaining possible grounds for removal jurisdiction

21   and finds that remand is required.  There is, however, one last question to resolve.

22       **5.    PRIOR PERSONAL JURISDICTION DISMISSAL ORDER.**

23       Finally, plaintiffs also seek vacatur of the prior order dismissing the complaints against

24   four of our defendants (BP, ConocoPhillips, Exxon Mobil, and Shell) for lack of personal

25   jurisdiction (Dkt. No. 287).  For their part, these four defendants seek an order under Rule

26   54(b) for entry of partial final judgment dismissing them from the case (Dkt. No 409).

27       Upon review, comity and equity both militate against defendants' motion and counsel in

28   favor of vacatur of the dismissal order.  *See Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S.

14

United States District Court
Northern District of California

1, 8 (1980).  Vacatur will better respect comity considerations.  Said another way, both sides deserve a clean slate in state court.  (In no way, however, should this vacatur be considered as changing this Court's view of the personal jurisdiction issue.)  Consequently, the prior dismissal order (Dkt. No. 287), is **VACATED**.

## CONCLUSION

For the foregoing reasons, the motion to remand is **GRANTED** and the personal jurisdiction dismissal order is **VACATED**.  The effect of this order is **STAYED** until all appeals are exhausted.  A further status conference is set for **MARCH 23, 2023, AT 11:00 A.M.**

**IT IS SO ORDERED.**

Dated:  October 24, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

15